KATHLEEN BLISS, ESQ. (NV Bar #7606)
Email: kb@kathleenblisslaw.com
**KATHLEEN BLISS LAW, PLLC**
1070 West Horizon Ridge Parkway, Suite 202
Henderson, Nevada  89012
Tele: (702) 463-9074
**-and-**
PAUL S. PADDA, ESQ. (NV Bar #10417)
Email: psp@paulpaddalaw.com
DAVID J. STANDER, ESQ. (*Admission Pending*)
Email: dstanderlaw@gmail.com
**PAUL PADDA LAW, PLLC**
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888
Fax: (702) 366-1940

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| NAVAJO HEALTH FOUNDATION – SAGE MEMORIAL HOSPITAL, INC. (doing business as "Sage Memorial Hospital"); an Arizona non-profit corporation, | |
| Plaintiff, | Case No. _____ |
| vs. | |
| RAZAGHI DEVELOPMENT COMPANY, LLC; a Nevada limited liability company (doing business as "Razaghi Healthcare"), AHMAD R. RAZAGHI; individually, TAUSIF HASAN; individually, DOES 1-10; ROES A-Z; | **PLAINTIFF'S COMPLAINT FOR MONEY DAMAGES AND EMERGENCY INJUNCTIVE RELIEF** |
| Defendants. | ***DEMAND FOR JURY TRIAL*** |

1

1
2
3

This is a civil action seeking monetary damages <u>and</u> emergency injunctive relief based upon the fraudulent taking of over $10.8 million dollars from Plaintiff.  In support of this Complaint, Plaintiff hereby alleges the following:

4
5

## INTRODUCTION

6
7
8
9
10
11
12
13
14
15

1.   The Navajo people have a saying: "A man can't get rich if he takes proper care of his family."  The concept of "family" is central to the ethos of Navajo culture.  It is this ethos that has caused the Navajo to treat even strangers as they would immediate family members resulting in a belief that the entire "community" is part of one's "family" and that family comes first.  Unfortunately, this warmth, kindness and trusting nature has sometimes led to tragic results for not only the Navajo but many other native peoples.  The historical record chronicling the experiences of native peoples is riddled with instances of deep injustice, deception, deceit and misappropriation by outsiders, many of whom approached native communities with larceny in their hearts and duplicitous motives.

16
17
18
19
20
21
22
23
24
25

2.   Defendant Ahmad R. Razaghi ("Razaghi") is exactly that type of outsider.  He came to the Navajo Nation to enrich himself at the expense of the Navajo.  Through an enterprise developed by Razaghi, which continues to this day and threatens to expand its pattern of deceit and fraud, he enriched himself to the significant detriment of the Navajo family/community, especially its most vulnerable and indigent members who rely upon Plaintiff for their basic medical needs.  So brazen has been Razaghi's arrogance and deceit that he, with the assistance of others, has fraudulently and illegally obtained more than $10.8 million of Plaintiff's funds, and even subsequently and to this day attempts to procure Plaintiff's monies under dubious

26
27
28

2

invoices seeking payment for services never rendered.  Razaghi has engaged in these acts because he apparently believes he is both entitled and invincible.  This lawsuit seeks justice for the Navajo people and to hold Razaghi and his co-Defendants accountable for their shameful acts of deception and fraud.

## LEGAL BASIS, JURISDICTION AND VENUE

3.   This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et. seq.*

4.   Razaghi Development Company, LLC was a Nevada corporation during all relevant times until its default on or about October 31, 2018.  To the extent any Defendant is not a citizen of Nevada, has not transacted business frequently in Nevada or is an entity not domiciled in Nevada, this Court has personal jurisdiction under 18 U.S.C. § 1965(b) because the ends of justice require that all Defendants be brought before this Court to answer for their fraud.  However, notwithstanding the foregoing, Plaintiff knows that each of the Defendants identified in this Complaint has minimum contacts with the forum state of Nevada.

5.   Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events, acts or omissions giving rise to this lawsuit occurred in this district.  Venue is proper in this district under 18 U.S.C. § 1965 as well because Plaintiff asserts a RICO claim against Defendants and because Defendants have an agent, have transacted their affairs or reside in this district during time periods relevant to this lawsuit.

.   .   .

3

6.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's common law state claims because those claims are so related to the claims within the Court's original jurisdiction that they form a part of the same case or controversy under Article III of the United States Constitution.

**THE PARTIES**

7.  Plaintiff Navajo Health Foundation - Sage Memorial Hospital, Inc. ("Sage Memorial" or "Sage") is an Arizona non-profit corporation headquartered in Ganado, Arizona. The corporation is governed by a Board of Directors ("BOD").  To serve on the BOD, a person must be an enrolled member of the Navajo Nation and live within the Nation.  The corporation's sole purpose is to administer and operate a 25-bed hospital for the predominant purpose of serving the Navajo Indian population.  The hospital is located within the territorial boundaries of the Navajo Nation and is the only hospital within a 40-mile radius.

8.  Defendant Razhagi Development Company, LLC is a Nevada limited liability company which was incorporated in or around October 2007.  During all time periods relevant to this Complaint, Razaghi Development Company, LLC has transacted business under the fictitious name "Razhagi Healthcare" and is referred to herein for ease of reference as simply "RH."

9.  Defendant Ahmad R. Razaghi during all time periods relevant to this Complaint, has served as the Chief Executive Officer ("CEO") of RH and as the "contract CEO" of Sage Memorial.  Upon information and belief, Razaghi is the sole and controlling member of RH. During all time periods relevant to this Complaint, Razaghi, an adult male, has been a resident

of Nevada and Arizona.  Razaghi is being sued herein in both his individual capacity and his

capacity as controlling member/owner of RH.

10.     Defendant Tausif Hasan ("Hasan") is an adult male who, during time periods

relevant to this Complaint, served as the "contract Chief Financial Officer" ("CFO") of Sage

Memorial.  During time periods relevant to this Complaint, Hasan was an employee of RH or an

entity controlled by Razaghi.  He reported to Razaghi and was installed by Razaghi as the CFO

of Sage Memorial.  Upon information and belief, Hasan is a resident of Arizona.  Hasan is

being sued herein in his individual capacity and as an employee of RH.

11.     Plaintiffs is informed and believes, and thereupon alleges, that each of the

Defendants designated as Does 1 through 10, inclusive, are responsible in some manner for the

events and happenings herein referred to and negligently and/or intentionally caused injuries

and damages to Plaintiff.  Plaintiff further alleges that it cannot currently ascertain the identity

of each of the Doe Defendants and Plaintiff will therefore seek leave of Court to amend this

Complaint to insert the true names and capacities of Doe Defendants when they have been

ascertained, together with appropriate charging allegations and to join such Defendants in this

action.

12.     Plaintiff is informed and believes, and thereupon allege, that each of the

Defendants designated as Roes A through Z, inclusive, is responsible in some manner for the

events and happenings herein referred to and negligently and/or intentionally caused injuries

and damages to Plaintiff.  Plaintiff is further informed and believes that each of the Roes is

either a corporation, related subsidiary, parent entity, group, partnership, holding company,

owner, predecessor entity, successor entity, affiliate, joint venture, related association, insurer or business entity, the true names of which are currently unknown to Plaintiff at this time. Additionally, Plaintiff alleges that it cannot currently ascertain the identity of each of the Roe Defendants and Plaintiff will therefore seek leave of Court to amend this Complaint to insert the true names and capacities of Roe Defendants when they have been ascertained, together with appropriate charging allegations and to join such Defendants in this action.

### NON-PARTIES AFFILIATED WITH DEFENDANTS

13.     Tadd Greenfield ("Greenfield") is an adult male who, during time periods relevant to this Complaint, served as the contract CEO of Sage Memorial.  During time periods relevant to this Complaint, Greenfield was an employee of RH or an entity controlled by Razaghi.  He reported to Razaghi and was installed for a period of time by Razaghi as the CEO of Sage Memorial.

14.     Stenson Wauneka ("Wauneka") is an adult male who, during time periods relevant to this Complaint, served as the Chairman of the Sage Memorial BOD.

15.     Abigail Paul ("Paul") is an adult female who, during time periods relevant to this Complaint, was employed by RH as a "Project Manager."  Paul's duties as a project manager with RH included performing administrative oversight at Sage Memorial and reporting information to Razaghi.

16.     Cheryl Bailey ("Bailey") is an adult female who, during time periods relevant to this Complaint, was employed by RH as a Senior Vice-President ("VP").  Bailey's duties as a

Senior VP with RH included performing administrative oversight at Sage Memorial and reporting information to Razaghi.

17.     Stephen Hoffman, Esq. ("Hoffman") is an adult male who, during time periods relevant to this Complaint, was selected by Razaghi to provide legal advice to Sage Memorial's BOD.  Hoffman is a licensed member of the State Bar of Arizona.  Hoffman recommended that the Sage Memorial BOD approve Razaghi's second amendment to his CEO services contract, a document that provided exceptionally favorable terms to Razaghi.  Although selected by Razaghi, Hoffman owed legal and fiduciary duties to Plaintiff's BOD and had a duty to act in Plaintiff's best interests.

