# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

NAVAJO HEALTH FOUNDATION – SAGE )
MEMORIAL HOSPITAL, INC., )
                             )       Case No.: 2:19-cv-00329-GMN-EJY
             Plaintiff, )
    vs. )        **ORDER**
                            )
RAZAGHI DEVELOPMENT COMPANY, )
LLC; AHMAD R. RAZAGHI; TAUSIF )
HASAN, )
                             )
            Defendants. )

Pending before the Court is the Motion to Dismiss, (ECF No. 46), filed by Defendants Tausif Hasan ("Hasan"), Ahmad R. Razaghi ("Razaghi"), and Razaghi Development Company, LLC ("RDC") (collectively, "Defendants"). Plaintiff Navajo Health Foundation – Sage Memorial Hospital ("Sage") filed a Response, (ECF No. 62), and Defendants filed a Reply, (ECF No. 80).

Also pending before the Court is Defendants' Motion to Strike, (ECF No. 47). Sage filed a Response, (ECF No. 61), and Defendants filed a Reply, (ECF No. 79).

Also pending before the Court is Sage's First Motion for Leave to File the First Amended Complaint ("Motion to Amend"), (ECF No. 76). Defendants filed a Response, (ECF No. 88), and Sage filed a Reply, (ECF No. 95). On January 15, 2021, United States Magistrate Judge Elayna Youchah entered a Report and Recommendation ("R&R"), recommending that the Court deny without prejudice the Motion to Amend. (*See* Order and R&R, ECF No. 117). Sage and Defendants filed Objections to the R&R, (ECF Nos. 120–21). The parties filed Responses to the respective Objections, (ECF No. 122, 127).

For the reasons discussed below, the Court **GRANTS** the Motion to Dismiss with leave to amend, **DENIES as moot** the Motion to Strike, and **ADOPTS** the Magistrate Judge's R&R to **DENY without prejudice** the Motion to Amend.

## I.     BACKGROUND

This case arises from Defendants' alleged scheme to defraud Sage of over $10.8 million through Defendants' deceptive acquisition and invocation of a lucrative termination payment provision in the hospital management agreement between RDC and Sage (the "Management Services Contract"), followed by Defendants' billing for services not rendered. (*See generally* Compl., ECF No. 1).  Sage is a federally funded non-profit hospital serving an indigent Navajo Nation community in rural Ganado, Arizona. (*Id.* ¶ 23).  The majority of Sage's operation budget comes from the Indian Health Service ("IHS"), an agency within the U.S. Department of Health and Human Services. (*Id.* ¶ 24).  Principally, Sage alleges that Defendants fraudulently induced Sage's Board of Directors ("BOD") to unwittingly authorize a contractual amendment to the parties' Management Services Contract containing an extremely generous termination payment, which Defendants invoked to siphon $10.8 million from Sage's operating budget. (*See id.* ¶¶ 39–57).  The Court's below discussion provides background on the relationship between Sage and Defendants, up to and including the scheme described in the Complaint.

### A.     Sage Engages Razaghi to Manage Hospital Operations

Pursuant to Sage's bylaws, every member of its BOD must be a member of the Navajo Nation and reside in the community in or around Ganado, Arizona. (*Id.* ¶ 21).  Sometime in 2007, "Razaghi and his brother partnered with a friend, Manuel Morgan ('Morgan'), a member of the Navajo Tribe and former Navajo Nation County Commissioner, to form Morgan & Associates, LLC, a company in which Morgan [held] majority ownership so that the entity could qualify as a Navajo business." (*Id.* ¶ 26).  Sage alleges that Razaghi, leveraging Morgan's

status as a member of the Navajo Nation, persuaded Sage to award Morgan & Associates a management services contract. (*Id.* ¶ 27). Under the terms of this contract, Razaghi would serve as Sage's "Contract CEO." (*Id.*). Sage claims Razaghi subsequently created business entities, including RDC, to supply Sage with medical personnel at a profit. (*Id.* ¶ 28).

On March 18, 2011, RDC[1] entered into the Management Services Contract with Sage's BOD. (*Id.* ¶ 29). This contract replaced Morgan & Associates' contract with the hospital and placed management of Sage under Razaghi and RDC's control. (*Id.*). Sage alleges that this was when the "multiple different schemes to defraud Sage Memorial began through the use of the mail and interstate wires." (*Id.*).

**B.    The First Amendment to the Management Services Contract**

On or about May 17, 2013, Sage's BOD approved a "First Amendment" of the March 18, 2011 Management Services Contract. (*Id.* ¶ 30). "Notably, . . . the [First Amendment to the] contract provided that [RDC] could hire, at Sage Memorial's expense, special counsel to represent . . . Sage Memorial . . . with respect to specific legal matters." (*Id.*) (internal alterations and quotation marks omitted). Razaghi selected Stephen Hoffman ("Hoffman") to serve as RDC's special counsel. (*Id.* ¶ 17). Around this time, non-party Stenson Wauneka ("Wauneka") served as Chairman of the BOD. (*Id.* ¶ 30). Sage alleges Razaghi "developed a close and friendly relationship with Wauneka, meeting with him privately on numerous occasions . . . for which Wauneka would receive a financial benefit following each meeting in the form of an 'honorarium payment.'" (*Id.*).

**C.    Legal Troubles Arise from Defendants' Management**

During RDC's management of Sage, Razaghi and others allegedly lined their pockets at Sage's expense. On October 16, 2014, a group of whistleblowers filed a complaint in the

---

[1] The Court's use of "RDC" is inclusive of allegations concerning predecessor entities such as "Razaghi Healthcare," which the Complaint abbreviates as "RH". (*See* Compl. ¶¶ 28–29).

1   United States District Court for the District of Arizona, alleging Razaghi and others violated the

2   False Claims Act ("FCA"), 31 U.S.C. § 3729. *See* Case No. 3:14-cv-8916-PCT-SRB.  These

3   whistleblowers alleged Razaghi "devised a massive scheme through which he abused his

4   relationship with [Sage] to divert millions of dollars of federal funds provided by federal

5   programs and contracts from Sage to himself" and others. (*Id.* ¶ 32).  In January 2017, after the

6   United States declined to intervene, the whistleblowers voluntarily dismissed the action. (*Id.* ¶

7   33).

8        Around the same time the whistleblower complaint was filed, IHS advised Sage that the

9   federal government would not be renewing its contracts with the hospital. (*Id.* ¶ 34).  On

10  October 23, 2014, Sage sued the Secretary of the U.S. Department of Health and Human

11  Services in the United States District Court for the District of New Mexico, challenging the

12  IHS action and alleging the federal government breached a number of prior contracts from

13  2009 through 2013. (*Id.*); (*See also Navajo Health Foundation – Sage Memorial Hospital, Inc.

14  v. Burwell et al.*, 263 F. Supp. 3d 1083 (D.N.M. 2016)).  On December 16, 2016, the United

15  States agreed to pay $122,500,000.00 to settle the litigation with Sage.  Sage represents that

16  the:

17           settlement document memorializing the parties' agreement provided that payment
18           must be used to fund Indian healthcare services, including ancillary services to the
             hospital or for any other legitimate healthcare purpose.  However, the settlement
19           agreement also expressly prohibited the hospital from providing payment to any
             management company or affiliated entity.  Notably, the agreement also singled out
20           Razaghi by name by further providing that "[i]f Ahmad R. Razaghi or any current
             officer or officer-level employee of a Razaghi-level entity is convicted of a felony
21           crime of fraud related to the management of [the] [h]ospital or any federal health
             care program operated by [the Hospital] within 5 years of the effective date of this
22           Settlement Agreement, IHS may conduct additional monitoring on the expenditure
23           of the Settlement sum . . . ." (*Id.* ¶ 36).