18.     Christopher S. Stachowiak, Esq. ("Stachowiak") is an adult male who, during time periods relevant to this Complaint, represented RH as legal counsel.  Stachowiak is a licensed member of the State Bar of Arizona.  By letter dated September 1, 2018, and presumably mailed that same day, Stachowiak, among other things, questioned whether the BOD had the authority to hire counsel other than the one selected for it by Razaghi.

## FACTUAL ALLEGATIONS

### I.     The History Of Sage Memorial

19.     In 1901 the Presbyterian Church began what was at the time known as the "Ganado Mission," focusing upon educational, healthcare and religious outreach to the Navajo people.  At that time, the Navajo Nation sold the Presbyterian mission several acres of land in "fee simple," all of which was located within the territorial boundaries of the tribal nation.  In

7

1911, Dr. James Kennedy started the mission's first "hospital," at the time a small makeshift facility, to serve the healthcare needs of the Navajo people.

20.     In the 1930s a school of nursing was created on mission property.  The nursing school (no longer in existence) trained women from approximately twenty different Indian tribes and several foreign countries.  The nursing school subsequently became accredited by the State of Arizona and was highly regarded at the time for its training programs.  At or around this same period, the Presbyterian mission constructed "Poncel Hall" which became the main building from which "Sage Memorial Hospital" formally commenced operations.

21.     In the 1970s (which was a period of greater awareness in American society regarding the self-determination movement of native communities) the Presbyterian Church, while still maintaining ownership of the land, handed over to the Navajo Nation Health Foundation (a tribal entity) the physical operations and plant of Sage Memorial.  Later, on or about October 24, 1978, Articles of Incorporation were filed with the State of Arizona registering a newly created non-profit corporation known as "Navajo Health Foundation – Sage Memorial Hospital, Inc."  Per the bylaws of the newly created company, the BOD of the corporation were to be drawn exclusively from the Navajo population as part of an effort to foster greater self-determination by local members of the Indian community over their own affairs.

22.     Between the late 1970s, when Plaintiff was formally incorporated, until the early 2000s, the hospital did well.  It was almost entirely financed through government health insurance programs (Medicare, Medicaid and Indian Health Service), all of which still remains

the case today.  Given the rural and indigent population serviced by Sage Memorial, there are very few patients with private insurance or who pay cash for services.

23.     Between 2000 and 2006, Sage Memorial began to experience a number of problems, including poor governance, accreditation issues and civil lawsuits.  The hospital contemplated bankruptcy at the time and went through a number of CEOs and CFOs.  These problems had a significant effect on the local community because, as remains the situation today, Sage Memorial is the <u>only</u> medical hospital within a 40-mile radius serving a remote, rural and indigent population (approximately 38% of the population on the Navajo reservation lives below the poverty line which is more than double the percentage for the general population of the State of Arizona).

24.     Today, Sage Memorial consists of a 25-bed hospital serving a surrounding community of approximately 25,000 people.  The hospital provides important and critical services such as: emergency care, radiology, family/internal medicine, behavioral health, physical therapy and dentistry.  Sage Hospital contracts with the Indian Health Service ("IHS"), an agency of the United States Department of Health and Human Services and is designated by the Navajo Nation as a public law (P.L. 93-638 or "638") provider to receive federal funds and to provide essential health care services to members of the Navajo Nation.  As a "638" provider, Sage Memorial must comply with the 1975 Indian Self-Determination and Education Assistance Act, and the regulations promulgated thereunder -- set forth in 25 C.F.R., part 900. Sage Memorial is essentially a tribal entity and thus stands in the shoes of the federal government as a "638" provider of healthcare.

## II.      Ahmad Razaghi Discovers Multiple Opportunities For Enrichment At Sage Memorial

25.      Ahmad Razaghi grew up in Salt Lake City, Utah following his family's emigration to the United States from Iran where he was born in 1966.  Following graduation from college, Razaghi worked as a project manager in the construction industry.  Upon information and belief, Razaghi had no experience at that time in the field of healthcare.

26.      In approximately 2007 Razaghi joined with his brother (Korosh "Kory" Razaghi) and former employer David Erichsen to complete the construction of the "Blue Mountain Hospital" in Blanding, Utah.  A majority of the funds for the construction of the hospital were donated by the Utah Navajo Health System and the Ute Mountain Ute Tribe of Colorado.  Prior to Razaghi's involvement with the Blue Mountain Hospital construction project, he had no experience in the medical or healthcare industry.  Indeed, his primary involvement with the Blue Mountain project was limited to construction matters and not hospital administration.  Contemporaneously, Razaghi and his brother partnered with a friend, Manuel Morgan ("Morgan"), a member of the Navajo Tribe and former Navajo Nation County Commissioner, to form Morgan & Associates, LLC, a company in which Morgan would have majority ownership so that the entity could qualify as a Navajo business.

27.      Through his connection with Morgan, Razaghi learned of Sage Memorial and the difficulties the hospital was facing at the time.  In 2007, Razaghi, leveraging his friend Morgan's status as an enrolled member of the Navajo Nation, was successful in having Morgan & Associates awarded a management services contract to administer operations at Sage Memorial.  In promoting his ability to administer the hospital prior to being awarded the

10

contract, Razaghi put on a presentation in which he made a number of exaggerations regarding his professional experience/skills (including representing he could provide investment banking services).  Razaghi was successful in being awarded the contract.  Under the terms of that contract, Razaghi would serve as the contract CEO for Sage Memorial and along with his brother Kory would be granted full control of Sage's business records and financial accounts.

28.     Presumably impressed with what he perceived as an abundance of money-making opportunities, in October 2007 Razaghi incorporated Razaghi Development Company, LLC (which also operated under the fictitious name of "Razaghi Healthcare" – referred to herein as "RH") in Nevada.  A short while later, in July 2008, Razaghi and his brother Kory formed the Attentus Provider Group, LLC in Nevada which was to be a staffing business to recruit and employ healthcare professionals to work at Sage Memorial.  Thus, while being compensated as contract management employees of Sage Memorial (with all the fiduciary duties such positions would normally entail), the Razaghi brothers would also stand to benefit by supplying the hospital with medical personnel at a profit.

29.     On or about March 18, 2011, Razaghi, by and through RH, entered into a contract ("the original contract") with Sage Memorial's BOD for management services of the hospital.  This contract replaced the prior Morgan & Associates contract and placed management of the hospital completely in the hands of Razaghi and RH.  Upon information and belief, this was when the multiple different schemes to defraud Sage Memorial began through the use of the mail and interstate wires.

30.     On or about May 17, 2013 the Sage Memorial BOD, with Defendant Wauneka serving as the Chairman, entered into a "First Amendment" of the March 18, 2011 contract. Notably, among other things, the contract provided that RH could hire, at Sage Memorial's expense, special counsel to represent "the Corporation [Sage Memorial]" with respect to specific legal matters.  Razaghi developed a close and friendly relationship with Wauneka, meeting with him privately on numerous occasions (in 2017 alone, Wauneka met Razaghi double the number of times compared to any other board members) for which Wauneka would receive a financial benefit following each meeting in the form of an "honorarium payment."

**III.     Razaghi And RH Are Accused Of Committing A Massive Fraud On The Federal Government**

31.     On October 16, 2014 several whistleblowers (which included physicians, dentists and the former Controller of Sage Memorial) filed a complaint in the United States District Court for the District of Arizona, Case No. 3:14-cv-8196-PCT-SRB, naming Razaghi and others with having violated the False Claims Act, 31 U.S.C. § 3729 *et. seq.* from 2007 onwards.

32.     Later, the whistleblowers filed a First Amended Complaint on August 31, 2016 which alleged, among other things, the following: "[a]t the center of the fraudulent activity that caused violations of the FCA is Defendant Ahmad Razaghi who devised a massive scheme through which he abused his relationship with [Sage Memorial] to divert millions of dollars of federal funds provided by federal programs and contracts from Sage to himself and the other [d]efendants" and that "Razaghi caused Sage to enter into contracts with individuals and related business entities over which he exercised control and undue influence, all to siphon federal funds to himself and away from their intended purposes."  *See* Exhibit A.

12

33.     After the United States declined to intervene, the whistleblowers voluntarily

dismissed their FCA action in or around January 2017.

**IV.   Sage Memorial Receives Over $122 Million In Settlement Money From The Federal Government On The Condition That Razaghi Cannot Personally Benefit From The Settlement**

34.     Around the same time the whistleblower complaint was pending, the Indian

Health Service ("IHS") notified Sage Memorial that its contracts with the federal government

would not be renewed.  Sage Memorial responded by initiating litigation on October 23, 2014 in

the United States District Court for the District of New Mexico, Case No. 1:14-cv-0958-JB-

KBM, naming Sylvia Burwell, in her official capacity as the Secretary of the United States

Department of Health and Human Services (of which IHS is a component agency), as a party-

defendant.