24  //

25  //

**D.      The Second Amendment to the Management Services Contract**

On June 16, 2017, Razaghi allegedly called a BOD meeting at which time Hoffman urged the BOD to approve a "Second Amendment" to RDC's Management Services Contract. (*Id.* ¶ 39).  Sage claims none of the BOD members, with the possible exception of Wauneka, were provided with a copy of the proposed Second Amendment prior to this meeting. (*Id.*). Sage further claims this omission was in contravention of BOD rules and policies that require members be provided with important documents at least twenty-four hours in advance of a meeting so they can conduct meaningful review prior to voting. (*Id.*).  Sage maintains none of the BOD members have any formal legal training or knowledge about contract interpretation and that many BOD members do not speak English as a first or native language. (*Id.*).  Among other things, Section 5.D (the "Termination Payment Provision") of the proposed Second Amendment "bestowed an extremely lucrative 'termination payment' upon Razaghi in the event he terminated the contract or the BOD terminated it for any reason (including for cause). These facts were inexplicably omitted from the BOD." (*Id.* ¶ 40).  In relevant part, Section 5.D(2) of the Termination Payment Provision provides that:

> In the event that this Contract expires, or [RDC] terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to expiration of this Contract for any Reason other than those listed as "cause" in Section 4.A, the Corporation shall, in addition to any other amounts due under this Contract, pay [RDC] a Termination Payment in an amount equal to the average of the amount paid to [RDC] by the Corporation each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration or termination.

(*Id.* ¶ 41) (internal alterations omitted).  In addition to the Termination Payment Provision, the Second Amendment proposed an increase of Razaghi's base hourly compensation from $175 per hour to $495 per hour and stated that the contract would retroactively become effective from July 6, 2016. (*Id.* ¶ 42).  Sage claims Hoffman recommended the BOD approve the Second Amendment without discussing the Termination Payment Provision or the increase in

1    Razaghi's base hourly rate. (*Id.* ¶ 41).  The BOD approved the Second Amendment. (*Id.* ¶ 42).

2    Razaghi, and Wauneka in his capacity as BOD Chairman, then signed the contract. (*Id.*).

3              **E.    The Alleged Termination Payment Scheme**

4              About a year later, Razaghi allegedly began taking steps in furtherance of terminating

5    the Management Services Contract.  On July 11, 2018, Nicole Hardy ("Hardy"), a non-party to

6    this action and an accounts specialist in Sage's finance department, allegedly received an email

7    request from Razaghi conveyed through Tom Matenaer ("Matenaer"), Sage's Controller, to

8    produce a "cost report" for the period from 2014 through 2017. (*Id.* ¶ 45).  Two days later,

9    Hardy emailed the cost report to Matenaer and Sage's staff accountant, Mary Arave ("Arave").

10   (*Id.* ¶ 46).  On July 18, 2018, Razaghi contacted contract CEO Christi El-Meligi ("CEM") and

11   Chief Operating Officer Netrisha Dalgai ("Dalgai") to tell them they were "doing a great job."

12   (*Id.* ¶ 47).  On July 19, 2018, CEM held a meeting with Matenaer and Sage's human resources

13   director to discuss the hospital's obligations to comply with Navajo Nation preferences in

14   employment laws and audit issues related to the finance department. (*Id.* ¶ 48).  On July 20,

15   2018, Razaghi circulated an email advising Sage's staff that CEM would be "re-assigned and . .

16   . removed" from her position. (*Id.* ¶ 49) (internal quotation marks omitted).  That same day,

17   BOD member Ray Ann Terry emailed her fellow board members to request a special meeting

18   to discuss her concerns with the RDC's Management Services Contract and CEM's

19   reassignment/removal. (*Id.*).

20             On July 23, 2018, the BOD convened a special meeting to discuss retaining independent

21   counsel to review RDC's twice-amended Management Services Contract. (*Id.* ¶ 50).  The BOD

22   decided that this independent counsel should not be someone appointed by Razaghi. (*Id.*).

23   Razaghi strongly objected to this decision and requested a copy of the current Sage bylaws and

24   conflict of interest policies over email. (*Id.*).  Notwithstanding Razaghi's protests, the BOD

25   engaged Jeff Davis ("Davis"), of Barnes & Thornburg, LLP, to review the amended

Management Services Contract and Razaghi's relationship with Sage. (*Id.*).  Sometime

thereafter, Razaghi held an emergency meeting with RDC management staff. (*Id.* ¶ 51).

Razaghi allegedly invited Wauneka to attend this meeting but declined to invite the majority of

the other BOD members. (*Id.*).

On August 2, 2018, RDC and Razaghi's counsel mailed and emailed a letter to Wauneka

advising him of the BOD's alleged "prospective breaches and/or interference" regarding the

Management Services Contract. (*Id.* ¶ 52).  In support of their assertions, Defendants' letter

explains "unauthorized communications and actions between certain Board members and

[CEM] and [Dalgai] . . . amounted to contract interference and a material breach of the

[management] contract." (*Id.*) (internal quotation marks omitted).  The letter also states that

"any attempt by the Board to cause the Contract to expire or terminate early will result in

[Sage's] immediate obligation to pay the Termination Payment to [RDC] in accordance with

the Contract, which will be several million dollars." (*Id.*) (internal quotation marks omitted).

Sage notes that RDC's Management Services Contract provides Sage with a thirty-day cure

period in the event of a breach, a fact which allegedly went unmentioned in this letter. (*Id.*)

Accordingly, Sage asserts that to the extent this August 2, 2018 letter served as notification of

the BOD's prospective breach, the BOD would have had until September 2, 2018 to cure that

breach under the terms of the Management Services Contract. (*Id.*).

On August 13, 2018, Wauneka emailed Davis and two other BOD members, copying

Razaghi on the message, stating: "I believe we are at a point in time where the question is

whether the Board wants to continue its relation with Razaghi Development Company, LLC."

(*Id.* ¶ 53).  Davis responded to this email by writing, in part:

> I would respectfully disagree with your statement that the Board is [at] a point
> where the question is whether the Board wants to continue its relationship with
> Razaghi Development Company.  Quite the contrary, I have had the pleasure of
> talking with other Board members and they are ready and willing to work with all
> and invigorate the Board so that it is an equal partner in insuring [sic] that

members of the Navajo Nation are provided services by Sage Memorial Hospital
received the best possible medical treatment and programs at a cost-efficient
medical facility.

On August 20, 2018, the BOD held an executive session meeting with Davis and Sage

Memorial's independent financial auditor Heather Gretch ("Gretch").  (*Id.* ¶ 54).  The

BOD, Davis, and Gretch allegedly discussed the Management Services Contract,

payments made to RDC, and the decision to not approve an incentive bonus for Razaghi

that year. (*Id.*).

On August 27, 2018, Hardy received a telephone call from Defendant Hasan, Sage's

contract Chief Financial Officer and an employee of RDC, requesting status and payment of

three invoices sent earlier that morning. (*Id.* ¶¶ 10, 55(b)).  Hardy reviewed the three invoices,

which totaled $11,048,517.71. (*Id.* ¶ 55(b)).  One of the invoices, Invoice #1369, referenced a

"Contract Termination Fee, Section 5.D" of $10,855,134.15 (the "$10.8 million"). (*Id.*) (*See

also* Invoices, Ex. B to Compl., ECF No. 1-2 at 2).  The only supporting document allegedly

attached to this Invoice was Hardy's July 16, 2018 cost report that Razaghi had requested. (*Id.*).