35.     In addition to claims challenging a lack of funding by IHS, the *Burwell* lawsuit

also alleged that the federal government had breached a number of prior contracts from 2009

through 2013.  The federal judge presiding over that case wrote a thorough decision detailing

the history of the parties' dealings.  *See* Navajo Health Foundation – Sage Memorial Hospital,

Inc. v. Burwell, *et. al.*, 263 F.Supp.3d 1083 (D.N.M. 2016).

36.     The United States eventually agree to a settlement (in principal) of the litigation

with Sage Memorial on or about December 16, 2016.  The United States agreed to pay the

hospital $122,500,000.00.  The settlement document memorializing the parties' agreement

provided that payments must be used to fund Indian healthcare services, including ancillary

services to the hospital or for any other legitimate healthcare purpose.  However, the settlement

13

agreement also expressly prohibited the hospital from providing payment to any management company or affiliated entity.  Notably, the agreement also singled out Razaghi by name by further providing that "[i]f Ahmad R. Razaghi or any current officer or officer-level employee of a Razaghi-related entity is convicted of a felony crime of fraud related to the management of [the] [h]ospital or any federal health care program operated by [the Hospital] within 5 years of the effective date of this Settlement Agreement, IHS may conduct additional monitoring on the expenditure of the Settlement sum . . .."  This provision clearly evinced the federal government's concerns regarding Razaghi's potential for fraudulent conduct.

37.     Following Sage Memorial's agreement to resolve the *Burwell* litigation, and with knowledge of the amount of money Sage Memorial would be receiving and the federal government's insistence on his <u>exclusion</u> as an explicit condition of the settlement, there was a marked change in Razaghi's attitude and behavior.  He became increasingly resentful of what he told others was a windfall for "the Indians" which he believed he should have been given credit for and received some benefit from.

38.     With the federal government having expressly excluded Razaghi and RH from receiving any of the settlement funds paid to Sage Memorial, Razaghi had to devise a scheme in order to justify receipt of some of the money.

.   .   .

.   .   .

.   .   .

.   .   .

14

**V.     Razaghi Defrauds $10.8 Million From Sage Memorial Under The Pretense Of A Contract Dispute**

     **A.     Based Upon Omissions And Concealment Of Material Facts During A Board Meeting, The BOD Approves An Unconscionable Contract Which It Had No Meaningful Opportunity To Review And For Which There Was No Urgency To Approve Except To Benefit Razaghi**

39.     Approximately six months after the federal government had agreed in principal to pay Sage Memorial over $122 million, Razaghi determined that he should have a new management contract in place, even though the existing contract was not scheduled to expire for another three years.  To that end, a BOD meeting was called on June 16, 2017 at which time Stephen Hoffman, ostensibly acting as special counsel on behalf of Sage Memorial, urged the BOD to approve a second amendment to RH's original contract which was a contract more favorable to Razaghi than the first amended contract.  As Sage Memorial's special counsel, Hoffman owed the corporation duties of loyalty, honesty and good faith.  He stood in a trusted, fiduciary relationship with Sage Memorial and its BOD.  The BOD at the time consisted of the following six individuals:  Stenson Wauneka, Andrew Simpson, Linda Yazzie, Maybelle Kelewood, Joyce Moore and Ray Ann Terry.  None of the members of the BOD, with the possible exception of Wauneka, had been provided with a copy of the agreement by Hoffman or anyone else <u>prior</u> to the June 16, 2017 meeting, despite the fact that BOD rules and custom required that members be provided with important documents 24-hours in advance of any meeting so they could conduct a meaningful review prior to any vote being taken.  None of the members of the BOD has any formal legal training or knowledge about contract interpretation.  In addition, English is neither the native or first language of many of the members of the BOD.

15

40.     Hoffman presented the second amended management services contract to the BOD through a power point presentation and recommended they approve it by simply voting "yes."  No details were provided by Hoffman regarding the implications of the various contract provisions/changes set forth in the 17-page agreement, especially with respect to section 5.D of the contract.  That provision bestowed an extremely lucrative "termination payment" upon Razaghi in the event he terminated the contract or the BOD terminated it for any reason (including for cause).  These facts were inexplicably omitted from the BOD.

41.     With respect to the termination payment provision of the second amended management services contract, the language of the contract (section 5.D(2)) provided the following:

> In the event that this Contract expires, or RH terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to expiration of this Contract for any Reason other than those listed as "cause" in Section 4.A, **the Corporation shall, in addition to any other amounts due under this Contract, pay RH a Termination Payment <u>in an amount equal to the average of the amount paid to RH by the Corporation each year during the most recent four years of service, including the year of expiration or termination</u>**, which shall be prorated through the actual date of such expiration or termination.

(emphasis supplied).  In other words, under the terms of the contract <u>Razaghi could literally set fire to the hospital</u> and he would still be entitled to, and Sage Memorial would ostensibly be liable for, a termination payment equal to <u>four-years worth of payments made to RH</u> ("payments" would encompass everything – including salaries, profit, pass through expenses etc.).  Hoffman, acting as the BOD's attorney, but whose invoices for fees were approved and

16

paid by RH employees, recommended that the BOD approve this exceptionally unfavorable and one-sided contract.

42.     In addition to the termination payment clause, the second amendment to the CEO services contract extended the contract to the year 2025 and increased Razaghi's base hourly rate from $175 per hour to $495 per hour, a more than 250% increase in his base hourly rate. The contract was signed that same day, June 16, 2017, by Wauneka in his capacity as the Chairman of the BOD and by Razaghi.  However, in another odd occurrence, the contract stated it would become effective retroactively one year earlier on <u>July 6, 2016</u>.  No reason for this was ever provided to the BOD by Hoffman or Razaghi, nor was any attention drawn to it by Hoffman during his presentation to the BOD, the entity whose interests he was purportedly representing.

43.     One year prior to the execution of the second amendment to the CEO services contract, the BOD approved an "escrow account."  This account was established on June 16, 2016 but subsequently modified by a hand-written change and made effective on July 6, 2016 which was exactly 20-days after the effective date of the second amendment of the CEO services contract.  Presumably Razhaghi modified the effective date of the escrow account to benefit himself under the terms of the second amended CEO services contract.

44.     The escrow account was established at Wells Fargo bank and funded with approximately $4.3 million.  The sole purpose of the account was to pay money upon termination under specific circumstances.  Razaghi on behalf of RH acknowledged this fact when he signed the Escrow Agreement.

17

**B.  With A Favorable Contract In Place That Was Approved Under Dubious Circumstances, Razaghi Engineers The Fraudulent Taking Of $10.8 Million Under The Pretense Of A Contract Dispute**

45.     On July 11, 2018 Nicole Hardy ("Hardy"), an accounts specialist in the finance department of Sage Memorial, received an email request from Razaghi conveyed through Tom Matenaer ("Matenaer"), the hospital's Controller, to produce a "cost report" (billing rates v. discount rates) for the period 2014 through 2017.

46.     On July 16, 2018 Hardy completed the cost report spreadsheet and emailed it to Matenaer and Sage Memorial's staff accountant, Mary Arave ("Arave").  Both Matenaer and Arave were hired as contract employees by Razaghi through the Robert Half staffing company.

47.     On July 18, 2018 Razaghi contacted Christi El-Meligi ("CEM") and Netrisha Dalgai ("Dalgai"), both RH employees contracted to Sage Memorial to tell them they were "doing a great job."  CEM was contracted to Sage Memorial as co-CEO (serving alongside Razaghi) and Dalgai served as Chief Operating Officer ("COO").

48.     On July 19, 2018, CEM held a meeting with Matenaer and Sage Memorial's human resources director Gary Pahe to discuss Sage Memorial's obligation to comply with Navajo Nation preference in employment laws and issues related to the finance department and uncompleted audits.

49.     On July 20, 2018, without any prior notice, Razaghi circulated an email informing staff that CEM was to be "re-assigned and would be removed" from her position at Sage.  Later that same day, BOD member Ray Ann Terry circulated an email to BOD members

18

to request a special meeting to discuss issues/concerns with respect to the RH contract and removal/reassignment of CEM.

50.     On July 23, 2018 the BOD held a special meeting and discussed retaining independent counsel to review and advise them on the RH management contract.  The BOD concluded that this independent counsel should not be someone selected by Razaghi, as he had done with Hoffman.  Razaghi strongly objected to this decision and, via email, requested a copy of "the current Sage bylaws and conflict of interest policy."  A short while later, the BOD engaged attorney Jeff Davis, Esq. ("Davis") of the national and well-respected law firm Barnes & Thornburg, LLP to review the second amended agreement and Razaghi's relationship with Sage Memorial.  After engaging Davis, a former federal prosecutor, the BOD had approximately 5 meetings with him and one meeting with an independent financial auditor to determine the state of affairs with Sage Memorial's finances and the deficiencies related thereto.

51.     In response to his failed efforts to stop the BOD from engaging independent counsel, Razaghi convened an emergency meeting between himself and his RH management staff.  Razaghi invited Wauneka to attend this meeting but excluded the majority of the BOD members.