Apprehensive about inputting an invoice for such a large amount, Hardy discussed appropriate

next steps with her supervisor, Arave, and Arave's supervisor, Matenaer. (*Id.*).  Matenaer said

he would speak to Hasan about the matter. (*Id.*).  When Hardy returned to her desk after taking

a break, she noticed that Matenaer had emailed Hasan about Invoice #1369. (*Id.* ¶ 55(c)).

Hardy also saw that Hasan had left her a voice message instructing her to call him back

immediately. (*Id.*).  "Upon returning his call, Hardy was ordered by Hasan to immediately input

the invoices into the system for payment and to code the payment for [I]nvoice #1369 as

'Management Services Fees.'" (*Id.*).  Hardy complied and uploaded the Invoice into Sage's

payment system. (*Id.* ¶ 55(d)).  Thereafter, Hasan purportedly accessed Sage's system to

transfer $500,000.00 from Sage's IHS Funding Account and $10,855,000.00 from the

hospital's Third-Party Revenue Account to Sage's General Operating Account to cover the

$10.8 million invoice. (*Id.* ¶ 55(f)).  Hasan then approved the $10.8 million payment to RDC. (*Id.* ¶ 55(g)).

On August 29, 2018, Razaghi sent a physical letter addressed to the BOD expressing his "concerns over the state of the Board of Directors," and notified the BOD that attorney Davis has "no authority [to] represent Navajo Sage under governing Navajo law and will not be paid." (*Id.* ¶ 56); (*see also* Memorandum Re: Recent Activities of Board of Directors or Individual Members Thereof, Ex. C to Compl., ECF No. 1-3 at 2).  Razaghi also stated that Sage's management would communicate with the BOD "only through the Chairperson[, Wauneka,] or the Board's authorized legal counsel," Hoffman. (*Id.*).  This letter did not disclose that Razaghi had withdrawn more than $10 million from Sage's Operating Account two days prior or that he had purportedly terminated the agreement to manage Sage. (*Id.*).

**F.    Alleged Subsequent "Invoice Fraud"**

Razaghi and RDC continued to send Invoices to Sage for services allegedly never rendered including, but not limited to:

> a. September 11, 2018 (invoice #1370) in the amount of $31,678.32 for credit card, legal and executive leadership services;
> b. September 6, 2018 (invoice #1371) in the amount of $74,448.08 for management incentive services fee;
> c. September 6, 2018 (invoice #1372) in the amount of $129,986.76 for management consulting services;
> d. September 6, 2018 (invoice #1373) in the amount of $106,120.38 for executive leadership, legal and professional services;
> e. October 4, 2018 (invoice #1374) in the amount of $156,694.93 for management consulting services (with interest charges);
> f. November 1, 2018 (invoice #1382) in the amount of $129,331.55 for management consulting services (with interest charges);
> g. November 27, 2018 (invoice #1383) in the amount of $511.395.11 for management consulting services for "transition period" (with interest charges);
> h. December 1, 2018 (invoice #1384) in the amount of $443,996.71 (with interest charges) for "legal and professional expenses[]"[; and,]
> i. January 2, 2019 (invoice #1385) in the amount of $235,873.85 (with interest charge[s]) for "management consulting services" and "incentive fees[.]"
> (Compl. ¶ 57).

1    Sage's Complaint seeks compensatory and treble damages for injuries to its business and

2    property allegedly caused by Defendants' racketeering activity in violation of the federal

3    Racketeer Influenced and Corrupt Organizations Act ("RICO"), companion Nevada

4    racketeering statutes, and various state common law claims. (*Id.* ¶¶ 58–143).  Sage also seeks

5    declaratory and injunctive relief. (*Id.* ¶ 145).

6  **II.    LEGAL STANDARD**

7     **A.    12(b)(1)**

8       Rule 12(b)(1) of the Federal Rules of Civil Procedure permits motions to dismiss for

9    lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  When subject matter jurisdiction is

10   challenged, the burden of proof is placed on the party asserting that jurisdiction exists. *Scott v.*

11   *Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (holding that "[t]he party seeking to invoke the

12   court's jurisdiction bears the burden of establishing that jurisdiction exists").  Accordingly, the

13   court will presume lack of subject matter jurisdiction until the plaintiff proves otherwise in

14   response to the motion to dismiss. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

15   377 (1994).

16      A motion to dismiss under Rule 12(b)(1) may be construed in one of two ways.

17   *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  It

18   may be described as 'facial,' meaning that it attacks the sufficiency of the allegations to support

19   subject matter jurisdiction. *Id.*  Alternatively, it may be described as 'factual,' meaning that it

20   "attack[s] the existence of subject matter jurisdiction in fact." *Id.*  When, as here, a court

21   considers a 'facial' attack made pursuant to Rule 12(b)(1), it must consider the allegations of

22   the complaint to be true and construe them in the light most favorable to the plaintiff. *Love v.*

23   *United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).

24   //

25   //

1    **B.    12(b)(6)**

2       Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

3    that fails to state a claim upon which relief can be granted. *See N. Star Int'l v. Ariz. Corp.*

4    *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule

5    12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not

6    give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.

7    *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the

8    complaint is sufficient to state a claim, the Court will take all material allegations as true and

9    construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792

10   F.2d 896, 898 (9th Cir. 1986).

11      The Court, however, is not required to accept as true allegations that are merely

12   conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

13   *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action

14   with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a

15   violation is *plausible*, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

16   *Twombly*, 550 U.S. at 555).

17      A court may also dismiss a complaint pursuant to Federal Rule of Civil Procedure 41(b)

18   for failure to comply with Federal Rule of Civil Procedure 8(a). *Hearns v. San Bernardino*

19   *Police Dept.*, 530 F.3d 1124, 1129 (9th Cir. 2008). Rule 8(a)(2) requires that a plaintiff's

20   complaint contain "a short and plain statement of the claim showing that the pleader is entitled

21   to relief." Fed. R. Civ. P. 8(a)(2). Furthermore, the Supreme Court has rejected any sort of

22   "heightened" pleading requirement for § 1983 municipal liability claims because such a

23   heightened pleading standard cannot be "square[d] . . . with the liberal system of 'notice

24   pleading' set up by the Federal Rules." *Leatherman v. Tarrant Cty. Narcotics Intelligence &*

25   *Coordination Unit*, 507 U.S. 163, 164 (1993).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion . . . . However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted).  Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss becomes a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The rule requires that claims of fraud be accompanied by the "who, what, when, where, and how" of the conduct charged, *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)), so that the complaint may not simply "lump multiple defendants together." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).  In other words, the complaint "must include 'an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quoting *Swartz v. KPMG, LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)) (internal quotations omitted).  Rule 9(b)'s particularity requirement ensures that the defendants are on "notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (internal quotations omitted).

If the court grants a motion to dismiss, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of . . . the amendment, [or] futility of the amendment . . . ." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

### C.    Report and Recommendation

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." *Id.*

### D.    Motion to Strike

The Court may strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[T]he function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial. . . ." *Sidney–Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion. *Cal. Dept. of Toxic Substances Control v. Alco Pacific, Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002). However, federal courts disfavor motions under Rule 12(f) and generally view them as a drastic remedy. *See, e.g., Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 923 (N.D. Cal. 2012); *Mag Instrument, Inc. v. JS Products Inc.*, 595 F. Supp. 2d 1102, 1006 (C.D. Cal. 2008); *Sorenson v. Countrywide Home Loans, Inc.*, 2010 WL 308794, at *2 (E.D. Cal. Jan. 12, 2010). "If the court

1  is in doubt as to whether challenged matter may raise an issue of fact or law, the motion to

2  strike should be denied, leaving an assessment of the sufficiency of the allegations for

3  adjudication on the merits." *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D.