52.     By letter dated August 2, 2018 (mailed and emailed that same day), counsel for RH and Razaghi (Christopher Stachowiak) wrote to Board Chair Wauneka (who had only days earlier met one-on-one with Razaghi and was on friendly terms with him) notifying him of "prospective breaches and/or interference" with the management contract with Sage.  In support of this broad allegation, Stachowiak's letter cited "unauthorized communications and actions

19

between certain Board members and Christi El-Meligi and Netrisha Dalgai."  Stachowiak's

letter opined that this amounted to "contract interference and a material breach of the contract."

The letter concluded by stating "any attempt by the Board to cause the Contract to expire or

terminate early will result in Corporation's immediate obligation to pay the Termination

Payment to RH in accordance with the Contract, which will be several million dollars."

Notwithstanding the letter's reference to an "immediate obligation," the second amended CEO

services contract specifically provided Sage Memorial with a 30-day cure period – a fact that

went unmentioned in Stachowiak's letter.  Accordingly, to the extent the August 2, 2018 letter

was notification of a prospective breach, the BOD on behalf of Sage Memorial would have had

until September 2, 2018 to cure that breach under the terms of the contract that Razaghi himself

urged the BOD to ratify.

53.     On August 13, 2018 Wauneka sent an email to Davis and two other BOD

members, with Razaghi copied on the email, in which he stated "I believe we are at a point in

time where the question is whether the Board wants to continue its relation with Razaghi

Development Company, LLC . . .."  The email was received by the recipients as suggesting the

Chairman of the BOD himself believed that Sage was in breach of the CEO services contract

and was perceived as nothing more than an attempt to bolster the August 2, 2018 letter by

Stachowiak.  The BOD's independent counsel Davis responding by stating the following:

> Mr. Stenson I have yet to meet you via e-mail, telephone or
> otherwise.  Thank you for sending the e-mail, I see you have
> included Mr. Razaghi, the CEO.  **I would respectfully disagree
> with your statement that the Board is [at] a point where the
> question is whether the Board wants to continue its relationship
> with Razaghi Development Company.  Quite the contrary, I have**

20

**had the pleasure of talking with other Board members and they are ready and willing to work with all** and invigorate the Board so that it is an equal partner in insuring that members of the Navajo Nation are provided services by Sage Memorial Hospital received the best possible medical treatment and programs at a cost-efficient medical facility.

Emphasis supplied.

54.     On August 20, 2018 the BOD convened an executive session meeting, with Davis and the hospital's independent financial auditor Heather Gretch ("Gretch") appearing by telephone conference call.  Apart from the BOD, Davis and Gretch, no one else was present in the room.  The three main topics discussed during that meeting were the Sage/RH management contract, payments made to RH and finally the fact that the BOD would not be approving an incentive bonus for Razaghi that year.

55.     Seven days after the August 20, 2018 meeting, or on August 27, 2018, Razaghi Caused the fraudulent taking of more than $10.8 million from Sage Memorial.  Specifically, the following occurred:

a.     At approximately 9 a.m. Hardy received a telephone call directly from Hasan, the contract CFO employed by RH but with fiduciary duties owed to Sage Memorial, requesting status and payment on three invoices sent that same day.  In submitting these invoices, RH and Razaghi made "representations" regarding the legitimacy of the statements contained therein which, at the time they were made, they knew were not true.

b.     Hardy checked the invoices and determined the total was $11,048,517.71.  Invoice #1369 was for a total of $10,855,134.15.  *See* Exhibit B.  Hardy checked for backup documents and determined there were none – the only attachment was her July 16, 2018 "cost report" spreadsheet.  Finally, Hardy discovered the "re" on the invoice merely referenced a "Contract Termination Fee, Section 5.D."  Exhibit B.  Worried about the size of the invoice, never having processed such a large amount and seeing that there was no backup and the invoice only referenced a contract provision,

21

Hardy went to her supervisor Arave and then ultimately to Arave's supervisor Matenaer. Matenaer advised Hardy that he would speak to Hasan about the matter, specifically the backup documents and coding issues.

c. Following a short break, Hardy returned to the office and noticed Matenaer's inquiry e-mail to Hasan on the two issues – the lack of backup documents and coding issues. However, in the meantime, she also discovered that Hasan, the CFO and Matenaer's superior, had left a message for her to call him back immediately. Upon returning his call, Hardy was ordered by Hasan to immediately input the invoices into the system for payment and to code the payment for invoice #1369 as "Management Services Fees."

d. At 10:50 a.m. Hardy completed inputting invoice #1369 into Sage Memorial's payment system (Meditech Financial Management System).

e. At 10:53 Hardy notified Hasan that she has completed uploading invoice #1369 in Sage Memorial's payment system.

f. At 10:59 Hasan accessed Sage Memorial's system and transferred $500,000.00 from the hospital's IHS Funding Account and $10,855,000.00 from Sage's Third-Party Revenue Account to Sage's General Operating Account to cover the $10.8 million invoice.

g. At 11:02 a.m. Hasan, as contract CFO, approved a $10.8 million payment to RH. RH was paid by "automated clearing house" or ACH payment instantly and the funds were taken from Sage Memorial's General Operating Account at Wells Fargo – not the Escrow Account.

56. After having just taken $10.8 million from Sage Memorial's bank account, Razaghi sent a letter to the BOD dated August 29, 2018 expressing his "concerns over the state of the Board of Directors" and "an invalid purported agreement with a Michigan attorney." *See* Exhibit C. The "Michigan attorney" referenced by Razaghi was Davis. In his letter Razaghi, an independent contractor with the hospital, notified the BOD that Davis "has no authority represent Navajo Sage under governing Navajo law and will not be paid . . .." The import of

22

this letter, among other things, was that it demonstrated that not only did Razaghi control the hospital's finances and who would and would not be paid, but he believed he could control the BOD's determination regarding the selection of its own legal counsel – a fact presumably not lost on attorneys Hoffman and Stachowiak both of whom were copied on the letter.  Exhibit C. Notwithstanding Razaghi's directives to the BOD, his letter notably <u>failed</u> to disclose that only two days earlier he had withdrawn more than $10.8 from the hospitals general operating account.  Oddly, if he believed he was entitled to that money because the BOD had breached his contract and that the contract was terminated, why did he believe he could continue lecturing and dictating to the BOD who it could retain as its own legal counsel among other things?  The letter simply demonstrates the sheer contempt, condescension and arrogance Razaghi held toward the BOD.

**C.      Razaghi Plunges The Knife Deeper Into Sage Memorial Following His Unilateral Taking Of $10.8 Million**

57.      After fraudulently taking more than $10.8 million from Sage Memorial, Razaghi and RH continued to attempt to defraud the hospital for the following matters through the use of electronic mail by seeking payments for services never rendered:

a.      September 11, 2018 (invoice #1370) in the amount of $31,678.32 for credit card, legal and executive leadership services;

b.      September 6, 2018 (invoice #1371) in the amount of $74,448.08 for management incentive services fee;

c.      September 6, 2018 (invoice #1372) in the amount of $129,986.76 for management consulting services;

d.      September 6, 2018 (invoice #1373) in the amount of $106,120.38 for executive leadership, legal and professional services;

23

  e.  October 4, 2018 (invoice #1374) in the amount of $156,694.93 for management consulting services (with interest charges);

  f.  November 1, 2018 (invoice #1382) in the amount of $129,331.55 for management consulting services (with interest charges);

  g.  November 27, 2018 (invoice #1383) in the amount of $511,395.11 for management consulting services for "transition period" (with interest charges);

  h.  December 1, 2018 (invoice #1384) in the amount of $443,996.71 (with interest charges) for "legal and professional expenses;"

  i.  January 2, 2019 (invoice #1385) in the amount of $235,873.85 (with interest charge) for "management consulting services" and "incentive fees";

Many of these invoices, while seeking exorbitant sums, provide little to no backup such that the hospital can meaningfully discern what it is being requested to pay for beyond vague references to "management services."

## FIRST CLAIM

### DECLARATORY AND INJUNCTIVE RELIEF

#### Against All Defendants

  58.  Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 57 above.

  59.  This lawsuit presents an actual case in controversy between the parties regarding more than $10,000,000.00 fraudulently taken from Plaintiff.

  60.  Under 28 U.S.C. § 2201 (the Declaratory Judgment Act) "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States upon the filing of appropriate

pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought" and that "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." And, pursuant to 28 U.S.C. § 2202, "further necessary or proper relief based on a declaratory judgment or decree may be granted after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

61.     Federal Rule of Civil Procedure 65 permits a federal court to grant a preliminary injunction upon a showing by the movant of substantial likelihood of success on the merits, that the movant will suffer irreparable injury without the injunction, that the injunction will not substantially injure others and that the injunction furthers the public interest.

62.     The Defendants RH and Razaghi had no right, contractual or otherwise, to unilaterally withdraw more than $10.8 million from Plaintiff's bank account on August 27, 2018.  This was simply a brazen act of fraud executed under the guise of a "contract dispute." A dispute that was completely manufactured by Defendant Razaghi after the Sage Memorial BOD retained independent counsel and began examining his conduct and mismanagement of the hospital.  The Defendants that are the parties to this dispute, with the assistance of others, were able to enrich themselves through a pattern of fraudulent and deceitful actions as set forth in this Complaint.