4  Cal. 2011) (citing *Whittlestone, Inc. v. HandiCraft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)).

5  ## III.    DISCUSSION

6  The Court first addresses Defendants' Motion to Dismiss because the Court's analysis

7  applies with equal force to the sufficiency of the proposed First Amended Complaint.  The

8  Court then turns to the Motion to Strike and Motion to Amend.

9  ### A.    Motion to Dismiss

10  Sage's Complaint raises the following causes of action: (1) declaratory and injunctive

11  relief against all Defendants; (2) Federal RICO violations under 18 U.S.C. § 1962(c) against

12  Razaghi and Hasan; (3) Federal RICO Conspiracy in violation of 18 U.S.C. § 1962(d) against

13  Razaghi and Hasan; (4) Nevada Civil RICO in violation of NRS 207.400(1)(c) against Razaghi

14  and Hasan; (5) Nevada Civil RICO Conspiracy in violation of NRS 207.400(1)(c) and

15  207.400(j) against Razaghi and Hasan; (6) Conversion against Razaghi and Hasan; (7) Civil

16  Conspiracy against Razaghi and Hasan; (8) Tortious Interference with Contract against

17  Razaghi; (9) Common Law Fraud against Razaghi and Hasan; (10) Constructive Fraud against

18  Razaghi and Hasan; and (11) Aiding and Abetting against unnamed Defendants.  The Court

19  addresses the sufficiency of the allegations in support of each cause of action below.

20  ### i.    Declaratory and Injunctive Relief

21  Defendants argue that the Court should dismiss Sage's first claim for declaratory and

22  injunctive relief because there is no separate claim available for the relief at law. (MTD 10:25–

23  11:2, ECF No. 46).  They contend that the claim is superfluous because there is no cause of

24  action pleaded for which declaratory relief could be granted, and the claim is an inappropriate

25  vehicle to seek review of the legality of Defendants' past conduct. (*Id.* 11:12–26).  Defendants

further argue that even if Sage could assert an independent claim for declaratory relief, the claim is insufficiently pleaded. (*Id.* 11:27–12:11). Sage's Response does not address the claim. (*See* MTD Resp., ECF No. 62). As Sage has effectively conceded its Complaint does not and cannot adequately allege an independent claim to declaratory relief, the Court dismisses the claim with prejudice. *Cf. Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).

### ii. Federal RICO – 18 U.S.C. 1962(c)

"To state a civil RICO claim, plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.'" *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) (citing 18 U.S.C. § 1964(c)). The Ninth Circuit has recognized that the heightened pleading standards applicable to fraud claims under Rule 9(b) apply to a RICO action alleging predicate acts of fraud. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).

Defendants seek dismissal of Sage's RICO claim, arguing: (1) Sage has not alleged cognizable injury in fact sufficient to confer standing;[2] and (2) Sage has failed to adequately allege a RICO enterprise, predicate acts, or a pattern of racketeering activity. (MTD 12:14–19:13).

### 1. *Article III Standing*

Defendants argue that the Court should dismiss Sage's federal RICO claims on standing grounds because Sage has not suffered an injury in fact. (MTD 13:5–14:3). They contend that because RDC was contractually entitled to the $10,855,134.15 termination fee, the only wrong alleged against Defendants derives from transferring the funds six days before the expiration of

---

[2] In the Motion to Dismiss, Defendants contextualize their standing argument only to RICO. (*See* MTD 12:14–14:13). However, in their Reply, they seek to apply the argument to all of Sage's damages claims. (*See* MTD Reply 2:24–26, ECF No. 80). As the Court finds adequate allegations in support of standing, the Court need not resolve the scope of Defendants' standing argument.

the cure period. (*Id.*).  Sage responds that Defendants engaged in a "scheme to defraud" Sage, contracted for the Termination Payment Provision through a "suspect and secretive process," directed the payment without notifying Sage of the applicable "cure period," and therefore Sage sustained damages as a result of the payment. (MTD Resp. 7:5–20).

The parties do not dispute that conduct causing a business financial loss satisfies the injury-in-fact requirement; rather, they dispute whether Sage has alleged that it suffered financial loss. (*See* MTD 13:6–15); (MTD Resp. 7:11–14).  Here, Sage alleges that Defendants engaged in fraud to procure the Termination Payment Provision, which allegedly nullifies Defendants' right to payment under the same. (*See* Compl. ¶¶ 39–57).  As the alleged damages under the RICO claim do not derive from the failure to provide the opportunity to cure, Sage has adequately alleged financial injury to its business sufficient to confer standing.

## 2. *Enterprise*

Defendants argue that Sage has not adequately alleged an enterprise with particularity under Rule 9 because the alleged enterprise includes unnamed persons. (MTD 14:28–15:10).  Sage notes that the Motion to Dismiss only contests the sufficiency of the alleged "association in fact" enterprise containing unnamed persons.  However, Sage notes that the Complaint alleges that RDC, as a legal entity, is an enterprise consisting of Razaghi, as its sole owner, with Hasan, as its senior consultant, who collectively "managed the affairs of [RDC]." (MTD Resp. 7:23–8:6); (Compl. ¶ 68).

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  "As is evident from the text, this definition is not very demanding. . . . a single 'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal entity' are all enterprises." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (en banc).

1    Here, Sage adequately alleges that RDC is an "enterprise" within the meaning of the

2    RICO statute.  The Complaint alleges that RDC is a legal entity described by the RICO statute,

3    consisting of Razaghi as its sole owner, and Hasan, an employee. (Compl. ¶¶ 8, 68).  The

4    allegation is sufficient to plausibly demonstrate the existence of an enterprise. *See* 18 U.S.C. §

5    1961(4); *Odom*, 486 F.3d at 541.

### 3.  *Predicate Acts*

7    Defendants argue that Sage has not sufficiently alleged predicate acts of mail and wire

8    fraud to sustain a RICO claim. (MTD 15:13–17:15).  Defendants argue that several of the

9    alleged predicate acts were undertaken by persons who are not alleged to be members of the

10   enterprise. (*Id.* 15:21–16:14).  Additionally, Defendants argue that the alleged acts are not

11   unlawful given that they concern invocation of contractual provisions. (*Id.* 16:15–17:15).  Sage

12   responds that it has alleged multiple communications that RDC enterprise members or agents

13   sent with the specific intent to defraud Sage. (MTD Resp. 10:23–11:9).  Sage argues that the

14   communications are consistent with the adequately alleged scheme to defraud. (*Id.* 12:1–

15   13:16).  Sage also argues that the enterprise can be liable for causing communications sent by

16   non-parties, and the subject communications need not contain misrepresentations if they are

17   essential to a fraudulent scheme. (*Id.* 11:10–27).

18   Predicate "racketeering activity" is prescribed by statute and includes both "mail fraud"

19   and "wire fraud." *See* 18 U.S.C. § 1961(1) (citing 18 U.S.C. §§ 1341, 1343).  "The mail and

20   wire fraud statutes are identical except for the particular method used to disseminate the fraud,

21   and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails

22   or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Elec. Props.*

23   *East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  Further, because

24   RICO claims involve underlying fraudulent acts, Federal Rule of Civil Procedure 9(b)'s

25   heightened pleading standard applies to the allegations. *Edwards v. Marin Park, Inc.*, 356 F.3d

1058, 1065–66 (9th Cir. 2004); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  Thus, to sufficiently plead its RICO claim, a plaintiff must specify the time, place, and content of the alleged underlying fraudulent acts and statements, as well as the parties involved and their individual participation. *Edwards*, 356 F.3d at 1066.