63.     Plaintiff requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring the following:

a.     The second amended CEO services contract executed on or about June 16, 2017 as amended on December 15, 2017, was procured by deceit, the omission of material facts and is unconscionable and therefore unenforceable;

b.     Razaghi and his co-Defendant Hasan had no legal right, contractual or otherwise, to unilaterally withdraw $10,855,134.15 from Plaintiff's bank account on August 27, 2018;

c.     Razaghi and Hasan breached their fiduciary duties towards Sage Memorial when they directed Sage's staff, with whom they stood in a supervisory role, to process the $10,855,134.15 invoice.

d.     Razaghi and RH breached any contract they might rely upon when they unilaterally withdrew $10,855,134.15 without providing Sage Memorial any opportunity to "cure."

e.     Razaghi and RH breached any contract they might rely upon when they unilaterally withdrew $10,855,134.15 from Sage Memorial's general operating account instead of the escrow account.

f.     Razaghi and his co-Defendant are jointly and severally liable to Plaintiff for $10,855,134.15.

64.     In addition to the declaratory relief identified above, Plaintiff requests a preliminary injunction because given the facts and manner in which Defendants unilaterally withdrew money from Plaintiff's bank account through stealth and deception there is a significant likelihood of success on the merits.  If a preliminary injunction is not granted,

26

Plaintiff and the indigent communities it serves will be <u>irreparably harmed</u>.  The granting of an injunction will not harm any other parties other than potentially Razaghi who is not entitled to the money he fraudulently seized in the first place.  Finally, the injunction is most certainly in the public interest given that the $10,855,134.15 was money intended to be utilized to provide essential medical services to an indigent, rural population.  In light of the foregoing, the Court should grant a preliminary injunction on the following grounds:

        a.      Razaghi and his co-Defendants should be ordered to provide a complete accounting (subject to examination under oath) to Plaintiff of what happened to the $10,855,134.15 following its withdrawal from Plaintiff's bank account and the current location of the money;

        b.      Razaghi and his co-Defendants should be required by this Court to immediately deposit $10,855,134.15 with a Court appointed receiver in Nevada during the pendency of this litigation.  In other words, the Court should order the creation of a <u>constructive trust</u> which is available to a party when the retention of legal title by the holder of another's property would be inequitable.  The existence of such a trust is essential to the effectuation of justice. Razaghi, who owed Plaintiff a duty of loyalty and trust, violated his duties and continues to do so by retaining Plaintiff's monies.  Equity requires a constructive trust.

        c.      The Court should set an expedited discovery schedule to permit examination under oath of individual Defendants, persons most knowledgeable and all other persons having relevance to this litigation in order to further the ends of justice if Defendant cannot provide an immediate accounting regarding the location of the $10,855,134.15.

**<u>SECOND CLAIM</u>**

**FEDERAL CIVIL RICO – 18 U.S.C. § 1962(c)**

**Against Defendants Razaghi and Hasan**

65.     Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 64 above.

**I.      The Applicable Statutes**

66.     Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."  And, under 18 U.S.C. § 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

67.     Federal RICO, specifically 18 U.S.C. § 1964(c), creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained as a result of recovery for the cost of suit including reasonable attorney fees.

**II.      The Enterprise**

68.     RH, a legal entity, is an "Enterprise" as described in 18 U.S.C. § 1961(4). Defendants Razaghi, the sole owner and manager of RH, and Hasan, a senior consultant hired by RH, with others conducted and managed the affairs of RH.

28

69.     Alternatively, the RICO Defendants and others associated in fact, including certain non-parties affiliated with Defendants, constitute an "Enterprise" (hereinafter the "Razaghi-Hasan" Enterprise) as described in 18 U.S.C. § 1961(4), which functioned for the purpose of defrauding Sage Memorial and enriching the Enterprise's members and associates. Each Defendant in Claim Two conducted the affairs of the Razaghi-Hasan Enterprise or acted at the direction of Razaghi in the conduct of the affairs of the Enterprise.

70.     At all times relevant to this Complaint, members and associates of the Razaghi-Hasan Enterprise, an association in fact enterprise, functioned together as a continuing unit, with a common purpose for the economic benefit and gain of the RICO Defendants who controlled the Razaghi-Hasan Enterprise, as further described herein.  The Razaghi-Hasan Enterprise had longevity sufficient to permit each of the RICO Defendants to pursue the Enterprise's purpose.

71.     The RICO Defendants' participation in the Razaghi-Hasan Enterprise was necessary for the successful operation of the fraudulent scheme.

72.     The activities of RH affected interstate commerce as it provided services to clients, such as Sage Memorial, who are located in other states and is a business which used goods and services which travel in interstate commerce.  The alternative Razaghi-Hasan Enterprise, an association in fact of individuals and entities, affected interstate commerce based on Defendants' unlawfully obtaining, transmitting, billing and collecting monies through use of interstate wirings, in furtherance of the racketeering scheme as alleged in the Complaint.

73.     Plaintiff is informed and believes that each member of the Enterprise played a role and acted in mutual reliance for the common purpose of defrauding Sage out of millions of dollars and engaging and attempting to engage in other illegal acts against Sage Memorial.

**III.     The Racketeering Violation**

74.     From on or about 2011, and continuing up through the date of the filing of this Complaint, the RICO Defendants, Razaghi and Hasan, each of whom are persons associated with or employed by RH, and alternatively were associated or employed by the Razaghi-Hasan Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

75.     Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity at the effective date of RICO and also within 10 years of each individual act. Defendants' actions violated the federal mail fraud statute 18 U.S.C. § 1341, and the wire fraud statute 18 U.S.C. § 1343, predicate acts for purposes of racketeering.

**IV.     Racketeering Activity**

76.     Over the course of years, the RICO Defendants knowingly and intentionally engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1962(c) by committing the predicate acts of mail and wire fraud, as set forth herein.  The fraudulent schemes involved using the mails and interstate wires to defraud Sage Memorial of millions of dollars.

. . .

. . .

30

77.     In furtherance of their scheme to defraud, and with the purpose of executing their schemes to defraud, Defendants herein, caused mailings and the use of interstate wires to correspond with Sage personnel, and associates, for the purpose of defrauding Sage of millions of dollars.  The interstate wirings consist of electronic messages which constitute interstate transmissions, the wiring of monies in the interstate banking system between Sage and the Defendants, and interstate telephone calls between Defendants Razaghi and Hasan and Sage personnel, all in violation of 18 US.C. Section 1343, as further described below.  Set forth below are specific mailings and wirings caused by Defendants pursuant to their scheme to defraud Plaintiffs through the operation of the Enterprises, as further described earlier in this Complaint:

(a) On July 11, 2018 Nicole Hardy, an accounts specialist in the finance department of Sage Memorial, received an email request from Razaghi conveyed through Tom Matenaer, the hospital's Controller, to produce a "cost report" (billing rates v. discount rates) for the period 2014 through 2017.

(b)     On July 16, 2018 Hardy completed the cost report spreadsheet and emailed it to Matenaer and Sage Memorial's staff accountant, Mary Arave;

(c)     On July 20, 2018, without any prior notice, Razaghi circulated an email informing staff that CEM and Dalgai were to be "re-assigned and would be removed" from their positions at Sage.  Later that same day, BOD member Ray Ann Terry circulated an email to BOD members to request a special meeting to discuss issues/concerns with respect to the RH contract and reassignment of CEM.

31

(d)     On July 23, 2018 the BOD held a special meeting and discussed retaining independent counsel to review and advise them on RH management contract.  The BOD concluded that this independent counsel should not be someone contracted through Razaghi, as he had done with Hoffman.  Razaghi strongly objected to this decision and, via email, requested a copy of "the current Sage bylaws and conflict of interest policy."

(e)     By letter dated August 2, 2018 (mailed and emailed that same day), counsel for RH and Razaghi (Christopher Stachowiak) wrote to Board Chair Wauneka (who had only days earlier met one-on-one with Razaghi and was on friendly terms with him) notifying him of "prospective breaches and/or interference" with the management contract with Sage.

(f)     On August 13, 2018 Wauneka sent an email to Davis and two other BOD members, with Razaghi copied on the email, in which he stated "I believe we are at a point in time where the question is whether the Board wants to continue its relation with Razaghi Development Company, LLC . . .."