The Complaint alleges that the enterprise sent the following mail and wire communications in furtherance[3] of Defendants' intent to fraudulently receive the termination payment:

- Razaghi, through counsel, solicited a "cost report" for 2014–2017 from Nicole Hardy, a Sage accounts specialist in the finance department, via email on July 11, 2018, which Razaghi later used as documentation in support of the invoiced termination payment. (Compl. ¶¶ 45, 55(b), 77(a)).

- Razaghi circulated an email to Sage staff on July 20, 2018, that CEM and Dalgai would be "re-assigned and would be removed" from their positions at Sage the day after CEM raised concerns with Sage's human resources department regarding Sage's compliance with Navajo Nation preferences in employment law as well as audit issues related to the finance department. (Compl. ¶¶ 47–49, 77(c)).

- Razaghi, via email, requested a copy of Sage's bylaws and conflict of interest policy in an attempt to prevent the Sage BOD from retaining independent counsel not appointed by Razaghi to review the Management Services Contract. (Compl. ¶¶ 50, 77(d)).

---

[3] Defendants' argument concerns the *contents* of the statements, not whether Sage has adequately alleged an underlying scheme to defraud for which the above-alleged communications are in furtherance. (*See* MTD 16:13–17:15) (arguing only that the alleged communications sought payment authorized by contract, but failing to dispute whether Sage has adequately alleged the underlying contract were procured by fraud).  However, the Court is not persuaded that the underlying scheme to defraud is sufficiently alleged under Rule 9.  While Defendants did not raise the argument in the context of Sage's RICO claim, Defendants raise similar arguments regarding the common law claims.  The Court therefore addresses the issue later in this Order.

- RDC, through counsel by mail and email, wrote to the chairman of the BOD on August 2, 2018, notifying him of Sage's "prospective breaches and/or interference" with the Management Services Contract. (Compl. ¶¶ 52, 77(e)).

- Razaghi received $10.8 million from Sage after having Hasan, via email and phone conversation, direct a Sage employee to upload the invoice, and Hasan, as Sage contract CFO, approved the invoice. (Compl. ¶¶ 55, 77(g)).

- Even after Defendants had apparently terminated the Management Services Contract, Defendants allegedly submitted nine invoices to Sage from September 11, 2018, through January 2, 2019 for services that were allegedly never rendered. (Compl. ¶ 57, 77(l)).

Even if the allegations of mailings or wires by third parties but caused by the enterprise failed to support a claim, which is not the case, the allegations of predicate acts sent by members of the enterprise are sufficient to state a claim. *See Pereira v. United States*, 347 U.S. 1, 9 (1954) (indicating that a RICO-defendant causing a third-party to commit a predicate act is sufficient to attribute the predicate to the defendant). The allegations plausibly show who within the enterprise sent mailings or wires, when the mailings or wires were sent, and the content of the mailings or wires that Defendants sent to Sage in an attempt to receive $10.8 million in funds from Sage. *See Edwards*, 356 F.3d at 1065–66 (explaining the necessary factual allegations to state RICO predicates sounding in fraud). Sage further alleges that the communications were part of a larger scheme to siphon funds from Sage, which began when Defendants fraudulently induced the BOD to ratify the Termination Payment Provision that authorized Defendants to demand the funds. (Compl. ¶¶ 38–42). Given the communications' centrality to the alleged broader conspiracy involving a fraudulently procured contract, it is immaterial that Defendants sent the communications to request payment pursuant to the parties' Management Services Contract. *Bridge*, 553 U.S. at 647 (explaining that "any mailing that is incident to an essential part of the scheme [to defraud] satisfies the mailing element even if the

1    mailing itself contains no false information.") (internal quotations, citations, and modifications

2    omitted); 18 U.S.C. § 1341 (explaining that mail fraud occurs when a person "having devised

3    or intending to devise any scheme or artifice to defraud" employs the mail "for the purpose of

4    executing such scheme or artifice or attempting to do so.").  Accordingly, the Court finds that

5    the Complaint plausibly alleges that Defendants engaged in predicate acts of mail and wire

6    fraud actionable under the RICO statute.

7                              4.  *Pattern of Racketeering Activity*

8            Defendants argue that even if Sage has alleged predicate acts, it has not demonstrated a

9    pattern of racketeering activity. (MTD 17:17–19:13).  More specifically, Defendants contend

10   Sage has not alleged continuity between the purported predicate acts of racketeering. (*Id.*).

11           A "pattern of racketeering activity" requires "at least two acts of racketeering activity,

12   one of which occurred after the effective date of this chapter and the last of which occurred

13   within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. §

14   1961(5).  While two predicate racketeering acts, as described in § 1961(1), "are necessary" to

15   plead a civil RICO claim, "they may not be sufficient." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S.

16   229, 237–38 (1989) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14

17   (1985)).  There is more to showing a "pattern" of racketeering activity than "simply [pointing

18   to] the number of predicate acts involved." *Id.* at 238.  A pattern requires that the acts have "the

19   same or similar purposes, results, participants, victims, or methods of commission, or otherwise

20   are interrelated by distinguishing characteristics. . . ." *Sun Sav. and Loan Ass'n v. Dierdorff*,

21   825 F.3d 187, 192 (9th Cir. 1987) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 n.14

22   (1985)).

23           A "pattern" of racketeering activity is established by two requisite elements, relatedness

24   and continuity, where continuity need not be alleged with certainty to overcome a motion to

25   dismiss. *H. J., Inc.*, 492 U.S. at 239, 250.  The continuity element has two types: closed-ended

and open-ended. *Id.* at 241. If either type is plausibly identified by the allegations, continuity is adequately alleged. *Id.* Generally, closed-ended continuity refers to repeated conduct over a specifically defined period of time; whereas, open-ended continuity refers to the threat of continued racketeering activity. *Id.* at 241–42.

With respect to the alleged pattern, the Court finds that Sage has adequately alleged the predicate acts are related. The mailings and wire communications were allegedly executed to improperly receive funds from Sage pursuant to the fraudulently procured Management Services Contract. The Court next considers whether Sage has adequately alleged either possible theory of continuity between the predicate acts.

### a. Closed-Ended Continuity

A plaintiff may allege closed-ended continuity through a single scheme to defraud "so long as the predicate acts involved are not isolated or sporadic." *Kearny v. Foley & Lardner*, 607 F. App'x 757, 759 (9th Cir. 2015) (quoting *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004); *Sun Sav. and Loan Ass'n*, 825 F.2d at 193–94; *see also Turner*, 362 F.3d at 1230 ("multiple criminal episodes are not required to establish a pattern of racketeering under RICO."). While closed-ended continuity requires that the alleged predicate acts have occurred over a "substantial period of time," there is no rigid time requirement for the duration of the alleged scheme. *Allwaste v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1993) (rejecting a bright line, one-year rule).