(g)     On or about August 27, 2018, Razaghi defrauded Sage Memorial of $10.8 million and caused the following wirings/mailings:

> Sage Memorial employee Hardy notified Hasan via e-mail that she had completed uploading invoice #1369 in Sage Memorial's payment system, as directed by Hasan.  This was in response to the fact that Defendants Razaghi and Hasan had, that same day, made representations to Hardy when they electronically submitted written invoice #1369 to Sage Memorial's accounting department and Hasan verbally directed Hardy (an accounting clerk) during a telephone conversation to pay the invoice in the amount of $10,855,134.15.  The invoice presented a material fact: that Sage owed Razaghi and RH $10,855,134.15.  At the time the invoice was submitted, both Razaghi and Hasan knew this statement was not true

32

because the very contract they were relying upon (the second amended contract) and cited in the invoice permitted Sage a 30-day curative period.  Indeed, recognizing this fact, Hasan expressed urgency to Hardy that the invoice be paid and he manipulated Sage's accounts, by virtue of his position as CFO, to ensure there would be sufficient money in the general operating account to pay the $10,855,134.15.  All of this was accomplished by Hasan within 90 minutes.  As Hardy's supervisor, notwithstanding that he was merely a contract CFO, Hasan knew that she would act upon his request given the imbalance in their respective positions – she was a clerk and he was the CFO.  When Hardy received the invoice, she was ignorant of its falsity and assumed Hasan was telling her the truth given his position as CFO.  When he verbally directed her via a telephone conversation to process the $10,855,134.15 she believed she was required to follow his directive.

Hasan, a few minutes later, accessed Sage Memorial's system and transferred $500,000.00 from the hospital's IHS Funding Account and $10,855,000.00 from Sage's Third-Party Revenue Account to Sage's General Operating Account to cover the $10.8 million invoice.

Hasan, as contract CFO, approved $10.8 million payment to RH.  RH is paid by "automated clearing house" or ACH payment instantly and the funds are taken from Sage Memorial's General Operating Account at Wells Fargo.

(h) On or about August 29, 2018, after receiving $10.8 million from Sage Memorial's bank account, Razaghi emailed a letter to the BOD expressing his "concerns over the state of the Board of Directors" and "an invalid purported agreement with a Michigan attorney."

(i)      On or about September 1, 2018, RH attorney Stachowiak mailed a letter to Sage notifying it of the termination of the second amended CEO services contract.

(j)  On or about September 4, 2018, RH attorney Stachowiak mailed a second letter to Sage BOD's containing misrepresentations regarding the RH termination.

(k) On or about November 5, 2018, RH project manager Abigail Paul sent an

33

e-mail to Sage Controller Tom Matenaer, with an attached letter, requesting a follow up meeting.  Presumably, this was a mere pretense for Razaghi to justify claiming entitlement to even more money.

(l) As detailed in paragraph 57 above, defendant Razaghi caused the interstate wiring of more than 9 separate invoices for services not rendered to Sage Memorial.

78.     In furtherance of the scheme to defraud, and with the purpose of executing their schemes, Defendants herein, caused the payment of monies (in the form of excessive "honorariums") to Sage's Chairman of the Board, Stenson Wauneka.  While this is not a RICO predicate activity itself, it is further evidence of Defendants' knowledge and participation of the scheme to defraud Plaintiff.

### V.     Pattern of Racketeering Activity

79.     Plaintiff alleges that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of defrauding Sage of millions of dollars, all for the personal enrichment of the Defendants and their associates.

80.     Plaintiff alleges that the continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period of time, *i.e.*, from about year 2011 to the present and is continuing.

81.     Plaintiff alleges that the pattern of racketeering activity is shown by the threat of continued activity as Razaghi and his associates throughout the years have repeatedly engaged in the same illegal and illicit activities involving Sage.  Thus, engaging in the pattern of racketeering

as set forth herein is the regular way Razaghi and his enterprise members regularly conducted the operations of RH, and the association-in-fact enterprise he created.  Although certain of the players have changed, the Razaghi-Hasan Enterprise has been ongoing since at least 2011, and Razaghi and the other RICO Defendants will continue the cycle of deception and illegal billings well into the future if not stopped.   Even now, for example, they continue to bill Sage for hundreds of thousands of dollars for "management fees" (and continue to contact Sage Memorial personnel and ex-BOD members regarding, among other things, purported invoices for payment of more monies) even after fraudulently receiving the $10.8 million dollar "termination fee, which by definition makes their conduct open-ended. Thus, Razaghi and his Enterprise members clearly remain a threat to others and their racketeering activity meets the open-ended continuity test.

## VI.     Injury

82.     As a direct and proximate result of the Defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(c), Plaintiff has been and is continuing to be injured in its business or property as set forth more fully above.

## THIRD CLAIM

### FEDERAL CIVIL RICO CONSPIRACY – 18 U.S.C. § 1962(d)
### Against Defendants Razaghi and Hasan

83.     Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 82 above.

## I.     The Conspiracy

84.     Plaintiffs allege that commencing in 2011, the RICO Defendants described above, *i.e.*, Razaghi and Hasan conspired to violate section 1962(c), i.e., each Defendant agreed

1    that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern

2    of racketeering, consisting of acts indictable under 18 U.S.C. §§ 1341 (Mail Fraud) and 1343

3    (Wire Fraud), as more fully described in Claim Two.  Plaintiff alleges that the conspiratorial

4    objective of that mutual agreement was intended to obtain Plaintiff's business and property, and

5    that such conspiratorial conduct violates RICO §1962(d).

6    85.    Each RICO Conspiracy Defendant intended to further the schemes to defraud,

7    which as described in Claim Two were completed and satisfied by at least one substantive

8    individual Defendant.  As demonstrated in detail above, the Defendants have engaged in

9    numerous predicate racketeering acts in furtherance of the conspiracy including systemic

10   fraudulent practices designed to defraud Plaintiff of money and other property interests.

11   86.    The nature of the above described acts, material misrepresentations, and

12   omissions in furtherance of the conspiracy give rise to an inference that Defendants not only

13   agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18

14   U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part

15   of an overall pattern of racketeering activity.

16   87.    The agreement to violate RICO with regard to each conspiracy Defendant is as

17   follows:

18          a.    Defendant Razaghi is the sole owner of RH and the leader of the association

19   in fact enterprise.  Razaghi has since year 2011 devised schemes through which he has abused

20   his relationship with Sage to divert millions of dollars of Sage monies to his benefit.  Razaghi

21   has caused conspirators to engage in multiple acts of mail fraud and wire fraud, to further

22   effectuate the defrauding of Sage monies, and has compromised the Sage Chairman of the BOD

23   Wauneka.  Through the causing of multiple racketeering acts and his leadership of the

24   enterprise, Defendant Razaghi has conspired to violate section 1962c, all in violation of section

25   1962(d).

26

27                                                    36

28

1         b.  Defendant Hasan was a senior consultant and former employee of RH who

2 followed the directions of Razaghi to engage in multiple racketeering acts of mail and wire

3 fraud, described above, which are realleged and averred in this Claim.  Hasan intended to

4 further the substantive violations of fraud, which were completed, and he adopted the goal of

5 furthering or facilitating the criminal endeavor.  Accordingly, Defendant Hasan has conspired to

6 violate section 1962(c), all in violation of section 1962(d).

7 **II.**      **The Injury**

8      88.     As a direct and proximate result of the Defendants' predicate acts in furtherance

9 of violating 18 U.S.C § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff has been

10 and is continuing to be injured in their business or property as set forth more fully above.

### FOURTH CLAIM

### NEVADA CIVIL RICO – NRS 207.400(1)(c)
### Against Defendants Razaghi and Hasan

15      89.     Plaintiff repeats and incorporates by reference each of the allegations set forth in

16 paragraphs 1 through 88 above.

17      90.     Pursuant to Nevada Revised Statutes (NRS) section 207.470, Plaintiff is a person

18 injured in his business  or property by reason of any violation of *NRS 207.400, Unlawful Acts*.

19 Plaintiff has a cause of action against a person causing such injury for three times the actual

20 damages sustained.

21      91.     Plaintiff alleges that RH is an enterprise as defined in NRS 207.380(1), i.e., a

22 legal entity.  Plaintiff also alleges that Razaghi, Hasan, and their associates have established an

23 association in fact enterprise as defined in NRS 207.380(2), *i.e*., "any union, association or

24 other group of persons associated in fact although not a legal entity."

37

92.     This Enterprise, identified above as the Razaghi-Hasan Enterprise, functioned for the purpose of defrauding Sage and enriching the Enterprise's members and associates. Each Defendant conducted the affairs of the Razaghi-Hasan Enterprise, or acted at the direction of Razagahi in the conduct of the affairs of the Enterprise.

93.     At all times relevant to this Complaint, members and associates of the Razaghi-Hasan Enterprise, an association in fact enterprise, functioned together as a continuing unit, with a common purpose, for the economic benefit and gain of the Defendants who controlled the Razaghi-Hasan Enterprise, as further described below. The Razaghi-Hasan Enterprise had longevity sufficient to permit each of the Defendants to pursue the Enterprise's purpose.

94.     The activities of RH affected interstate commerce as it provided services to clients, such as Sage, who are located in other states and territorial jurisdictions (Navajo Nation) and used goods and services which travel in interstate commerce.  The alternative Razaghi-Hasan Enterprise, an association in fact of individuals and entities, affected interstate commerce based on defendants' use of interstate banking facilities, and process of obtaining, transmitting, billing and collecting fraudulent monies through the use of interstate facilities, in furtherance of the racketeering scheme as alleged in the Complaint.