Generally, if alleged conduct only "extend[ed] over a few weeks or months," the allegations do not support a theory of closed-ended continuity. *H.J. Inc.*, 492 U.S. at 242. While the Ninth Circuit has rejected a one-year per se rule, if the alleged conduct occurred over a period under one year, then a scheme involving a limited number of participants and a limited number of victims is insufficient to establish closed-ended continuity. *See Kan-Di-Ki, LLC v. Sorenson*, 723 F. App'x 432, 434 (9th Cir. 2018)

Sage has not adequately alleged that the predicate acts occurred over a substantial period of time. While the Complaint contends that "the Razaghi-Hasan Enterprise has been ongoing since at least 2011," Sage's Response explains that Defendants' pattern of racketeering activity, which was a "scheme to collect on the so-called 'termination fee clause'," began via email "in July 2018." (*Compare* Compl. ¶¶ 80–81); (*with* MTD Resp. 15:9–14). The Complaint alleges that Defendants collected the termination payment through wire communications on August 29, 2018. (Compl. ¶ 77(g)). Although there is no rigid time requirement to establish a pattern of racketeering activity, the Ninth Circuit has indicated that two months is insufficient to allege closed-ended continuity. *See Kearney*, 607 F. App'x at 759 n.1 (explaining that, with allegations spanning approximately three months, "[u]nder *H.J. Inc.*, the *Sun Savings* plaintiff could not have demonstrated that the harm amounted to a substantial period for closed-ended continuity because of the short duration of time. . . ."). As the alleged predicate acts procuring the $10.8 million payment occurred over a period of two months, the allegations are alone insufficient to plausibly allege a pattern of racketeering activity.

The question remains whether the subsequent allegations of wire fraud—the nine invoices sent from September 6, 2018, through January 2, 2019, in combination with the above-described scheme, plausibly demonstrate closed-ended continuity. (*See* Compl. ¶ 57, 77(l)). They do not as presently pleaded. The alleged scheme contained two defendants, Razaghi and Hasan, and one victim, Sage. Given the limited number of participants in the enterprise and a single victim, a series of predicate acts from August 29, 2018 to January 2, 2019—a period of slightly more than four months—does not demonstrate continuity sufficient to establish a pattern of racketeering activity through closed-ended continuity. *Cf. Kan-Di-Ki, LLC*, 723 F. App'x at 434. The Court next considers whether Sage has plausibly alleged a pattern of racketeering activity through open-ended continuity.

//

*b. Open-Ended Continuity*

"Open-ended continuity is shown by 'past conduct that by its nature projects into the future with a threat of repetition,' i.e., predicate acts that specifically threaten repetition or that become a 'regular way of doing business.'" *Allwaste*, 65 F.3d at 1528 (quoting *H.J. Inc.*, 492 U.S. at 241–42).

As presently pleaded, the Complaint does not indicate that the enterprise is continuing to defraud Sage. However, in Sage's Response, it contends that Defendants continue to send Sage fraudulent wire requests for services that have not been rendered. (MTD Resp. 17:14–23). Accordingly, while Sage has not yet plausibly alleged a pattern of racketeering activity, it seems the Complaint could be amended to plausibly allege a pattern through open-ended continuity. Therefore, the Court dismisses Sage's RICO claim with leave to amend.

### iii. Federal RICO Conspiracy – 18 U.S.C. 1962(d)

Defendants argue that the Court should dismiss the RICO conspiracy claim because the underlying RICO claim is insufficiently pleaded. (MTD 19:16–27). The Court agrees. As the Court has dismissed Sage's underlying claim, the Court likewise dismisses the conspiracy claim with leave to amend.

### iv. Nevada Civil RICO – NRS 207.400(1)(c)

Defendants argue that the Court should dismiss Sage's Nevada RICO claims because they are subject to the same grounds for dismissal as the corollary federal RICO claims. (MTD 20:2–8). Additionally, Defendants argue that the claims must be dismissed because, as none of the predicate acts allegedly took place within Nevada, the acts are outside the Nevada RICO statute's territorial scope. (*Id.* 20:9–28). Sage's Response does not contend that it has alleged predicate acts taking place in Nevada. (*See* MTD Resp. 18:7–21).

Although the Court agrees that the claim should be dismissed for the same reason as the federal claim, the Court also finds that Sage has not plausibly alleged that any of the predicate

1  acts occurred within Nevada.  (*See* R&R 20:23–21:23) (explaining why Sage has failed to

2  adequately allege Ahmad or Hasan committed acts that subject them to criminal liability in

3  Nevada).[4]  As the Nevada RICO statute only extends to activity affecting commerce in Nevada,

4  the Complaint is insufficiently pleaded.  However, given that Sage could amend its Complaint

5  to cure the deficiencies identified herein, the Court dismisses the claim with leave to amend.

6                          v.   Conversion[5]

7          "Arizona has adopted the definition of conversion contained in the Restatement

8  (Second) of Torts § 222A(1) (1965): an intentional exercise of dominion or control over a

9  chattel which so seriously interferes with the right of another to control it that the actor may

10  justly be required to pay the other the full value of the chattel." *Universal Mktg. & Enter., Inc.*

11  *v. Bank One of Ariz., N.A.*, 53 P.3d 191, 193 (Ariz. Ct. App. 2002).  Mere interference does not

12  support a claim to conversion; rather, the requisite substantial interference requires hostility.

13  *Focal Point v. U-Haul Co.*, 746 P.2d 488, 489–90 (Ariz. Ct. App. 1986).  To determine the

14  seriousness of the alleged interference, the court must consider: (1) the extent and duration of

15  the alleged control over the property; (2) defendant's intent to assert a right to control the

16  property; (3) the extent and duration of the resulting interference with plaintiff's right of

17  control; (4) damage done to the property; and (5) inconvenience and expense caused to

18  plaintiff. *See Focal Point v. U-Haul Co.*, 746 P.2d 488, 490 (Ariz. Ct. App. 1986) (citing

19  Restatement (Second) of Torts § 222(A)(2).  "The proper plaintiff in a conversion action is one

20  'who had the right to immediate possession of the chattel at the time of the alleged

21  conversion.'" *Universal Mktg. & Enter., Inc.*, 53 P.3d at 193.

22

23  _____

24  [4] The Court more thoroughly addresses the jurisdictional issues of the Nevada RICO claims when discussing the R&R later in this Order.

25  [5] The parties agree that Sage's remaining claims, which all arise at common law, are subject to Arizona substantive law. (*See* MTD 9:14–10:16); (MTD Resp. 19:24–23:13).

1   Defendants' response to Sage's conversion claim is substantially similar to its RICO

2   standing argument; Defendants did not "seriously interfere" with Sage's property because they

3   had a contractual right to the property. (MTD 21:1–21).  Sage contends that being deprived of

4   approximately $10.8 million meant to go to patient services sufficiently alleges a substantial

5   interference with the funds. (MTD Resp. 18:23–19:22).

6   The Court finds that Sage has not adequately alleged that Defendants "substantially

7   interfered" with the $10.8 million.  First, Sage's theory of recovery is not clear from the

8   Complaint; the claim does not explain whether Defendants engaged in conversion by acquiring

9   the funds pursuant to a fraudulently procured contract, or if its theory is predicated upon the

10  disposition of funds prior to the expiration of the cure period. (*See* Compl. ¶¶ 117–120).

11  Second, assuming the latter theory of recovery, given the claim emphasizes the date of the

12  transfer but does not reference the alleged invalidity of the underlying contract, Sage has not

13  adequately alleged Defendants substantially interfered with its right of control.  The short, six-

14  day duration of the alleged interference, the lack of any damage to the funds, and the absence of

15  any inconvenience associated with the premature processing thereof render Sage's pleading

16  implausible.  While Sage contends that it had to cover the payment by transferring funds from

17  other accounts to its operating account, Sage does not express what, if any, affect the transfers

18  had on hospital function.  Accordingly, if Sage's theory is only that Defendants committed

19  conversion by prematurely transferring the funds, the allegations do not state a claim upon

20  which relief may be granted.  The Court therefore dismisses the claim without prejudice.