95.     Plaintiff is informed and believes that each member of the Enterprise played a role and acted in mutual reliance on the common purpose of defrauding Sage out of millions of dollars, and engaging and attempting to engage in other illegal acts against Sage.

**I.      The Nevada Unlawful Acts Violation**

96.     From on or about 2011, and continuing up through the date of the filing of this Complaint, the Nevada RICO Defendants, Razaghi and Hasan, each of whom are persons associated with or employed by RH, and alternatively were associated or employed by the Razaghi-Hasan Enterprise, did knowingly and unlawfully conduct or participate, directly or

indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of NRS 207.400(1)(c).

**II.      Racketeering Activity**

97.      Pursuant to NRS 207.390 "racketeering activity" means engaging in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents, if at least one of the incidents occurred after July 1, 1983, and the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering.

98.      Over the course of years, each RICO Defendant knowingly and intentionally engaged in "racketeering activity" under N.R.S. § 207.390 by committing at least two "crimes related to racketeering," set forth below.

99.      Pursuant to N.R.S.§207.360, a "crime related to racketeering" includes the commission of, attempt to commit or conspiracy to commit any of the following crimes, pertinent here:

> § 9. Taking property from another under circumstances not amounting to robbery;
>
> § 27. Embezzlement of money or property valued at $650 or more;
>
> § 28. Obtaining possession of money or property valued at $650 or more, or obtaining a signature by means of false pretenses;
>
> § 32. Any violation of NRS 90.570, 91.230 (fraudulent conduct); and
>
> § 35. Any violation of NRS 205.377 (multiple transactions involving fraud or deceit in course of enterprise or occupation)

100.      In furtherance of these offenses, Defendants herein did and caused the acts described in Claims Two and Three, described above, all constituting violations of NRS

39

207.360 (9); (27); (28); (32); and (35), and are incorporated herein.   These acts satisfy the requirements for "racketeering activity," as described in N.R.S. § 207.390, i.e., the acts are related, *i.e*., the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering and are "not isolated incidents," as described in the Pattern of Racketeering Section of Claim II, which allegations are realleged and averred herein.

### III.    Injury

101.    Pursuant to NRS. 207.470(1), Plaintiff has been injured in its business or property by reason of violation of **NRS 207.400** and thus has a cause of action against the person(s) causing such injury for three times the actual damages sustained.

102.     Plaintiff may also recover attorney's fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.

103.    Under Nevada law, specifically NRS 207.440(1), any injured person has a claim to forfeited property or the proceeds derived therefrom and this claim is superior to any claim the State may have to the same property or proceeds if the injured person's claim is asserted before a final decree is issued which grants forfeiture of the property or proceeds to the State.

### FIFTH CLAIM

### NEVADA CIVIL RICO CONSPIRACY – NRS 207.400(1)(c) and 207.400(j)
### Against Defendants Razaghi and Hasan

104.    Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 103 above.

105.    Pursuant to Nevada Revised Statutes (NRS) section 207.470, Plaintiff is a person injured in his business  or property by reason of any violation of *NRS 207.400, Unlawful Acts*. Plaintiff has a cause of action against a person causing such injury for three times the actual damages sustained.

40

106.     Plaintiff alleges that RH is an enterprise as defined in NRS section 207.380(1), a legal entity.  Plaintiff also alleges that Razaghi, Hasan, and their associates have established an association in fact enterprise as defined in NRS section 207.380(2), *i.e.*, "any union, association or other group of persons associated in fact although not a legal entity."

107.     This Enterprise, identified above as the Razaghi-Hasan Enterprise, functioned for the purpose of defrauding Sage and enriching the Enterprise's members and associates. Each Defendant conducted the affairs of the Razaghi-Hasan Enterprise, or acted at the direction of Razagahi in the conduct of the affairs of the Enterprise.

108.     At all times relevant to this Complaint, members and associates of the Razaghi-Hasan Enterprise, an association in fact enterprise, functioned together as a continuing unit, with a common purpose, for the economic benefit and gain of the Defendants who controlled the Razaghi-Hasan Enterprise, as further described below. The Razaghi-Hasan Enterprise had longevity sufficient to permit each of the Defendants to pursue the Enterprise's purpose.

109.     The activities of RH affected interstate commerce as it provided services to clients, such as Sage, who are located in other states and territorial jurisdictions (Navajo Nation) and is a business which uses goods and services which travel in interstate commerce.  The alternative Razaghi-Hasan Enterprise, an association in fact of individuals and entities, affected interstate commerce based on defendants' unlawful process of obtaining, transmitting, billing and collecting fraudulent monies through use of interstate wires, in furtherance of the racketeering scheme as alleged in the Complaint.

110.     Plaintiff is informed and believes that each member of the Enterprise played a role and acted in a mutual reliance on the common purpose of defrauding Sage out of millions of dollars, and engaging and attempting to engage in other illegal acts against Sage.

.   .   .

.   .   .

41

## I.     The Conspiracy

111.     From on or about 2011, and continuing up through the date of the filing of this Complaint, the Nevada RICO Defendants, Razaghi and Hasan, each of whom are persons associated with or employed by RH, and alternatively were associated or employed by the Razaghi-Hasan Enterprise, did knowingly and unlawfully conspire to conduct or participate, directly or indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of N.R.S. § 207.400(1)(c) and § 207.400(j) ("conspire to violate any of the provisions of this section").

112.     Defendants conspired to violate provisions of N.R.S. § 207.390 "racketeering activity" by agreeing that conspirators would commit at least two "crimes related to racketeering" as described in Claim Four.   Pursuant to N.R.S. § 207.360, a "crime related to racketeering" means the commission of, attempt to commit or conspiracy to commit any of the following crimes:

> § 9. Taking property from another under circumstances not amounting to robbery;
>
> § 27. Embezzlement of money or property valued at $650 or more;
>
> § 28. Obtaining possession of money or property valued at $650 or more, or obtaining a signature by means of false pretenses;
>
> § 32. Any violation of NRS 90.570, 91.230 (fraudulent conduct); and
>
> § 35. Any violation of NRS 205.377 (multiple transactions involving fraud or deceit in course of enterprise or occupation)

113.     In furtherance of these offenses, Defendants herein did conspire to violate the crimes described in N.R.S. § 207.360 (9); (27); (28); (32); and (35).

## II.    Injury

114.    Pursuant to N.R.S. § 207.470(1), Plaintiff has been injured in its business or property by reason of any violation of NRS 207.400 and thus has a cause of action against a person(s) causing such injury for three times the actual damages sustained.

115.    Plaintiff may also recover attorney's fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.

116.    Under Nevada law, specifically NRS 207.440(1), any injured person has a claim to forfeited property or the proceeds derived therefrom, and this claim is superior to any claim the State may have to the same property or proceeds if the injured person's claim is asserted before a final decree is issued which grants forfeiture of the property or proceeds to the State.

## SIXTH CLAIM

### CONVERSION

### Against Defendants Razaghi and Hasan

117.    Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 116 above.

118.    When Defendants Razaghi and Hasan unilaterally withdrew (without notice to the Sage BOD) $10,855,134.15 from Plaintiff's bank account on August 27, 2018 they engaged in the tort of conversion.  That is, the act of wrongful dominion and control over the personal property of Sage Memorial in denial of or inconsistent with the rights of Sage.

119.    The acts of Razaghi and Hasan were intentional and deliberate and did cause the direct loss of $10,855,134.15 by Sage Memorial.  The acts of Razaghi and Hasan are both the direct and proximate cause of damages sustained by Sage Memorial.

120.     Sage Memorial has no other adequate remedy at law except a money judgment against Razaghi and Hasan, joint and severally, in the amount fraudulently taken from its bank account.

### SEVENTH CLAIM

### CIVIL CONSPIRACY

### Against Defendants Razaghi and Hasan

121.     Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 120 above.

122.     When Defendants Razaghi and Hasan unilaterally withdrew (without notice) $10,855,134.15 from Plaintiff's bank account on August 27, 2018 they committed the tort of civil conspiracy.   That is, the agreement between two or more persons to accomplish an unlawful purpose or to accomplish a lawful objective by unlawful means causing damages.

123.     The acts of Razaghi and Hasan, each acting out of self-interest, were intentional and deliberate and did cause the direct loss of $10,855,134.15 by Sage Memorial.  The acts of Razaghi and Hasan are both the direct and proximate cause of damages sustained by Sage Memorial.  The conspiracy between Razaghi and Hasan was the agreement to commit the wrongful acts (i.e. torts) of fraud, conversion and intentional interference with contract.

124.     There is clear and convincing evidence in support of Plaintiff's claim for civil conspiracy as evidenced by the fact that the money taken in a rushed manner (in less than 90 minutes) by Defendants utilizing their supervisory authority over lower Sage personnel, no backup was provided to justify the taking of the money except a vague reference to a contract clause, the money was taken prior to the expiration of a 30-day cure period, the money was taken from Sage's general operating account instead of the escrow account and the money was taken without any prior notice provided to the Sage Memorial BOD (taken through stealth) which would have allowed Sage to prevent the conversion.