21                    vi.  Tortious Interference with Contract

22  Sage's tortious interference claim alleges that Defendants interfered with a contract

23  between Sage and the federal government following resolution of the *Burwell* litigation.

24  (Compl. ¶ 127).  The claim alleges that the agreement indicated that if Razaghi or one of its

25  affiliates were convicted of fraud related to hospital management within five years of the

settlement, IHS would conduct scrutiny over how Sage expended the funds paid in the settlement. (*Id.*).  Defendants seek dismissal of Sage's tortious interference claim because Sage has not alleged facts in support of any alleged tortious interference with the agreement. (MTD 22:18–23:13).  Put differently, Defendants contend that Sage has not alleged facts indicating conduct of Defendants that caused IHS to put Sage under additional scrutiny. (*Id.* 23:4–13).  Defendants also argue that Sage has not adequately alleged damages in support of the claim. (*Id.*).  Sage's response disregards the IHS contract referenced in the Complaint and instead contends that it has adequately alleged tortious interference with the Management Services Contract between Sage and RDC. (MTD Resp. 20:19–21:7).[6]

In Arizona, a tortious interference with contract claim must allege "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Wells Fargo*, 38 P.3d at 31.  Arizona courts also recognize a claim for tortious interference where the defendant has not caused a breach, but has made the plaintiff's performance "more expensive or burdensome." *Plattner v. State Farm Mut. Auto. Ins. Co.*, 812 P.2d 1129, 1134 (Ariz. Ct. App. 1991) (citing Restatement (Second) of Torts, § 766A (1979)).  In order to show that the defendant acted improperly, a plaintiff must show that defendant's conduct was "wrongful by some measure beyond the fact of the interference itself." *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 212 (Ariz. 1986).  In other words, a plaintiff must allege that the defendant's conduct was motivated by ill will, undertaken in bad faith, or otherwise contrary to public policy. *See* Restatement (Second) of Torts § 767, cmt. d.

---

[6] The Court's analysis considers the claim raised in the Complaint, not a version of the theory that may have been raised.

1    Sage has not plausibly alleged a tortious interference claim. Sage contends that the

2    withdrawal of the termination payment "has invited scrutiny from federal authorities which

3    have, upon information and belief, began inquiry/investigation into the conduct at issue in this

4    lawsuit as well as related matters." (Compl. ¶ 128). Sage has not alleged that it has incurred

5    any expense or burden through the alleged investigation. Rather, the potential burden is

6    speculative, and the relevant contractual provision that would authorize the IHS to scrutinize

7    Sage's transactions depends on an indictment and conviction that have not materialized.

8    Accordingly, the Court dismisses the claim without prejudice.

9    vii.  Common Law and Constructive Fraud

10    Sage alleges that Defendants' invoice for the Termination Payment contained a false

11    misrepresentation of material fact because Sage did not yet owe the balance on the invoice as

12    its cure period had not yet lapsed. (Compl. ¶ 133). Defendants argue that Sage's common law

13    fraud claims should be dismissed because they neither allege facts supporting the materiality of

14    the alleged misrepresentation, nor that the alleged misrepresentation resulted in consequent and

15    proximate injury. (MTD 23:16–24:4). Sage's response asserts, without explanation, that it has

16    alleged sufficient facts in support of the elements of the claim. (MTD Resp. 21:1–26).

17    "A fraud claim, under Arizona law, requires proof of nine elements: (1) a representation;

18    (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its

19    truth; (5) the speaker's intent that it be acted upon by the recipient in a manner reasonably

20    contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's

21    reliance on the truth of the representation; (8) the right to rely on it; and (9) consequent and

22    proximate injury." *McManus v. Am. Express Tax & Bus. Servs.*, 67 F. Supp. 2d 1083, 1089 (D.

23    Ariz. 1999).

24    The Court agrees that Sage has not adequately alleged a claim. Sage's allegations do not

25    demonstrate the materiality of the alleged misrepresentation because there is no indica that

1    Hardy would not have completed the invoice had Hasan informed her of the remaining time in

2    the cure period.  Sage's allegations indicate the opposite; Hardy processed the payment because

3    Hasan demanded it and there was a significant power imbalance between the two. (*See* Compl.

4    ¶ 133) ("As Hardy's supervisor, notwithstanding that he was merely a contract CFO, Hasan

5    knew that she would act upon his request given the imbalance in their respective positions – she

6    was a clerk and he was the CFO.").  Additionally, even if the payment was not yet due for an

7    additional six days, there is no allegation explaining how Sage was injured through premature

8    execution of the Termination Payment Provision.  Accordingly, the Court dismisses the claim

9    with leave to amend.

10                              viii.   Civil Conspiracy

11           Defendants argue that the Court should dismiss Sage's civil conspiracy claim because

12   Sage has not adequately alleged and underlying tort, and, under Arizona law, employees or

13   agents of a corporation cannot be liable for conspiring on behalf of their corporate principal and

14   not for the individual's advantage. (MTD 21:21–22:16).  Sage responds that the conspiracy

15   alleged against the individual Defendants fell outside the scope of any legal or fiduciary

16   obligation to RDC. (MTD Resp. 19:25–20:17).

17           "While Arizona does not recognize a civil action for conspiracy, it does recognize 'an

18   action for damages caused by acts committed pursuant to a conspiracy.'" *Wojtunik v. Kealy*,

19   394 F. Supp. 2d 1149 (D. Ariz. 2005).  Under Arizona law, a conspiracy requires that, "two or

20   more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by

21   unlawful means, causing damages." *Wells Fargo Bank v. Arizona Laborers, Teamsters and*

22   *Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 36 (Ariz. 2002).

23           Sage alleges the underlying torts of fraud, conversion, and intentional interference with

24   contract. (Compl. ¶ 123).  For the reasons discussed above, Sage has not adequately alleged an

25

underlying tort.  Accordingly, the Court dismisses the civil conspiracy claim with leave to amend.

### ix.  Aiding and Abetting

Defendants move to dismiss Sage's aiding and abetting claims as the underlying tort claims are insufficiently pleaded, and the claim is asserted only against fictitious parties. (MTD 24:6–11).  Sage contends because there is no prohibition against naming fictitious parties, and the claim is sufficiently pleaded, the claim should not be dismissed. (MTD Resp. 22:2–24:13).

In Arizona, "claims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Wells Fargo Bank*, 38 P.3d 12 (Ariz. 2002).  Further, "To have committed 'tortious acts in concert,' there must be some factual allegation showing a separate tortious act was committed." *Young v. Liberty Mut. Group, Inc.*, No. CV-12-2302-PHX-JAT, 2013 U.S. Dist. LEXIS 30168, 2013 WL 840618, at *3 (D. Ariz. March 6, 2013).  The acts committed in concert with the underlying tort must be distinct enough to be separate from the primary tort factually. *Id.*

Even if Sage could assert a claim against fictitious parties whose identities it could uncover in discovery, Sage has failed to adequately allege an underlying tort.  Accordingly, the Court dismisses the claim with leave to amend.

### B.    Motion to Amend

After filing its Response to the Motion to Dismiss, Sage filed a Motion seeking leave to file an amended complaint. (*See* Mot. Am., ECF No. 76).  Following briefing, the Magistrate Judge entered an R&R, (ECF No. 117), recommending that the Court deny the Motion.  In the R&R, the Magistrate Judge found that the proposed Amended Complaint deficiently pleaded:

(1) the telephone calls in support of the RICO claims occurred in interstate commerce; (2) the requisite particularity of predicate acts of "invoice fraud" in support of the civil RICO conspiracy claim; (3) that predicate acts in support of the Nevada civil RICO claims occurred within Nevada; and (4) aiding and abetting because it was brought against only fictitious defendants (R&R 14:17–18:13, 20:15–21:25, 25:1–14).  Both parties objected to the R&R; Sage takes issue with several of the deficiencies identified by the Magistrate Judge, and Defendants argue that several of the purportedly sufficient claims in the proposed First Amended Complaint are not adequately pleaded. (*See* Objections, ECF Nos. 120–21).  The Court has already addressed the aiding and abetting objection in the Motion to Dismiss discussion.  The Court now addresses the remaining arguments raised by the parties, beginning with Sage's Objection to the R&R.