44

125.     Sage Memorial has no other adequate remedy at law except a money judgment against Razaghi and Hasan, joint and severally, in the amount fraudulently taken from its bank account.

### EIGHTH CLAIM

### TORTIOUS INTERFERENCE WITH CONTRACT
### Against Defendant Razaghi

126.     Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 125 above.

127.     The United States entered into an agreement (in principal) with Sage Memorial on or about December 16, 2016 to resolve the *Burwell* litigation as referenced earlier in this Complaint.  The agreement was memorialized in a written documented finalized on or about October 3, 2017.  Under the terms of that agreement, the United States agreed to pay Sage Memorial $122,500,000.00 on the condition that the monies must be used to fund Indian healthcare services, including ancillary services to the hospital or for any other legitimate healthcare purpose.  The settlement agreement expressly prohibited the hospital from providing payment to any management company or affiliated entity.  Notably, the agreement, demonstrating the federal government's significant concerns pertaining to Razaghi, singled him out by name providing that "[i]f Ahmad R. Razaghi or any current officer or officer-level employee of a Razaghi-related entity is convicted of a felony crime of fraud related to the management of [the] [h]ospital or any federal health care program operated by [the Hospital] within 5 years of the effective date of this Settlement Agreement, IHS may conduct additional monitoring on the expenditure of the Settlement sum . . .."  In other words, the government anticipated that Razaghi was the type of person who could be convicted of a felony otherwise it would not have gone to the unusual length of singling him out by name in an agreement.

128.     On account of Razaghi's brazen and fraudulent withdrawal of more than $10.8 million from Sage's bank account, he has invited scrutiny from federal authorities which have, upon information and belief, began an inquiry/investigation into the conduct at issue in this lawsuit as well as related matters.  As a result of Razaghi's brazen and fraudulent conduct, he has placed in jeopardy the agreement between Sage Memorial and the United States of America.

129.   Razaghi is liable to Sage for tortious interference with its contract with the United States based upon the following: he knew about the settlement agreement (contract) between Sage Memorial and the United States (including his exclusion from receiving any monies), he intentionally interfered with that contract when he unilaterally withdrew more than $10.8 million from Sage's bank account on August 27, 2018 thereby causing a breach of that relationship which, upon information and belief, is now being investigated by federal authorities and his conduct in engaging in the foregoing was improper.

130.     Sage has been damaged by Razaghi's actions which are the actual and proximate cause of Sage's damages, which include, but are not limited to the fraudulent taking of the more than $10.8 million and legal fees incurred on account of the activities referenced herein.

## <u>NINTH CLAIM</u>

### COMMON LAW FRAUD
### Against Defendants Razaghi and Hasan

131.     Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 130 above.

132.     A claim for common law fraud requires proof of the following: a representation, its falsity, its materiality, the speaker's knowledge of its falsity or ignorance of its truth, the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated,

the hearer's ignorance of its falsity, the hearer's reliance on its truth, the right to rely on it and consequent and proximate injury.

133.     In this case, Defendants Razaghi and Hasan made a representation on August 27, 2018 when they submitted a written invoice (#1369) to Sage Memorial's accounting department and Hasan verbally directed Hardy (an accounting clerk) to pay the invoice in the amount of $10,855,134.15.  The invoice presented a material fact: that Sage owed Razaghi and RH $10,855,134.15.  At the time the invoice was submitted, both Razaghi and Hasan knew this statement was not true because the very contract they were relying upon (the second amended contract) and citing in the invoice permitted Sage a 30-day curative period.  Indeed, recognizing this fact, Hasan expressed urgency to Hardy that the invoice be paid and he manipulated Sage's accounts, by virtue of his position as CFO, to ensure there would be sufficient money in the general operating account to pay the $10,855,134.15.  All of this was accomplished by Hasan within 90 minutes.  As Hardy's supervisor, notwithstanding that he was merely a contract CFO, Hasan knew that she would act upon his request given the imbalance in their respective positions – she was a clerk and he was the CFO.  When Hardy received the invoice, she was ignorant of its falsity and assumed Hasan was telling her the truth given his position as CFO. Her belief that she must follow his directive given his title and position (and ability to discipline her if she disobeyed) was not unreasonable.  Razaghi and Hasan's fraud was the actual and proximate cause of Sage Memorial's loss of $10,855,134.15.

134.     Razaghi benefited from this fraud and directed Hasan to perpetrate it.  As a result, Sage Memorial has been damaged in excess of $10,855,134.15.

.   .   .

.   .   .

.   .   .

.   .   .

47

1

2

3

**<u>TENTH CLAIM</u>**

**CONSTRUCTIVE FRAUD**

**Against Defendants Razaghi and Hasan**

4

5

135.    Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 134 above.

6

7

8

9

136.    Constructive fraud is a breach of a legal or equitable duty which, irrespective of the moral guilt or intent of the party charged, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Dishonesty of purpose and intent to deceive are not essential elements of constructive fraud.

10

11

12

13

14

137.    Both Razaghi and Hasan stood in a fiduciary relationship to Plaintiff, its BOD and the patients of Sage Memorial hospital.  Razaghi was Plaintiff's CEO and Hasan was its CFO. Both men had complete and total access to Plaintiff's financial and accounting records/systems.  By virtue of their position, both men had authority to access Plaintiff's bank accounts.

15

16

17

18

19

20

21

22

23

24

25

138.    Defendants Razaghi and Hasan made a representation on August 27, 2018 when they submitted a written invoice (#1369) to Sage Memorial's accounting department and Hasan verbally directed Hardy (an accounting clerk) to pay the invoice in the amount of $10,855,134.15.  The invoice presented a material fact: that Sage owed Razaghi and RH $10,855,134.15.  At the time the invoice was submitted, both Razaghi and Hasan knew this statement was not true because the very contract they were relying upon (the second amended contract) and cited in the invoice permitted Sage a 30-day curative period.  Indeed, recognizing this fact, Hasan expressed urgency to Hardy that the invoice be paid and he manipulated Sage's accounts, by virtue of his position as CFO, to ensure there would be sufficient money in the general operating account to pay the $10,855,134.15.  All of this was accomplished by Hasan within 90 minutes.  As Hardy's supervisor, notwithstanding that he was merely a contract CFO,

26

27

28

Hasan knew that she would act upon his request given the imbalance in their respective positions – she was a clerk and he was the CFO.  When Hardy received the invoice, she was ignorant of its falsity and assumed Hasan was telling her the truth given his position as CFO. Her belief that she must follow his directive given his title and position (and ability to discipline her if she disobeyed) was not unreasonable.  Razaghi and Hasan's constructive fraud was the actual and proximate cause of Sage Memorial's loss of $10,855,134.15.

139.    Both Razaghi and Hasan abused their fiduciary duties towards Sage Memorial, its BOD and its patients when they unilaterally withdraw $10,855,134.15 from the hospital's bank account through acts of deception and through abuse of their fiduciary positions, all to the financial detriment of Sage Memorial in the amount of $10,855,134.15.

## ELEVENTH CLAIM

### AIDING AND ABETTING

### Against Defendants Does and Roes

140.    Plaintiff repeats and incorporates by reference each of the allegations set forth in paragraphs 1 through 139 above.

141.    One who counsels, advises, abets or assists the commission of an actionable wrong by another is responsible to the injured person for the <u>entire loss or damage</u>.

142.    In this case, certain parties (to be added at a later date through amendment of this Complaint) were responsible for counseling, advising, abetting, assisting and giving comfort to Razaghi in his brazen and fraudulent taking (conversion) of more than $10.8 million from Sage Memorial.

143.    The Doe and Roe defendants to be added at a later date, once the extent of their actions are fully known and discovered, knew that Razaghi's actions constituted a breach of his

duties towards Sage Memorial and they substantially assisted or encouraged him in the commission of his breach/fraud/conversion.

## **DEMAND FOR JURY TRIAL**

144.    Pursuant to the Seventh Amendment of the Constitution, Plaintiff respectfully invokes its right to a trial by jury on all triable issues implicated by this Complaint.

## **RELIEF REQUESTED**

145.    Wherefore, in light of the foregoing, Plaintiff requests that the Court enter the following relief in this matter:

　　　i.    Set this matter for trial by jury on a date certain;

　　　ii.    Award Plaintiff declaratory and injunctive relief on the terms set forth above;

　　　iii.    Award Plaintiff compensatory, punitive and treble damages in an amount exceeding $30,000,000.00;

　　　iv.    Award Plaintiff interest (prejudgment and postjudgment) on all sums permitted by law;

.   .   .

.   .   .

.   .   .

.   .   .

.   .   .

.   .   .

.   .   .

.   .   .

.   .   .

50

v.     Award Plaintiff reasonable attorney's fees and costs for having to prosecute this matter; and

vi.    Award all other just and proper relief.

Respectfully submitted,

/s/ *Kathleen Bliss*

/s/ *Paul S. Padda*

/s/ *David J. Stander*

_____

Kathleen Bliss, Esq.
Paul S. Padda, Esq.
David J. Stander, Esq.

Counsel for Plaintiff

Dated: February 22, 2019

51