### i.  Sage's Objection, (ECF No. 120)

Sage objects to the Magistrate Judge's R&R on the following grounds: (1) that the phone calls alleged to be federal RICO predicates of wire fraud are plausibly alleged to have occurred through interstate or foreign wire communications because they were between Arizona and Navajo Nation; (2) the proposed First Amended Complaint adequately alleges instances of invoice fraud with particularity; and (3) the R&R misstates the requirements of standing. (Sage's Obj. 5:11–14:9, ECF No. 120).

### 1.  *Interstate or Foreign Wires*

The Magistrate Judge concluded that the proposed First Amended Complaint alleged intrastate calls within Arizona. (R&R 14:17–15:23).  Sage contends that: (1) the calls occurred through interstate or foreign commerce because they were between Arizona and Navajo Nation, even though the relevant territorial borders of the Navajo Nation are within Arizona; and (2) the allegations are not essential predicate acts to the RICO claim. (Sage's Obj. 5:11–9:9).

Tellingly, Sage fails to identify a single case in which a court has held that predicate acts affecting commerce between a state and intrastate tribal lands affects "interstate or foreign commerce" as required under RICO. 18 U.S.C. § 1962(a).  Instead, Sage argues, without explanation, that the RICO Act must be construed broadly because to hold otherwise would risk abrogating tribal sovereignty. (Sage's Obj. 7:2–19).

"To support the mail and wire fraud allegations, the plaintiffs must plausibly allege . . . that [defendants] communicated, or caused communications to occur, through the U.S. mail or interstate wires to execute that fraudulent scheme." *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018).  Tribal nations are domestic-dependent nations, not foreign nations. *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 613–14 (9th Cir. 2018).  The United States Constitution explicitly distinguishes between commerce involving foreign nations and tribal nations. *See* U.S. Const. art. I, § 8, cl. 3 ("Congress shall have the power to regulate Commerce with foreign nations and among the several states, and with the Indian tribes").  Accordingly, the calls did not affect foreign commerce merely by being sent or received on tribal lands.  Likewise, as Navajo Nation is not its own state, and the alleged calls took place within Arizona, the calls did not affect interstate commerce.  Sage's arguments concerning the effect of this holding on tribal sovereignty are unavailing; Sage offers no explanation about how the Court's interpretation of "interstate or foreign commerce" would limit or disfavor tribal sovereignty.  Accordingly, the Court adopts the Magistrate Judge's recommendation regarding the status of the alleged phone calls, but the Court agrees with Sage that the finding does not affect the viability of an amended RICO claim given the other alleged predicate acts.

### 2. *Invoice Fraud Allegations*

The Magistrate Judge found that Sage failed to adequately allege "invoice fraud" under Rule 9(b) because the allegations refer generally to "Defendant" or "Defendants." (R&R

16:27–18:13) (citing proposed First Am. Compl. ¶¶ 76–84, 89, 92).  Sage contends that its allegations are sufficient because there are associated email exhibits which indicate that "the particular Defendant causing e-mails can be clearly discerned from the factual circumstances." (Sage's Obj. 10:3–8) (citing Sage's Obj. at 15–16, ECF No. 115).  Sage further contends that each alleged act identifies the date of the invoice, the invoice number, the amount of the invoice, the false representations in the invoice, and the date the invoice was paid. (*Id.* 10:8–23).

Courts may generally consider exhibits attached to a complaint when assessing the sufficiency of a complaint's allegations under a Rule 12(b)(6) motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  While the exhibits Sage identifies may be on the docket, they are not attached to the proposed First Amended Complaint. (*See* Proposed First Am. Compl., Ex. 1 to Mot. Am., ECF No. 76-1).  Accordingly, even if the exhibits show the particular Defendant who allegedly committed the invoice fraud in the factual contentions the Magistrate Judge identified as deficient, the exhibits are not properly incorporated by reference.  The Court adopts the finding of the Magistrate Judge that the proposed Complaint's allegations of "Defendant" or "Defendants'" conduct are insufficient to allege who committed the purported invoice fraud with particularity.

### 3.  *Standing*

Sage contends that the Magistrate Judge reached the correct conclusion regarding standing, but the R&R contains an incorrect statement of law about the type of economic harm necessary to allege injury in fact. (Sage's Obj. 12:1–14:9).  When a district judge designates a motion to a magistrate judge for an R&R, the magistrate judge makes "findings of fact" and "recommendations for disposition." 28 U.S.C. § 636(b)(1)(B).  Parties may then object to "such proposed findings and recommendations." *Id.*  Here, Sage neither objects to a "finding of fact" nor a "recommendation for disposition."  Accordingly, the Court need not address Sage's

1  quibble about a statement of law immaterial to the proposed disposition.  Should the standing

2  dispute become material, Sage may renew its objection when it becomes ripe.

3                ii.   <u>Defendants' Objection, (ECF No. 121)</u>

4         Defendants expressly do not object to the Magistrate Judge's proposed recommendation

5  for disposition. (Defs.' Obj. 2:12–13, ECF No. 121).  Instead, "Defendants submit the instant

6  partial objections to preserve certain arguments Defendants may wish to raise in defense of

7  future proposed amended complaint(s)." (*Id.* 2:15–18).  As the Objection does not concern

8  findings of fact or the proposed disposition, its arguments are not ripe for resolution because

9  they concern a complaint or complaints that do not yet exist.  Accordingly, the Court declines

10  to address the substantive arguments contained within Defendants' Objection as doing so

11  would effectively render an advisory opinion.

12       **C.**    **Motion to Strike**

13         In light of Sage's opportunity to amend the Complaint, the Court denies as moot the

14  Motion to Strike because Sage may amend its Complaint in light of Defendants' objections to

15  the allegations sought to be stricken. *See, e.g.*, *Gottesman v. Santana*, 263 F. Supp. 3d 1034,

16  (S.D. Cal. 2017) ("the Court declines to [grant the motion to strike] at this juncture because, as

17  explained in its Order dismissing Plaintiff's FAC, Plaintiff will have an opportunity to amend

18  his complaint to cure certain pleading deficiencies.  He will also have the opportunity to

19  reconsider his allegations against Attorney Defendants, and in so doing he has the benefit of

20  knowing their objections to his allegations as they currently stand.").  Should Sage retain the

21  purportedly offending allegations, Defendants may renew their Motion to Strike.

22  //

23  //

24  //

25  //

IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that the Motion to Dismiss, (ECF No. 46), is **GRANTED with leave to amend** consistent with the forgoing.  Sage shall have twenty-one (21) days from entry of this Order to file an Amended Complaint curing the deficiencies identified by this Order.

**IT IS FURTHER ORDERED** that the Motion to Strike, (ECF No. 47), is **DENIED as moot**.

**IT IS FURTHER ORDERED** that the Court **ADOPTS in full** the Magistrate Judge's R&R, (ECF No. 117), which recommends that the Court **DENY without prejudice** the Motion for Leave to File the First Amended Complaint, (ECF No. 76).

 Dated this  15  day of March, 2021.


_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT