# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Navajo Health Foundation -        )
Sage Memorial Hospital, Inc.      )
(doing business as "Sage          )
Memorial Hospital"),              )
                                  )
                    Plaintiff,    )Case No.
                                  )3:23-cv-08072-DJH
            vs.                   )
                                  )
Razaghi Development Company,      )
LLC (doing business as            )
"Razaghi Healthcare"); Ahmad      )
R. Razaghi; Tausif Hasan; Does    )
1-10,                             )
                                  )
                    Defendants.   )
                                  )

DEPOSITION OF TAUSIF HASAN

Phoenix, Arizona
May 7, 2024
1:07 p.m.

REPORTED STENOGRAPHICALLY BY:
KRISTI K. SPIRES, RPR
Certified Reporter
Certificate No. 50135

PREPARED FOR:
(COPY/ASCII)



**Griffin Group International**
888.529.9990 | 602.264.2230

**Page 2**

```
 1                  I N D E X
 2
 3   WITNESS:
 4      TAUSIF HASAN                    PAGE
 5
 6      Examination by Mr. Burns          4
 7
 8
 9
10              *      *      *
11
12
13              E X H I B I T S
14
15   EXHIBITS   DESCRIPTION             PAGE
     No. 51     Email Chain and Attachments
16              (Bates No. SAGE0034794-96)
                (3 pages)                 61
17
     No. 52     Email (1 page)            61
18
     No. 53     ACH Detail Report
19              (Bates Nos. SAGE0011086-87)
                (2 pages)                 80
20
     No. 54     Account Details - Operating
21              (Bates No. SAGE0011899) (1 page)  82
22   No. 55     Email Chain and Attachments
                (Bates No. SAGE0024484) (1 page)  98
23
     No. 56     Letter to Mr. Pahe from
24              Mr. Greenfield 9/8/2018
                (Bates Nos. SAGE0044968-70)
25              (3 pages)                100
```

**Page 3**

```
 1              E X H I B I T S
 2
 3   EXHIBITS   DESCRIPTION             PAGE
 4   No. 57     Email Chain and Attachments
                (6 pages)               103
 5
     No. 58     Email Chain and Attachments
 6              (2 pages)               112
 7
     No. 59     Defendants' Supplemental Responses
 8              To First Set of Interrogatories
                (24 pages)              119
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              DEPOSITION OF TAUSIF HASAN was taken
 2   on May 7, 2024, commencing at 1:07 p.m. at
 3   DICKINSON WRIGHT, 1850 North Central Avenue,
 4   Suite 1400, Phoenix, Arizona, before KRISTI K.
 5   SPIRES, a Certified Reporter in the State of Arizona.
 6
 7   COUNSEL APPEARING:
 8
     For the Plaintiff:
 9
                DICKINSON WRIGHT, PLLC
10              By:  Bradley A. Burns
                By:  D. Samuel Coffman
11              1850 North Central Avenue, Suite 1400
                Phoenix, Arizona 85004
12
13   For the Defendants:
14              THORPE SHWER, PC
                By:  Andrew H. Merrett
15              3200 North Central Avenue, Suite 1560
                Phoenix, Arizona 85012
16
17
18   Also Present: Melinda White
                   Todd McGee (via videoconference)
19
20
21
22
23
24
25
```

**Page 5**

```
 1
 2              TAUSIF HASAN, a witness herein,
 3   having been first duly sworn by the Certified Court
 4   Reporter to speak the truth and nothing but the
 5   truth, was examined and testified as follows:
 6
 7              EXAMINATION
 8   BY MR. BURNS:
 9      Q. Good afternoon.  Let's start by stating your
10   name for the record.
11      A. Tausif Hasan.
12      Q. Can you spell it?
13      A. It's T-A-U-S-I-F H-A-S-A-N.
14      Q. Have you ever been deposed before?
15      A. No.
16      Q. Have you ever been a party in a lawsuit
17   before?
18      A. No.
19      Q. Have you ever given testimony in court before
20   or anything like a court?
21      A. No.
22      Q. So this is -- so today is your first time
23   under oath giving testimony in person, right?
24      A. Yes.
25      Q. Let's talk about some basic ground rules of a
```

Page 6

1 deposition.
2          This is our opportunity to ask questions.
3 The goal is to discover what you know, for you to
4 testify about what you know and to talk about it. So
5 some basic ground rules are: It's a
6 question-and-answer session. I ask a question, take
7 one second, let your attorney jump in and object if
8 he has an objection.
9    **A. Okay.**
10    Q. He'll state his objection for the record if
11 he has one, and then you proceed to answer the
12 question.
13          What doesn't work is when we're talking
14 over each other. We will do it today because
15 everyone does it in every deposition.
16    **A. Okay.**
17    Q. But when we do it, the court reporter might
18 chime in, and then we try to be good about it. We
19 like nice clean questions and answers.
20    **A. Okay.**
21    Q. What's important is that you understand the
22 questions that I'm asking. Sometimes attorneys ask
23 poor questions. Sometimes the question is great, but
24 you just don't understand it.
25    **A. Right.**

Page 7

1    Q. If you don't understand a question, please
2 let me know. I'll rephrase the question, and we'll
3 work through it together.
4          The other thing is if you need a break,
5 just let me know. This is not supposed to be some
6 kind of marathon punishment session. But I'll ask
7 that breaks be taken after a question is answered,
8 not while they're pending.
9    **A. Right.**
10    Q. Are you on any medications that could impair
11 your ability to answer my questions today?
12    **A. No.**
13    Q. Any other conditions, situations, concerns
14 that would impair your ability to answer questions?
15    **A. No.**
16    Q. Where do you reside?
17    **A. Chandler, Arizona.**
18    Q. Just go ahead and give me your residential
19 address.
20    **A. 1701 West Flamingo Drive, Chandler, Arizona**
21 **85286.**
22    Q. How long have you lived there?
23    **A. About five months.**
24    Q. Previous to that, where did you live?
25    **A. I lived in Chandler at 1625 West Enfield Way,**

Page 8

1 **Chandler 85286.**
2    Q. How long did you live there?
3    **A. About ten years.**
4    Q. Tell me about your educational background
5 after high school.
6    **A. I have bachelor's in accounting, and I have**
7 **Certified Healthcare Financial Professional**
8 **certification.**
9    Q. Tell me about the bachelor's in accounting.
10 Where did you get it?
11    **A. I got it from University of Karachi.**
12    Q. Where is that located?
13    **A. That was back home in Pakistan.**
14    Q. And then that's the last, like, college
15 degree you got, right?
16    **A. The degree, yes. But I did get higher**
17 **education from ASU in accounting, no degree.**
18    Q. Was it a degree program that you were in, or
19 was it just, like, continuing education?
20    **A. It was continuing education.**
21    Q. Tell me about the ASU program.
22    **A. I took courses at 300 and 400 levels.**
23    Q. Tell me about the courses. I'd like to know
24 just generally about it. What was it about?
25    **A. It was management accounting, and it was all**

Page 9

1 of the other prospects of accounting.
2    Q. Anything about accounting ethics?
3    **A. I don't know. I don't remember.**
4    Q. You mentioned a certification. I missed it.
5 What was it?
6    **A. CHFP. That is very famous in healthcare**
7 **industry. It's a Certified Healthcare Financial**
8 **Professional certification through HFMA.**
9    Q. Does that certification involve any courses
10 in ethics?
11    **A. No. They have two exams basically just like**
12 **CPA. You pass the first one, and then you have about**
13 **a year to pass the second one. If you don't, then it**
14 **expires. You have to do it all over again. It's**
15 **just like CPA, but it's only for the healthcare**
16 **professions.**
17    Q. I take it that you're not a CPA?
18    **A. No.**
19    Q. Have you ever been a CPA?
20    **A. No.**
21    Q. Other than what you've already told me, any
22 other professional licenses or certifications?
23    **A. No.**
24    Q. I'd like to learn about your first job in
25 accounting.



Page 10

1    A. This was back in '96 at Healthsouth rehab
2    hospital.  I was an accountant.
3    Q. Where was that?
4    A. It was in Glendale, Arizona.
5    Q. So your first accounting job was in the
6    United States in about 1996?
7    A. About 1996.
8    Q. Have you ever had an accounting job outside
9    of the healthcare industry?
10    A. In between it was medical equipment, but it
11    was related to healthcare.  I think mostly my
12    25 years is in healthcare.
13    Q. I would just like to run through the jobs
14    that you've had.  So tell me what happened after the
15    Healthsouth accountancy job.
16    A. Then I joined Native American Connections,
17    which was the drug and alcohol abuse rehabilitation
18    center.  I was there.  And then after that, I joined
19    Scottsdale Healthcare, which is now HonorHealth.
20    After that, I was with Casa Grande Regional Medical
21    Center.
22    Q. So approximately when did you join Native
23    American Connections?
24    A. It was back in 2000.
25    Q. And then approximately when at Scottsdale

Page 11

1    Healthcare?
2    A. 2001.
3    Q. And approximately when at Casa Grande
4    Regional?
5    A. 2003.
6    Q. And then what after that?
7    A. 2010 I was with Healing Medical Equipment,
8    which was DME, and I was there for about three years.
9    After that, I was with White Mountain Regional
10    Medical Center, and I was there for two years.
11    Q. So now we're at approximately 2015, right?
12    A. After that, I had one more at Cobre Valley
13    Regional Medical.  I was there for about eight
14    months.  It was in Globe.  It was too difficult for
15    me to commute, so I left that job.
16    Q. So what year do you end up getting connected
17    with Razaghi Development Company?
18    A. September 2015.
19    Q. Tell me about how you first met
20    Ahmad Razaghi.
21    A. In my first interview.
22    Q. So how did you find this job then?
23    A. It was on Indeed.
24    Q. What was the job that you were applying for?
25    A. That was a healthcare consultant job.

Page 12

1    Q. Had you been a healthcare consultant before?
2    A. No.
3    Q. Did you want to be a healthcare consultant?
4    A. I have experience.
5    Q. I'm trying to understand:  Were you trying to
6    get a financial accounting job, or were you trying to
7    get something different?
8    A. When I joined Razaghi, it was a healthcare
9    consultant job, but they told me that they are
10    managing a hospital.  So that interested me because I
11    had hospital background.
12    Q. Obviously you get hired.  What do you get
13    first hired to do at Razaghi Healthcare?
14    It's got a bunch of different names.
15    What did the company go by when you were there?  What
16    was the most common name?
17    A. As I know, Razaghi Healthcare.
18    Q. We'll call "Razaghi Development Company"
19    "Razaghi Healthcare."  Are you okay with that?
20    A. Sure.
21    Q. So what was your first role at Razaghi
22    Healthcare?
23    A. I was a consultant.  I was doing the
24    probation period of 90 days.  So I was just doing --
25    looking at the processes.  They gave me a project of

Page 13

1    if we have a startup company how to create processes
2    for accounting department:  payroll, AP, general
3    ledger.
4    Q. You say "creating processes."  Were there
5    in-place processes already?
6    A. No.  No.  I'm not talking about they have.
7    They just give me a project of how to do this, how to
8    create it.
9    So I put the processes -- this is how you
10    process to make sure -- if you are creating a new
11    accounting department, how to do, what to do.
12    Q. What did you understand that process you
13    made -- what would it be used for?
14    A. Used for the companies if they have clinic --
15    medical clinic, how to create an accounts receivable
16    department, billing and coding.  What do we have to
17    do in order to make it -- people to work on it in the
18    system.  AP, the same way.  Payroll, the same way.
19    General ledger, the same way.
20    Q. So it was kind of -- the project was if you
21    were starting from scratch, this is how you'd build
22    the department?
23    A. Right.
24    Q. Does your project here -- I mean, you
25    obviously make it past the probationary period,



Page 14

1  right?
2  **A. No. That was in the probationary period.**
3  Q. Right. But you end up staying at Razaghi
4  Healthcare past the probationary period, right?
5  **A. Yes.**
6  Q. Now, the project that you did during the
7  probationary period, you just described it.
8  **A. Right.**
9  Q. What is that used for later?
10  **A. For nothing. They wanted to see if I have**
11  **enough knowledge to have the processes in place, how**
12  **to do it. They wanted to know if I understand how it**
13  **works.**
14  Q. So the processes you made, they don't end up
15  getting used for anything?
16  **A. Get what?**
17  Q. They don't end up getting used for anything?
18  **A. No.**
19  Q. So it was some kind of 90-day test or
20  something like that, right?
21  **A. Yes.**
22  Q. What was the results of this test? Did
23  anybody give you feedback on how well you had done?
24  **A. At that time, Todd was the CFO. I showed**
25  **him, and he looked at it, and he said it looks good.**

Page 15

1  Q. Did Mr. Razaghi have an opinion about your
2  work?
3  **A. I don't know. My contact was with the CFO at**
4  **that time.**
5  Q. Can you give me his full name?
6  **A. His what?**
7  Q. His full name.
8  **A. Todd McGee.**
9  Q. Once you start full-time, you directly report
10  to who?
11  **A. Todd McGee.**
12  Q. Anyone else?
13  **A. He's the only one.**
14  Q. So when you start full-time, what is your job
15  title?
16  **A. I was -- the first time I went to Sage with**
17  **Todd McGee, it was audit in process. I just went**
18  **there to see how everything is going, how everything**
19  **works.**
20  Q. Okay. You just said "Sage." Was that
21  referring to the Navajo Health Foundation, Sage
22  Memorial Hospital, Incorporated?
23  **A. Yes.**
24  Q. So that business entity we'll refer to as
25  "Sage" today. Is that all right with you?

Page 16

1  **A. Sure.**
2  Q. So your first work when you actually started
3  full-time is with Sage; is that true?
4  **A. Yes. But I was not involved in doing**
5  **anything. I was just looking and seeing what**
6  **everyone is doing with the processes. I was not**
7  **involved in any other processes over there like doing**
8  **any research or working with the auditors. I was not**
9  **involved with that.**
10  Q. But you were evaluating the accounting
11  processes they had, right?
12  **A. Yes. Just looking into it, observing it.**
13  Q. And what did you learn? What did you
14  conclude after you did that?
15  **A. There were so many things to be improved at**
16  **that time. That's what I learned.**
17  Q. It was a mess, right?
18  **A. Right.**
19  Q. How did you and Razaghi Healthcare go about
20  fixing that mess?
21  **A. When they made me director of finance, I**
22  **start looking into processes. I made adjustments in**
23  **there, and we get better.**
24  Q. How did you do that? How did it get better?
25  **A. Can you explain what the question is there?**

Page 17

1  Q. Sure.
2       So you just said that you worked on
3  making it better.
4  **A. Uh-huh.**
5  Q. I'm trying to understand how you worked on
6  making it better. What did you do?
7  **A. You just look at the processes, what they are**
8  **doing currently. For example, in revenue cycle if**
9  **you are getting a lot of denials, a lot of billing is**
10  **not on time, it gets delayed. The payments get**
11  **delayed.**
12       **So you make sure that you start creating**
13  **the process that everything is related to each other:**
14  **medical records, registration. So everything is**
15  **linked. So if the medical record is delayed, the**
16  **billing is delayed. So you make sure that everything**
17  **is on time. We set up the timing for it.**
18       **And then once it comes to the billing**
19  **side, they make sure that they have certain days to**
20  **bill it so we can get timely payments on it. So**
21  **those are the things that I was looking for.**
22  Q. What about the accuracy of information that
23  is inputted in an accounting system? Is that
24  something you worked on?
25  **A. Repeat the question.**

Page 18

1    Q. How about the accuracy of information that is
2  put into the accounting system?  Is that something
3  you worked on?
4    **A. Yes.**
5    Q. Why is that important?
6    **A. Because accuracy is the main key for the**
7  **hospitals.**
8    Q. What about, like, invoice review processes?
9  Is that something you evaluated?
10   **A. Yes.**
11   Q. Tell me what you did there.
12   **A. Invoices are -- when it comes to the**
13  **hospital, first of all, the AP side looks at it**
14  **whether it's PO related or non-PO related.  If it is**
15  **PO related, then you don't need an authorization**
16  **because it has already been done.**
17   **When it is non-PO related, it goes to**
18  **whoever department that it relates to, and the**
19  **director or manager has to approve that it is the**
20  **right amount and the right pieces.**
21   **Once it comes back, then AP processes it.**
22  **Once they are done, they send it to the controller to**
23  **verify those pieces.  You look at it, and you verify**
24  **it, and it goes back and process the payments.**
25   Q. So ultimately who's the person that has final

Page 19

1  say on invoice payments?
2    MR. MERRETT:  Form.
3    **THE WITNESS:  Invoice payments usually is**
4  **the controller job.  I was director of finance.  I**
5  **was approving it.  Once it's done, it goes to the CFO**
6  **to the final approval.**
7  BY MR. BURNS:
8    Q. Why is it important to have multiple people
9  approve invoices?
10   **A. It's because of the pieces that is the**
11  **process in accounting system for the hospital.**
12  **That's how it works in every hospital.**
13   Q. What was your understanding of what Sage's
14  business was when you first got involved?
15   **A. It's a hospital, see patients.**
16   Q. Did you know it was a nonprofit corporation?
17   **A. Yes.**
18   Q. Ultimately who's the decider of the business
19  decisions of a nonprofit corporation like Sage?
20   MR. MERRETT:  Form and foundation.
21  BY MR. BURNS:
22   Q. What was your understanding when you started
23  working for Sage?
24   MR. MERRETT:  Form and foundation.
25   **THE WITNESS:  I don't know.**

Page 20

1  BY MR. BURNS:
2    Q. Did you know that Sage had a board of
3  directors?
4    **A. Yes.**
5    Q. What was your understanding of the role of
6  the board of directors?
7    **A. The board of directors are responsible for**
8  **the decision -- whatever the executive leadership**
9  **made.  They go in front of the board and explain**
10  **that.  If it is good for the hospital, they will look**
11  **at it and approve it.**
12   Q. So this initial job you have at Razaghi
13  Healthcare, I understand it lasts for some amount of
14  time and then it changes.
15   Can you tell me what the job was and when
16  did it change?
17   **A. Repeat the question.**
18   Q. You had a role when you started at Razaghi
19  Healthcare, correct?
20   **A. Are we talking about the initial, or are we**
21  **talking once I get the --**
22   Q. Initial.
23   **A. As a healthcare consultant.**
24   Q. And how long does that last?
25   **A. 90 days.**

Page 21

1    Q. After that, what's the job you get hired into
2  more permanently?
3    **A. I explained that earlier about I went to Sage**
4  **with the CFO and just observe the first couple of**
5  **months.  I did not involve in any matters over there.**
6    Q. What happens after that?
7    **A. I became director of finance.  I think it was**
8  **in 2016, if I remember correctly.**
9    Q. Director of finance of what?  Of Razaghi
10  Healthcare?
11   **A. For Sage.**
12   Q. Who did you report to as director of finance
13  for Sage?
14   **A. Todd McGee, CFO.**
15   Q. When you received, like, paychecks, what
16  entity would they come from during that time?
17   **A. For?**
18   Q. When you were director of finance for Sage,
19  who would actually pay your salary?
20   **A. My salary comes from Razaghi Healthcare.**
21   Q. And you understand that Sage would reimburse
22  Razaghi Healthcare for that salary?
23   **A. Yes.**
24   Q. How long were you director of finance for
25  Sage?

Page 22

1    A. It was six or seven months.
2    Q. What happens after director of finance?
3    A. I was promoted to CFO.
4    Q. What happened to Mr. McGee?
5    A. He left.
6    Q. Do you know why he left?
7    A. I don't know.
8    Q. Did he ever tell you why he was leaving?
9    A. No.
10   Q. Did Mr. Razaghi ever tell you why Mr. McGee
11   was leaving?
12   A. No.
13   Q. Did anyone ever tell you why Mr. McGee was
14   leaving?
15   A. No.
16   Q. Did you ask?
17   A. No.
18   Q. Did you have any impression of why he might
19   not want to be there anymore?
20   A. No.
21   Q. So when do you become CFO?
22   A. In January of 2017.
23   Q. And this is -- you're CFO of Sage, not CFO of
24   Razaghi Healthcare.
25   A. Sage.

Page 23

1    Q. Same thing with the paychecks when you became
2    CFO?
3    A. Yes.
4    Q. How long do you stay -- I understand you
5    leave and come back. But how long do you stay in
6    that CFO position?
7    A. I was there through August of 2017. So about
8    seven and eight months. And then I left, and from the
9    request, I came back in December of 2017.
10   Q. So why did you leave?
11   A. Because at that time the administrator,
12   Christi El-Meligi, was not capable of doing -- her
13   leadership was bad. I was having trouble working
14   with her because she always wants me to hire or fire
15   someone from her perspective.
16        And I said, you know, "Let me do my job."
17        And she said, "You have to do what I have
18   you do."
19        I said, "If that is the case, I'm out of
20   here." So I left.
21   Q. So you said, "Hire or fire someone from her
22   perspective." Did I hear that right?
23   A. Yes.
24   Q. That was one of the things that concerned
25   you, I think you were saying.

Page 24

1        What do you mean by that? What was her
2    perspective?
3    A. You know, I cannot say. I mean, she -- by
4    the beginning of the audit -- when audit comes in,
5    let's say, November, she comes to me and said to fire
6    this person without any reason.
7    Q. And you disagreed with that?
8    A. And I disagreed.
9    Q. Are you thinking of a particular person? Who
10   was it?
11   A. No. I don't know the name.
12   Q. So you just didn't get along with her; is
13   that right?
14   A. That is correct.
15   Q. So you decide to leave. How do you -- how do
16   you go out? I mean, who do you tell that you're
17   resigning?
18   A. I told Christi and Ahmad.
19   Q. What was Mr. Razaghi's reaction?
20   A. He was okay with that at that time.
21   Q. Okay. And what about Christi's reaction?
22   A. She was fine.
23   Q. So what month did you say you actually left?
24   A. August of 2017.
25   Q. And then you do come back, I think, in

Page 25

1    December; is that right?
2    A. December 2017.
3    Q. How did it come about that you decided to
4    come back? How did that occur?
5    A. They ask me to come back because
6    accounting and financial department was a mess.
7    Q. Who is "they"?
8    A. Ahmad.
9    Q. I have no problem with first names. But when
10   you refer to "Ahmad," you mean Mr. Razaghi?
11   A. Mr. Razaghi, yes.
12   Q. You can use Ahmad now. I just want to be
13   clear.
14   A. Okay.
15   Q. So Mr. Razaghi invited you back; is that
16   right?
17   A. Yes.
18   Q. And he had told you that the accounting
19   department was a mess, right?
20   A. Yes.
21   Q. Was it a mess when you arrived?
22   A. Yes.
23   Q. Tell me the ways in which it was a mess.
24   A. I left in August, and then I came back in
25   December, and it was audit time. There was a lot of

Page 26

1  reconciliations, a lot of GL accounts was not
2  reconciling at all. Especially when you are working
3  with the grants and funding through the government,
4  you have to make sure that everything reconciles
5  because they look at it very closely. And nothing
6  reconciles.
7       So I have to come in and do it all over.
8  I have to do the reconciliation, the fixed asset,
9  which is -- you have to make sure that that
10  reconciles for the GL side. Nothing reconciles at
11  that time.
12       Q. You eventually have it reconcile or not?
13       A. So I did that for the audit. You have to do
14  it in a certain period of time.
15       Q. But given the mess that it was in when you
16  got there in December of 2017, did you have any
17  confidence in the financial statements that were
18  getting made around that time?
19       A. The financial statements I have to do before
20  the year because that's what the audit is for. It's
21  to make sure that you have correct financials, and
22  then you present it to the auditors. So I did a lot
23  of adjustments at that time.
24       Q. Did you feel it was fully corrected by the
25  time the audit was done?

Page 27

1       A. No.
2       Q. What wasn't corrected?
3       A. Some of the pieces -- because there are so
4  many things going in there, you just can't have a
5  single person to do it. And there was some
6  weaknesses, some pieces in the audit, which is pretty
7  common. Every hospital has those, but we corrected
8  after.
9       Q. Wasn't there a problem with the quality of
10  information that was being inputted in the accounting
11  system at the very bottom level? The consistency of
12  the way invoices were put in? The way POs were
13  processed? What I'm talking about is the very
14  beginning of the accounting process. Weren't there
15  flaws in the way that was done?
16       MR. MERRETT: Form; foundation.
17       THE WITNESS: Repeat the question.
18  BY MR. BURNS:
19       Q. Accounting products that end up getting
20  audited are fairly complicated, right?
21       A. Right.
22       Q. There are numbers that are highly derivative
23  of other things that create them, right?
24       A. Uh-huh.
25       Q. Such as an invoice, right?

Page 28

1       A. Invoice, to me, is a simple process. The
2  invoice comes in. You verify it either through the
3  PO system or through the manager or director. They
4  verify it, and then you process it.
5       Q. But an invoice is an example of a piece of
6  information that is inputted in the accounting system
7  that ends up yielding financial statements, right?
8       A. That is correct.
9       Q. And I'm talking about for every single piece
10  of accounting information that is put into the system
11  in December of 2017, that system was very flawed,
12  wasn't it?
13       A. I mean, we corrected it. At that time, there
14  was so many mistakes in there on the GL side.
15       Q. And you didn't personally individually go
16  look at every piece of underlying information
17  underlying the accounting system, right?
18       A. No.
19       Q. So when the system had been flawed for some
20  time before your return, the results may not have
21  been consistent with reality, right?
22       A. I don't know.
23       Q. An audit wouldn't have caught that because
24  the audit doesn't look that deep, correct?
25       A. Audit looks at the key pieces plus they look

Page 29

1  at, you know, how the system -- that's why they look
2  at the processes, how are we entering into the GL
3  system. And then they look at basic things, each
4  individual line item. I'm talking about the
5  operating costs, how everything is done. And then
6  they find out if there is any mistakes or any issues
7  in there.
8       Q. The point is they're not looking at every
9  scrap of paper, right?
10       A. No.
11       Q. So when you return in December 2017, who do
12  you directly report to?
13       A. At that time, I was just reporting to the
14  administrator, co-CEO of Sage Memorial.
15       Q. Who is that?
16       A. At that time, it was Tadd Greenfield.
17       Q. How regularly would you meet with
18  Tadd Greenfield?
19       A. If he's at Sage, then we meet, like, every
20  day or every other day.
21       Q. How often were you at Sage physically?
22       A. Every two weeks I used to go there for a
23  week.
24       Q. And in between that time, you didn't share an
25  office with Tadd?

Page 30

1    A. When I'm at Scottsdale office and Tadd is
2  there, then we meet.
3    Q. How about Mr. Razaghi?  How often did you
4  interact with him in your CFO role, starting in
5  December 2017?
6    A. Maybe once every two weeks.  Whenever he's in
7  the office.
8    Q. What kind of direction would you get from
9  Mr. Razaghi?
10      MR. MERRETT:  Form.
11      THE WITNESS:  I don't.
12 BY MR. BURNS:
13   Q. No direction?
14   A. I don't.
15   Q. Did you ever receive direction from
16 Mr. Razaghi after you became CFO?
17   A. I have direct contact with Tadd Greenfield.
18   Q. So that's a no, you never received any
19 direction from Mr. Razaghi from December 2017 on?
20   A. No.
21   Q. We've established that you're CFO of Sage
22 during this time.  That's chief financial officer,
23 right?
24   A. Yes.
25   Q. What duties do you think you had to Sage?

Page 31

1      MR. MERRETT:  Form and foundation.
2      THE WITNESS:  My job is to look at
3  financial operations, give them the leadership and
4  manage the departments.  I was managing about six or
5  seven departments.
6  BY MR. BURNS:
7    Q. If there was a conflict between Razaghi
8  Healthcare and Sage while you were CFO of Sage, who
9  was your duty of loyalty to?
10      MR. MERRETT:  Form and foundation.
11      THE WITNESS:  I don't know.
12 BY MR. BURNS:
13   Q. You don't know?
14   A. My fiduciary duty is with Sage.
15   Q. I want to understand how your employment at
16 Sage -- well, actually, your employment at Sage ends.
17 When does that end?
18   A. August of 2018.
19   Q. Why did that end?
20   A. They terminated our contract.
21   Q. When did your employment at Razaghi
22 Healthcare end?
23   A. I think the first or second week of
24 September.
25   Q. Why did that happen?

Page 32

1    A. I don't know.
2    Q. Who notified you that you had been terminated
3  by Razaghi Healthcare?
4    A. Mr. Razaghi.
5    Q. Why did he tell you you were being
6  terminated?
7    A. I don't know.
8    Q. Did he explain anything about why you were
9  being terminated?
10   A. Because he doesn't have any of the contracts
11 of --
12   Q. So -- go ahead.  Sorry.
13   A. That was the only contract they hired me for.
14 When the contract terminated, I was -- I left too.
15   Q. And that's approximately September-ish 2018?
16   A. Yeah.  The first or second week of September.
17   Q. What do you do after that?
18   A. I was out of job for about nine months, and
19 then I joined San Carlos Apache as interim CFO.
20   Q. Did you have any other business dealings with
21 Mr. Razaghi after September 2018?
22   A. No.
23   Q. Did you work for any entity affiliated with
24 him?
25   A. No.

Page 33

1    Q. Did any compensation come to you from
2  Mr. Razaghi or Razaghi Healthcare after
3  September 2018?
4    A. No.
5    Q. What's your current relationship with Razaghi
6  Healthcare?
7    A. No relationship.
8    Q. What about Mr. Razaghi himself?  Anything
9  ongoing?
10   A. Occasionally we talk on the phone.
11   Q. Okay.  When was the last time you talked to
12 Mr. Razaghi?
13   A. I would say about two weeks ago.
14   Q. What did you guys talk about?
15   A. Just family.
16   Q. Do you consider Mr. Razaghi a friend?
17   A. Yes.
18   Q. Did you discuss anything other than family in
19 this call two weeks ago?
20   A. No.
21   Q. And when was the last time you discussed --
22 well, strike that.
23      Have you ever discussed this case with
24 Mr. Razaghi -- this case we're in today?
25   A. Initially because my name was in there, so we

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 11 of 109

Navajo Health Foundation - Sage Memorial vs.
Razaghi Development

Tausif Hasan

Page 34

1  discussed about this lawsuit.
2      Q. Tell me about those discussions.
3      A. Not a detailed discussion. It was just
4  basically that we have to prepare ourself for this
5  lawsuit.
6      Q. Who's paying your legal bills?
7          MR. MERRETT: Form and foundation.
8          To the extent it's privileged, I'm going
9  to ask him not to answer the question.
10          MR. BURNS: Are you instructing him not
11  to answer?
12          MR. MERRETT: I am.
13          MR. BURNS: A third-party payer you're
14  contending is privileged?
15          MR. MERRETT: That's a fair
16  clarification.
17          You can answer whether you're paying your
18  attorneys fees or not.
19          THE WITNESS: I'm not.
20  BY MR. BURNS:
21      Q. Take a second after I ask the question.
22          So who is paying your legal fees?
23          MR. MERRETT: I'm going to instruct him
24  not to answer that question.
25  BY MR. BURNS:

Page 35

1      Q. Has Mr. Razaghi or Razaghi Healthcare ever
2  agreed to pay your legal bills?
3          MR. MERRETT: Same instruction.
4  BY MR. BURNS:
5      Q. Do you know what indemnification is?
6      A. No.
7      Q. Has anyone agreed to pay any judgment
8  rendered against you in this lawsuit?
9      A. I don't know.
10      Q. Has anyone ever provided you assurances that
11  if there's a judgment against you in this lawsuit you
12  won't have to pay it?
13      A. No.
14      Q. Is there a contract to which you are a party
15  where any person has agreed to pay your legal bills
16  related to this case?
17          MR. MERRETT: Same instruction.
18  BY MR. BURNS:
19      Q. We've had a few instructions from counsel to
20  not answer. I just want to clear it for the record
21  that you're following the instruction to not answer,
22  correct?
23      A. Yes.
24      Q. When you were CFO starting in
25  December 2018 -- when you were CFO starting in

Page 36

1  December 2017, were you aware that Razaghi Healthcare
2  had some kind of contractual relationship with Sage?
3      A. Yes.
4      Q. What was that contractual relationship?
5      A. They have a contract.
6      Q. Did you see that contract during your time as
7  CFO?
8      A. No.
9      Q. At any time during your time as CFO?
10      A. No.
11      Q. I'm going to zoom down specifically.
12          In August 2018, you had not seen a
13  contract between Sage and Razaghi Healthcare; is that
14  correct?
15      A. That is correct.
16      Q. There's a book in front of you. I can either
17  hand you copies or you can look in the book.
18  Sometimes it's easier to look in the book.
19      A. Okay.
20      Q. It will be Tab 4 in the book. It's already
21  marked as Exhibit 4.
22      A. Right here?
23      Q. Yes.
24      A. Tab 4?
25      Q. Tab 4.

Page 37

1          I'm looking at a document marked
2  Exhibit No. 4. At the bottom right, there's a
3  number. We call this a Bates number. It's
4  SAGE48224.
5          Are we looking at the same document, sir?
6      A. 48224.
7      Q. I'll take you to the second to the last page
8  of Exhibit 4. The reason I'm flipping you there is
9  there's a date on here that can help orient you to
10  what you're looking at. It's a document signed in
11  2011.
12          Do you see that, sir?
13      A. Yes.
14      Q. So looking at Exhibit 4 --
15          MR. MERRETT: I'm sorry. You said it's
16  the second to the last page. It's the last page on
17  my copy.
18          MR. BURNS: Oh, okay. There we go.
19          MR. MERRETT: Okay.
20  BY MR. BURNS:
21      Q. The last page of Exhibit 4, you can see it's
22  signed in 2011, sir?
23      A. Yes.
24      Q. I'm just trying to orient you to the
25  document. So looking at the totality of Exhibit 4, I

Page 38

1  guess, during your time as CFO, did you ever see
2  Exhibit 4?
3      A. No.
4      Q. Did you ever see -- I mean, it may be a
5  difficult question. I'm going to acknowledge that up
6  front.
7          Did you ever see part of Exhibit 4? Did
8  anyone ever show you part of it or anything like
9  that?
10     A. No.
11     Q. Have you seen Exhibit 4 in the time since you
12 left as CFO of Sage?
13     A. No.
14     Q. Did you review this document in preparing for
15 your testimony today?
16     A. No.
17     Q. This is just something you're totally
18 unfamiliar with, right?
19     A. Right.
20     Q. You can go to Tab 11. Tab 11 is marked
21 Exhibit 11. It has a Bates number ending in 9710.
22         Are we looking at the same document, sir?
23     A. Yes.
24     Q. Just to orient you, at the top, the second
25 from the top line says, "Amendment No. 2."

Page 39

1          Do you see that?
2      A. Yes.
3      Q. And then if we look at the last page, there's
4  signatures in 2017.
5          Do you see that?
6      A. Yes.
7      Q. Looking at Exhibit 11 -- and you can take a
8  second if you need it. You probably won't. But did
9  you ever see Exhibit 11 during your time as CFO?
10     A. No.
11     Q. And specifically in August 2018 this isn't
12 something you saw?
13     A. No.
14     Q. Have you seen this document in the time
15 since?
16     A. No.
17     Q. What about part of the document? Has any
18 part of this document been shown to you?
19     A. No.
20     Q. We'll turn to Tab 12. This is a Bates number
21 ending in 8271. Let's look at the last page of
22 Exhibit 12 just to orient you. It appears to be the
23 same signature dates as Exhibit 11.
24         In looking at the totality of Exhibit 12,
25 is this a document that you saw during your time as

Page 40

1  CFO?
2      A. No.
3      Q. Specifically in August of 2018, you had not
4  seen this document, correct?
5      A. No.
6      Q. What about in the time since? Have you seen
7  this document?
8      A. No.
9      Q. Did you review this document in preparation
10 for your testimony today?
11     A. No.
12     Q. Have you ever been shown or given a portion
13 of this document?
14     A. No.
15     Q. Has anyone given you a description of what
16 this document contains?
17     A. No.
18     Q. Let me turn you to -- it's document page 8,
19 and that's Bates number ending in 8278.
20     A. 8278?
21     Q. Yes.
22     A. Okay.
23     Q. At the very bottom, we can see a Section 5,
24 Legal Compensation.
25         Do you see that there?

Page 41

1      A. Yes.
2      Q. Have you ever reviewed Section 5? I want you
3  to take a second to look at it. It continues on to
4  the next several pages. Have you ever reviewed
5  Section 5 before?
6          MR. MERRETT: Asked and answered.
7          THE WITNESS: No.
8  BY MR. BURNS:
9      Q. I want you to look at the Bates number ending
10 in 8280.
11     A. Okay.
12     Q. I'm looking at Subsection D, Termination
13 Payment.
14         Do you see that, sir?
15     A. Yes.
16     Q. Have you ever reviewed this section entitled
17 "Termination Payment"?
18     A. No.
19     Q. And since you never have reviewed it, you
20 also didn't review it in August of 2018, correct?
21     A. That is correct.
22     Q. Did anyone tell you what it contained in
23 August 2018?
24     A. No.
25     Q. Let's talk about -- we're about ten minutes

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 13 of 109    Tausif Hasan

Page 42

1 from a break unless you want one earlier.
2 **A. I'm okay.**
3 Q. Let's talk about some mechanics of how
4 invoices were approved.
5 What is the Meditech Financial Management
6 System?
7 **A. Meditech is the software -- accounting**
8 **software for most of the hospitals.**
9 Q. When you say "most of the hospitals,"
10 hospitals you've worked at?
11 **A. Right.**
12 Q. So when you come in and you're working for
13 Sage, Meditech is something you're very familiar
14 with, right?
15 **A. Meditech I did at one other hospital, but I**
16 **was familiar but not that much.**
17 Q. Did you have any difficulties using Meditech?
18 **A. No.**
19 Q. Starting in December 2017, what was your role
20 in approving expenses in the Meditech system?
21 **A. Approving is -- at that time, the controller**
22 **was Marise. She was the one who is in charge. And**
23 **once she's approved it, then it comes to me for final**
24 **approval.**
25 Q. Can you give me the controller's full name?

Page 43

1 **A. Marise Andrade.**
2 Q. And so the process -- what's the controller's
3 role in the process? Tell me about that.
4 **A. The controller process is to -- once AP looks**
5 **at the invoices, they verify it and send it to the**
6 **controller.**
7 Q. That's accounts payable, right?
8 **A. Right.**
9 Q. And then they send it to the controller,
10 right?
11 **A. Right.**
12 Q. What does the controller do?
13 **A. They verify it and then approve it and then**
14 **send it to the CFO.**
15 Q. And then what does the CFO do?
16 **A. Just final approval, send it back to AP and**
17 **then they process it.**
18 Q. So this process that's in place, it has
19 multiple levels of approval, right?
20 **A. Correct.**
21 Q. And the CFO is the last level of approval?
22 **A. No. It depends. If the amount is higher,**
23 **then the CEO -- the co-CEO administrator has to**
24 **approve it.**
25 Q. What amounts would trigger co-CEO approval?

Page 44

1 **A. Anything over 100,000.**
2 Q. So let me just understand: Accounts payable
3 would put it in the system, right?
4 **A. Not in the system first. First it has to**
5 **be -- the invoice has to be approved first from the**
6 **director of finance or a controller. And then it**
7 **goes back to accounts payable. They process it, and**
8 **then they send it to me when I was CFO.**
9 Q. So it would go through at least three layers
10 of approval: accounts payable, the controller and
11 the CFO, right?
12 **A. Yes.**
13 Q. And then if it was over $100,000 the co-CEO
14 would do it?
15 **A. Yes.**
16 Q. From December 2017 until you left, who was
17 the co-CEO that would approve invoices over 100,000?
18 **A. Tadd Greenfield.**
19 Q. Tadd Greenfield also worked for Razaghi
20 Healthcare, right?
21 **A. He was administrator of Sage Memorial.**
22 Q. What was his relationship with Razaghi
23 Healthcare?
24 **A. They hired him.**
25 Q. So between December 2017 and August 2018, did

Page 45

1 you ever reject an invoice that had been sent to you
2 in Meditech?
3 **A. I don't know.**
4 Q. I'm trying to get a sense of how much
5 scrutiny you were actually giving these invoices and
6 expenses.
7 Can you recall a time where you ever
8 rejected one or pushed back?
9 **A. I don't recall.**
10 MR. BURNS: Now is a good time for a
11 break.
12 (Recess from 1:57 p.m. to 2:09 p.m.)
13 BY MR. BURNS:
14 Q. We can go back on the record.
15 I want to turn to the events of
16 August 2018 and specifically the termination payment.
17 You knew that Razaghi Healthcare was
18 planning on terminating the contract between Razaghi
19 Healthcare and Sage in July 2018, didn't you?
20 **A. No.**
21 Q. When did you first learn that Razaghi
22 Healthcare was trying to get out of the contract?
23 MR. MERRETT: Form.
24 **THE WITNESS: It was, I think, when we**
25 **receive memorandum, I think, from Gary Pahe.**

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 14 of 109    Tausif Hasan

Page 46

1  BY MR. BURNS:
2      Q. Tell me about that memorandum.
3      A. Memorandum was that we are terminating
4  contract for Razaghi Healthcare effective August 31st
5  or something. I don't remember the whole thing.
6      Q. So that was the first inkling you had that a
7  termination was occurring?
8      A. Yes.
9      Q. Why was a termination payment made before a
10  termination occurred?
11      A. Repeat the question.
12      Q. Why was a termination payment made before a
13  termination occurred?
14      A. It went to Tadd Greenfield. He approved it,
15  and then I processed it.
16      Q. No. I'm asking why a termination payment was
17  made.
18      A. I don't know.
19      Q. I mean, on August 27th, that's before you
20  knew of any termination, right?
21      A. Yes.
22      Q. Why would you approve a termination payment
23  when there's been no termination?
24      A. It was the co-CEO who approved it.
25      Q. You also approved it, right?

Page 47

1      A. After that, I processed it.
2      Q. You knew that payments over a certain amount
3  required board of director approval, right?
4      A. I don't know.
5      Q. You didn't know that in August 2018?
6      A. No.
7      Q. Did you ever learn that?
8      A. No. Because in other hospitals, we never get
9  it approved through the board of directors. It goes
10  through the CEO.
11      Q. Do you know today that payments above a
12  certain amount required board of director's approval
13  at Sage in August 2018?
14      A. I don't know.
15      Q. Do you think that's something a CFO should
16  have known?
17      A. I don't know.
18      Q. You knew that Razaghi Healthcare had sent a
19  letter to Sage at the beginning of August claiming a
20  breach of contract, right?
21      A. I don't recall that letter. If it was cc'd
22  to me, then probably. When I see it, I can -- but I
23  don't recall that.
24      Q. I'm asking about in the time before the
25  termination payment. You knew there was controversy

Page 48

1  about Razaghi Healthcare's status at Sage, right?
2          MR. MERRETT: Form.
3          THE WITNESS: No.
4  BY MR. BURNS:
5      Q. You knew there was fighting between Razaghi
6  Healthcare and Sage, right?
7          MR. MERRETT: Form.
8          THE WITNESS: No.
9  BY MR. BURNS:
10      Q. You knew that Razaghi Healthcare had started
11  calculating a termination payment in July 2018,
12  right?
13      A. No.
14      Q. You can turn to Tab 23. I'm looking at a
15  document marked Exhibit 23, Bates number ending in
16  8377.
17          Are we looking at the same document, sir?
18      A. Yes.
19      Q. So this is a series of emails, but I want to
20  start at the one at the bottom of the page and work
21  our way up.
22      A. Okay.
23      Q. I understand you're not copied on this email,
24  but I'm trying to understand your knowledge about
25  circumstances surrounding it.

Page 49

1          The bottom email purports to say, "Hey,
2  just completed a phone call with Ahmad. He is
3  requesting a report that he needs to present to the
4  Sage board. Need by mid next week."
5      Do you see that?
6      A. Is it in the bottom?
7      Q. It's in the bottom email. You can see that
8  it was sent Wednesday, July 11th.
9      A. Okay.
10      Q. And then if you look at the first paragraph
11  of text of the email --
12      A. Okay.
13      Q. -- that's what, I think, I just read.
14      A. Okay.
15      Q. I'm just asking if you see that section
16  there.
17      A. Yes.
18      Q. And then the information sort of in the
19  middle paragraph of the bullet points is comparing by
20  year the Razaghi invoices showing billed rates versus
21  discounted rates and the difference needed for three
22  years, and you see the years there.
23      A. Yes.
24      Q. You became involved in this project to make
25  these calculations, didn't you?



Navajo Health Foundation - Sage Memorial vs.
Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 15 of 109    Tausif Hasan

Page 50

1        MR. MERRETT:  Form.
2        THE WITNESS:  No.
3  BY MR. BURNS:
4     Q. You saw these calculations being made, didn't
5  you?
6     A. When I received the invoice, that's the time
7  I see it.
8     Q. When you're saying "the invoice," you're
9  talking about an invoice around August 27, 2018?
10    A. Yes.
11    Q. Okay.  Let's turn to Exhibit 24 in your book.
12  First, I want to identify the document.  I'm looking
13  at Exhibit 24, Bates number ending in 8504.
14        I note at the top it's sent Monday,
15  July 16th.  Do you see that there?
16    A. Yes.
17    Q. And you're copied.  Do you see that?
18    A. Yes.
19    Q. Who's Thomas Matenaer?
20    A. He was controller at that time for Sage.
21    Q. When did he become controller?  There was a
22  different controller in 2017.  So when does
23  Thomas Matenaer become controller?
24    A. Somewhere in 2018.  I believe in maybe June
25  or July.

Page 51

1     Q. So this is the person in that chain of
2  invoice approval in Meditech.
3     A. Yes, sir.
4     Q. He's the controller.
5     A. Yes.
6     Q. What did you think when you received this
7  email?  It has an attachment that's quite extensive.
8  We'll go through it in a second.
9     A. Informational purposes.
10    Q. I'm wondering:  Did you review it to see if
11  it was correct?
12    A. Can I see the --
13    Q. Yeah.
14    A. No.
15    Q. I want to look at the Bates number ending in
16  8505.  It's the second actual page of the exhibit.
17        I'm looking at sort of an Excel
18  spreadsheet that's printed out.  I'm looking at the
19  column that says, "Paid Amount."  Just let me know
20  when you find that.
21    A. 85 --
22    Q. 8505.
23    A. Okay.
24    Q. I'm looking at the column that says, "Paid
25  Amount."  Do you see that?

Page 52

1     A. It's not showing Paid Amount.
2     Q. If you look at the column on the far right,
3  it says, "Final."
4     A. Oh, Paid Amount.  Okay.
5     Q. And then one to the left of that in Column E,
6  do you see the Paid Amount column?
7     A. Yes.
8     Q. I'm wondering if you reviewed the Paid Amount
9  column on this document at any time?
10    A. No.
11    Q. Do you have any reason to believe, as you sit
12  here today, that the figure of -- the figures
13  reflected in the Paid Amount column for 2015, '16 and
14  '17 -- if they're in any way wrong?
15        MR. MERRETT:  Form; foundation.
16        THE WITNESS:  No.
17  BY MR. BURNS:
18    Q. I'm going to show you Exhibit 30.  You can
19  just turn to Tab 30.
20        First of all, the email depicted on
21  Exhibit 30 -- I'm looking at Bates No. 3767.
22        Do you see that, sir?
23    A. Yes.
24    Q. What is the email account
25  acc@razaghihealthcare.com?

Page 53

1        MR. MERRETT:  Foundation.
2        THE WITNESS:  I don't know.  Maybe
3  financial accounting at Razaghi Healthcare.  They
4  have the account.  I don't know who has that.
5  BY MR. BURNS:
6     Q. Who sent this email?
7     A. I don't know.
8     Q. When you received this email, what did you do
9  with it?  You received this email, didn't you?
10    A. Yes.
11    Q. What did you do with it?
12    A. I reviewed it.
13    Q. And you didn't wonder who had sent it?
14    A. One of the accounting people.  I don't know.
15  But that was the account.
16    Q. What was the account?
17    A. On the Razaghi Healthcare side, the
18  accounting department's account.  They have multiple
19  people in there.  I don't know who sent it.
20    Q. Who directed the accounting department to
21  send it?
22        MR. MERRETT:  Foundation.
23        THE WITNESS:  I don't know.
24  BY MR. BURNS:
25    Q. I mean, you get an invoice of over

Navajo Health Foundation - Sage Memorial vs.
Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 16 of 109    Tausif Hasan

Page 54

1  $10 million.
2  **A. Uh-huh.**
3  Q. And you're the CFO of Sage, right?
4  **A. Uh-huh.**
5  Q. What do you do to figure out the legitimacy
6  of this invoice?
7  **A. I verified from Nicole, the AP, at Sage.**
8  Q. Tell me about that.
9  **A. Tell you about what?**
10  Q. What did you do to verify the AP?
11  **A. This invoice was received, they processed it,**
12  **and then they send it over.**
13  Q. I'm trying to understand what you did to make
14  sure this invoice was legitimate.
15  **A. I sent it to the CEO at that time,**
16  **Tadd Greenfield.**
17  Q. What did Tadd Greenfield say when you sent it
18  to him?
19  **A. He looked at it, and he approved it.**
20  Q. But where did it originate from? Who created
21  it?
22  **A. I don't know.**
23  Q. Why would you submit it for approval without
24  knowing where it came from?
25  **A. I don't know.**

Page 55

1  Q. You're saying that you received an invoice of
2  over $10 million from an unknown source and you
3  submit it to the CEO for approval without checking on
4  where it came from?
5  MR. MERRETT: Form.
6  **THE WITNESS: Yes.**
7  BY MR. BURNS:
8  Q. And you didn't check into the backup
9  information supporting it either, did you?
10  **A. I reviewed it.**
11  Q. How detailed was your review?
12  **A. There is a backup behind. I reviewed the**
13  **total amounts, and I forward it to Tadd. Tadd**
14  **already got that invoice.**
15  Q. From who?
16  **A. In this email because Tadd Greenfield is also**
17  **there.**
18  Q. What conversations did you have with
19  Tadd Greenfield about this invoice?
20  **A. I looked at it, and I say, "Is it an invoice**
21  **that you want me to process?"**
22  **He looked at it, and he said, "Yes. Go**
23  **ahead and process it." He verified it.**
24  Q. What was Ahmad Razaghi's role in approving
25  this invoice?

Page 56

1  MR. MERRETT: Foundation.
2  **THE WITNESS: None.**
3  BY MR. BURNS:
4  Q. How do you know he had no role? You just
5  said you didn't know where it came from.
6  **A. I don't know.**
7  Q. But you're sure he had no role?
8  **A. I don't know.**
9  Q. He might have had a role, right?
10  **A. I don't know.**
11  Q. Let's look at the invoice. Let's look at the
12  second page of the invoice, which is Bates No. 3769.
13  **A. Okay.**
14  Q. Do you see this Razaghi Healthcare Severance
15  Calculations sheet? You saw that on August 27, 2018,
16  right?
17  **A. Yes.**
18  Q. Who made this sheet?
19  **A. I don't know.**
20  Q. Didn't you think you needed to inquire as to
21  how these calculations were made when you received
22  it?
23  MR. MERRETT: Form.
24  **THE WITNESS: Whoever was responsible to**
25  **create it, I -- I got the final product whether to**

Page 57

1  approve it or not.
2  BY MR. BURNS:
3  Q. And you did approve it, right?
4  **A. Yes.**
5  Q. Did you understand when you approved it how
6  these calculations were made? These calculations run
7  on for six-something pages.
8  **A. Yes.** Did you understand how these calculations
9  were made?
10  Q. Did you understand how these calculations
11  **A. Basically they said the total costs, costs**
12  **paid and costs not paid. They basically add those**
13  **up.**
14  Q. Who is they?
15  **A. I don't know. That's what I'm saying.**
16  **Whoever created this sheet, that's how they**
17  **calculated it.**
18  Q. I'm asking what inquiry you did to verify the
19  information that is depicted in Exhibit 30 in the
20  calculations sheets starting at page 3769. What did
21  you do to verify the accuracy of that information?
22  **A. I did -- I did only verify on this sheet**
23  **whatever the numbers are. I didn't verify other than**
24  **this.**
25  Q. But what did you verify on this sheet?

Navajo Health Foundation – Sage Memorial vs.
Razaghi Development

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 17 of 109    Tausif Hasan

Page 58

1    A. I look at the total amount, and I look at the
2 costs not paid. So I basically subtracted to get the
3 total amount of $10,855,000.
4    Q. So you were pointing, I believe, at the top
5 box on the page ending in 3769.
6    A. Yes.
7    Q. You just made sure that the top box added up?
8    A. Yes.
9    Q. What verification did you do on the
10 information underlying the numbers that appeared in
11 the top box?
12    A. I did not.
13    Q. So this document has five pages of references
14 to INV, which, I believe, means invoices.
15        Did you look at any of those invoices?
16    A. No.
17    Q. Did you consider whether or not certain items
18 on those invoices should or should not have been
19 included in total costs?
20    A. No.
21    Q. Who did verify that information?
22        MR. MERRETT: Form and foundation.
23        THE WITNESS: I don't know.
24 BY MR. BURNS:
25    Q. So your testimony is that you approved this

Page 59

1 invoice in the Meditech system without knowing if
2 anyone at all had verified the accuracy of the
3 information on the calculations sheet, right?
4    A. I did not verify myself.
5    Q. But you didn't know if anyone had done it at
6 all, right?
7    A. Whoever created that.
8    Q. But you don't even know who that is.
9    A. I don't know.
10    Q. So you didn't ask anyone if they had done it
11 correctly?
12    A. No.
13    Q. You didn't evaluate the method they had used?
14    A. No.
15    Q. You didn't look at the information yourself?
16    A. No.
17    Q. So you have no way of knowing, when you
18 approved this, one way or the other of whether or not
19 the information is accurate, right?
20    A. Uh-huh. Yes.
21    Q. What did Tadd Greenfield tell you this was
22 for?
23    A. He told me termination fee.
24    Q. What else did he tell you?
25    A. That's about it.

Page 60

1    Q. You actually called Nicole Hardy on
2 August 27th and told her to process this, didn't you?
3    A. Yes.
4    Q. What did you tell her?
5    A. I tell her to process these invoices.
6    Q. What did she ask you about the invoices --
7 about the invoice?
8    A. I don't recall what she -- what was her
9 response. She said okay, and then she processed
10 them.
11    Q. Why apply pressure to Nicole Hardy to process
12 the invoice on August 27th?
13    A. I did not.
14        MR. MERRETT: Form.
15 BY MR. BURNS:
16    Q. Why call her to do it?
17    A. Because usually whenever it's something that
18 needs to be processed, I always call her.
19    Q. You don't call Nicole Hardy for every invoice
20 processing, do you?
21    A. Not every invoice, but sometimes I call her
22 to do it. A lot of times an invoice that -- they
23 send it to the hospital, and they never received it.
24 It was late, like, two months, and they are asking
25 for the payment. So I call her to process it right

Page 61

1 now and send it to me so I can process that through
2 the bank.
3    Q. And here you did process this payment through
4 the bank, right?
5    A. Yes.
6    Q. The transfers of the Wells Fargo bank, those
7 were done by you, right?
8    A. Yes.
9    Q. We'll talk about those in a minute.
10        Nicole Hardy had some concerns about
11 processing this payment, didn't she?
12    A. As far as I know, no.
13    Q. When did you talk to Tom Matenaer on
14 August 27th about this invoice?
15    A. I don't recall talking to him.
16    Q. Didn't you talk to Tom Matenaer and Tom asked
17 you for backup information supporting the invoice?
18    A. I don't know.
19        MR. BURNS: We'll mark Exhibit 51.
20        (Deposition Exhibit No. 51 was marked for
21 identification.)
22        MR. BURNS: I marked the wrong one.
23 Let's mark that as Exhibit 52.
24        (Deposition Exhibit No. 52 was marked for
25 identification.)

Page 62

1  BY MR. BURNS:
2    Q. I'm looking at Exhibit 52.
3    **A. Okay.**
4    Q. I know you're not on this email, but
5  Mr. Matenaer writes, "Just spoke with" -- you know,
6  I'm having trouble pronouncing your first name, and I
7  apologize.
8    **A. No worries.  Tausif.**
9    Q. "Just spoke with Tausif about the large
10 invoice.  I had sent him an earlier email requesting
11 some sort of backup as the dollar amount is rather
12 large and unusual.  He told me that the appropriate
13 backup would be coming."
14        Do you see that there?
15   **A. Yes.**
16   Q. Does that refresh your recollection about a
17 conversation you had with Mr. Matenaer?
18   **A. See, I don't know.  I don't recall.**
19   Q. Didn't you tell Mr. Matenaer that you would
20 be providing backup?
21   **A. Yes, probably at that time, but I don't**
22 **recall the conversation.**
23   Q. What did you do to get the appropriate
24 backup?
25   **A. You know, these are the backup that we looked**

Page 63

1  at.  This is it.
2    Q. That's attached to the invoice, though.
3    **A. Yeah.**
4    Q. So Mr. Matenaer already had that, didn't he?
5    **A. He might.**
6    Q. So, I mean, what backup would be appropriate
7  for an invoice over $10 million?  It is a large
8  number for Sage, isn't it?
9    **A. Yes.**
10   Q. Biggest payment it's ever made?
11   **A. I don't know about that, but --**
12   Q. Biggest payment while you were there, right?
13       MR. MERRETT:  Let him finish his answer.
14 BY MR. BURNS:
15   Q. Biggest payment while you were there, right?
16   **A. I don't know.  I was there for about eight**
17 **months as the CFO.  At that time, yes.  Yes.**
18   Q. So what would be appropriate backup for
19 something that large?
20   **A. Backup that relates to that amount.**
21   Q. And backup on entitlement to it, right?
22   **A. I don't know.**
23   Q. When you're approving invoices, don't you
24 make sure that Sage actually owes it?
25   **A. Yes.**

Page 64

1    Q. So appropriate backup would be whether or not
2  Sage actually owed this, right?
3    **A. Yes.**
4    Q. Tell me about your impressions of
5  Mr. Matenaer.  I mean, you worked with him for
6  several months, didn't you?
7    **A. Couple months, yes.**
8    Q. What are your impressions of him?
9    **A. He was knowledgeable.**
10   Q. Like a competent accountant, right?
11   **A. Yes.**
12   Q. Would it surprise you that Mr. Matenaer
13 considered the Sage books to be the worst books he
14 had ever encountered in his career?
15   **A. I don't know.**
16   Q. You don't know if that would be a surprise?
17 I'm asking if it would be a surprise to you.
18   **A. I mean, what year?  When I was there in 2017,**
19 **the books were good.  When I left, the books were not**
20 **good.**
21   Q. I'm talking about in the time after Matenaer
22 joins -- middle of 2018.
23   **A. That was his -- that was his impression of**
24 **the financials at that time.**
25   Q. He thought it was a mess, right?

Page 65

1    **A. I don't know.**
2    Q. He told you when he was working with you that
3  the condition of the books were not good, right?
4    **A. I don't recall.**
5    Q. Why was Robert Huff brought in to help with
6  the books of Sage?
7        MR. MERRETT:  Foundation.
8        **THE WITNESS:  We hired through**
9  **Robert Huff not just one but a couple of people in**
10 **accounting to work with -- help Sage working on the**
11 **books.**
12 BY MR. BURNS:
13   Q. There's a problem that needed to get fixed,
14 right?
15   **A. It's -- it's normal to hire someone to help.**
16 **It's not necessarily that you have a problem with the**
17 **books.  It's always you hire someone to get efficient**
18 **and on time working on the books.  Sometimes when you**
19 **have that information but someone is not doing it**
20 **right, you hire someone so he can do it right.**
21   Q. And that's what Tom Matenaer was supposed to
22 do, right?
23   **A. Yeah.  Because the old controller -- she**
24 **left, so we had to hire someone.**
25   Q. You never saw Mr. Matenaer do anything



1  dishonest, right?
2  **A. No.**
3  Q. Let's turn you back to Exhibit 51. I took
4  these out of order, but it should be sitting right in
5  front of you.
6  **A. Yes.**
7  Q. You were under enormous pressure from the
8  Razaghi Healthcare folks to report positive financial
9  results to the board of directors, weren't you?
10  MR. MERRETT: Form.
11  **THE WITNESS: No.**
12  BY MR. BURNS:
13  Q. There was some pressure, wasn't there?
14  **A. No.**
15  MR. MERRETT: Form.
16  BY MR. BURNS:
17  Q. You desired to report positive financial
18  results, right?
19  **A. No.**
20  Q. In fact, you manually changed the books of
21  Sage to turn losses into profits, didn't you?
22  **A. No.**
23  Q. You did it at least once, didn't you?
24  **A. No.**
25  Q. Mr. Matenaer objected to the way that you

1  handled certain books and records, didn't he?
2  **A. I don't recall.**
3  Q. Let's look at Exhibit 51. It's an email
4  chain. These appear to have a time zone issue. So I
5  believe that in reality they -- as you go up, they're
6  later emails, but the times don't seem to match.
7  We'll start at the bottom.
8  Is that your email there sent Monday,
9  August 27th at 11:30 a.m.?
10  **A. Yes.**
11  Q. The body of the email states, "Could you
12  please adjust AHCCCS contractual of $2.8 million in
13  June financial, send me an updated one."
14  **A. Yes.**
15  Q. That was you changing a profit and loss
16  statement, right?
17  **A. You have to understand the contractual, what**
18  **that is.**
19  Q. I would like to learn today. That's you
20  changing it, right?
21  **A. Yes.**
22  Q. So Tom writes back to you in the next email
23  up -- so we're looking at an email from
24  Thomas Matenaer on August 27 at 10:57 a.m. I don't
25  think we're time traveling. I think we have a time

1  zone issue.
2  It says, "Hey, got your email." Then it
3  confirms what you want. I'm just orienting you.
4  Then we go to the top, and you write, "Yes."
5  **A. Correct.**
6  Q. So you're making a manual $2.8 million
7  adjustment, right?
8  **A. Yes.**
9  Q. If we turn to the second page of
10  Exhibit 51 -- and I'm looking at Bates number ending
11  in 4795.
12  **A. Okay.**
13  Q. I'm looking at the column entitled "June 2018
14  Activity." The document is entitled "Comparative
15  Profit and Loss Statement for Period Ending June 30,
16  2018."
17  Do you see that, sir?
18  **A. Yes.**
19  Q. As CFO one of your jobs is producing these
20  profit and loss statements and reporting them to
21  Razaghi Healthcare leadership and, therefore, the
22  board of directors, right?
23  **A. Yes.**
24  Q. So when we're looking at these columns, we're
25  looking at revenue, right?

1  **A. The top one is revenue.**
2  Q. Right. So let's look at Inpatient Revenue,
3  which is the top row of the June 2018 column. We'll
4  only be talking about the June 2018 column.
5  **A. Yes.**
6  Q. I see there that inpatient revenue from
7  AHCCCS is 231-some thousand, right?
8  **A. Yes.**
9  Q. And then there's commercial, which is like
10  12,000.
11  **A. Uh-huh.**
12  Q. Indian Health Services, which is like 55,000,
13  and Medicare is 191,000.
14  **A. Correct.**
15  Q. And then I'm going down to the Outpatient
16  Revenue row. And apparently a lot more revenue comes
17  from outpatient.
18  Was that your experience?
19  **A. Yes.**
20  Q. AHCCCS we see 1.6 million-plus column.
21  **A. Yes.**
22  Q. And then it goes down to other sources. But
23  when we get to total outpatient revenue of
24  $3.2 million, that's not actually dollars that have
25  reached Sage's bank accounts, right?

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 20 of 109    Tausif Hasan

Page 70

1    A. 3.2 million is the net.
2    Q. Net billings, right?
3    A. Net billings.
4    Q. Right. So that's not actually money that has
5    reached Sage's bank account, right?
6    A. No. That doesn't work that way.
7    Q. Those are bills that have gone out, right?
8    A. Right. That's the AR side.
9    Q. In your experience -- and you've been in
10   healthcare accounting for a long time --
11   A. Yes.
12   Q. -- when you bill a government entity like
13   AHCCCS $1.6 million, they don't pay $1.6 million,
14   right?
15   A. That is correct.
16   Q. They pay substantially less.
17   A. About -- depending on what services you
18   provide, sometimes 60 percent, sometimes 80 percent.
19   It depends. Same with Medicare.
20   Q. 60 to 80 percent less or 60 to 80 percent of
21   the face amount?
22   A. Whatever you bill, they pay you about
23   60 percent of that bill.
24   Q. And that's true with commercial insurance
25   too.

Page 71

1    A. Commercial is the same way. They even pay
2    less -- a little bit less.
3    Q. And then dental, they pay even less, right?
4    A. Dental is pretty much the same. I think they
5    pay about 70 percent of the bill.
6    Q. So for all of these -- and I'm looking at the
7    Outpatient Revenue row. These are all billings that
8    have gone out totaling 3.2 million, right?
9    A. That's correct.
10   Q. And then Deductions From Patient Revenue is
11   the next row down. That's what I wanted to talk to
12   you about.
13   A. Okay.
14   Q. So when AHCCCS pays about 60 percent of what
15   you bill them, when you're putting this information
16   on the profit and loss statement, you account for how
17   much you actually expect to get dollars in the door
18   later, right?
19   A. Correct.
20   Q. And so this deduction -- and I'm not saying
21   it's exactly the right number, but this deduction
22   that's taken on this sheet deducts 735-some thousand
23   dollars from the 1.6 million.
24   A. Uh-huh.
25   Q. So they're saying about 40 percent is going

Page 72

1    to be taken off for collections, right?
2    A. Not for that month. We are talking about
3    adjustment. It's pretty common in the hospitals that
4    you look at the year-to-date contractuals, and then
5    you calculate it. And then if you think that we have
6    less contractuals that we deducted before, we adjust
7    it. Sometimes you get less. Sometimes you get more.
8       Contractual is something you calculate
9    based on whatever their contract is. If you're
10   getting 60 percent or 70 percent, then you say,
11   "Okay. We will probably get" -- because as the day
12   gets older -- let's say 120 days and above. If you
13   haven't received payment, then the chances are you're
14   not going to get it. And then you have to
15   contractual percentage higher.
16   Q. The way you take that deduction -- this is an
17   accrual account, right?
18   A. Yes.
19   Q. The way you take that deduction depends on
20   how old the invoice is, what the services were for.
21   They might pay more for one thing and less for
22   another, right? That all goes into how you calculate
23   this deduction.
24   A. Yes.
25   Q. But you take a deduction from 1.6, right?

Page 73

1    A. In this case, the deduction -- again, you
2    look at year-to-date numbers, and then we deduct it.
3    But for that month, we did that deduction of 2.9.
4    Q. I'm trying to understand -- before we skip
5    ahead to the 2.8 --
6    A. Okay.
7    Q. -- this $1.6 million in billings to AHCCCS is
8    supposed to have a deduction from it, right?
9    A. Yes.
10   Q. And AHCCCS is never going to pay 1.6 million,
11   right?
12   A. That is correct.
13   Q. And they're definitely not going to pay more
14   than 1.6 million, right?
15   A. Correct.
16   Q. So when you make a $2.8 million deduction --
17   let's turn the page -- you're actually adding -- I'm
18   trying to not be too technical.
19   A. Okay.
20   Q. You're actually adding $2.8 million to the
21   AHCCCS deduction. So instead of having a deduction
22   of 700-some thousand, we now have a deduction of
23   positive over 2 million, right?
24   A. Yes.
25   Q. So now reflected in the June profit and loss



Page 74

1  that's going to be presented to the board of
2  directors, we not only have AHCCCS being billed
3  1.6 million and paying that 1.6 million, but they're
4  also paying an additional $2 million on top of that,
5  right?
6        MR. MERRETT:  Form.
7        THE WITNESS:  This is not how that works.
8  Contractual basis is based on whatever the
9  year-to-date contractural is, and then you make that
10  decision whether to reduce it or increase it.
11  Whether that will be June, whether that will be
12  September -- I mean, we will have to look at it and
13  see when do we have to make an adjustment.
14  BY MR. BURNS:
15     Q. You're never adjusting a deduction to be more
16  than what was billed, right?
17     A. Not -- not more than what was billed.  I'm
18  not talking about for the month.  I'm talking about
19  for the year.
20     Q. But if you have concerns about deductions
21  that were taken before June 2018, you should make
22  changes to those deductions before June 2018, right?
23  You don't just add $2.8 million to June 2018, right?
24     A. It's difficult to explain, but that's how it
25  is in the hospitals.  That's how we work on

Page 75

1  contractuals based on the revenue that we billed.
2  And then we do it a couple of times in a year to
3  adjust the contractuals based on the year-to-date
4  numbers.
5     Q. You would make an adjustment for an entire
6  year during one month?  You would have a deduction
7  for $1.6 million in revenue yield a positive
8  $2 million number?
9     A. So if you look at the AHCCCS revenue for the
10  year to date, it's about 18 million.  So you are
11  reducing it by 2 million for the year to date.
12     Q. But you are arbitrarily adding $2.8 million
13  in June, right?
14     A. I don't know.
15     Q. Why wouldn't you adjust the deductions in the
16  months that you thought were wrong?
17     A. I don't know.
18     Q. It had the effect of erasing a loss in
19  June 2018, didn't it?
20     A. I don't know.
21     Q. You don't remember a loss being there?
22     A. I don't know.
23     Q. Do you not remember a loss in June 2018?
24     A. I don't know.
25     Q. We can agree that adding $2.8 million into a

Page 76

1  single month is not the right way to account for
2  that, right?
3     A. It is the right way.
4     Q. How did --
5     A. That's how I did it in other hospitals.
6     Q. How did you come up with $2.8 million?
7     A. I don't recall how I did it, but that was the
8  number.
9     Q. I'm turning to Exhibit No. 30.  I'm looking
10  at the second page of Exhibit 30, Bates number ending
11  in 3768.
12     A. 30?
13     Q. Yes.
14     A. Okay.
15     Q. I'm looking at the invoice page, not the
16  calculations page.
17     A. Okay.
18     Q. I may know the answer to this, but I have to
19  confirm it.
20        The $15 million number that appears in
21  the right column in the middle of the page -- do you
22  see that?
23     A. Are you looking at the invoice?
24     Q. Yes.
25     A. Okay.

Page 77

1     Q. -- who calculated that?
2        MR. MERRETT:  Foundation.
3        THE WITNESS:  I don't know.
4  BY MR. BURNS:
5     Q. Looking under the left column that's
6  connected to that, there's reimbursable legal and
7  professional services, pass-through expenses,
8  contract termination fee Section 5D and then a date
9  range.
10        Do you see that there?
11     A. Yes.
12     Q. Who wrote that?
13        MR. MERRETT:  Foundation.
14        THE WITNESS:  I don't know.
15  BY MR. BURNS:
16     Q. Who determined that legal and professional
17  expenses would be included in this?
18     A. I don't know.
19        MR. MERRETT:  Foundation.
20  BY MR. BURNS:
21     Q. Who included -- who decided to include
22  pass-through expenses in this?
23        MR. MERRETT:  Foundation.
24        THE WITNESS:  I don't know.
25        MR. BURNS:  Let's take an early break.

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 22 of 109    Tausif Hasan

Page 78

1              (Recess from 2:49 p.m. to 3:02 p.m.)
2    BY MR. BURNS:
3         Q. Let's go back on the record.
4              Let's take a look at Tab 17.
5         A. Okay.
6         Q. I'm looking at a memorandum dated July 24th.
7    It's Bates number ending in 62.
8         A. Yes.
9         Q. You saw this memorandum, correct?
10        A. Yes.
11        Q. You understood that Christi had angered some
12   people at Razaghi Healthcare, right?
13             MR. MERRETT: Form.
14             THE WITNESS: I don't know.
15   BY MR. BURNS:
16        Q. Why was Christi reassigned?
17             MR. MERRETT: Form and foundation.
18             THE WITNESS: I don't know.
19   BY MR. BURNS:
20        Q. So in July 2018, you had no knowledge as to
21   why Christi was reassigned?
22        A. No.
23        Q. What changed day to day after Christi got
24   removed from her co-CEO position?
25        A. Nothing changed for me.

Page 79

1         Q. Had you been working with Christi at all?
2         A. I did before.
3         Q. When is before?
4         A. I did before she left.
5         Q. So who took on Christi's duties after she
6    left?
7         A. Tadd Greenfield.
8         Q. Was that an improvement? A change? What was
9    different?
10        A. I don't know.
11        Q. You can't tell me anything that was different
12   between Tadd Greenfield's leadership and Christi's?
13        A. For me, it's the same. He's the
14   administrator co-CEO. I report to him, and that's
15   all I know.
16        Q. Did Mr. Greenfield take more of an interest
17   in accounting functions than Christi did?
18        A. He was helpful.
19        Q. In what ways?
20        A. He wants me to -- if I need any help, let me
21   know. If you need me, I'll be available.
22        Q. Did you take him up on that offer?
23        A. At the audit time, yes.
24        Q. Did you ever ask Mr. Greenfield for
25   documentation for the invoice of $10 million?

Page 80

1         A. No.
2              (Deposition Exhibit No. 53 was marked for
3    identification.)
4    BY MR. BURNS:
5         Q. What am I looking at here with Exhibit 53?
6              MR. MERRETT: Form; foundation.
7              THE WITNESS: It's the bank report.
8    BY MR. BURNS:
9         Q. What's an ACH payment?
10        A. ACH is the form of automatic payment to the
11   vendors who are on EFTs.
12        Q. So I'm looking at a single line time sort of
13   in the middle. There's a Beneficiary Name, a
14   Beneficiary ID and then some more information.
15             Do you see that there?
16        A. Let me see here. Are you looking at
17   Beneficiary Status?
18        Q. The row above that.
19        A. Oh, Beneficiary Name. Yes.
20        Q. And if we just stay on that row, do you see
21   where it says, "Razaghi Healthcare" under Beneficiary
22   Name?
23        A. Yes.
24        Q. If we stay on that row all the way across, we
25   see the Org amount of $10,855,134.15.

Page 81

1              Do you see that there?
2         A. Yes.
3         Q. This ACH payment -- if we look at the
4    middle -- it comes from an account number.
5              Are you familiar with that account
6    number?
7         A. It must be an operating account.
8         Q. It's the Sage operating account, right?
9         A. Yes.
10        Q. This payment from the Sage operating account
11   to Razaghi Healthcare, you initiated this ACH
12   payment, correct?
13        A. Yes.
14        Q. And when you did it, you knew that the
15   payment was going to Razaghi Healthcare?
16        A. Yes.
17        Q. Did you tell anyone from the Sage Board of
18   Directors that this was happening?
19        A. No.
20        Q. Did anyone tell you the Sage Board of
21   Directors had approved it?
22        A. No.
23        Q. Don't you think someone from Sage should have
24   been given the opportunity to review this before it
25   was approved?



Navajo Health Foundation - Sage Memorial vs.
Razaghi Development

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 23 of 109    Tausif Hasan

Page 82

1       MR. MERRETT:  Form and foundation.
2       **THE WITNESS:  I don't know.**
3       MR. BURNS:  This will be 54.
4       (Deposition Exhibit No. 54 was marked for
5   identification.)
6   BY MR. BURNS:
7       Q. I'm looking at an Account Details printout,
8   and I'm looking at Account Activity date August 27th.
9       Do you see that there?
10  **A. Yes.**
11      Q. There's a number of activities on
12  August 27th.  Most of them are small, but the top two
13  are the ones I'm focused on.
14  **A. Yes.**
15      Q. What is the $500,000 transfer?
16  **A. It was transferred from one account to**
17  **another.**
18      Q. Why was that transfer made?
19  **A. To make sure we have enough funds to cover**
20  **10.5.**
21      Q. The operating account didn't have
22  $10.8 million in it, right?  There wasn't enough to
23  cover a $10.8 million payment, right?
24  **A. Yes.**
25      Q. And so you needed to get an additional

Page 83

1   $500,000 from something else?
2   **A. Yes.**
3       Q. What was that something else?
4   **A. It was another account.**
5       Q. What was that account?
6   **A. I don't know.  I don't remember.**
7       Q. It was the account where the Indian Health
8   Service settlement payment monies were held, right?
9   **A. I don't know.**
10      Q. You don't know?
11      MR. MERRETT:  Asked and answered.
12      **THE WITNESS:  No.**
13  BY MR. BURNS:
14      Q. Did you know at the time?
15  **A. No.**
16      Q. You wouldn't grab money from a random
17  account, right?
18  **A. Right.**
19      Q. So you would have looked into the account you
20  were pulling $500,000 from before doing it?
21      MR. MERRETT:  Form.
22      **THE WITNESS:  Yes.**
23  BY MR. BURNS:
24      Q. If it did come from the Indian Health Service
25  settlement funds, that would have been improper,

Page 84

1   right?
2       MR. MERRETT:  Foundation.
3       **THE WITNESS:  I don't know.**
4   BY MR. BURNS:
5       Q. You were aware that Indian Health Service
6   settlement funds could not be paid to Razaghi
7   Healthcare, correct?
8       MR. MERRETT:  Form and foundation.
9       **THE WITNESS:  Yes.**
10  BY MR. BURNS:
11      Q. You were aware of it.  Yes?
12  **A. Yes.**
13      Q. Did you ever talk to Mr. Razaghi about the
14  payments we just discussed?  The transfer of over
15  $10 million from Sage to Razaghi Healthcare, did you
16  ever discuss that with Mr. Razaghi?
17  **A. No.**
18      Q. Before it happened, you didn't discuss it
19  with him?
20  **A. No.**
21      Q. What about after?
22  **A. No.**
23      Q. What about in the phone calls you've had with
24  him regarding defense of the case?
25  **A. No.**

Page 85

1       Q. You were aware there was an escrow account
2   that had been created to handle any potential
3   termination payment, right?
4       MR. MERRETT:  Form.
5       **THE WITNESS:  I don't know.**
6   BY MR. BURNS:
7       Q. You didn't know about an escrow account?
8   **A. No.**
9       Q. We just looked at Exhibit 54.  Who's the
10  signer on this account at Wells Fargo?  It's Razaghi
11  Healthcare, right?
12      **A. Razaghi Healthcare, yes.**
13      Q. So whose signature, if there was a physical
14  check, would actually go on a check out of this
15  account?
16      **A. That, I don't know.**
17      Q. Did you ever write a physical check out of
18  these accounts?
19      **A. No.**
20      Q. But Sage wasn't the signatory, right?
21      **A. That, I don't know.**
22      Q. What I'm trying to understand is:  It's
23  Razaghi Healthcare that was controlling the way these
24  funds were gathered and paid, right?
25      MR. MERRETT:  Foundation.

Navajo Health Foundation – Sage Memorial vs.
Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 24 of 109    Tausif Hasan

Page 86

1           THE WITNESS: I don't know.
2   BY MR. BURNS:
3       Q. Did Mr. Razaghi or Razaghi Healthcare ever
4   pay you anything beyond what you were paid by -- like
5   your salary?
6       A. No.
7       Q. How was your salary set? Was it a flat
8   number yearly, or how did it work?
9       A. It was hourly.
10      Q. Tell me about that.
11      A. I was getting paid, when I started, 60,000 a
12  year.
13      Q. That's what it added up to or that was the
14  agreed amount?
15      A. That's the agreed amount.
16      Q. When you say "hourly," what did hourly mean?
17      A. Hourly means hourly rate. So whatever that
18  was. 30 bucks an hour.
19      Q. And you billed for your time, right? You
20  kept track of your time and billed it?
21      A. Yeah. I mean, I put it on the timesheets.
22      Q. Did you get paid anything beyond your salary
23  at any time during your affiliation with Razaghi
24  Healthcare?
25      A. No.

Page 87

1       Q. What about Mr. Wauneka? How did he get paid?
2           MR. MERRETT: Form and foundation.
3           THE WITNESS: I don't know.
4   BY MR. BURNS:
5       Q. Are you aware of any payments made to
6   Mr. Wauneka of any kind?
7       A. No.
8       Q. Can you -- is there any document -- can you
9   point me to any document that exists where the
10  Sage Board of Directors approved the over $10 million
11  payment we have been discussing?
12      A. I don't know.
13      Q. I'm asking if you can identify any document
14  that does that.
15      A. I've never seen it, so I don't know.
16      Q. Where did the money go when it was
17  transferred to Razaghi Healthcare?
18          MR. MERRETT: Form and foundation.
19          THE WITNESS: I don't know.
20  BY MR. BURNS:
21      Q. I mean, it went to a Razaghi Healthcare
22  account, correct?
23      A. That's about it. We transferred it, and then
24  I don't know where it goes.
25      Q. Did you have any interaction or control over

Page 88

1   the Razaghi Healthcare accounts it was transferred
2   to?
3       A. No.
4       Q. Did anyone tell you -- did anyone ever tell
5   you what happened with the money after it was taken?
6       A. No.
7       Q. Did you receive any portion of the over
8   $10 million?
9       A. No.
10      Q. What were you paid total for your work with
11  Sage in the calendar year 2018? An approximation is
12  fine.
13      A. I was paid 70 bucks an hour at that time. I
14  was a contractor. So for seven or eight months,
15  maybe close to 80, 90,000.
16      Q. What about 2019? Did you get paid anything
17  no?
18      A. No, because I was not with Razaghi.
19      Q. After the termination payment is made -- and
20  we're talking August 27th -- does Razaghi Healthcare
21  depart immediately?
22      A. I don't know.
23      Q. Does Razaghi Healthcare still exert control
24  over Sage after August 27th?
25      A. I don't know.

Page 89

1       Q. Did you ever tell anyone from the board that
2   the payment had been made? What -- it had been made
3   on August 27th. What about in the future? Did you
4   tell anyone from the board that the payment had been
5   made?
6       A. No.
7       Q. Do you know how the board became aware the
8   payment was made?
9       A. No.
10      Q. Did anyone from the board ever ask you for
11  information about the payment?
12      A. No.
13      Q. Look at Exhibit 22. I'm looking at a letter
14  marked Exhibit 22, Bates number ending 4587.
15          Are we looking at the same document?
16      A. Yes.
17      Q. Have you seen this letter before?
18      A. No.
19      Q. You were aware in early August that there was
20  some controversy between Razaghi Healthcare and the
21  Sage board about something, right?
22          MR. MERRETT: Form.
23          THE WITNESS: No.
24  BY MR. BURNS:
25      Q. You became aware at some point during August,

Navajo Health Foundation – Sage Memorial vs.
Razaghi Development

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 25 of 109    Tausif Hasan

1 right?

2     MR. MERRETT: Form.

3     THE WITNESS: No. The meeting that I

4 went to -- I don't know what date it was, but they

5 had an executive session right away. We were out.

6 That was the only time that we were out without

7 explaining the audit reports because we were there

8 for the audit, and they didn't want us to explain

9 anything.

10 BY MR. BURNS:

11     Q. Why didn't -- "they" is the board, right?

12     A. Board.

13     Q. Why didn't the board want you to explain

14 anything?

15     A. I don't know.

16     MR. MERRETT: Foundation.

17 BY MR. BURNS:

18     Q. You attended this board meeting. Was it

19 August 20th?

20     A. I think, yes.

21     Q. Just to pin it down, it was before the

22 $10 million payment was made, right?

23     A. Yes.

24     Q. Tell me how this board meeting starts.

25     A. We were never in that meeting. We were in

1 there, and then they just got executive session right

2 away.

3     Q. So you're in the meeting room for a minute?

4     A. For a minute maybe.

5     Q. What happened?

6     A. They said, "We are going in an executive

7 session to vote."

8     Q. And then what do you do?

9     A. We go outside.

10     Q. Outside like outside the board meeting?

11     A. Yes.

12     Q. How far outside the board meeting?

13     A. About maybe ten feet.

14     Q. And how long do you wait for this executive

15 session?

16     A. About an hour and a half, two hours.

17     Q. So you're just sitting in the hallway --

18     A. Yes.

19     Q. -- that whole time.

20     And then do you eventually go back into

21 this meeting?

22     A. Yes.

23     Q. And what happens when you go back in?

24     A. They said, "We are done."

25     Q. So you spend a considerable amount of time

1 waiting in the hallway?

2     A. Yes.

3     Q. And what do you hear when you're in the

4 hallway?

5     A. I did nothing. I did not hear anything.

6     Q. How close to the door are you?

7     A. I said about ten feet.

8     Q. Were there loud, clear voices coming from the

9 meeting room?

10     A. Yes.

11     Q. So you could hear what people were saying,

12 right?

13     A. No. You can hear mumbling, but I don't know

14 what they are saying.

15     Q. Who's in the hallway with you?

16     A. Me, Tadd Greenfield.

17     Q. And who else?

18     A. An assistant, I think, Abigail Paul.

19     Q. Is anybody recording in the hallway?

20     A. I don't know.

21     Q. Were you recording in the hallway?

22     A. No.

23     Q. Did you see any kind of recorder?

24     A. No.

25     Q. Anybody else besides yourself, Mr. Greenfield

1 and the assistant in the hallway?

2     A. No.

3     Q. Who was taking notes in the hallway?

4     A. I don't know.

5     Q. Did you see anyone taking notes in the

6 hallway?

7     A. No.

8     Q. For the 90 minutes to 2 hours you were in the

9 hallway, were you talking to the other people in the

10 hallway?

11     A. I was talking to Tadd.

12     Q. Who was seated closest to the door?

13     A. I don't know.

14     Q. But you didn't notice anyone taking notes --

15     A. No.

16     MR. MERRETT: Asked and answered.

17 BY MR. BURNS:

18     Q. -- at any point during that, correct?

19     A. That's correct.

20     Q. Let's look at Exhibit 29. I'm looking at

21 Exhibit 29. It's an email from Ahmad Razaghi.

22     Do you see that there?

23     A. Yes.

24     Q. I see that you're not copied on it, but

25 that's not what we're talking about with you today.

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08072-DJH Trial vs. Document 421-8 Filed 11/26/24 Page 26 of 109 Tausif Hasan

Page 94

1      If you turn to the second page of
2   Exhibit 29, I'm looking at a Sage Board of Directors
3   meeting document dated August 20, 2018, at 4:00 p.m.
4      Do you see that?
5   **A. Yes.**
6   Q. Is that the meeting you attended?
7   **A. Yes.**
8   Q. We see here that present at the meeting --
9   there's a list of board of director members, and
10  there's a list of executive leadership.
11     Mr. Greenfield and yourself are listed as
12  attending. Do you see that?
13  **A. Yes.**
14  Q. And then these other management folks --
15  Abigail Paul, was she in the hallway with you?
16  **A. Yes.**
17  Q. Gary Pahe, was he in the hallway with you?
18  **A. No.**
19  Q. Ms. Nez, was she in the hallway with you?
20  **A. I don't recall.**
21  Q. And then we see Ms. Heather Grech. Do you
22  see that?
23  **A. Yes.**
24  Q. Who is Ms. Heather Grech?
25  **A. Auditor.**

Page 95

1   Q. Who did Ms. Heather Grech work for?
2   **A. Repeat that question.**
3   Q. Who did she work for?
4   **A. She's an auditor for Sage Memorial.**
5   Q. Is that an independent auditor or was she
6   paid by --
7   **A. Yes, independent auditor.**
8   Q. Tell me about your interactions with
9   Ms. Grech.
10  **A. Just the audit stuff. We discussed the --**
11  **whenever we had audit, if she had questions or she**
12  **wanted some reports, she let me know and then I**
13  **provided her.**
14  Q. That process was ongoing on August 20th,
15  correct?
16  **A. No.**
17  Q. It had concluded?
18  **A. Because we did -- the 2017 audit was done by**
19  **that time. We had the copies of it, but she reported**
20  **in this meeting to the board members.**
21  Q. Have you reviewed this document, Exhibit 29,
22  before?
23  **A. No.**
24  Q. Did you review it in preparation for your
25  testimony today?

Page 96

1   **A. No.**
2   Q. If we look at the second page -- actually,
3   starting at the bottom of the first page, there's an
4   account of what occurred inside the executive
5   session. The board asked Ms. Grech to report on the
6   fiscal year 2017 audit. It starts there.
7   **A. Right.**
8   Q. And then it runs all the way on to the next
9   page, and there's a large block of text there.
10     Do you see that there?
11  **A. Yes.**
12  Q. Have you ever read this account before?
13  **A. No.**
14  Q. I want you to take a minute, and I want you
15  to tell me if you heard any of this while you were
16  sitting in the hallway outside of the executive
17  session.
18  **A. No. No.**
19  Q. It seems to be a detailed account of what
20  happens during the meeting.
21  **A. But that was closed doors. Like I said, we**
22  **were listening to some mumbling, but I did not hear a**
23  **word what they were saying to each other.**
24  Q. I mean, was there detailed notes being taken
25  right outside the door by someone? Did you see that?

Page 97

1      MR. MERRETT: Asked and answered.
2      **THE WITNESS: No.**
3   BY MR. BURNS:
4   Q. Were you aware of anyone on the phone other
5   than Ms. Grech?
6      MR. MERRETT: Form.
7      **THE WITNESS: I don't know.**
8   BY MR. BURNS:
9   Q. I'm asking if you were aware of it. So you
10  either are or are not aware of it.
11  **A. I am not.**
12  Q. Going back to page 1 of Exhibit 29, I'm
13  looking at the second paragraph from the bottom. I'm
14  going to read it. "The conversation taking place in
15  the executive conference room was very loud and
16  portions of it could be overheard easily by the group
17  waiting in the hall."
18  **A. Okay.**
19  Q. "What was overheard follows:"
20     Do you see that?
21  **A. Uh-huh.**
22  Q. Is that true?
23  **A. Personally I did not hear anything. I can't**
24  **say about other people.**
25  Q. But you were having conversations in that

Page 98

1  hall yourselves, right?
2  **A. Me and Tadd, yes.**
3       MR. BURNS:  That will be 55.
4       (Deposition Exhibit No. 55 was marked for
5  identification.)
6  BY MR. BURNS:
7    Q. This is an email.  It's Bates No. 4484.
8  Exhibit 55 is an email from Tadd Greenfield on
9  Monday, September 3rd.
10      Did you receive this email?
11  **A. Yes.**
12   Q. Did you review this email?
13  **A. I probably read it.**
14   Q. I'm going to look at the bold Section 2 in
15  the middle.  It says, "Hospital Finance Policies."
16  **A. Uh-huh.**
17   Q. I'm trying to understand the broken
18  processes, inaccuracies and no standardized approach
19  that this paragraph references.
20      MR. MERRETT:  Wait a minute.  Is there a
21  question there?
22  BY MR. BURNS:
23   Q. I'm trying to understand it.  What were
24  there?
25  **A. What was the question?**

Page 99

1       MR. MERRETT:  Form and foundation.
2  BY MR. BURNS:
3    Q. What were the broken processes that
4  Mr. Greenfield references?
5       MR. MERRETT:  Foundation.
6  **THE WITNESS:  I don't know.**
7  BY MR. BURNS:
8    Q. What were the inaccuracies that
9  Mr. Greenfield references?
10      MR. MERRETT:  Foundation.
11  **THE WITNESS:  I don't know.**
12  BY MR. BURNS:
13   Q. When you read this, what did you understand
14  the inaccuracies to be?
15      MR. MERRETT:  Form; foundation.
16  **THE WITNESS:  I don't know.**
17  BY MR. BURNS:
18   Q. The email says you've made significant
19  improvements in finance over the past several months;
20  is that true?
21  **A. Whatever we can, we try to improve.  Yes.**
22   Q. I just want to be clear.  You have no
23  understanding of what the broken processes,
24  inaccuracies and no standardized approach is
25  referencing?  You have no understanding what that is?

Page 100

1  **A. No.**
2    Q. It identifies in the first sentence,
3  "significant issues in the finance department with
4  regards to policies, practice, and processes."
5       Do you see that there?
6  **A. Uh-huh.**
7    Q. What is your understanding of what that
8  meant?
9       MR. MERRETT:  Form.
10  **THE WITNESS:  I don't know.**
11      MR. BURNS:  This will be Exhibit 56.
12      (Deposition Exhibit No. 56 was marked for
13  identification.)
14  BY MR. BURNS:
15   Q. I'm looking at Exhibit 56.  It starts with
16  Bates number ending in 4968.  I'm looking at the last
17  page, and it indicates it's copied to several people
18  including Mr. Hasan.
19      Do you see that, sir?
20  **A. Yes.**
21   Q. Do you review this letter when it was sent?
22  **A. No.**
23   Q. Did you receive it?
24  **A. Yes.**
25   Q. Did you look at it, though, when you did

Page 101

1  receive it?
2  **A. I don't recall.**
3    Q. There's a reference in the middle of the
4  first page of Exhibit 56 to a July 23rd special board
5  meeting.
6       Do you see that?
7  **A. Yes.**
8    Q. You were not at that board meeting, correct?
9  **A. No.**
10   Q. Would you agree with me that Sage was
11  entitled to records regarding payments that Sage had
12  made to Razaghi Healthcare?
13      MR. MERRETT:  Foundation.
14  **THE WITNESS:  I don't know.**
15  BY MR. BURNS:
16   Q. If someone from the Sage board had asked you
17  for -- strike that.
18      You're aware that Razaghi Healthcare
19  refused to provide information about payments that
20  had been made, correct?
21      MR. MERRETT:  Form.
22  **THE WITNESS:  I don't know.**
23  BY MR. BURNS:
24   Q. I'm going to jump back to the August 20th
25  meeting.

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 28 of 109    Tausif Hasan

Navajo Health Foundation - Sage Memorial vs.
Razaghi Development

Page 102

1    A. Okay.
2    Q. You became aware, as a result of your
3    attendance at that meeting, that there was
4    controversy between Sage and Razaghi Healthcare,
5    correct?
6        MR. MERRETT:  Form; foundation.
7        THE WITNESS:  No.
8    BY MR. BURNS:
9    Q. I'm asking if you became aware of it.  Did
10   you become aware of it?
11   A. No.
12       MR. BURNS:  We'll go off the record.
13       (Recess from 3:38 p.m. to 3:39 p.m.)
14   BY MR. BURNS:
15   Q. We can go back on.
16       Did you ever have a conversation with
17   Mr. Wauneka of any kind?
18   A. No.
19   Q. Did Mr. Wauneka ever communicate to you that
20   Sage was terminating the Razaghi Healthcare contract?
21   A. No.
22   Q. Has someone else told you that Mr. Wauneka
23   said that?
24   A. No.
25   Q. That's the first time you're hearing that

Page 103

1    fact today, something like that?
2    A. When we receive the invoice.
3    Q. What when you received the invoice?
4    A. About the termination fee.
5    Q. I'm asking about communications from
6    Mr. Wauneka.
7    A. No.
8    Q. No one has ever told you that Mr. Wauneka
9    communicated that a termination was occurring?
10   A. No.
11       MR. BURNS:  Let's mark that as 57.
12       (Deposition Exhibit No. 57 was marked for
13   identification.)
14   BY MR. BURNS:
15   Q. I'm looking at Exhibit 57.  At the bottom
16   right, it looks like the Bates numbers got trimmed.
17   I'm looking at page 3 of 4, which is the third actual
18   page of Exhibit 57.
19       In the middle of the page, there's an
20   email -- at the bottom of the page, there's an email
21   that says August 6, 2018, from Ahmad Razaghi to you,
22   right?
23   A. Yes.
24   Q. Mr. Razaghi says, "Please send me a note with
25   average of last 4 years of payments made by Navajo

Page 104

1    Sage to RH."
2        Do you see that there?
3    A. Yes.
4    Q. And then do you see the contract text beneath
5    that?
6    A. Yes.
7    Q. You were sent portions of the Razaghi
8    Healthcare contract, weren't you?
9    A. Yeah.  They send it to me, but I never pay
10   attention to those.
11   Q. If we move one email up, on August 6, 2018,
12   at 11:09 a.m., you wrote, "Ahmad, Attached is the
13   last four years payments/average."
14   A. Yes.
15   Q. So you actually did those calculations,
16   right?
17   A. Which one?
18   Q. The ones you sent on August 6th, right?
19   A. Okay.  Do you have a copy of that
20   calculation?
21   Q. We'll get there.
22       So you did the calculations you sent on
23   August 6th, correct?
24   A. I want to see that calculation to make sure
25   that I did that.

Page 105

1    Q. You sent it on August 6th, right?
2    A. Okay.
3    Q. Did you?
4    A. I did.  Yeah.
5    Q. You wouldn't lie in an email, right?
6    A. Right.
7    Q. So, I guess, the question I'm trying to get
8    to is:  You knew that Mr. Razaghi was contemplating
9    terminating at least by August 6, 2018, correct?
10   A. No.
11   Q. Why is he calculating a termination payment
12   if he's not terminating?
13   A. Information purposes.
14   Q. You knew that termination is something that's
15   at issue, right?
16   A. I don't know.
17   Q. Let's go one email up on August 7th.  There's
18   a lot of acronyms in here.  I'd like you to explain
19   to me what you meant when you talk about backup.
20   A. Which column are you looking at?
21   Q. So you send an email on August 7, 2018.
22   A. Okay.  What is the question?
23   Q. Why are you saying the calculation should be
24   based on audits?
25   A. That's what I did the calculation based off.

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 29 of 109    Tausif Hasan

Page 106

1  **The audit numbers are the final numbers.**
2    Q. You had an opinion on how to calculate the
3  termination payment, right?
4    **A. No.**
5    Q. Why are you saying it should be based on
6  audits?
7    **A. Audit is always the final numbers. Whenever**
8  **we calculate something prior years, it's based on the**
9  **financial audit numbers. So we calculated the**
10  **audited financial numbers. You calculate whatever**
11  **the amount was.**
12    Q. When you write, "Comparison audit vs. GL,"
13  you mean general ledger, correct?
14    **A. Correct.**
15    Q. And you write, "In fiscal year 2014-2015" --
16  that's what FY means, right? Fiscal year?
17    **A. Yes.**
18    Q. -- "general ledger is lower than audit in
19  2014 over 2 million (see Meditech report)."
20      Do you see that?
21    **A. Yes.**
22    Q. So you were telling him to use the audit
23  because it's higher, correct?
24    **A. I don't know.**
25    Q. The audit is higher, right?

Page 107

1    **A. Yes.**
2    Q. And then you tell him the calculation should
3  be based on audits, right?
4    **A. The audit is the final number. That is the**
5  **reason.**
6    Q. You're teaching Mr. Razaghi how to increase
7  his payment by over $2 million, aren't you?
8    **A. No.**
9    Q. Let's look at the second to the last page of
10  Exhibit 57. I see something approximating an Excel
11  spreadsheet. One column is entitled "Audited" and
12  one is "As per Meditech Report."
13      Do you see that there?
14    **A. Yes.**
15    Q. These calculations were prepared by you,
16  correct?
17    **A. Yes.**
18    Q. And specifically this $42,395,404, that was
19  prepared by you?
20    **A. Audited report, yes.**
21    Q. How did you decide what to include in that?
22    **A. These numbers are the net of the Sage**
23  **Memorial financials. You take that, and then you**
24  **average that out.**
25    Q. What does net mean in the sentence you just

Page 108

1  used?
2    **A. Net means whatever is left after the**
3  **operating costs, contractuals. Whatever the**
4  **remaining is is the net.**
5    Q. So what is an operating cost, for example?
6    **A. Salaries, wages, purchase services, fixed**
7  **assets, interest.**
8    Q. So what you calculated here was the amount
9  that had been paid in the -- to Razaghi Healthcare
10  without expenses included, right?
11    **A. Not to Razaghi. This is the numbers from**
12  **Sage -- the audited numbers from Sage.**
13    Q. Right. The numbers paid to Razaghi, correct,
14  by Sage?
15    **A. I don't know. Yeah. I don't recall.**
16    Q. Let's look at page 3 again.
17    **A. Okay.**
18    Q. I'm looking at Mr. Razaghi's August 6th
19  email. We looked at it to start this.
20    **A. Okay.**
21    Q. It says, "Please send me a note with average
22  of the last 4 years of payments made by Navajo Sage
23  to RH."
24    **A. Okay.**
25    Q. So you were calculating payments made by

Page 109

1  Navajo Sage to RH, correct?
2    **A. Right.**
3    Q. And when you say "net," what is that supposed
4  to include?
5    **A. Net, again, is take out the operating costs,**
6  **contractuals. And whatever the net is, that's what**
7  **the net -- cost on the P&L side.**
8    Q. What do you exclude? I'm trying to
9  understand what operating costs are. If you have a
10  Xerox machine that's being rented, does that go into
11  that number?
12    **A. Yes, an operating cost.**
13    Q. And that would not show up here or would show
14  up in the $42 million number?
15    **A. Yeah. Whatever that total net is -- that's**
16  **taking out of those pieces the total revenue minus**
17  **those operating costs, and then you have the net.**
18    Q. I'm trying to understand how you calculated
19  payments made by Sage to Razaghi Healthcare.
20    **A. Okay.**
21    Q. And I -- I understand some of this may be a
22  little bit confusing, but the way we're using net is
23  not how I understand net. So I'm trying to
24  understand what you mean. Okay. I'm trying to
25  understand what that $42 million represents.



Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 30 of 109    Tausif Hasan

Page 110

1    What type of payments to Razaghi
2  Healthcare are we talking about?
3      A. Those will be, you know, the monthly invoices
4  that Razaghi Healthcare sent to Sage Memorial.
5      Q. And what do you take out of those monthly
6  invoices?
7      A. From the Sage side?
8      Q. From -- so Razaghi Healthcare would send an
9  invoice, right?
10     A. Yes.
11     Q. What gets included in this $42 million number
12  and what gets excluded?
13     A. That, I don't know.
14     Q. I mean, you're the one that performed this
15  calculation. So how did you determine it?
16     A. I don't remember.
17     Q. You just included everything, right?
18     A. I don't know.
19     Q. I'm trying to understand what you thought
20  Mr. Razaghi was asking you for.
21        Was he asking you to include pass-through
22  expenses like Xerox machines? What was he asking you
23  for? What was your understanding?
24     A. No.
25     Q. You thought he intended for you to exclude

Page 111

1  pass-through expenses, right?
2      A. I don't know.
3      Q. You knew that when you were performing this
4  calculation, it could result in a payment to Razaghi
5  Healthcare, right?
6      A. I don't know.
7      Q. Well, it's the termination payment. You knew
8  what that was at the time, right?
9      A. I knew it when we received the invoice.
10  Before that, I did not know about the termination
11  payment.
12     Q. You know it at least as of August 6th when
13  Mr. Razaghi sent you this email, right?
14     A. So where does it says termination?
15     Q. If you look at the large, bold text sort of
16  at the bottom of the page on page 3 of 4 of
17  Exhibit 57 --
18     A. Yeah. I don't know. I don't know.
19     Q. I mean, you knew that this is a termination
20  payment at least as of August 6th, right?
21     A. No.
22     Q. You got an email?
23     A. No.
24     Q. Mr. Razaghi directed you to "see below" in
25  this email on August 6th, didn't he?

Page 112

1      A. Yes.
2      Q. Did you "see below"?
3      A. No. I just calculated whatever he was asking
4  for. I did not read the whole thing.
5      Q. You did not read the whole email?
6      A. No.
7      Q. So when you were calculating over $10 million
8  will be paid from Razaghi Healthcare -- from Sage to
9  Razaghi Healthcare, you didn't bother to read the
10  entire email; is that correct?
11     A. That's correct.
12        MR. BURNS: Let's go off the record.
13        (Recess from 3:53 p.m. to 4:09 p.m.)
14        (Deposition Exhibit No. 58 was marked for
15  identification.)
16  BY MR. BURNS:
17     Q. Back on the record.
18        I put in front of you Exhibit 58. It's
19  an email from Nicole Hardy to you.
20        Do you see that, sir?
21     A. Yes.
22     Q. The email body states -- it's August 7, 2018.
23  The email body states, "Please see the attached
24  Meditech report for the Razaghi payments made from
25  2013 to 2017." And the second page of the exhibit is

Page 113

1  some kind of accounting rendering.
2        Do you see that?
3      A. Yes.
4      Q. So you actually reached out to Nicole Hardy
5  to get the information about payments made from Sage
6  to Razaghi Healthcare from the Meditech system,
7  right?
8      A. Yes.
9      Q. You actually had a conversation with her
10  about it, right?
11     A. Yes.
12     Q. Tell me everything you remember about that
13  conversation.
14     A. That's exactly what it says here. I wanted
15  her to give me the Meditech payments from '13 to '17
16  that were recorded on the GL side.
17     Q. Did you give her any detail about what
18  payments meant or what to include or not include?
19     A. No.
20     Q. I'm going to jump back in time. We can close
21  Exhibit 58. I'm going to jump back in time.
22        We were talking about an August 20, 2018,
23  board meeting earlier. There was an executive
24  session, and you were in the hallway.
25        Do you remember this conversation?

Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08072-DJH — Document 421-8    Filed 11/26/24    Page 31 of 109    Tausif Hasan

Page 114

1   A. Yes.
2   Q. I wanted to ask something about -- what's
3   your understanding of what an executive session is?
4   **A. So when the board members just talk to them**
5   **about anything that they don't want anybody else to**
6   **be in that meeting.**
7   Q. So the idea is to exclude other people,
8   right?
9   **A. Right.**
10  Q. So you knew that the people in the hallway
11  were not supposed to be listening to that
12  conversation, right?
13  **A. Right.**
14  Q. And if you could hear the conversation, what
15  would you have done?
16  **A. If I could hear it, I can go farther.**
17  Q. And you would have done that, right?
18  **A. Yes.**
19  Q. Turn to Exhibit 10 in your notebook. I'm
20  looking at a document marked Exhibit 10, Bates number
21  ending in 1096.
22      Are we looking at the same document?
23  **A. Yes.**
24  Q. This is entitled "Escrow Agreement." I want
25  you to take a minute with it. Earlier you talked

Page 115

1   about not knowing about an escrow account. I want to
2   know if you knew anything about an escrow agreement.
3   **A. No.**
4   Q. You can take a minute to be sure. I just
5   want to make sure if you knew or did not know
6   anything about this escrow agreement.
7   **A. No, I do not. I saw that on the balance**
8   **sheet -- the escrow account -- but I didn't have any**
9   **knowledge of this.**
10  Q. You didn't know the purpose of the escrow
11  account on the balance sheet, right?
12  **A. Yes.**
13  Q. You knew an escrow account existed but not
14  its purpose?
15  **A. Yes.**
16  Q. Who would have been in charge of knowing
17  about its purpose?
18      MR. MERRETT: Foundation.
19      **THE WITNESS: I don't know.**
20  BY MR. BURNS:
21  Q. If you had a question about what the escrow
22  account was -- you didn't know what it was, right?
23  **A. Right.**
24  Q. If you had a question, who would you have
25  asked?

Page 116

1   A. Tadd Greenfield.
2   Q. Let's look at Exhibit 3 to Exhibit 10. We're
3   looking at Bates number ending in 1113.
4       MR. MERRETT: I'm sorry. You said
5   Exhibit 3?
6       MR. BURNS: Exhibit C as in Charlie. I
7   may have misspoke.
8       **THE WITNESS: Exhibit C.**
9   BY MR. BURNS:
10  Q. If you look at Bates No. 1113 at the bottom
11  right, that will get you there.
12  **A. Okay.**
13  Q. It's very near the back.
14  **A. Okay.**
15  Q. If you turn the page to 1114, there's the
16  document actually appearing. It seems to be some
17  kind of trust services statement from Wells Fargo.
18      Do you see that there?
19  **A. Yes.**
20  Q. You just weren't aware of this -- the purpose
21  of this Wells Fargo account, right?
22  **A. Yes.**
23  Q. I'm sorry. You were not aware, correct?
24  **A. Correct.**
25  Q. What were your impressions during the time

Page 117

1   you worked at Sage -- actually, once you returned to
2   Sage as CFO in December of 2017, what were your
3   impressions of Christi El-Meligi? I'm sorry. I'm
4   very bad at the names. You know who I'm talking
5   about, right?
6   **A. Yes.**
7   Q. What were your impressions of her
8   professional competence?
9   **A. She was not a competent leader.**
10  Q. And what about Netrisha Delgai? Did you have
11  any interactions with her?
12  **A. Not that much. So I don't know about her.**
13  Q. Did you have any impressions of her
14  professional competence?
15  **A. No.**
16  Q. When did you become aware that Christi and
17  Matt were complaining to the board about -- strike
18  that.
19      When did you become aware that Christi
20  was complaining to the board about Razaghi
21  Healthcare's financial practices?
22      MR. MERRETT: Form and foundation.
23      **THE WITNESS: I don't know.**
24  BY MR. BURNS:
25  Q. Did you become aware of it at some point?



Navajo Health Foundation - Sage Memorial vs. Razaghi Development

Case 3:23-cv-08073-DJH    Document 421-8    Filed 11/26/24    Page 32 of 109    Tausif Hasan

1    A. No.
2    Q. That's the first time you're hearing that
3 today?
4    A. Yes.
5    Q. You were unaware that Christi was alleging
6 financial improprieties being committed by Razaghi
7 Healthcare?
8    A. I don't know.
9    Q. I'm asking if you're aware.
10    A. No.
11    Q. You had no awareness of that?
12    A. No.
13    Q. Did you know -- do you have any awareness
14 that Christi was claiming that there were
15 improprieties in the audits that were being done of
16 Sage's finances?
17    A. No.
18    Q. You just learned that when I asked you that,
19 right?
20    A. Yes.
21    Q. You can go ahead and look at Exhibit 16 in
22 your book.
23    A. Okay.
24        MR. BURNS: Let's mark 59.
25

1        (Deposition Exhibit No. 59 was marked for
2 identification.)
3 BY MR. BURNS:
4    Q. Let's start with 59. Do you have that in
5 front of you, sir?
6    A. Yes.
7    Q. They're remarkably similar documents, so
8 we'll be detailed to keep the difference between the
9 two.
10        We can see at the top left above the
11 caption there's a law firm Thorpe Shwer.
12        Do you see that?
13    A. Yes.
14    Q. Is that your law firm?
15    A. Yes.
16    Q. I'm not going to ask you about conversations
17 you've had with your counsel. That's important with
18 a document like this. So my questions are not
19 intended to implicate the conversations you've had
20 with counsel. So you don't need to include that in
21 your answers, but I need to ask some questions about
22 this document.
23        We can see in the first line -- it's
24 actually at line number 22 on the page. "Defendants
25 Razaghi Development Company, LLC, Ahmad R. Razaghi

1 and Tausif Hasan" -- I'm skipping a line -- "hereby
2 submit first First Supplemental Responses to
3 Plaintiff's First Set of Interrogatories."
4        Do you see that line there?
5    A. Yes.
6    Q. What I'm trying to understand is: You
7 understand you're a defendant in this action, right?
8    A. Yes.
9    Q. Did you review these supplemental responses
10 before they were made?
11    A. No.
12    Q. At page 13 of the supplemental responses,
13 there's an Interrogatory No. 6.
14        Do you see that, sir?
15    A. Yes.
16    Q. I'll just state for you that interrogatories
17 are demands for information or questions, and legal
18 documents like this -- I know they're not authored by
19 clients. I'm not trying to play a trick, but here's
20 what I need to understand. This answer to No. 6, is
21 it something you agree with? Is it your answer, or
22 is there additional information we need to know?
23        MR. MERRETT: Form.
24 BY MR. BURNS:
25    Q. And so if you could read No. 6, I'll ask you

1 a few questions about it.
2    A. Okay.
3    Q. The answer to Interrogatory No. 6 runs on to
4 the next page, and it's the answer to Interrogatory
5 No. 6 I'm going to be primarily focused on. So you
6 may want to take a minute to review that.
7    A. Okay.
8    Q. I'm not going to represent this to you
9 because I don't know, but sometimes in supplemental
10 documents new text is bolded. That's what we believe
11 happened here, but it's something I'm going to be
12 asking you about.
13    A. Okay.
14    Q. When we have a joint document -- and here we
15 have multiple defendants -- sometimes one defendant
16 knows a lot about something and sometimes one
17 defendant knows not a lot about something. I'm
18 trying to ask what you know about the answer to
19 Interrogatory No. 6, these facts that are listed
20 here.
21        Do you know any of this, or is this not
22 something you know?
23    A. Repeat the question.
24    Q. Sure.
25        I'm trying to understand for the

Page 122

1  information that's listed in the answer to
2  Interrogatory No. 6 in Exhibit 59 -- is this
3  information you have knowledge of?
4  **A. No.**
5  Q. So this -- and I'm going to look at the
6  bolded text specifically on page 14 of Exhibit 59.
7  Do you have any knowledge about the facts
8  in the bolded text?
9  **A. No, not until August 27th.**
10  Q. What did you learn on August 27th?
11  **A. When we received the invoice.**
12  Q. Besides the knowledge of receiving the
13  invoice, is there anything else about this that you
14  have personal knowledge of? I'm looking at the
15  bolded text on page 14.
16  **A. No.**
17  Q. I want you to just take a minute and be sure.
18  This is our one chance to ask you about it, and we're
19  trying to understand what different defendants know.
20  Is there anything else, other than what
21  you told me, that you have personal knowledge about
22  in the bolded text on page 14 of Exhibit 59?
23  MR. MERRETT: Asked and answered.
24  **THE WITNESS: I don't know.**
25  BY MR. BURNS:

Page 123

1  Q. So you have no knowledge?
2  **A. No.**
3  MR. BURNS: I'm going to take two minutes
4  to talk to Sam real quick.
5  (Recess from 4:24 p.m. to 4:26 p.m.)
6  MR. BURNS: We'll go back on the record.
7  Nothing further for now.
8  MR. MERRETT: We'll read and sign.
9
10  (Deposition concluded at 4:26 p.m.)
11
12
13
14
_____
TAUSIF HASAN
15
16
17
18
19
20
21
22
23
24
25

Page 124

1      CERTIFICATE OF CERTIFIED REPORTER
2      BE IT KNOWN that the foregoing
proceedings were taken before me; that the witness
3  before testifying was duly sworn by me to testify to
the whole truth; that the foregoing pages are a full,
4  true and accurate record of the proceedings, all done
to the best of my skill and ability; that the
5  proceedings were taken down by me in shorthand and
thereafter reduced to print under my direction; I
6  have complied with the ethical obligations set forth
in ACJA 7-206(F) and ACJA 7-206 J(1)(g)(1) and (2).
7
8      I CERTIFY that I am in no way related to
any of the parties hereto, nor am I in any way
interested in the outcome hereof.
9
10      [X] Review and signature requested; any
changes made by the witness will be attached to the
original transcript
11      [ ] Review and signature waived/not requested
[ ] Review and signature not required
12
13      Dated at Phoenix, Arizona, this 9th of May,
2024.
14
15      /s/ Kristi K. Spires
16      Kristi K. Spires, RPR
Certified Reporter
17      Arizona CR No. 50135
18  *     *     *     *     *
19      I CERTIFY that GRIFFIN GROUP INTERNATIONAL,
has complied with the ethical obligations set forth
20  in ACJA 7-206(J)(1)(g)(1) through (6).
21
22      /s/ Pamela A. Griffin
23      GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
24      Arizona RRF No. R1005
25

Page 125

1  GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY
2  3200 East Camelback Road Suite 177 Phoenix, Arizona 85018
3  Tausif-Hasan-May 07, 2024
4  Errata & Signature due no later than June 14, 2024.
5
7  PAGE  LINE  CORRECTIONS/CHANGES      REASON
8  ___  ___  _____  _____
9  ___  ___  _____  _____
10  ___  ___  _____  _____
11  ___  ___  _____  _____
12  ___  ___  _____  _____
13  ___  ___  _____  _____
14  ___  ___  _____  _____
15  ___  ___  _____  _____
16  ___  ___  _____  _____
17  ___  ___  _____  _____
18  ___  ___  _____  _____
19  ___  ___  _____  _____
20  ___  ___  _____  _____
21  ___  ___  _____  _____
22  ___  ___  _____  _____
23  ___  ___  _____  _____
24  _____        _____
25  SIGNATURE OF WITNESS            DATE

# EXHIBIT 41

1 | **THORPE SHWER, P.C.**
André H. Merrett (No. 020889)
2 | Bradley D. Shwer (No. 022696)
Matthew T. St. Martin (No. 034037)
3 | 3200 North Central Avenue, Suite 1560
Phoenix, Arizona 85012-2441
4 | Telephone: (602) 682-6100
Email: docket@thorpeshwer.com
5 | Email: amerrett@thorpeshwer.com
Email: bshwer@thorpeshwer.com
6 | Email: switthoft@thorpeshwer.com
Email: mstmartin@thorpeshwer.com
7 |
*Attorneys Defendants Razaghi Development*
8 | *Company, LLC, Ahmad R. Razaghi and Tausif Hasan*

9

10 | **IN THE UNITED STATES DISTRICT COURT**

11 | **DISTRICT OF ARIZONA**

12 | Navajo Health Foundation – Sage Memorial    Case No. 3:23-cv-08072-DJH (DMF)
Hospital, Inc. d/b/a Sage Memorial Hospital,
13 |

14 |         Plaintiff,                          **DEFENDANTS' FIRST
                                                SUPPLEMENTAL RESPONSES TO**
15 | v.                                         **PLAINTIFF'S FIRST SET OF
                                                INTERROGATORIES**
16 |
Razaghi Development Company, LLC; Ahmad
17 | R. Razaghi; Tausif Hasan; and Does 1-10,

18 |         Defendants.

19 |

20 | AND ALL RELATED CLAIMS.

21

22 |         Defendants Razaghi Development Company, LLC ("RDC"), Ahmad R. Razaghi

23 | ("Razaghi") and Tausif Hasan ("Hasan") (collectively, "Defendants"), by and through

24 | counsel undersigned, hereby submit their First Supplemental Responses to Plaintiff's First

25 | Set of Interrogatories (the "Interrogatories"), as follows:

26 |                        **PRELIMINARY STATEMENT**

27 |         1.      These supplemental objections and responses are made solely for the

28 | purposes of and use in this litigation.

THORPE SHWER, P.C. *(left margin, vertical)*

9476273

2.    Defendants' investigation and development of all facts and circumstances relating to this action is ongoing. These supplemental responses and objections are made without prejudice to, and are not a waiver of, Defendants' right to rely on other facts or documents at trial.

3.    By making the accompanying supplemental responses and objections to the Interrogatories, Defendants do not waive, and hereby expressly reserve, their right to assert any and all objections as to the admissibility of such responses into evidence in this action, or any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege.

4.    Further, Defendants make the supplemental responses and objections herein without in any way implying that they consider the Interrogatories or responses thereto to be relevant to any party's claims or defenses and proportional to the needs of this case.

5.    Defendants' supplemental responses are based upon their present knowledge, information, and belief. Defendants expressly reserve the right to supplement, clarify, revise, or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental responses.

6.    Except for the facts explicitly admitted herein, no admission of any nature whatsoever is to be implied or inferred. The fact that a request herein has been answered should not be taken as an admission of, or a concession of the existence of, any facts set forth or assumed by such request. All responses must be construed as given on the basis of present recollection.

7.    In the event that any of Defendants' responses are ever read to the jury or to the Court, Defendants expressly require that any modifications or supplements to these responses be read as well.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.    Defendants object to the definition of "CEO Services Contract" as "the contract Razaghi Healthcare and Sage entered into on or around March 18, 2011, as subsequently amended." Defendants object to the characterization of any "CEO Services

2

Contract" because (a) Razaghi Healthcare, L.L.C. and Plaintiff entered a "CEO Services Contract" dated March 18, 2011; (b) Razaghi Development Company dba Razaghi Healthcare and Plaintiff entered an "Amendment No. 1 and Extension No. 1 to CEO Services Contract" dated May 17, 2013, which states that it "entirely supersede[d]" the March 18, 2011 "Original Contract" and is thus a restatement and not an amendment of the March 18, 2011 agreement; and (c) Defendant RDC and Plaintiff entered an "Amendment No. 2 to CEO Services Contract" dated June 16, 2017, which "entirely supersede[d] the Original Contract and the Original Contract as amended" and is also a restatement and not an amendment of the May 17, 2013 agreement.

2.      Defendants object to the definition of "Relevant Time Period" as "the time period from March 2011 to the present." Defendants object on the grounds that such time period is overbroad and not reasonably limited in time or temporally tied to the claims and defenses at issue in this matter. Indeed, the longest statute of limitations applicable to Plaintiff's claims is six years. Plaintiff filed its claim ostensibly subject to this statute of limitations on or about May 28, 2021. Alleged actions, omissions, and other events occurring more than ten years prior to the filing are not relevant to Plaintiff's claims.

3.      Defendants object to the definitions of "Document," "Documents," "Communication," "Person," "Persons," "Relating to," "Regarding," "Concerning," "Identify," "Describe," and "Specify," to the extent they are inconsistent with the Federal Rules of Civil Procedure, or to the extent they do not comport with the ordinary meaning of those words.

4.      Defendants further object to the definitions of "RDC" or "Razaghi Healthcare" to the extent they purport to impose on Defendants an obligation to produce information from any person or entity other than RDC, or to the extent they purport to impose an obligation on RDC to produce information that is not in RDC's possession, custody, or control.

## GENERAL OBJECTIONS

The following General Objections apply to each of the Interrogatories and shall have

3

the same force and effect as if set forth in full in response to each individually numbered request.

1.    Defendants object to each of the Interrogatories to the extent that they seek information protected from discovery or exempted from disclosure by the attorney-client privilege, the attorney-work product doctrine, or any other applicable privilege, protection, immunity, law, or rule.

2.    Defendants object to each of the Interrogatories (and their accompanying Instructions) to the extent that they seek to impose burdens and obligations on Defendants that exceed those imposed by the Federal Rules of Civil Procedure or the Local Rules of Practice for the District of Arizona.

3.    Defendants object to each of the Interrogatories to the extent they are overly broad and unduly burdensome and seek information that is not relevant to any claims or defenses in this action.

4.    Defendants object to each of the Interrogatories to the extent they seek documents or information already in the possession of or readily available to Plaintiffs.

5.    Defendants incorporate by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendants do not waive their right to amend their responses.

## INTERROGATORIES

**INTERROGATORY NO. 1**:

Identify all Razaghi Healthcare employees, agents, representatives, subcontractors, and independent contractors, as well as all third parties hired or recruited by Razaghi Healthcare (including any attorneys, accountants, contractors, or other professionals), who provided services to or for the benefit of Sage or the Sage Board at any point during the Relevant Time Period. The identification shall, in addition to the information set forth in

. . .

THORPE SHWER, P.C.

4

9476273

1  the definition for "Identify" above, include a description of each person's role and title, by

2  date, during all times that the person provided such services.

3  **RESPONSE:**

4      In addition to the Preliminary Statement, Objections to the Definitions and

5  Instructions, and General Objections listed above, Defendants object to Interrogatory No.

6  1 because it is overly broad and unduly burdensome, including but not limited to, because

7  it is not reasonably limited in time, location, or subject matter. ***Any interrogatory which***

8  ***is too general and all-inclusive need not be answered. Auer v. Hershey Creamery Co.,***

9  ***1 F.R.D. 14 (D. N.J. 1939); Stovall v. Gulf and South American Steamship Company,***

10 ***Inc., 30 F.R.D. 152 (S.D. Tex. 1961). Plaintiff cannot reasonably be expected to know***

11 ***"all" of anything and a court would likewise have difficulty making an enforceable order***

12 ***requiring Plaintiff to identify "all" of anything.***

13      Defendants also object to this Interrogatory because it would cause unreasonable

14 annoyance, oppression, burden, or expense and would require Defendants to undertake an

15 unreasonable investigation. It is unreasonable and would take excessive time and cost for

16 Defendants to gather information as requested. Defendants further object to this

17 Interrogatory to the extent it seeks information that is equally available to Plaintiff as it is

18 to Defendants. Subject to the foregoing, pursuant to Fed. R. Civ. P. 33(d), Defendants refer

19 Plaintiff to the following documents, which contain information responsive to this

20 Interrogatory No. 1 for the time period relevant to Plaintiff's claims, May 2015 to August

21 2018: [RDC Sage_007794 – RDC Sage_007966]. Defendants reserve the right to

22 supplement, clarify, revise, or correct its response to this Interrogatory.

23

24 **INTERROGATORY NO. 2**:

25      For each person identified in response to Interrogatory No. 1, identify all services

26 provided by that person to or for the benefit of Sage, all amounts charged to Sage for those

27 services, all rates charged to Sage for those services (including the time periods for each,

28 . . .

THORPE SHWER, P.C.

5

9476273

1  if different rates were charged at different times), and the contractual or other basis for the

2  amounts charged.

3  **RESPONSE**:

4      In addition to the Preliminary Statement, Objections to the Definitions and

5  Instructions, and General Objections listed above, Defendants object to Interrogatory No. 2

6  because it is overly broad and unduly burdensome, including but not limited to, because it

7  is not reasonably limited in time, location, or subject matter. ***Any interrogatory which is***

8  ***too general and all-inclusive need not be answered. Auer v. Hershey Creamery Co.,***

9  ***1 F.R.D. 14 (D. N.J. 1939); Stovall v. Gulf and South American Steamship Company,***

10  ***Inc., 30 F.R.D. 152 (S.D. Tex. 1961). Plaintiff cannot reasonably be expected to know***

11  ***"all" of anything and a court would likewise have difficulty making an enforceable order***

12  ***requiring Plaintiff to identify "all" of anything.***

13      Defendants also object to this Interrogatory because it would cause unreasonable

14  annoyance, oppression, burden, or expense and would require Defendants to undertake an

15  unreasonable investigation. It is unreasonable and would take excessive time and cost for

16  Defendants to gather information as requested. Defendants further object to this

17  Interrogatory to the extent it seeks information that is equally available to Plaintiff as it is

18  to Defendants. Subject to the foregoing, pursuant to Fed. R. Civ. P. 33(d), Defendants refer

19  Plaintiff to the following documents, which contain information responsive to this

20  Interrogatory No. 2 for the time period relevant to Plaintiff's claims, May 2015 to August

21  2018: [RDC Sage_007794 – RDC Sage_007966]. Defendants reserve the right to

22  supplement, clarify, revise, or correct its response to this Interrogatory.

23

24  **INTERROGATORY NO. 3**:

25      Describe in detail the factual and legal support for each and every affirmative

26  defense to Sage's claims that You asserted in Your First Amended Answer to Plaintiff's

27  Third Amended Complaint (Doc. 298). If any such affirmative defense, or the factual or

28  . . .

THORPE SHWER, P.C.

9476273

legal support for any such affirmative defense, is not asserted equally for each Defendant, please explain in detail any such differences of position.

**RESPONSE**:

Subject to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants respond to Interrogatory No. 3 as follows with respect to Defendants' Answer to Plaintiff's Fourth Amended Complaint (Doc. 345), which is the current operative Answer:

Statute of Limitations.  Defendants have asserted that Plaintiff's claims are barred, in whole or in part, by applicable statutes of limitations.  Plaintiff's RICO claims are subject to a four-year statute of limitations.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  The limitations period begins to run on the date the plaintiff knew or should have known the elements of a civil RICO cause of action existed.  Plaintiff asserted its RICO claims in the original Complaint filed February 22, 2019.  To the extent Plaintiff proves the elements of its RICO claims, Defendants may be able to show that Plaintiff was aware or should have been aware that the elements of such claims existed prior to February 22, 2015, and thus the filing of the RICO claims falls outside the permissible limitations period for such claims.

Plaintiff's claims for fraud and constructive fraud are subject to a three-year statute of limitations pursuant to A.R.S. § 12-543(3).  Plaintiff's common law fraud and constructive fraud claims, as asserted in the Complaint were predicated on the alleged false representation made on August 27, 2018 in relation to Defendants' submittal of invoice #1369.  Plaintiff's common law fraud and constructive fraud claims were expanded in the First Amended Complaint filed on June 1, 2021 to include alleged false representations and omissions in addition to that alleged as having been made on August 27, 2018 in relation to the submittal of invoice #1369.  To the extent Plaintiff's common law fraud and constructive fraud claims are based on alleged false representations and omissions occurring prior to June 1, 2018 and not alleged in the original Complaint, such claims are time-barred.

THORPE SHWER, P.C.

7

9476273

THORPE SHWER, P.C.

1    Plaintiff's claim for civil conspiracy and aiding and abetting is governed by the
2    statute of limitations for the underlying tort action – fraud.  *See YF Trust v. JP Morgan*
3    *Chase Bank, N.A.,* 2008 U.S. Dist. LEXIS 102350, at *7 (D. Ariz. 2008).  Plaintiff's claim
4    for civil conspiracy and aiding and abetting is time-barred to the same extent, and for the
5    same reasons outlined with respect to Plaintiff's claims for common law fraud and
6    constructive fraud.

7    Plaintiff's claims for breach of fiduciary duty are governed by a two-year statute of
8    limitations pursuant to A.R.S. § 12-542.  Plaintiff first pled these claims in the First
9    Amended Complaint filed on June 1, 2021.  To the extent Plaintiff's breach-of-fiduciary-
10   duty claims are based on acts and omissions occurring prior to June 1, 2019 and facts not
11   alleged in the original Complaint, such claims are time-barred.

12   To the extent Plaintiff's claim for breach of the covenant of good faith and fair
13   dealing relies on the allegation that RDC "tortuously contravened the intention and spirit
14   of the [Contract] by failing to obtain the approval of the Sage Board to increase Razaghi's
15   billing rate from $175 per hour to a net rate of $495 per hour," such claim is governed by
16   a two-year statute of limitations pursuant to A.R.S. § 12-542.  Plaintiff's claim for tortious
17   breach of the covenant of good faith and fair dealing based on this theory was first asserted
18   in the First Amended Complaint filed on June 1, 2021.  To the extent Plaintiff's claim is
19   based on acts and omissions occurring prior to June 1, 2019 and not alleged in the original
20   Complaint, such claim is time-barred.

21   Plaintiff's unjust enrichment claim is governed by a three-year statute of limitations
22   pursuant to A.R.S. § 12-543(1).  Plaintiff's first asserted their unjust enrichment claim in
23   the First Amended Complaint filed June 1, 2021.  To the extent Plaintiff's claim is based
24   on acts and omissions occurring prior to June 1, 2018 and not alleged in the original
25   Complaint, such claim is time-barred.

26   <u>Waiver, Laches, and/or Estoppel</u>.  Defendants have asserted that Plaintiff's claims
27   are barred, in whole or in part, by the doctrines of waiver, laches, and/or estoppel.
28   Waiver is the intentional relinquishment of a known right with knowledge of its existence

8

9476273

and the intent to relinquish it. *Arizona v. Tohono O'Odham Nation*. 944 F.Supp.2d 748. 757 (D. Ariz. 2013) (quoting *United States v. King Features Entm't, Inc.,* 843 F.2d 394. 399 (9th Cir. 1988)). Laches "is an equitable defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (internal quotation marks and citation omitted). Estoppel, is proved by establishing four elements: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the former's conduct to its injury. *Central Ariz. Water Conservation Dist. v. United States*, 32 F.Supp.2d 1117, (D. Ariz. 1998) (quoting *United States v. Garan,* 12 F.3d 858, 860 (9th Cir. 1993).

Collateral Estoppel and/or Judicial Estoppel.    Defendants have asserted that Plaintiff's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or judicial estoppel.   Defendants intend to withdraw the asserted defense of collateral estoppel.  Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument then relying on a contradictory argument to prevail in another phase." *Fisher v. Aetna Life Ins. Co.*, 2009 U.S. Dist. LEXIS 147484, *8 (quoting *Zedner v. United States*, 547 U.S. 489, 504 (2006)).

Economic Loss Doctrine.  Defendants have asserted that Plaintiff's tort claims are barred by the economic loss doctrine.   Tort claims arising out of breach-of-contract actions are barred by the Economic Loss Doctrine, which limits contracting parties to contractual remedies for the recovery of economic losses unaccompanied by physical injuries to persons or other property. *Barrio v. Gisa Invs. LLC*, 2020 U.S. Dist. LEXIS 191584, at *3-4; *citing Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 223 P.3d 664 (2010).  Plaintiff's claims for fraud and constructive fraud arise from the parties' contractual relationship.  The Contract provides provisions related to allocating losses and remedies.  Plaintiff alleges only economic losses and no physical injuries to

THORPE SHWER, P.C.

9

9476273

persons or other property. Thus, Plaintiff's fraud and constructive fraud claims are barred by the economic loss rule.

Recoupment/Set-Off/Offset. Defendants have asserted that, to the extent that Plaintiff is entitled to damages or penalties, Defendants are entitled to a recoupment/set-off/offset for any overpayments of consideration by Defendants previously provided to Plaintiff or underpayment of consideration by Plaintiff owed to Defendants. Recoupment is an equitable doctrine wherein the claim of a defendant can be used to reduce or to eliminate a judgment. *W.J. Kroeger Co. v. Travelers Indem. Co.*, 112 Ariz. 285, 287-88, 541 P.2d 385, 387-88 (1975). The right of offset, or setoff, allows parties owing each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)).

Indemnification. Defendants have asserted that Defendants are entitled to indemnification for damages, if any, and any and all costs and fees incurred by Defendants in defense of this lawsuit pursuant to Section 12(H) of the Contract.

Failure to Mitigate Damages. Defendants intend to withdraw the asserted affirmative defense of failure to mitigate damages.

Discovery into the facts supporting the above-referenced affirmative defenses is ongoing. Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.

**INTERROGATORY NO. 4**:

Identify and describe in detail each of the "contractual provisions" You claim Sage breached, as alleged in Paragraphs 105 and 109 of Razaghi Healthcare's Counterclaims and Second Amended Third Party Claims (Doc. 298), including: (1) the specific provision You contend was breached and (2) every fact supporting Your contention that it was breached.

. . .

THORPE SHWER, P.C.

10

9476273

1  **RESPONSE**:

2       Subject to the Preliminary Statement, Objections to the Definitions and Instructions,

3  and General Objections listed above, Defendants respond to Interrogatory No. 4 as follows:

4  Paragraph 105 of RDC's Counterclaims and Second Amended Third-Party Claims

5  (Doc. 217) refers to Plaintiff "failing to allow RDC to perform its management functions

6  under the contract," "interfering with the reassignment of El-Meligi and Dalgai from Sage

7  Memorial Hospital to RDC," and "failing to pay RDC the performance fee approved by

8  the Board of Directors on or about December 15, 2017."

9       Section 2(A) of the Contract provides that the Board shall retain authority placed in

10  it by law and its bylaws except to the extent such authority has been delegated to RDC.

11  Section 2(C) of the Contract delegates to RDC "the right and commensurate authority and

12  responsibility, express or implied, to oversee the supervision and effective management of

13  the Corporation." Section 2(C)(1) further provides that RDC "agrees to perform the duties

14  and responsibilities of the position of Chief Executive Officer set forth in the Sage

15  Memorial Hospital Position Description for the position of Chief Executive Officer."

16  Section 2(C)(2) expressly states that RDC "shall be responsible for overseeing the

17  recruitment, hiring, promotion, disciplining, and firing of (i) Corporation key executives

18  who report to the CEO, including without limitation the Chief Financial Officer, the

19  Medical Director, the Chief Operations Officer, and the Director of Nursing ("Key

20  Executives")…." Netrisha Dalgai's position as Chief Operations Officer fell squarely

21  within the definition of a Key Executive. Christi El-Meligi's position as Co-CEO also fell

22  within the definition of a Key Executive as the job description expressly provided that the

23  Co-CEO would be supervised by the Chief Executive Officer. Thus, Plaintiff breached the

24  above-referenced provisions of the Contract when it obstructed RDC's ability to perform

25  the above-listed management functions under the contract and by interfering with the

26  reassignment of El-Meligi and Dalgai from Sage Memorial Hospital to RDC.

27       Paragraph 109 of RDC's Counterclaims and Second Amended Third-Party Claims

28  (Doc. 217) refers to Plaintiff's failure to pay RDC the entire compensation outlined in the

THORPE SHWER, P.C.

11

9476273

Contract up to the date of termination, including but not limited to Incentive Fees, Annual Retention Bonuses, Management Consulting Services, Executive Leadership Services, employee reimbursements, and reimbursement for D&O Insurance.  Section 5 of the Contract lists various categories of compensation to which RDC was entitled in exchange for its services.  Among other things, Section 5(A) provides for base pay for professional services rendered by Ahmad R. Razaghi, Section 5(B) provides for an Annual Incentive Fee, Section 5(C) provides for an Annual Retention Bonus, Section 5(D) provides for the Termination Payment, Section 5(E) provides for a Performance Fee, and Section 5(F) acknowledges Plaintiff's agreement to provide RDC with D&O Insurance.  Section 2(C)(2) of the Contract acknowledges Plaintiff's agreement to pay RDC the costs of services of RDC personnel.  Plaintiff breached the above-listed provisions of the Contract as further set forth in Defendants response to Interrogatory No. 9.  Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.

**INTERROGATORY NO. 5**:

Identify and describe in detail each "unauthorized communication" that, in Paragraphs 41, 124, 142, and 149 of Razaghi Healthcare's Counterclaims and Second Amended Third-Party Claims (Doc. 298), You allege occurred, including: (1) the date of each such communication, (2) all persons involved in each such communication, (3) the substance of each such communication, and (4) all facts supporting your contention that each such communication was "unauthorized."

**RESPONSE**:

Subject to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants respond to Interrogatory No. 5 as follows:

Upon information and belief, in July 2018, Ms. El-Meligi and Ms. Dalgai communicated with certain members of the Sage Board, including but not limited to Ms. Kelewood and Ms. Terry, to protest their reassignment from Sage Memorial Hospital to Razaghi Healthcare's Scottsdale, Arizona offices and devise a plan for the Board to

THORPE SHWER, P.C.

12

9476273

intervene to prevent the reassignment or otherwise interfere with RDC personnel matters. Upon further information and belief, Ms. El-Meligi and Ms. Dalgai communicated with certain members of the Sage Board to plan points of discussion for meetings of the Sage Board to question and interfere with RDC's authority over personnel matters and RDC's management of Sage Memorial Hospital. Upon further information and belief, certain members of the Sage Board forwarded email communications between the Board and RDC regarding RDC personnel matters to Ms. El-Meligi and Ms. Dalgai. Discovery is ongoing. Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.

**INTERROGATORY NO. 6**:

Describe in detail all factual and legal basis for the wiring of the $10.8 million from Sage to Razaghi Healthcare on or about August 27, 2018, including without limitation all facts and calculations supporting Your contention that Razaghi Healthcare was entitled to those funds.

**RESPONSE**:

Subject to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants respond to Interrogatory No. 6 as follows: Section 4(C) of the Contract provides:

> In the event this Contract expires, or RH terminates this contract for cause, or the Corporation elects to terminate this Contract at any time prior to termination of this Contract for any reason other than those listed as "cause" in Section 4.A., the Corporation shall pay to RH (a) sum equal to the compensation described in this Contract up to the date of termination plus (b) the Termination Payment . . .

Section 5(D)(2) of the Contract provides:

> In the event that this Contract expires, or RH terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to

THORPE SHWER, P.C.

13

expiration of this Contract for any reason other than those listed as "cause" in Section 4.A., the Corporation shall, in addition to any other amounts due under this Contract, pay RH a Termination Payment in an amount equal to the average of the amount paid to RH by the Corporation each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration of termination.

*On August 31, 2018, Plaintiff's board of directors adopted a resolution pursuant to which Plaintiff terminated the Contract effective immediately. The termination purportedly resulted from the board's learning on August 30, 2018, that RDC paid itself the Termination Payment on August 27, 2018. RDC's receipt of the Termination Payment on August 27, 2018, rather than on September 1, 2018, 30 days after RDC's August 2, 2018 notice of Plaintiff's breaches of the Contract, may have constituted a non-criminal material breach of the Contract. However, Plaintiff terminated the Contract without providing RDC with written notice of this breach and without giving RDC 30 days to cure any such breach. Consequently, Plaintiff terminated the Contract under circumstances entitling RDC to the Termination Payment.*

*The Termination Payment was calculated as an amount equal to the average of the amount Plaintiff paid to RDC during the then most recent four years of service. As reflected on RDC's Invoice # 1369, RDC calculated the Termination Payment as follows:*

    *a.    RDC determined that the applicable four year period was September 1, 2014 to August 27, 2018; and*

    *b.    RDC calculated the average of the amount Plaintiff paid to it during this time period ($15,937,168.45) and applied a Professional Services Discount of $5,082,034.30, which produced a Termination Payment in the amount of $10,855,134.15.*

## INTERROGATORY NO. 7:

Describe in detail all factual and legal basis for Your contention that Razaghi

14

THORPE SHWER, P.C.

9476273

Healthcare was owed a Termination Payment under Paragraph D of the CEO Services Contract, as amended.

**RESPONSE:**

In addition to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants object to Interrogatory 8 because Defendants do not contend that Razaghi Healthcare was owed a Termination Payment under "Paragraph D" of the CEO Services Contract, as amended. Subject to the foregoing, *see* Defendants' Response to Interrogatory 6.


**INTERROGATORY NO. 8**:

Identify and describe the services or other work performed by or on behalf of any Defendant to support each of the invoices detailed in Paragraphs 137 and 178 of Plaintiff's Third Amended Complaint (Doc. 192).

**RESPONSE:**

In addition to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants object to Interrogatory No. 8 because it is overly broad and unduly burdensome, including but not limited to, because it is not reasonably limited in time, location, or subject matter. Defendants also object to this Interrogatory because it would cause unreasonable annoyance, oppression, burden, or expense and would require Defendants to undertake an unreasonable investigation. It is unreasonable and would take excessive time and cost for Defendants to gather information as requested.   Defendants further object to this Interrogatory to the extent it seeks information that is equally available to Plaintiff as it is to Defendants.  ***Subject to these objections, and without waiver thereof, with the exception of Invoice # 1371, the invoices referenced in Paragraph 137 of Plaintiff's Third Amended Complaint were provided with support for the charges and services reflected in the invoices attached. Invoice No. 1371 is an invoice for the Incentive Fee due and owing by Sage to RDC for the period of*** . . .

15

THORPE SHWER, P.C.

*August 20, 2018 through September 2, 2018. This invoice obviously would not reflect service or work performed by anyone for anyone.*

*Likewise, each of the invoices detailed in Paragraph 178 of Plaintiff's Third Amended Complaint were provided with all support for the charges reflected in the invoices attached. Indeed, Plaintiff's allegations regarding these invoices are set forth in such detail as to demonstrate that Plaintiff is well aware of not only the content of these invoices, but also what the invoices contain to support Plaintiffs claim that the invoices seek payment for Fraudulent Expenses. Under the circumstances, RDC can discern no good faith basis for this interrogatory. Pursuant to Fed. R. Civ. P. 33(d), Defendants refer Plaintiff to the invoices and back up documentation to be produced with Defendants' responses to Plaintiff's First Set of Requests for Production of Document No. 17. Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.*

**INTERROGATORY NO. 9:**

Describe in detail any and all alleged damages Razaghi Healthcare is seeking on its Counterclaims against Sage (including the categories, calculations, and legal basis therefor), and identify all facts, documents, and witness testimony supporting, contradicting, or otherwise relating to those alleged damages and calculations.

**RESPONSE**:

A.    The Incentive Fee

In connection with its performance of an annual evaluation of RDC, at each annual meeting the board was required to determine the Annual Incentive Fee. Plaintiff was required to calculate the Annual Incentive Fee utilizing the then current Code Section 4958 Report. *The Annual Incentive Fee was to equal 5.4% of Plaintiff's net revenues.*

*For Plaintiff's fiscal years 2017 and 2018, the budgeted Annual Incentive Fee was $2,781,000 each year.* Plaintiff was obligated to pay *70% percent of the Annual Incentive Fee ($1,946,700) as invoiced and the remaining 30% ($834,300)* in a lump-sum

THORPE SHWER, P.C.

16

9476273

THORPE SHWER, P.C.

1   payment at the end of the fiscal year *following Plaintiff's board's determination that*

2   *RDC's performance was at least satisfactory*. Upon termination of the Contract, Plaintiff

3   was obligated to pay the entire unpaid amount of the Annual Incentive Fee through the

4   effective date of the termination. *Plaintiff failed to satisfy this obligation. As reflected on*

5   *RDC's Invoice No. 1371 and 1394, there remains an outstanding balance of $74,448.08*

6   *representing the final FY 2018 installment payment. As reflected on RDC's Invoice*

7   *No. 1394, there remains an outstanding balance of $834,299.92 representing the lump-*

8   *sum payment due for FY 2018. These amounts have accrued and continue to accrue*

9   *interest at the rate of 1.5% per month. As of March 31, 2024, Plaintiff owes RDC*

10  *Incentive Fees and accrued interest totaling $2,155,159.*

11      *Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield,*

12  *David Erichsen, Plaintiff's board members during the relevant time periods, Christi El-*

13  *Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is entitled.*

14  *In addition to the Contract, board meetings and other documents referred to herein,*

15  *RDC's damages are also reflected in the invoices RDC provided to Plaintiff.*

16      B.    The Annual Retention Bonus

17      Plaintiff was required to pay RDC a retention bonus equal to 30 days or 240 of

18  professional time for each year that RDC continued to serve under the Contract (the

19  "Retention Bonus"). *Plaintiff did not pay any of the Retention Bonus to RDC during*

20  *fiscal year 2018 and, accordingly, there remains an outstanding balance of $118,000 due*

21  *and owing to RDC. Interest has accrued and is accruing on this amount at the rate of*

22  *1.5% per month.*

23      *Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield,*

24  *David Erichsen, Plaintiff's board members during the relevant time periods, Christi El-*

25  *Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is entitled.* In

26  addition to the Contract, board meetings and other documents referred to herein, RDC's

27  damages are also reflected in the invoices RDC provided to Plaintiff, including but not

28  limited to Invoice Nos. 1244-1269, 1272, 1276, 1280, 1284, 1288, 1292-1293, 1297-1298,

9476273

1  1311-1312, 1316, 1319, 1232, 1327, 1331, 1335, 1340, 1344, 1348, 1353, 1357, 1361,

2  1370-1374, 1394, 1398 and 1410.

3      C.    <u>Personnel Costs</u>

4      Plaintiff was obligated to reimburse RDC for the costs of key executives who report

5  to Plaintiff's CEO including, without limitation, the Chief Financial Officer, Medical

6  Director, Chief Operations Officer and Director of Nursing, as well as healthcare

7  consultants hired to assist these executives. Following Plaintiff's termination of the

8  Contract, RDC submitted invoices for these costs which Plaintiff has failed to pay.

9      *1.    Invoice #1214*

10      *On or about September 29, 2015, RDC submitted its Invoice #1214, which detailed*

11  *all of the total fees due and owing by Plaintiff to RDC as a result of RDC's agreement to*

12  *perform services at a rate below fair market value to assist Plaintiff in continuing as a*

13  *going concern while it managed the extraordinary circumstances caused by its former*

14  *employees, the Navajo Area IHS investigation, subsequent litigation and related matters.*

15  *The total of the fees due and owing at the time of Invoice #1214 was $7,042,713.52.*

16  *During Plaintiff's Special Board of Directors Meeting held November 14, 2015,*

17  *Plaintiff's board unanimously approved Invoice #1214.*

18      *Plaintiff has failed and/or refused to pay Invoice #1214. Interest has accrued and*

19  *continues to accrue on Invoice #1214 at the rate of 1.5% per month and the amount now*

20  *due totals approximately $32,157,059.*

21      *2.    Invoice # 1370*

22      *On or about September 11, 2018, RDC submitted its Invoice #1370, which detailed*

23  *charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in*

24  *the amount of $31,678.32. Plaintiff has failed and/or refused to pay Invoice #1370.*

25  *Interest has accrued and continues to accrue on Invoice #1370 at the rate of 1.5% per*

26  *month and the amount now due totals approximately $173,110.*

27      *3.    Invoice #1372*

28      *On or about September 11, 2018, RDC submitted its Invoice #1370, which detailed*

THORPE SHWER, P.C.

18

9476273

*charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in the amount of $129,986.76. Plaintiff has failed and/or refused to pay Invoice #1372. Interest has accrued and continues to accrue on Invoice #1372 at the rate of 1.5% per month and the amount now due totals approximately $347,262.*

### 4.    Invoice #1373

*On or about September 6, 2018, RDC submitted its Invoice #1370, which detailed charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in the amount of $106,120.38. Plaintiff has failed and/or refused to pay Invoice #1373. Interest has accrued and continues to accrue on Invoice #1373 at the rate of 1.5% per month and the amount now due totals approximately $283,502.*

### 5.    Invoice #1396

*On or about August 5, 2019, RDC submitted its Invoice #1396, which detailed the Personnel Costs due and owing by Plaintiff in the amount of $330,648.50. Plaintiff has failed and/or refused to pay Invoice # 1396. Interest has accrued and continues to accrue on Invoice #1396 at the rate of 1.5% per month and the amount now due totals approximately $749,892.*

*Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield, David Erichsen, Plaintiff's board members during the relevant time periods, Christi El-Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is entitled.* In addition to the Contract, board meetings and other documents referred to herein, RDC's damages are also reflected in the invoices RDC provided to Plaintiff, including but not limited to Invoice Nos. 1244-1269, 1272, 1276, 1280, 1284, 1288, 1292-1293, 1297-1298, 1311-1312, 1316, 1319, 1232, 1327, 1331, 1335, 1340, 1344, 1348, 1353, 1357, 1361, 1370-1374, 1394, 1398 and 1410.

### D.    D&O Insurance Reimbursement

Plaintiff was obligated to provide D&O insurance for RDC *with adequate tail coverage to protect RDC, Mr. Razaghi, and any successor CEO and Key Executives (as those terms are defined in the Contract) from any claims made after the expiration or*

19

*termination of the Contract for any actions or omissions alleged to have occurred during the term of the Contract.* Plaintiff failed to provide the insurance during FY 2018 and, consequently, RDC was forced to obtain the coverage itself. *On or about August 5, 2019, RDC submitted its Invoice No. 1398, which included, among other charges, the premium RDC was forced to pay due to Plaintiff's failure to provide the required insurance coverage. RDC seeks the recovery of the premiums it paid along with accrued and accruing interest at the rate of 1.5% per month, which as of March 31, 2024 total $33,321.00.*

*Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield, David Erichsen, Plaintiff's board members during the relevant time periods, Christi El-Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is entitled.* In addition to the Contract, board meetings and other documents referred to herein, RDC's damages are also reflected in the invoices RDC provided to Plaintiff, including but not limited to Invoice Nos. 1244-1269, 1272, 1276, 1280, 1284, 1288, 1292-1293, 1297-1298, 1311-1312, 1316, 1319, 1232, 1327, 1331, 1335, 1340, 1344, 1348, 1353, 1357, 1361, 1370-1374, 1394, 1398 and 1410.

**INTERROGATORY NO. 10:**

Identify whether any Defendant contends that it is entitled to any portion of the funds in the escrow account opened by Sage at Wells Fargo Bank on June 16, 2016, as detailed in Paragraphs 120-21 of Plaintiff's Third Amended Complaint (Doc. 192); and, if so, identify the amount claimed and all factual and legal support for that position.

**RESPONSE:**

No Defendant other than RDC was a party to a contract with Plaintiff that provided for the establishment of the escrow account or its uses. RDC does not contend that it is entitled to any portion of the escrow account.

. . .

. . .

THORPE SHWER, P.C.

9476273

**INTERROGATORY NO. 11**:

Identify in detail all contractual terms that You contend were in place between Razaghi Healthcare and Sage at each time during the Relevant Time Period.  This includes identifying each amendment to the terms of the CEO Services Contract that You contend occurred and, for each amendment, identifying when You contend each amended provision was in effect.

**RESPONSE**:

RDC objects to this interrogatory on the ground that it is vague. RDC cannot discern what Plaintiff means by the phrase "all contractual terms that You contend were in place between Razaghi Healthcare and Sage at each time during the Relevant Time Period." As RDC states above, the Relevant Time Period is May 2015 to August 2018. During that time period each and every term of the Navajo Health Foundation – Sage Memorial Hospital, Inc. Amendment No. 1 and Extension No. 1 to CEO Services Contract was in place until July 16, 2017 and each and every term of the Contract was in place until Plaintiff terminated the Contract.

*In light of the clarification of this interrogatory provided during the parties' meet and confer on March 26, 2024, and Plaintiff's counsel's email dated March 28, 2024, Defendants supplement this response as follows:*

*For the relevant portion of Fiscal Year 2011 and for Fiscal Years 2012 and 2013, the Base Pay rate of $175 per hour set forth in § 5(A) of the Navajo Health Foundation – Sage Memorial Hospital, Inc. CEO Services Contract dated March 18, 2011 was in effect. After considering HealthCare Appraisers Incorporated's Determination of the Fair Market Value of Hospital Management Services dated December 23, 2013, which indicated, among other things, that the fair market range for Mr. Razaghi's services was $340 per hour to $530 per hour, the Fiscal Year 2014 Base Pay rate was adjusted to $425 per hour and discounted to $175 per hour.*

*On or about May 1, 2014, the Base Pay rate was adjusted to $530 per hour, which after applying a $175 per hour discount resulted in an increase of the Base Pay rate from*

21

*$175 per hour to $355 per hour. This increase was reflected in the backup information that accompanied RDC's Invoice #1180, which was submitted to Plaintiff on or about June 2, 2014. On September 26, 2014, Plaintiff's board of directors approved a continuing resolution pursuant to which it adopted Plaintiff's Fiscal Year 2014 operating budget as the Fiscal Year 2015 operating budget. In May 2015, the Base Pay rate was adjusted to $495 per hour.*

*In its letter dated October 2, 2015, RDC reminded Plaintiff of its request that RDC carry forward a portion of each of its service invoices as discounts below fair market value. RDC informed Plaintiff that it had been carrying these costs since January 2014. As of September 29, 2015, the balance due on those unpaid costs totaled $7,042,713.52 and, accordingly, RDC's Invoice #1214 in that amount was submitted with its letter. At Plaintiff's board of directors meeting held November 14, 2015, RDC reported to Plaintiff's board of directors on Invoice #1214 and the $7.042 million carry forward cost. Plaintiff's board voted unanimously to approve Invoice #1214. By this action, Plaintiff's board approved any rate charged by RDC for the period of time covered by Invoice #1214, provided the rate was within the highest fair market value rate for Mr. Razaghi's services and the discounted rate charged to Plaintiff.*

*On October 7, 2015, Plaintiff's board of directors approved Plaintiff's Fiscal Year 2016 operating budget. In connection with this approval, Plaintiff's board received and reviewed the Navajo Health Foundation – Sage Memorial Hospital FY2016 Budget Review. Included in that document was an Executive Management and Consulting Services Rate Sheet which, among other things, showed that for Fiscal Year 2016 that RDC would charge $530 per hour for Mr. Razaghi services which, after applying a 6.6% discount, resulted in a discounted hourly rate of $495 per hour.*

*On September 27, 2016, Plaintiff's board of directors approved a continuing resolution pursuant to which it adopted Plaintiff's Fiscal Year 2016 operating budget as Plaintiff's Fiscal Year 2017 operating budget. In connection with the adoption of this continuing resolution, Plaintiff's board received and reviewed the Navajo Health*

THORPE SHWER, P.C.

9476273

THORPE SHWER, P.C.

*Foundation – Sage Memorial Hospital Continuing Resolution – FY2017 Budget. Included in that document was an Executive Management and Consulting Services Rate Sheet which, among other things, showed that for Fiscal Year 2017 that RDC would charge $530 per hour for Mr. Razaghi services which, after applying a 6.6% discount, resulted in a discounted hourly rate of $495 per hour.*

*On August 25, 2017, Plaintiff's board of directors approved a continuing resolution pursuant to which it adopted Plaintiff's Fiscal Year 2017 operating budget as Plaintiff's Fiscal Year 2018 operating budget. In connection with the adoption of this continuing resolution, Plaintiff's board received and reviewed the Navajo Health Foundation – Sage Memorial Hospital Continuing Resolution Adopting Fiscal Year 2018 Budget (Adopting fiscal year 2017 budget for fiscal year 2018). Included in that document was an Executive Management and Consulting Services Rate Sheet which, among other things, showed that for Fiscal Year 2018 that RDC would charge $530 per hour for Mr. Razaghi services which, after applying a 6.6% discount, resulted in a discounted hourly rate of $495 per hour.*

DATED this 15th day of April, 2024.

**THORPE SHWER, P.C.**

By */s/ André H. Merrett*
        André H. Merrett
        Bradley D. Shwer
        Matthew T. St. Martin
        *Attorneys Defendants Razaghi*
        *Development Company, LLC, Ahmad*
        *R. Razaghi and Tausif Hasan*

23

9476273

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on this 15th day of April, 2024, the foregoing document was

3    served via electronic mail on the following:

4

D. Samuel Coffman

5

Bradley A. Burns

Amanda E. Newman

6

Mitchell P. Reber

7

Dickinson Wright PLLC

1850 North Central Avenue, Suite 1400

8

Phoenix, Arizona 85004

anewman@dickinsonwright.com

9

bburns@dickinsonwright.com

scoffman@dickinsonwright.com

10

mreber@dickinsonwright.com

11

**Attorneys for Plaintiff**

12

13

14    */s/ Joan Peralta*

15

16

THORPE SHWER, P.C.

24

# EXHIBIT 42



3585 S. Town Center Drive
Las Vegas, NV 89135
Office:    (702) 850-1670
Facsimile: (702) 877-7045
www.razaghihealthcare.com

October 2, 2015

Ms. Christi El-Meligi
Chief Executive Officer
Navajo Health Foundation –
Sage Memorial Hospital
SRS 191 & Highway 264
Ganado, AZ  86505

Dear Ms. El-Meligi,

Since January 2014, you requested that Razaghi Healthcare ("RH") carry forward a portion of
each of its service invoices as discounts ("costs") below fair market value to assist Sage in
continuing as a going concern while it manages the extraordinary circumstances caused by its
former disgruntled ex-employees, Navajo Area IHS investigation, subsequent litigation, and
related matters.

Over the past 20 months, the current balance due on those unpaid Costs is $7,042,713.52 for
approximately 38,279 hours of regular, overtime, weekend, and holiday professional time.
Please refer to the attached invoice no. 1214.

We appreciate the opportunity to assist the Board of Directors to advance its mission, and
supporting the executive team and the operations of the hospital through the balance of these
extraordinary circumstances.

Please feel free to contact us with any questions or comments.

Best Regards,

Razaghi Healthcare

Razaghi Healthcare

Healthcare Executive Management and Consulting

SUMMERLIN, NEVADA                SCOTTSDALE, ARIZONA                NAVAJO NATION, ARIZONA

Confidential



Razaghi Healthcare
410 S. Rampart Boulevard
Suite 390
Las Vegas, NV 89145

(702)726-6780

## Invoice

| Date | Invoice # |
|------|-----------|
| 09/29/2015 | 1214 |

| Terms | Due Date |
|-------|----------|
| Due on receipt | 09/29/2015 |

**Bill To**

Navajo Health Foundation - Sage Memorial
Hospital
PO Box 457
Ganado, AZ 86505

| Professional Service | Charge |
|----------------------|--------|
| • Invoice 1171 February 4, 2014 carry forward cost | 46,051.06 |
| • Invoice 1172 February 10, 2014 carry forward cost | 258,863.64 |
|   Adjusted to exclude 195.58 hours of OT discounted at 100% for M. Katigbak | |
| • Invoice 1173 March 1, 2014 carry forward cost | 20,688.00 |
| • Invoice 1174 March 14, 2014 carry forward cost | 20,144.12 |
| • Invoice 1175 March 24, 2014 carry forward cost | 38,117.63 |
| • Invoice 1176 April 7, 2014 carry forward cost | 99,523.46 |
| • Invoice 1177 April 18, 2014 carry forward cost | 21,730.56 |
| • Invoice 1178 May 2, 2014 carry forward cost | 21,344.00 |
| • Invoice 1179 May 19, 2014 carry forward cost | 127,383.35 |
| • Invoice 1180 June 2, 2014 carry forward cost | 118,211.25 |
| • Invoice 1181 June 16, 2014 carry forward cost | 101,746.75 |
| • Invoice 1182 June 30, 2014 carry forward cost | 100,859.50 |
| • Invoice 1183 July 14, 2014 carry forward cost | 212,091.25 |
| • Invoice 1184 July 29, 2014 carry forward cost | 156,292.25 |
| • Invoice 1185 August 20, 2014 carry forward cost | 145,855.00 |
| • Invoice 1186 August 27, 2014 carry forward cost | 171,189.25 |
| • Invoice 1187 September 10, 2014 carry forward cost | 176,719.00 |
| • Invoice 1189 September 22, 2014 carry forward cost | 183,228.25 |
| • Invoice 1190 October 7, 2014 carry forward cost | 139,288.30 |
|   Adjusted to exclude services October 1 - 3, 2014 | |
| • Invoice 1191 October 22, 2014 carry forward cost | 240,993.00 |
|   Adjusted to include services October 1 - 3, 2014 | |
| • Invoice 1192 November 3, 2014 carry forward cost | 244,647.50 |
| • Invoice 1193 November 23, 2014 carry forward cost | 169,146.75 |
| • Invoice 1194 December 1, 2014 carry forward cost | 306,875.00 |
|   Adjusted to exclude 749.13 hours of OT discounted at 100% for M. Katigbak | |
| • Invoice 1195 January 1, 2015 carry forward cost | 342,788.50 |
| • Invoice 1196 January 13, 2015 carry forward cost | 162,430.60 |
| • Invoice 1197 January 26, 2015 carry forward cost | 169,597.00 |
| • Invoice 1199 February 10, 2015 carry forward cost | 206,437.50 |
| • Invoice 1200 February 23, 2015 carry forward cost | 179,075.00 |
| • Invoice 1201 March 9, 2015 carry forward cost | 189,751.05 |

Continue to the next page

Healthcare Executive Management & Consulting

Confidential

| Professional Service | Charge |
|---|---|
| • Invoice 1202 March 24, 2015 carry forward cost | 216,017.20 |
| • Invoice 1203 April 6, 2015 carry forward cost | 162,581.50 |
| • Invoice 1204 April 21, 2015 carry forward cost | 158,714.50 |
| • Invoice 1205 May 5, 2015 carry forward cost | 158,796.00 |
| • Invoice 1206 May 20, 2015 carry forward cost | 187,723.25 |
| • Invoice 1207 June 2, 2015 carry forward cost | 153,710.25 |
| • Invoice 1208 June 16, 2015 carry forward cost | 170,401.50 |
| • Invoice 1209 June 30, 2015 carry forward cost | 139,750.75 |
| • Invoice 1210 July 15, 2015 carry forward cost | 151,974.25 |
| • Invoice 1211 July 29, 2015 carry forward cost | 173,730.25 |
| • Invoice 1212 August 11, 2015 carry forward cost | 186,984.25 |
| • Invoice 1213 August 25, 2015 carry forward cost | 193,844.00 |
| • Invoice 1215 September 8, 2015 carry forward cost | 169,250.75 |
| • Invoice 1216 September 23, 2015 carry forward cost | 448,166.55 |

Note: Invoice 1179 – 68 hours of CEO retention was originally billed at the discounted instead of gross rate, RH has not included the $15,980 in carry forward cost that would have resulted from billing correctly at the gross rate originally.

| | Total | $7,042,713.52 |
|---|---|---|

Healthcare Executive Management & Consulting

SAGE0102305

# EXHIBIT 43

1   **THORPE SHWER, P.C.**
    André H. Merrett (No. 020889)
2   Bradley D. Shwer (No. 022696)
    Matthew T. St. Martin (No. 034037)
3   3200 North Central Avenue, Suite 1560
    Phoenix, Arizona  85012-2441
4   Telephone:  (602) 682-6100
    Email:  docket@thorpeshwer.com
5   Email:  amerrett@thorpeshwer.com
    Email:  bshwer@thorpeshwer.com
6   Email:  switthoft@thorpeshwer.com
    Email:  mstmartin@thorpeshwer.com
7
    *Attorneys Defendants Razaghi Development*
8   *Company, LLC, Ahmad R. Razaghi and Tausif Hasan*

9

10              **IN THE UNITED STATES DISTRICT COURT**

11                  **FOR DISTRICT OF ARIZONA**

12   Navajo Health Foundation – Sage Memorial        Case No. 3:23-cv-08072-DJH (DMF)
     Hospital, Inc. d/b/a Sage Memorial Hospital,
13

14          Plaintiff,

                                                      **DEFENDANTS' THIRD**
15   v.                                               **SUPPLEMENTAL RESPONSES TO**
                                                      **PLAINTIFF'S FIRST SET OF**
16                                                    **INTERROGATORIES**
     Razaghi Development Company, LLC; Ahmad
17   R. Razaghi; Tausif Hasan; and Does 1-10,

18          Defendants.

19

20   AND ALL RELATED CLAIMS.

21

22          Pursuant to the Court's orders filed June 4, 2024 (Doc. 374) and June 21, 2024 (Doc.

23   378), Defendants Razaghi Development Company, LLC ("RDC"), Ahmad R. Razaghi

24   ("Razaghi") and Tausif Hasan ("Hasan") (collectively, "Defendants"), by and through

25   counsel undersigned, hereby submit their Third Supplemental Responses to Plaintiff's First

26   Set of Interrogatories (the "Interrogatories"), as follows:[1]

27   _____

28   [1] Additions in ***bold italics***, deletions in ~~strikethrough~~.

9508355

THORPE SHWER, P.C.

# PRELIMINARY STATEMENT

1. These supplemental objections and responses are made solely for the purposes of and use in this litigation.

2. Defendants' investigation and development of all facts and circumstances relating to this action is ongoing. These supplemental responses and objections are made without prejudice to, and are not a waiver of, Defendants' right to rely on other facts or documents at trial.

3. By making the accompanying supplemental responses and objections to the Interrogatories, Defendants do not waive, and hereby expressly reserve, their right to assert any and all objections as to the admissibility of such responses into evidence in this action, or any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege.

4. Further, Defendants make the supplemental responses and objections herein without in any way implying that they consider the Interrogatories or responses thereto to be relevant to any party's claims or defenses and proportional to the needs of this case.

5. Defendants' supplemental responses are based upon their present knowledge, information, and belief. Defendants expressly reserve the right to supplement, clarify, revise, or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental responses.

6. Except for the facts explicitly admitted herein, no admission of any nature whatsoever is to be implied or inferred. The fact that a request herein has been answered should not be taken as an admission of, or a concession of the existence of, any facts set forth or assumed by such request. All responses must be construed as given on the basis of present recollection.

7. In the event that any of Defendants' responses are ever read to the jury or to the Court, Defendants expressly require that any modifications or supplements to these responses be read as well.

. . .

THORPE SHWER, P.C.

2

9508355

1    8.    ***Defendants served their First Supplemental Responses to Plaintiff's First***

2    ***Set of Interrogatories on April 15, 2024 and their Second Supplemental Responses to***

3    ***Plaintiff's First Set of Interrogatories on July 11, 2024. Those supplemental***

4    ***interrogatory responses are incorporated herein.***

5    **OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

6    1.    Defendants object to the definitions of "Document," "Documents,"

7    "Communication," "Person," "Persons," "Relating to," "Regarding," "Concerning,"

8    "Identify," "Describe," and "Specify," to the extent they are inconsistent with the Federal

9    Rules of Civil Procedure, or to the extent they do not comport with the ordinary meaning

10    of those words.

11    2.    Defendants further object to the definitions of "RDC" or "Razaghi

12    Healthcare" to the extent they purport to impose on Defendants an obligation to produce

13    information from any person or entity other than RDC, or to the extent they purport to

14    impose an obligation on RDC to produce information that is not in RDC's possession,

15    custody, or control.

16    **GENERAL OBJECTIONS**

17    The following General Objections apply to each of the Interrogatories and shall have

18    the same force and effect as if set forth in full in response to each individually numbered

19    request.

20    1.    Defendants object to each of the Interrogatories to the extent that they seek

21    information protected from discovery or exempted from disclosure by the attorney-client

22    privilege, the attorney-work product doctrine, or any other applicable privilege, protection,

23    immunity, law, or rule.

24    2.    Defendants object to each of the Interrogatories (and their accompanying

25    Instructions) to the extent that they seek to impose burdens and obligations on Defendants

26    that exceed those imposed by the Federal Rules of Civil Procedure or the Local Rules of

27    Practice for the District of Arizona.

28    . . .

THORPE SHWER, P.C.

3

9508355

3.    Defendants incorporate by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendants do not waive their right to amend their responses.

**INTERROGATORIES**

**INTERROGATORY NO. 1**:

Identify all Razaghi Healthcare employees, agents, representatives, subcontractors, and independent contractors, as well as all third parties hired or recruited by Razaghi Healthcare (including any attorneys, accountants, contractors, or other professionals), who provided services to or for the benefit of Sage or the Sage Board at any point during the Relevant Time Period. The identification shall, in addition to the information set forth in the definition for "Identify" above, include a description of each person's role and title, by date, during all times that the person provided such services.

**RESPONSE:**

Besides the identifying information pertaining to themselves specifically, no individual Defendant has any information responsive to this Interrogatory in his possession, custody or control and, therefore, relies on the information in the possession, custody or control of Razaghi Development Company, LLC ("RDC"), if any. Nor does any individual Defendant have personal knowledge of "all Razaghi Healthcare employees, agents, representatives, subcontractors, independent contractors or third parties hired or recruited by Razaghi Healthcare." RDC ceased operating its hospital management activities in 2018. It has not maintained any personnel files or other records upon which it might rely to provide information called for by the expansive definition of the term "Identify." Subject to the foregoing, in addition to the identifying information set forth below, Defendants refer Plaintiff to the tables attached hereto as Exhibits A and B for information regarding RDC's employees, agents and representatives. Defendants refer Plaintiff to the table attached hereto as Exhibit C for information regarding the contractors

THORPE SHWER, P.C.

4

and professionals.  Further, Defendants refer Plaintiff to the documents identified by Bates

label in Exhibits A and/or B.  Additionally, Defendants refer Plaintiff to the ~~following~~

documents previously produced Bates labeled RDC Sage_007794 – RDC Sage_007966,

which contain information responsive to this Interrogatory for the time period of May 2015

to August 2018.  Defendants reserve the right to supplement, clarify, revise, or correct its

response to this Interrogatory.

    A.    RDC Employees, Agents and Representatives

    1.    Ahmad Razaghi
5902 E. Redwing Rd.
Paradise Valley, AZ
702-858-3300

    2.    David Erichsen
5666South Adaley Ave
Murray, UT 84107
801-953-5368

    3.    Allen Billings
1076 Carol Ln. #74
Lafayette, CA 94549
415-308-0429

    4.    Robert Erichsen
[ADDRESS]
[TEL]

    5.    Michael Katigback
[ADDRESS]
[TEL]

    6.    Melody Roberts
[CONTACT INFORMATION UNKNOWN]

    7.    Jose Perez
[CONTACT INFORMATION UNKNOWN]

    8.    Caroline Mylotte
[CONTACT INFORMATION UNKNOWN]

    9.    Nathania Henderson

THORPE SHWER, P.C.

5

9508355

[CONTACT INFORMATION UNKNOWN]

10.  Netrisha Dalgai
     Highway 264, County Road 426
     Ganado, AZ 86505

11.  Elena Puerner
     [CONTACT INFORMATION UNKNOWN]

12.  Hailey Leeming
     [CONTACT INFORMATION UNKNOWN]

13.  Amber Razaghi
     5902 E. Redwing Rd.
     Paradise Valley, AZ

14.  Mark Sewald
     [CONTACT INFORMATION UNKNOWN]

15.  Christi El-Meligi
     6057 Star Point Rd.
     North Las Vegas, NV 89031
     [TELEPHONE UNKNOWN]

16.  Frackson Sakala
     [CONTACT INFORMATION UNKNOWN]

17.  Kimberly Jones
     [CONTACT INFORMATION UNKNOWN]

18.  Abigail Paul
     2652 West Kiva Ave.
     Mesa, AZ 85202
     207-332-4505

19.  John W. Hanna
     [CONTACT INFORMATION UNKNOWN]

20.  Christian Astorga
     [CONTACT INFORMATION UNKNOWN]

21.  Todd McGee
     47 Yadkin Rd.
     Fletcher, NC 28732

THORPE SHWER, P.C.

6

9508355

602-571-4280

22.  Guang Liu
     [ADDRESS UNKNOWN]
     480-526-1432

23.  Juan Carlos Bolanos
     [CONTACT INFORMATION UNKNOWN]

24.  Rey Katigback
     [CONTACT INFORMATION UNKNOWN]

25.  Tasif Hasan
     1625 W. Enfield Way
     Chandler, AZ 85286

26.  Christopher West
     [CONTACT INFORMATION UNKNOWN]

27.  Janna Ross
     [CONTACT INFORMATION UNKNOWN]

28.  Monica Phillips
     [CONTACT INFORMATION UNKNOWN]

29.  Lindsay Naas
     [CONTACT INFORMATION UNKNOWN]

30.  Matthew Black
     [CONTACT INFORMATION UNKNOWN]

31.  Mary Griest
     [CONTACT INFORMATION UNKNOWN]

32.  Tim Stuart
     [CONTACT INFORMATION UNKNOWN]

33.  Maria Ross
     [CONTACT INFORMATION UNKNOWN]

34.  Jonathan Moening
     [CONTACT INFORMATION UNKNOWN]

35.  Justin Thorpe

7

9508355

THORPE SHWER, P.C.

[CONTACT INFORMATION UNKNOWN]

36. Keith Cavaness
[CONTACT INFORMATION UNKNOWN]

37. Md Shafinur Murad
[CONTACT INFORMATION UNKNOWN]

38. Chris Curtis
[CONTACT INFORMATION UNKNOWN]

39. Michael Luong
[CONTACT INFORMATION UNKNOWN]

40. Allan Scroggins
[CONTACT INFORMATION UNKNOWN]

41. Carissa Turnbull
[CONTACT INFORMATION UNKNOWN]

42. Megan Cauthen
[CONTACT INFORMATION UNKNOWN]

43. Curtis Mellor
[CONTACT INFORMATION UNKNOWN]

44. Carolyn Hughley
[CONTACT INFORMATION UNKNOWN]

45. Jason Crowl
[CONTACT INFORMATION UNKNOWN]

46. Carl Schrank
[CONTACT INFORMATION UNKNOWN]

47. Vernell Bagey
[CONTACT INFORMATION UNKNOWN]

48. Boyce Gordon
[CONTACT INFORMATION UNKNOWN]

49. Lisa Ridges
[CONTACT INFORMATION UNKNOWN]

THORPE SHWER, P.C.

9508355

50. Ahmed Ayesh
[CONTACT INFORMATION UNKNOWN]

51. Heather Betts
[CONTACT INFORMATION UNKNOWN]

52. L. David Albaugh
[CONTACT INFORMATION UNKNOWN]

53. Marise Andrade
[CONTACT INFORMATION UNKNOWN]

54. Melanie Sherry
[CONTACT INFORMATION UNKNOWN]

55. Tadd Greenfield
114 Margaret Lane
Libby, MT59923
406-291-5954

56. Teresita Munoz
[CONTACT INFORMATION UNKNOWN]

57. Taylor Fox
[CONTACT INFORMATION UNKNOWN]

58. Trish Spence
[CONTACT INFORMATION UNKNOWN]

59. Ira Vandever
[CONTACT INFORMATION UNKNOWN]

60. Gary Bortolotti
[CONTACT INFORMATION UNKNOWN]

61. Jean Paul Creusat
[CONTACT INFORMATION UNKNOWN]

62. Jelena Cakarmis
[CONTACT INFORMATION UNKNOWN]

63. Valerie Redhorse
[CONTACT INFORMATION UNKNOWN]

THORPE SHWER, P.C.

9

9508355

THORPE SHWER, P.C.

1
2

64.    Lovena Lee
       [CONTACT INFORMATION UNKNOWN]

3
4

65.    Cheryl Bailey
       [CONTACT INFORMATION UNKNOWN]

5
6

66.    Mary Arave
       [CONTACT INFORMATION UNKNOWN]

7
8

67.    George Merritt
       [CONTACT INFORMATION UNKNOWN]

9

68.    Vincent Brooks
       [CONTACT INFORMATION UNKNOWN]

10
11

69.    Delphine Lee
       [CONTACT INFORMATION UNKNOWN]

12
13

70.    Dennis Adams
       [CONTACT INFORMATION UNKNOWN]

14
15

71.    Chinue Carr
       [CONTACT INFORMATION UNKNOWN]

16

B.    Contractors and Professionals

17
18

1.    Ward, Miller & Geyer
      165 S. Main St., Ste. 200
      Salt Lake City, UT 84111

19
20

2.    Frye Law Firm
      10400 Academy NE, Ste. 310
      Albuquerque, NM 87111

21
22

3.    Warner Angle
      2555 E. Camelback Rd., #800
      Phoenix, AZ 85016

23
24

4.    Jorgenson Law
      [CONTACT INFORMATION UNKNOWN]

25
26

5.    Hutchison & Steffen
      10080 Alta Dr.
      Las Vegas, NV 89145

27
28

6.    Rothstein Donatelli
      500 4th St. N.W., Ste. 400
      Albuquerque, NM 87102

10

THORPE SHWER, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7.    McDonald-Carano-Wilson
      100 W. Liberty St., 10th Fl
      Reno, NV 89501

8.    Pintar Albiston
      6053 S. Fort Apache Rd. #120
      Las Vegas, NV 89148

9.    Professional Business Advisors
      1706 S. 500 W, Ste. 200
      Bountiful, UT 84010

10.   Burnham & Schumm
      1981 E. Murray-Holliday Rd, Ste. 245
      Salt Lake City, UT 84117

11.   Bradshaw Smith & Co., LLP
      3851 W. Charleston
      Las Vegas, NV 89140

12.   York Howell
      6405 South 3000 East, Ste. 150
      Salt Lake City, UT 84121

13.   Ward Malloy, P.C.
      800 McIntyre Bldg.
      68 South Main St.
      Salt Lake City, UT 84101

14.   Steptoe & Johnson
      Collier Center, 16th Floor
      201 E. Washington St.
      Phoenix, AZ 85004

15.   Innovative Employee Solutions
      9665 Granit Ridge Dr. #420
      San Diego, CA 92123

16.   Kunga Engineering
      [CONTACT INFORMATION UNKNOWN]

17.   Associated Engineering

18.   Freedman Boyd Hollander
      20 First Plaza, Ste. 700
      Albuquerque, NM 87102

19.   Jacobus Consulting
      15375 Barranca Pkwy, Ste. B-202
      Irvine, CA 92618

20.   IMA Consulting a/k/a RevInt Solutions
      6 Hillman Dr., Ste. 100
      Chadds Ford, PA 19317

11

9508355

21.    Quannie Tax & Accounting Services
       1213 Highway 491
       Gallup, NM 87301

22.    Winter DeLaMare
       5673 S. Adelay Ave.
       Salt Lake City, UT 84107

23.    Spiess & Bell
       4500 N. 32nd St., Ste. 201B
       Phoenix, AZ 85018

24.    McCard
       [CONTACT INFORMATION UNKNOWN]

25.    Sandstone Public Relations
       P.O. Box 30192
       Flagstaff, AZ 86003

26.    Jackson Engineering
       3376 Stonehill Ln
       Cottonwood Heights, UT 84121

27.    McGovern & Green
       200 W. Jackson Blvd., Ste. 2325
       Chicago, IL 60606

28.    Osborn Maledon
       2929 N. Central Ave., 21st Floor
       Phoenix, AZ 85012

29.    Subterranean Associates
       7265 S. 1950 East #20
       Salt Lake City, UT 84121

30.    Rotech IT
       2831 Camino Del Rio S. #108
       San Diego, CA 92108

31.    Peter Keenan
       P.O. Box 43
       McMinnville, OR 97128

32.    M&P Engineering
       459 N. Gilbert Rd., Ste. A-195
       Gilbert, AZ 85234

33.    FFKR Architects
       730 Pacific Ave.
       Salt Lake City, UT 84107

34.    Lewis Brisbois
       633 W. Fifth St.
       Los Angeles, CA 90071

THORPE SHWER, P.C.

12

9508355

THORPE SHWER, P.C.

| | | |
|---|---|---|
| 1 | 35. | Wasatch IT |
| 2 | | 5242 S. College Dr. #200 |
| | | Murray, UT 84123 |
| 3 | 36. | Tuggle Duggins |
| 4 | | 400 Bellemeade St. #800 |
| | | Greensboro, NC 27401 |
| 5 | 37. | Erichsen Engineering |
| 6 | | 5666 S. Adaley Ave. |
| | | Murray, UT 84107 |
| 7 | 38. | Keeswood International |
| 8 | | P.O. Box 862 |
| | | Window Rock, AZ 86515 |
| 9 | 39. | Concur Technologies, Inc. |
| 10 | | 62157 Collections Center Dr. |
| | | Chicago, IL 60693 |
| 11 | 40. | Corgan |
| 12 | | P.O. Box 910253 |
| | | Dallas, TX 75391 |
| 13 | 41. | Accounttemps |
| 14 | | P.O. Box 743295 |
| | | Los Angeles, CA 90074 |
| 15 | 42. | Trimble |
| 16 | | P.O. Box 203558 |
| | | Dallas, TX 75320 |
| 17 | 43. | Xtend Healthcare |
| 18 | | 500 W. Main St., Ste. 14 |
| | | Hendersonville, TN 37075 |
| 19 | 44. | Onsager, Werner & Oberg |
| 20 | | 3200 N. Central Ave., Ste. 1800 |
| | | Phoenix, AZ 85012 |
| 21 | 45. | Dell Marketing |
| 22 | | One Dell Way |
| | | Round Rock, TX 78682 |
| 23 | 46. | CompHealth |
| 24 | | P.O. Box 972651 |
| | | Dallas, TX 75397 |
| 25 | 47. | NTT Data |
| 26 | | 2300 W. Plano Parkway |
| | | Plano, TX 75075 |
| 27 | 48. | Bean & Associates |
| 28 | | 201 Third St., NW, Ste. 1630 |
| | | Albuquerque, NM 87102 |

9508355

1    49.    Porter Group
             11 D. St., SE
2            Washington, DC 20003

3    50.    Vista Staffing Solutions
             2800 East Cottonwood Pkwy, Ste. 400
4            Cottonwood Heights, UT 84121

5    51.    IMEG
             623 26th Ave.
6            Rock Island, IL 61201

7    52.    Sedona Foot & Ankle
             401 S. Calvary Way, Ste. A
8            Cottonwood, AZ 86326

9    53.    Speros Design, LLC
             6698A 161st Ave. SE
10           Bellevue, WA 98006

11   54.    Merritt Hawkins
             [CONTACT INFORMATION UNKNOWN]
12

13   55.    Vernon Aviation
             1080 W. Navajo St., Hangar 11
14           Farmington, NM 87401

15   56.    BDO
             8401 Greensboro Dr., Ste. 800
16           McLean, VA 22102

17   57.    Falling Clouds
             P.O. Box 424
18           Prewitt, NM 87045

19    The contractual basis for the rates and amounts charged to Sage by these contractors

20   and professionals can be found at Section 2(D) of the Navajo Health Foundation – Sage

21   Memorial Hospital, Inc. CEO Services Contract dated March 18, 2011, Section 2(C) of the

22   Navajo Health Foundation – Sage Memorial Hospital, Inc. Amendment No. 1 and

23   Extension No. 1 to CEO Services Contract dated May 17, 2013 and Section 2(C) of the

24   Navajo Health Foundation – Sage Memorial Hospital, Inc. Amendment No. 2 to CEO

25   Services Contract dated June 16, 2017.

26

27   **INTERROGATORY NO. 2**:

28    For each person identified in response to Interrogatory No. 1, identify all services

14

THORPE SHWER, P.C.

1  provided by that person to or for the benefit of Sage, all amounts charged to Sage for those

2  services, all rates charged to Sage for those services (including the time periods for each,

3  if different rates were charged at different times), and the contractual or other basis for the

4  amounts charged.

5  **RESPONSE**:

6      Besides the information pertaining to themselves specifically, no individual

7  Defendant has any information responsive to this Interrogatory in his possession, custody

8  or control and, therefore, relies on the information in the possession, custody or control of

9  RDC, if any. RDC ceased operating its hospital management activities in 2018. It has not

10  maintained any personnel files or other records upon which it might rely to provide

11  information called for by the expansive definition of the term "Identify." Subject to the

12  foregoing, in addition to the identifying information set forth below, Defendants refer

13  Plaintiff to the table attached hereto as Exhibit A for the information available to

14  Defendants to respond to this interrogatory with respect to invoices submitted to Sage for

15  services rendered by prior to December 1, 2014, and a description of the services provided

16  during the Relevant Time Period. Defendants refer Plaintiff to the table attached hereto as

17  Exhibit B for information available to Defendants regarding its employees', agents' and

18  representatives' titles, roles, rates and amounts charged to Sage on RDC's invoices after

19  December 1, 2014. Defendants refer Plaintiffs to the table attached hereto as Exhibit C for

20  information available to Defendants to respond to this interrogatory with respect to

21  invoices submitted to Plaintiff for services rendered by Contractors and Professionals

22  during the Relevant Time Period. Additionally, Defendants refer Plaintiff to the ~~following~~

23  documents previously produced Bates labeled RDC Sage_007794 – RDC Sage_007966,

24  which contain information responsive to this Interrogatory No. 2 for the time period of

25  May 2015 to August 2018. Defendants reserve the right to supplement, clarify, revise, or

26  correct its response to this Interrogatory.

27      The contractual basis for the rates and amounts charged to Sage by these contractors

28  and professionals can be found at Section 2(D) of the Navajo Health Foundation – Sage

THORPE SHWER, P.C.

15

1   Memorial Hospital, Inc. CEO Services Contract dated March 18, 2011, Section 2(C) of the
2   Navajo Health Foundation – Sage Memorial Hospital, Inc. Amendment No. 1 and
3   Extension No. 1 to CEO Services Contract dated May 17, 2013 and Section 2(C) of the
4   Navajo Health Foundation – Sage Memorial Hospital, Inc. Amendment No. 2 to CEO
5   Services Contract dated June 16, 2017.

6

7   **INTERROGATORY NO. 3**:

8       Describe in detail the factual and legal support for each and every affirmative
9   defense to Sage's claims that You asserted in Your First Amended Answer to Plaintiff's
10  Third Amended Complaint (Doc. 298). If any such affirmative defense, or the factual or
11  legal support for any such affirmative defense, is not asserted equally for each Defendant,
12  please explain in detail any such differences of position.

13  **RESPONSE**:

14      Subject to the Preliminary Statement, Objections to the Definitions and Instructions,
15  and General Objections listed above, Defendants respond to Interrogatory No. 3 as follows
16  with respect to Defendants' Answer to Plaintiff's Fourth Amended Complaint (Doc. 345),
17  which is the current operative Answer:

18      Statute of Limitations. Defendants have asserted that Plaintiff's claims are barred,
19  in whole or in part, by applicable statutes of limitations. Plaintiff's RICO claims are subject
20  to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
21  483 U.S. 143, 156 (1987). The limitations period begins to run on the date the plaintiff
22  knew or should have known the elements of a civil RICO cause of action existed. Plaintiff
23  asserted its RICO claims in the original Complaint filed February 22, 2019. To the extent
24  Plaintiff proves the elements of its RICO claims, Defendants may be able to show that
25  Plaintiff was aware or should have been aware that the elements of such claims existed
26  prior to February 22, 2015, and thus the filing of the RICO claims falls outside the
27  permissible limitations period for such claims.

28      Plaintiff's claims for fraud and constructive fraud are subject to a three-year statute

THORPE SHWER, P.C.

16

9508355

of limitations pursuant to A.R.S. § 12-543(3). Plaintiff's common law fraud and constructive fraud claims, as asserted in the Complaint were predicated on the alleged false representation made on August 27, 2018 in relation to Defendants' submittal of invoice #1369. Plaintiff's common law fraud and constructive fraud claims were expanded in the First Amended Complaint filed on June 1, 2021 to include alleged false representations and omissions in addition to that alleged as having been made on August 27, 2018 in relation to the submittal of invoice #1369. To the extent Plaintiff's common law fraud and constructive fraud claims are based on alleged false representations and omissions occurring prior to June 1, 2018 and not alleged in the original Complaint, such claims are time-barred.

Plaintiff's claim for civil conspiracy and aiding and abetting is governed by the statute of limitations for the underlying tort action – fraud. *See YF Trust v. JP Morgan Chase Bank, N.A.,* 2008 U.S. Dist. LEXIS 102350, at *7 (D. Ariz. 2008). Plaintiff's claim for civil conspiracy and aiding and abetting is time-barred to the same extent, and for the same reasons outlined with respect to Plaintiff's claims for common law fraud and constructive fraud.

Plaintiff's claims for breach of fiduciary duty are governed by a two-year statute of limitations pursuant to A.R.S. § 12-542. Plaintiff first pled these claims in the First Amended Complaint filed on June 1, 2021. To the extent Plaintiff's breach-of-fiduciary-duty claims are based on acts and omissions occurring prior to June 1, 2019 and facts not alleged in the original Complaint, such claims are time-barred.

To the extent Plaintiff's claim for breach of the covenant of good faith and fair dealing relies on the allegation that RDC "tortuously contravened the intention and spirit of the [Contract] by failing to obtain the approval of the Sage Board to increase Razaghi's billing rate from $175 per hour to a net rate of $495 per hour," such claim is governed by a two-year statute of limitations pursuant to A.R.S. § 12-542. Plaintiff's claim for tortious breach of the covenant of good faith and fair dealing based on this theory was first asserted in the First Amended Complaint filed on June 1, 2021. To the extent Plaintiff's claim is

17

1    based on acts and omissions occurring prior to June 1, 2019 and not alleged in the original

2    Complaint, such claim is time-barred.

3         Plaintiff's unjust enrichment claim is governed by a three-year statute of limitations

4    pursuant to A.R.S. § 12-543(1). Plaintiff's first asserted their unjust enrichment claim in

5    the First Amended Complaint filed June 1, 2021. To the extent Plaintiff's claim is based

6    on acts and omissions occurring prior to June 1, 2018 and not alleged in the original

7    Complaint, such claim is time-barred.

8         <u>Waiver, Laches, and/or Estoppel</u>. Defendants have asserted that Plaintiff's claims

9    are barred, in whole or in part, by the doctrines of waiver, laches, and/or estoppel. Waiver

10   is the intentional relinquishment of a known right with knowledge of its existence and the

11   intent to relinquish it. *Arizona v. Tohono O'Odham Nation*, 944 F.Supp.2d 748, 757 (D.

12   Ariz. 2013) (quoting *United States v. King Features Entm't, Inc.,* 843 F.2d 394, 399 (9th

13   Cir. 1988)).

14        At all relevant times Plaintiff had full knowledge of the hourly rate for Mr. Razaghi.

15   In fact, the Sage board reviewed and approved Mr. Razaghi's rates from 2011-2018. By

16   each action described herein, the Sage board intended to relinquish its right to challenge or

17   otherwise address concerns it had regarding Mr. Razaghi's rate.

18        For the relevant portion of Fiscal Year 2011 and for Fiscal Years 2012 and 2013,

19   the Base Pay rate of $175 per hour set forth in § 5(A) of the Navajo Health Foundation –

20   Sage Memorial Hospital, Inc. CEO Services Contract dated March 18, 2011 was in effect.

21   After considering HealthCare Appraisers Incorporated's Determination of the Fair Market

22   Value of Hospital Management Services dated December 23, 2013, which indicated,

23   among other things, that the fair market range for Mr. Razaghi's services was $340 per

24   hour to $530 per hour, the Fiscal Year 2014 Base Pay rate was adjusted to $425 per hour

25   and discounted to $175 per hour.

26        On or about May 1, 2014, the Base Pay rate was adjusted to $530 per hour, which

27   after applying a $175 per hour discount resulted in an increase of the Base Pay rate from

28   $175 per hour to $355 per hour. This increase was reflected in the backup information that

THORPE SHWER, P.C.

18

1    accompanied RDC's Invoice #1180, which was submitted to Plaintiff on or about June 2,
2    2014. On September 26, 2014, Plaintiff's board of directors approved a continuing
3    resolution pursuant to which it adopted Plaintiff's Fiscal Year 2014 operating budget as
4    the Fiscal Year 2015 operating budget. In May 2015, the Base Pay rate was adjusted to
5    $495 per hour.

6         In its letter dated October 2, 2015, RDC reminded Plaintiff of its request that RDC
7    carry forward a portion of each of its service invoices as discounts below fair market value.
8    RDC informed Plaintiff that it had been carrying these costs since January 2014. As of
9    September 29, 2015, the balance due on those unpaid costs totaled $7,042,713.52 and,
10   accordingly, RDC's Invoice #1214 in that amount was submitted with its letter. At
11   Plaintiff's board of directors meeting held November 14, 2015, RDC reported to Plaintiff's
12   board of directors on Invoice #1214 and the $7.042 million carry forward cost. Plaintiff's
13   board voted unanimously to approve Invoice #1214.  By this action, Plaintiff's board
14   approved any rate charged by RDC for the period of time covered by Invoice #1214,
15   provided the rate was within the highest fair market value rate for Mr. Razaghi's services
16   and the discounted rate charged to Plaintiff.

17   On October 7, 2015, Plaintiff's board of directors approved Plaintiff's Fiscal Year
18   2016 operating budget. In connection with this approval, Plaintiff's board received and
19   reviewed the Navajo Health Foundation – Sage Memorial Hospital FY2016 Budget
20   Review. Included in that document was an Executive Management and Consulting
21   Services Rate Sheet which, among other things, showed that for Fiscal Year 2016 that RDC
22   would charge $530 per hour for Mr. Razaghi services which, after applying a 6.6%
23   discount, resulted in a discounted hourly rate of $495 per hour.

24   On September 27, 2016, Plaintiff's board of directors approved a continuing
25   resolution pursuant to which it adopted Plaintiff's Fiscal Year 2016 operating budget as
26   Plaintiff's Fiscal Year 2017 operating budget. In connection with the adoption of this
27   continuing resolution, Plaintiff's board received and reviewed the Navajo Health
28   Foundation – Sage Memorial Hospital Continuing Resolution – FY2017 Budget. Included

THORPE SHWER, P.C.

19

9508355

1  in that document was an Executive Management and Consulting Services Rate Sheet
2  which, among other things, showed that for Fiscal Year 2017 that RDC would charge $530
3  per hour for Mr. Razaghi services which, after applying a 6.6% discount, resulted in a
4  discounted hourly rate of $495 per hour.

5  On August 25, 2017, Plaintiff's board of directors approved a continuing resolution
6  pursuant to which it adopted Plaintiff's Fiscal Year 2017 operating budget as Plaintiff's
7  Fiscal Year 2018 operating budget.  In connection with the adoption of this continuing
8  resolution, Plaintiff's board received and reviewed the Navajo Health Foundation – Sage
9  Memorial Hospital Continuing Resolution Adopting Fiscal Year 2018 Budget (Adopting
10 fiscal year 2017 budget for fiscal year 2018).  Included in that document was an Executive
11 Management and Consulting Services Rate Sheet which, among other things, showed that
12 for Fiscal Year 2018 that RDC would charge $530 per hour for Mr. Razaghi services which,
13 after applying a 6.6% discount, resulted in a discounted hourly rate of $495 per hour.

14 Laches "is an equitable defense that prevents a plaintiff, who with full knowledge
15 of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony*
16 *Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (internal quotation marks and citation omitted).

17 As set forth above, Plaintiff had full knowledge of the facts regarding Mr. Razaghi's
18 Base Pay rate from 2011-2018 and the approval of such rates. By each action taken, as
19 described above, the Sage board acquiesced as to Mr. Razaghi's rate. Plaintiff had at least
20 five years to challenge Mr. Razaghi's hourly rate (which the Sage board approved), but it
21 did not. Rather, Plaintiff slept on its rights to claim that the charged rates were somehow
22 improper, barring Plaintiff's claims.

23 Estoppel, is proved by establishing four elements: (1) the party to be estopped must
24 know the facts; (2) the party to be estopped must intend that its conduct shall be acted on
25 or must so act that the party asserting the estoppel has a right to believe it is so intended;
26 (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party
27 asserting the estoppel must rely on the former's conduct to its injury. *Central Ariz. Water*
28 *Conservation Dist. v. United States*, 32 F.Supp.2d 1117, (D. Ariz. 1998) (quoting *United*

THORPE SHWER, P.C.

20

9508355

1  *States v. Garan,* 12 F.3d 858, 860 (9th Cir. 1993).

2  As set forth above, Plaintiff knew all pertinent facts regarding Mr. Razaghi's Base

3  Pay rate. By approving Mr. Razaghi's rate each year as described above, the Sage board

4  intended for that rate to be applicable to Mr. Razaghi's work for Plaintiff. Further,

5  Mr. Razaghi and RDC had a right to believe that the Sage board intended to approve and

6  honor Mr. Razaghi's rate through the Sage Board's actions as described above.

7  Mr. Razaghi and RDC justifiably relied on the Sage Board's conduct only to now face

8  Plaintiff's claims that Mr. Razaghi's hourly rate was charged to Plaintiff improperly.

9  <u>Collateral Estoppel and/or Judicial Estoppel</u>. Defendants have asserted that

10 Plaintiff's claims are barred, in whole or in part, by the doctrines of collateral estoppel

11 and/or judicial estoppel. Defendants intend to withdraw the asserted defense of collateral

12 estoppel. Judicial estoppel "prevents a party from prevailing in one phase of a case on an

13 argument then relying on a contradictory argument to prevail in another phase." *Fisher v.*

14 *Aetna Life Ins. Co.*, 2009 U.S. Dist. LEXIS 147484, *8 (quoting *Zedner v. United States*,

15 547 U.S. 489, 504 (2006)).

16 Due to the nature of the affirmative defense of judicial estoppel, Defendants do not,

17 and cannot, currently know of factual support for that defense. However, to the extent that

18 Plaintiff prevails in a phase of this case on an argument and then relies on a contradictory

19 argument to prevail in another phase of this, Plaintiff is judicially estopped from doing so.

20 <u>Economic Loss Doctrine</u>. Defendants have asserted that Plaintiff's tort claims are

21 barred by the economic loss doctrine. Tort claims arising out of breach-of-contract actions

22 are barred by the Economic Loss Doctrine, which limits contracting parties to contractual

23 remedies for the recovery of economic losses unaccompanied by physical injuries to

24 persons or other property. *Barrio v. Gisa Invs. LLC*, 2020 U.S. Dist. LEXIS 191584, at

25 *3-4; *citing Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320,

26 223 P.3d 664 (2010). Plaintiff's claims for fraud and constructive fraud arise from the

27 parties' contractual relationship. The Contract provides provisions related to allocating

28 losses and remedies. Plaintiff alleges only economic losses and no physical injuries to

THORPE SHWER, P.C.

21

9508355

persons or other property. Thus, Plaintiff's fraud and constructive fraud claims are barred by the economic loss rule.

    <u>Recoupment/Set-Off/Offset</u>. Defendants have asserted that, to the extent that Plaintiff is entitled to damages or penalties, Defendants are entitled to a recoupment/set-off/offset for any overpayments of consideration by Defendants previously provided to Plaintiff or underpayment of consideration by Plaintiff owed to Defendants. Recoupment is an equitable doctrine wherein the claim of a defendant can be used to reduce or to eliminate a judgment. *W.J. Kroeger Co. v. Travelers Indem. Co.*, 112 Ariz. 285, 287-88, 541 P.2d 385, 387-88 (1975). The right of offset, or setoff, allows parties owing each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)).

    <u>Indemnification</u>. Defendants have asserted that Defendants are entitled to indemnification for damages, if any, and any and all costs and fees incurred by Defendants in defense of this lawsuit pursuant to Section 12(H) of the Contract.

    <u>Failure to Mitigate Damages</u>. Defendants intend to withdraw the asserted affirmative defense of failure to mitigate damages.

    Discovery into the facts supporting the above-referenced affirmative defenses is ongoing. Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.

**INTERROGATORY NO. 4**:

    Identify and describe in detail each of the "contractual provisions" You claim Sage breached, as alleged in Paragraphs 105 and 109 of Razaghi Healthcare's Counterclaims and Second Amended Third Party Claims (Doc. 298), including: (1) the specific provision You contend was breached and (2) every fact supporting Your contention that it was breached.

**RESPONSE**:

THORPE SHWER, P.C.

9508355

1    Subject to the Preliminary Statement, Objections to the Definitions and Instructions,

2    and General Objections listed above, Defendants respond to Interrogatory No. 4 as follows:

3    Paragraph 105 of RDC's Counterclaims and Second Amended Third-Party Claims

4    (Doc. 217) refers to Plaintiff "failing to allow RDC to perform its management functions

5    under the contract," "interfering with the reassignment of El-Meligi and Dalgai from Sage

6    Memorial Hospital to RDC," and "failing to pay RDC the performance fee approved by

7    the Board of Directors on or about December 15, 2017."

8    Section 2(A) of the Contract provides that the Board shall retain authority placed in

9    it by law and its bylaws except to the extent such authority has been delegated to RDC.

10    Section 2(C) of the Contract delegates to RDC "the right and commensurate authority and

11    responsibility, express or implied, to oversee the supervision and effective management of

12    the Corporation."  Section 2(C)(1) further provides that RDC "agrees to perform the duties

13    and responsibilities of the position of Chief Executive Officer set forth in the Sage

14    Memorial Hospital Position Description for the position of Chief Executive Officer."

15    Section 2(C)(2) expressly states that RDC "shall be responsible for overseeing the

16    recruitment, hiring, promotion, disciplining, and firing of (i) Corporation key executives

17    who report to the CEO, including without limitation the Chief Financial Officer, the

18    Medical Director, the Chief Operations Officer, and the Director of Nursing ("Key

19    Executives")…." Netrisha Dalgai's position as Chief Operations Officer fell squarely

20    within the definition of a Key Executive.  Christi El-Meligi's position as Co-CEO also fell

21    within the definition of a Key Executive as the job description expressly provided that the

22    Co-CEO would be supervised by the Chief Executive Officer.  Thus, Plaintiff breached the

23    above-referenced provisions of the Contract when it obstructed RDC's ability to perform

24    the above-listed management functions under the contract and by interfering with the

25    reassignment of El-Meligi and Dalgai from Sage Memorial Hospital to RDC.

26    Paragraph 109 of RDC's Counterclaims and Second Amended Third-Party Claims

27    (Doc. 217) refers to Plaintiff's failure to pay RDC the entire compensation outlined in the

28    Contract up to the date of termination, including but not limited to Incentive Fees, Annual

THORPE SHWER, P.C.

9508355

Retention Bonuses, Management Consulting Services, Executive Leadership Services, employee reimbursements, and reimbursement for D&O Insurance. Section 5 of the Contract lists various categories of compensation to which RDC was entitled in exchange for its services. Among other things, Section 5(A) provides for base pay for professional services rendered by Ahmad R. Razaghi, Section 5(B) provides for an Annual Incentive Fee, Section 5(C) provides for an Annual Retention Bonus, Section 5(D) provides for the Termination Payment, Section 5(E) provides for a Performance Fee, and Section 5(F) acknowledges Plaintiff's agreement to provide RDC with D&O Insurance. Section 2(C)(2) of the Contract acknowledges Plaintiff's agreement to pay RDC the costs of services of RDC personnel. Plaintiff breached the above-listed provisions of the Contract as further set forth in Defendants response to Interrogatory No. 9. Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.

**INTERROGATORY NO. 5**:

Identify and describe in detail each "unauthorized communication" that, in Paragraphs 41, 124, 142, and 149 of Razaghi Healthcare's Counterclaims and Second Amended Third-Party Claims (Doc. 298), You allege occurred, including: (1) the date of each such communication, (2) all persons involved in each such communication, (3) the substance of each such communication, and (4) all facts supporting your contention that each such communication was "unauthorized."

**RESPONSE**:

Subject to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants respond to Interrogatory No. 5 as follows: Upon information and belief, in July 2018, Ms. El-Meligi and Ms. Dalgai communicated with certain members of the Sage Board, including but not limited to Ms. Kelewood and Ms. Terry, to protest their reassignment from Sage Memorial Hospital to Razaghi Healthcare's Scottsdale, Arizona offices and devise a plan for the Board to intervene to prevent the reassignment or otherwise interfere with RDC personnel matters. Upon further

THORPE SHWER, P.C.

24

9508355

information and belief, Ms. El-Meligi and Ms. Dalgai communicated with certain members of the Sage Board to plan points of discussion for meetings of the Sage Board to question and interfere with RDC's authority over personnel matters and RDC's management of Sage Memorial Hospital. Upon further information and belief, certain members of the Sage Board forwarded email communications between the Board and RDC regarding RDC personnel matters to Ms. El-Meligi and Ms. Dalgai.

Specifically, in April 2018, Ms. El-Meligi and Ms. Dalgai met with Stenson Wauneka. During that meeting, Mr. Wauneka called Mr. Razaghi on speakerphone while Ms. El-Meligi and Ms. Dalgai were in the room. Ms. El-Meligi testified that the discussion was about "the CEO, the contract, and [Ms. El-Meligi's position], and Stenson was voicing his disapproval." On or about June 14, 2018, Ms. El-Meligi met with Mr. Wauneka again to question the CEO contract and costs billed to Sage for work associated with Sage's directive to RDC to move forward with the development and expansion of Sage's services and service area by working with other healthcare organizations to assist them to become 638 organizations. Between June 2018 and August 2018, Ms. El-Meligi had "many, many" conversations with Ms. Kelewood, Ms. Terry, and Mr. Simpson. Those conversations included such topics as: Mr. Razaghi's lack of "willingness to move forward with the development and the execution of the construction of the new healthcare facility;" Mr. Razaghi's reassignment of Ms. El-Meligi as Sage CEO; and Mr. Razaghi re-hiring Mr. Hasan after Ms. El-Meligi fired Ms. Hasan. Between June 2018 and August 2018, Ms. El-Meligi, Ms. Kelewood, Ms. Terry, and/or Mr. Simpson continued to communicate with the apparent purpose of retaliating against RDC for Ms. El-Meligi's reassignment by interfering with RDC's performance under the Contract and tarnishing RDC's reputation.

Sage board members' communications with Ms. El-Meligi and Ms. Dalgai directly undercut and interfered with Razaghi's rights and authority under the Contract. Section §2(C)(1) of the Contract provides that "Ahmad R. Razaghi shall perform the duties and responsibilities of the position of the Chief Executive Officer set forth in Exhibit B of the Contract, until RH identifies a successor CEO, and any such successor CEO will be

25

9508355

evaluated by RH" and "Corporation shall not solicit or hire any such successor CEO to work directly for Corporation as an employee or an independent contractor during the term of the Contract." Further, §2(C)(2) of the Contract expressly states that Razaghi Healthcare had the right to (a) oversee the recruitment, hiring, promotion, disciplining, and firing of RH management consultants, (b) place and replace RH personnel at Sage, and (c) supervise and manage any member of the staff of Corporation, including physicians, subject to the terms of the Contract. The communications that the Sage board members had with Ms. El-Meligi and Ms. Dalgai, interfered with Razaghi Healthcare personnel matters and other contractual rights of Razaghi Healthcare and were therefore unauthorized.

Discovery is ongoing. Defendants reserve the right to supplement, clarify, revise, or correct its response to this Interrogatory.

**INTERROGATORY NO. 6**:

Describe in detail all factual and legal basis for the wiring of the $10.8 million from Sage to Razaghi Healthcare on or about August 27, 2018, including without limitation all facts and calculations supporting Your contention that Razaghi Healthcare was entitled to those funds.

**RESPONSE[2]:**

Subject to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants respond to Interrogatory No. 6 as follows: Section 4(C) of the Contract provides:

. . .

> In the event this Contract expires, or RH terminates this contract for cause, or the Corporation elects to terminate this Contract at any time prior to termination of this Contract for any reason other than those listed as "cause" in Section 4.A., the Corporation shall pay to RH (a) sum equal to the compensation described in this Contract up to the date of termination plus (b) the Termination Payment . . .

---

[2] Defendants supplemented their response to this interrogatory on April 15, 2024. Defendants believe that supplemental response provides both the calculation underlying and factual bases for the calculations underlying the $10.8 million wired to RDC.

9508355

Section 5(D)(2) of the Contract provides:

> In the event that this Contract expires, or RH terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to expiration of this Contract for any reason other than those listed as "cause" in Section 4.A., the Corporation shall, in addition to any other amounts due under this Contract, pay RH a Termination Payment in an amount equal to the average of the amount paid to RH by the Corporation each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration of termination.

On August 31, 2018, Plaintiff's board of directors adopted a resolution pursuant to which Plaintiff terminated the Contract effective immediately. The termination purportedly resulted from the board's learning on August 30, 2018, that RDC paid itself the Termination Payment on August 27, 2018. RDC's receipt of the Termination Payment on August 27, 2018, rather than on September 1, 2018, 30 days after RDC's August 2, 2018 notice of Plaintiff's breaches of the Contract, may have constituted a non-criminal material breach of the Contract. However, Plaintiff terminated the Contract without providing RDC with written notice of this breach and without giving RDC 30 days to cure any such breach. Consequently, Plaintiff terminated the Contract under circumstances entitling RDC to the Termination Payment.

The Termination Payment was calculated as an amount equal to the average of the amounts Plaintiff paid to RDC during the then most recent four years of service. As reflected on RDC's Invoice # 1369, RDC calculated the Termination Payment as follows:

a.   RDC determined that the applicable four-year period was September 1, 2014 to August 27, 2018; and

b.   RDC calculated the average of the amounts Plaintiff paid to it during this time period ($15,937,168.45) and applied a Professional Services Discount of $5,082,034.30, which produced a Termination Payment in the amount of $10,855,134.15.

***As demonstrated on the spreadsheet that accompanied Invoice #1369, RDC determined the total amount of its invoices using the information included in the columns labeled "Date invoice," "Inv #," and "Total Costs" to calculate the total amount***

27

THORPE SHWER, P.C.

9508355

*billed by RDC to Sage during the four-year period between September 10, 2014 and August 27, 2018 ($15,937,168.45). RDC then calculated the difference between the "Total Costs" and the Costs Paid," which produced the amounts reflected in the "Costs not paid" column. These amounts reflect RDC's carried forward charges for services provided below fair market value (the "Professional Discount"). Subtracting the four-year average of the "Costs Paid" from the four-year average of the "Costs Incurred" produced the "Costs not paid" (Professional Services Discount) of $5,082,034.30 reflected in RDC's Invoice #1369.*

**INTERROGATORY NO. 7**:

Describe in detail all factual and legal basis for Your contention that Razaghi Healthcare was owed a Termination Payment under Paragraph D of the CEO Services Contract, as amended.

**RESPONSE:**

In addition to the Preliminary Statement, Objections to the Definitions and Instructions, and General Objections listed above, Defendants object to Interrogatory 8 because Defendants do not contend that Razaghi Healthcare was owed a Termination Payment under "Paragraph D" of the CEO Services Contract, as amended. Subject to the foregoing, *see* Defendants' Response to Interrogatory 6.

**INTERROGATORY NO. 8**:

Identify and describe the services or other work performed by or on behalf of any Defendant to support each of the invoices detailed in Paragraphs 137 and 178 of Plaintiff's Third Amended Complaint (Doc. 192).

**RESPONSE**[3]:

---

[3] Defendants supplemented their response to this interrogatory on April 15, 2024. Defendants believe that this supplemental response meets the substance of the interrogatory. However, Defendants further supplement their response to this interrogatory in red italics above**.**

THORPE SHWER, P.C.

9508355

1    In addition to the Preliminary Statement, Objections to the Definitions and

2    Instructions, and General Objections listed above, Invoice No. 1371 is an invoice for the

3    Incentive Fee due and owing by Sage to RDC for the period of August 20, 2018 through

4    September 2, 2018. This invoice obviously would not reflect service or work performed by

5    anyone for anyone.

6    Regarding the Invoices 1370, 1372-34, 1382-84 detailed in Paragraph 137,

7    Defendants refer Plaintiff to their responses to Interrogatories 1 and 2. Likewise, with

8    respect to Invoices 1261-71, 1274-75, 1278-79, 1303, 1336, 1345 and 1354 detailed in

9    Paragraph 178, Defendants refer Plaintiff to their responses to Interrogatories 1 and 2.

10    Indeed, Plaintiff's allegations regarding these invoices are set forth in such detail as to

11    demonstrate that Plaintiff is well aware of not only the content of these invoices, but also

12    what the invoices contain to support Plaintiffs claim that the invoices seek payment for

13    Fraudulent Expenses. Under the circumstances, RDC can discern no good faith basis for

14    this interrogatory.

15

16    **INTERROGATORY NO. 9:**

17    Describe in detail any and all alleged damages Razaghi Healthcare is seeking on its

18    Counterclaims against Sage (including the categories, calculations, and legal basis

19    therefor), and identify all facts, documents, and witness testimony supporting,

20    contradicting, or otherwise relating to those alleged damages and calculations.

21    **RESPONSE[4]:**

22    A.    The Incentive Fee

23    In connection with its performance of an annual evaluation of RDC, at each annual

24    meeting the board was required to determine the Annual Incentive Fee. Plaintiff was

25

26

_____

27    [4] Defendants supplemented their response to this interrogatory on April 15, 2024.
Defendants believe that this supplemental response meets the substance of the

28    interrogatory. However, Defendants further supplement their response to this interrogatory
in red italics*.*

THORPE SHWER, P.C.

29

1  required to calculate the Annual Incentive Fee utilizing the then current Code Section 4958

2  Report. The Annual Incentive Fee was to equal 5.4% of Plaintiff's net revenues.

3        For Plaintiff's fiscal years 2017 and 2018, the budgeted Annual Incentive Fee was

4  $2,781,000 each year. Plaintiff was obligated to pay 70% percent of the Annual Incentive

5  Fee ($1,946,700) as invoiced and the remaining 30% ($834,300) in a lump-sum payment

6  at the end of the fiscal year following Plaintiff's board's determination that RDC's

7  performance was at least satisfactory.  Upon termination of the Contract, Plaintiff was

8  obligated to pay the entire unpaid amount of the Annual Incentive Fee through the effective

9  date of the termination.  Plaintiff failed to satisfy this obligation. As reflected on RDC's

10  Invoice Nos. 1371 and 1394, there remains an outstanding balance of $74,448.08

11  representing the final FY 2018 installment payment. As reflected on RDC's Invoice

12  No. 1394, there remains an outstanding balance of $834,299.92 representing the lump-sum

13  payment due for FY 2018. These amounts have accrued and continue to accrue interest at

14  the rate of 1.5% per month.  As of March 31, 2024, Plaintiff owes RDC Incentive Fees and

15  accrued interest totaling $2,155,159.

16        Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield,

17  David Erichsen, Guang Liu, Plaintiff's board members during the relevant time periods,

18  Christi El-Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is

19  entitled. In addition to the Contract, board meetings and other documents referred to herein,

20  RDC's damages are also reflected in the invoices RDC provided to Plaintiff.

21        B.   The Annual Retention Bonus

22        Plaintiff was required to pay RDC a retention bonus equal to 30 days or 240 of

23  professional time for each year that RDC continued to serve under the Contract (the

24  "Retention Bonus"). Plaintiff did not pay any of the Retention Bonus to RDC during fiscal

25  year 2018 and, accordingly, there remains an outstanding balance of $118,000 due and

26  owing to RDC. Interest has accrued and is accruing on this amount at the rate of 1.5% per

27  month.

28

THORPE SHWER, P.C.

30

9508355

1    Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield,
2    David Erichsen, Guang Liu, Plaintiff's board members during the relevant time periods,
3    Christi El-Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is
4    entitled.  In addition to the Contract, board meetings and other documents referred to
5    herein, RDC's damages are also reflected in the invoices RDC provided to Plaintiff,
6    including but not limited to Invoice Nos. 1244-1269, 1272, 1276, 1280, 1284, 1288, 1292-
7    1293, 1297-1298, 1311-1312, 1316, 1319, 1232, 1327, 1331, 1335, 1340, 1344, 1348,
8    1353, 1357, 1361, 1370-1374, 1394, 1398 and 1410.

9    C.    Personnel Costs

10    Plaintiff was obligated to reimburse RDC for the costs of key executives who report
11    to Plaintiff's CEO including, without limitation, the Chief Financial Officer, Medical
12    Director, Chief Operations Officer and Director of Nursing, as well as healthcare
13    consultants hired to assist these executives. Following Plaintiff's termination of the
14    Contract, RDC submitted invoices for these costs which Plaintiff has failed to pay.

15    D.    *Invoice #1214*

16    On or about September 29, 2015, RDC submitted its Invoice #1214, which detailed
17    all of the total fees due and owing by Plaintiff to RDC as a result of RDC's agreement to
18    perform services at a rate below fair market value to assist Plaintiff in continuing as a going
19    concern while it managed the extraordinary circumstances caused by its former employees,
20    the Navajo Area IHS investigation, subsequent litigation and related matters. The total of
21    the fees due and owing at the time of Invoice #1214 was $7,042,713.52. During Plaintiff's
22    Special Board of Directors Meeting held November 14, 2015, Plaintiff's board
23    unanimously approved Invoice #1214.

24    Plaintiff has failed and/or refused to pay Invoice #1214.  Interest has accrued and
25    continues to accrue on Invoice #1214 at the rate of 1.5% per month and the amount now
26    due totals approximately $32,157,059.

27    E.    Invoice # 1370

28    On or about September 11, 2018, RDC submitted its Invoice #1370, which detailed

THORPE SHWER, P.C.

31

9508355

charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in the amount of $31,678.32. Plaintiff has failed and/or refused to pay Invoice #1370. Interest has accrued and continues to accrue on Invoice #1370 at the rate of 1.5% per month and the amount now due totals approximately $173,110.

F.    Invoice #1372

On or about September 11, 2018, RDC submitted its Invoice #1370, which detailed charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in the amount of $129,986.76. Plaintiff has failed and/or refused to pay Invoice #1372. Interest has accrued and continues to accrue on Invoice #1372 at the rate of 1.5% per month and the amount now due totals approximately $347,262.

G.    Invoice #1373

On or about September 6, 2018, RDC submitted its Invoice #1370, which detailed charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in the amount of $106,120.38. Plaintiff has failed and/or refused to pay Invoice #1373. Interest has accrued and continues to accrue on Invoice #1373 at the rate of 1.5% per month and the amount now due totals approximately $283,502.

H.    Invoice #1374

On or about October 4, 2018, RDC submitted its Invoice #1370, which detailed charges for Personnel Costs and reimbursements due and owing by Plaintiff to RDC in the amount of $156,120.38. Plaintiff has failed and/or refused to pay Invoice #1374. Interest has accrued and continues to accrue on Invoice #1374 at the rate of 1.5% per month and the amount now due totals approximately $283,502.

I.    Invoice #1396

On or about August 5, 2019, RDC submitted its Invoice #1396, which detailed Personnel Costs due and owing by Plaintiff in the amount of $330,648.50 $175,648.50. Plaintiff has failed and/or refused to pay Invoice #1396. Interest has accrued and continues to accrue on Invoice #1396 at the rate of 1.5% per month and the amount now due totals approximately $749,892 $422,805.80.

THORPE SHWER, P.C.

32

1       Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield,

2   David Erichsen, Guang Liu, Plaintiff's board members during the relevant time periods,

3   Christi El-Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is

4   entitled.  In addition to the Contract, board meetings and other documents referred to

5   herein, RDC's damages are also reflected in the invoices RDC provided to Plaintiff,

6   including but not limited to Invoice Nos. 1244-1269, 1272, 1276, 1280, 1284, 1288, 1292-

7   1293, 1297-1298, 1311-1312, 1316, 1319, 1232, 1327, 1331, 1335, 1340, 1344, 1348,

8   1353, 1357, 1361, 1370-1374, 1394, 1398 and 1410.

9       J.    Invoice #1403

10      On or about June 30, 2014, RDC submitted its Invoice #1182, which included the

11  Incentive Fee due and owing by Plaintiff in the amount of $1,842,550.  Plaintiff paid a

12  portion of that Incentive Fee.  However, there remains due and owing $852,680.39.  On

13  February 11, 2020, RDC submitted its Invoice # 1403, which details the outstanding

14  balance of the Incentive Fee.  Interest has accrued and continues to accrue on Invoice #1403

15  at the rate of 1.5% per month and the amount now due totals approximately $2,179,105.37.

16      K.    D&O Insurance Reimbursement

17      Plaintiff was obligated to provide D&O insurance for RDC with adequate tail

18  coverage to protect RDC, Mr. Razaghi, and any successor CEO and Key Executives (as

19  those terms are defined in the Contract) from any claims made after the expiration or

20  termination of the Contract for any actions or omissions alleged to have occurred during

21  the term of the Contract.  Plaintiff failed to provide the insurance during FY 2018 and,

22  consequently, RDC was forced to obtain the coverage itself.  On or about August 5, 2019,

23  RDC submitted its Invoice No. 1398, which included, among other charges, the premium

24  RDC was forced to pay due to Plaintiff's failure to provide the required insurance coverage.

25  RDC seeks the recovery of the premiums it paid along with accrued and accruing interest

26  at the rate of 1.5% per month, which as of March 31, 2024 total $33,321.00.

27      Ahmad Razaghi, Tausif Hasan, Allen Billings, Todd McGee, Tadd Greenfield,

28  David Erichsen, Guang Liu, Plaintiff's board members during the relevant time periods,

THORPE SHWER, P.C.

9508355

Christi El-Meligi and/or Netrisha Dalgai may testify as to the damages to which RDC is entitled.  In addition to the Contract, board meetings and other documents referred to herein, RDC's damages are also reflected in the invoices RDC provided to Plaintiff, including but not limited to Invoice Nos. 1244-1269, 1272, 1276, 1280, 1284, 1288, 1292-1293, 1297-1298, 1311-1312, 1316, 1319, 1232, 1327, 1331, 1335, 1340, 1344, 1348, 1353, 1357, 1361, 1370-1374, 1394, 1398 and 1410.

**INTERROGATORY NO. 10:**

Identify whether any Defendant contends that it is entitled to any portion of the funds in the escrow account opened by Sage at Wells Fargo Bank on June 16, 2016, as detailed in Paragraphs 120-21 of Plaintiff's Third Amended Complaint (Doc. 192); and, if so, identify the amount claimed and all factual and legal support for that position.

**RESPONSE:**

No Defendant other than RDC was a party to a contract with Plaintiff that provided for the establishment of the escrow account or its uses.  RDC does not contend that it is entitled to any portion of the escrow account.

**INTERROGATORY NO. 11:**

Identify in detail all contractual terms that You contend were in place between Razaghi Healthcare and Sage at each time during the Relevant Time Period.  This includes identifying each amendment to the terms of the CEO Services Contract that You contend occurred and, for each amendment, identifying when You contend each amended provision was in effect.

**RESPONSE[5]:**

In light of the clarification of this interrogatory provided during the parties' meet and confer on March 26, 2024, and Plaintiff's counsel's email dated March 28, 2024,

---

[5] Defendants supplemented their response to this interrogatory on June 5, 2024. Defendants believe that this supplemental response meets the substance of the interrogatory.

THORPE SHWER, P.C.

34

9508355

1    Defendants supplement this response as follows:

2        For the relevant portion of Fiscal Year 2011 and for Fiscal Years 2012 and 2013,

3    the Base Pay rate of $175 per hour set forth in § 5(A) of the Navajo Health Foundation –

4    Sage Memorial Hospital, Inc.  CEO Services Contract dated March 18, 2011 was in effect.

5    After considering HealthCare Appraisers Incorporated's Determination of the Fair Market

6    Value of Hospital Management Services dated December 23, 2013, which indicated,

7    among other things, that the fair market range for Mr. Razaghi's services was $340 per

8    hour to $530 per hour, the Fiscal Year 2014 Base Pay rate was adjusted to $425 per hour

9    and discounted to $175 per hour.

10       On or about May 1, 2014, the Base Pay rate was adjusted to $530 per hour, which

11   after applying a $175 per hour discount resulted in an increase of the Base Pay rate from

12   $175 per hour to $355 per hour.  This increase was reflected in the backup information that

13   accompanied RDC's Invoice #1180, which was submitted to Plaintiff on or about June 2,

14   2014. On September 26, 2014, Plaintiff's board of directors approved a continuing

15   resolution pursuant to which it adopted Plaintiff's Fiscal Year 2014 operating budget as

16   the Fiscal Year 2015 operating budget. In May 2015, the Base Pay rate was adjusted to

17   $495 per hour.

18       In its letter dated October 2, 2015, RDC reminded Plaintiff of its request that RDC

19   carry forward a portion of each of its service invoices as discounts below fair market value.

20   RDC informed Plaintiff that it had been carrying these costs since January 2014. As of

21   September 29, 2015, the balance due on those unpaid costs totaled $7,042,713.52 and,

22   accordingly, RDC's Invoice #1214 in that amount was submitted with its letter. At

23   Plaintiff's board of directors meeting held November 14, 2015, RDC reported to Plaintiff's

24   board of directors on Invoice #1214 and the $7.042 million carry forward cost. Plaintiff's

25   board voted unanimously to approve Invoice #1214.  By this action, Plaintiff's board

26   approved any rate charged by RDC for the period of time covered by Invoice #1214,

27   provided the rate was within the highest fair market value rate for Mr. Razaghi's services

28   and the discounted rate charged to Plaintiff.

THORPE SHWER, P.C.

35

1    On October 7, 2015, Plaintiff's board of directors approved Plaintiff's Fiscal Year

2  2016 operating budget.  In connection with this approval, Plaintiff's board received and

3  reviewed the Navajo Health Foundation – Sage Memorial Hospital FY2016 Budget

4  Review. Included in that document was an Executive Management and Consulting

5  Services Rate Sheet which, among other things, showed that for Fiscal Year 2016 that RDC

6  would charge $530 per hour for Mr. Razaghi services which, after applying a 6.6%

7  discount, resulted in a discounted hourly rate of $495 per hour.

8    On September 27, 2016, Plaintiff's board of directors approved a continuing

9  resolution pursuant to which it adopted Plaintiff's Fiscal Year 2016 operating budget as

10  Plaintiff's Fiscal Year 2017 operating budget.  In connection with the adoption of this

11  continuing resolution, Plaintiff's board received and reviewed the Navajo Health

12  Foundation – Sage Memorial Hospital Continuing Resolution – FY2017 Budget. Included

13  in that document was an Executive Management and Consulting Services Rate Sheet

14  which, among other things, showed that for Fiscal Year 2017 that RDC would charge $530

15  per hour for Mr. Razaghi services which, after applying a 6.6% discount, resulted in a

16  discounted hourly rate of $495 per hour.

17    On August 25, 2017, Plaintiff's board of directors approved a continuing resolution

18  pursuant to which it adopted Plaintiff's Fiscal Year 2017 operating budget as Plaintiff's

19  Fiscal Year 2018 operating budget.  In connection with the adoption of this continuing

20  resolution, Plaintiff's board received and reviewed the Navajo Health Foundation – Sage

21  Memorial Hospital Continuing Resolution Adopting Fiscal Year 2018 Budget (Adopting

22  fiscal year 2017 budget for fiscal year 2018).  Included in that document was an Executive

23  Management and Consulting Services Rate Sheet which, among other things, showed that

24  for Fiscal Year 2018 that RDC would charge $530 per hour for Mr. Razaghi services

25  which, after applying a 6.6% discount, resulted in a discounted hourly rate of $495 per

26  hour.

27    Other than as discussed above, Defendants are unaware of any contractual term that

28  was not in place during the term of the CEO Services Contract dated March 18, 2011,

THORPE SHWER, P.C.

36

9508355

1 Amendment No. 1 and Extension No. 1 to CEO Services Contract dated May 17, 2013 and

2 Amendment No. 2 to CEO Services Contract dated June 16, 2017 (as amended on

3 December 15, 2017).

4         DATED this 23rd day of September, 2024.

5                                          **THORPE SHWER, P.C.**

6

7                                          By */s/ André H. Merrett*

8                                             André H. Merrett
                                            Bradley D. Shwer

9                                             Matthew T. St. Martin
                                            *Attorneys Defendants Razaghi*

10                                            *Development Company, LLC, Ahmad*
                                            *R. Razaghi and Tausif Hasan*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37

THORPE SHWER, P.C.

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of September, 2024, the foregoing document was served via electronic mail on the following:

D. Samuel Coffman
Bradley A. Burns
Amanda E. Newman
Mitchell P. Reber
Dickinson Wright PLLC
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
anewman@dickinsonwright.com
bburns@dickinsonwright.com
scoffman@dickinsonwright.com
mreber@dickinsonwright.com

**Attorneys for Plaintiff**


*/s/ Brandi Kline*

THORPE SHWER, P.C.

38

9508355

## **VERIFICATION**

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the factual information contained in Defendants' Second Supplemental Responses to Plaintiff's First Set of Interrogatories is true and correct.

DATED this ___ day of September, 2024.

By: _____
       Ahmad Razaghi

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the factual information contained in Defendants' Second Supplemental Responses to Plaintiff's First Set of Interrogatories is true and correct.

DATED this ___ day of September, 2024.

By: _____
       Tausif Hasan

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the factual information contained in Defendants' Second Supplemental Responses to Plaintiff's First Set of Interrogatories is true and correct. I am authorized to make this verification on behalf of Razaghi Development Company, LLC.

DATED this ___ day of September, 2024.

Razaghi Development Company, LLC

By: _____

Its: _____

THORPE SHWER, P.C.

39

9508355

1    **VERIFICATION**

2        I declare under penalty of perjury that to the best of my knowledge, information,

3    and belief, the factual information contained in Defendants' Third Supplemental

4    Responses to Plaintiff's First Set of Interrogatories is true and correct.

5        DATED this 25 day of September, 2024.

6

7            By: *Ahmad R. Razaghi*
            Ahmad Razaghi

8

9        I declare under penalty of perjury that to the best of my knowledge, information,

10   and belief, the factual information contained in Defendants' Third Supplemental

11   Responses to Plaintiff's First Set of Interrogatories is true and correct.

12       DATED this 25 day of September, 2024.

13

14           By: *tausif hasan*
            Tausif Hasan

15       I declare under penalty of perjury that to the best of my knowledge, information,

16   and belief, the factual information contained in Defendants' Third Supplemental

17   Responses to Plaintiff's First Set of Interrogatories is true and correct.  I am authorized to

18   make this verification on behalf of Razaghi Development Company, LLC.

19       DATED this 25 day of September, 2024.

20           Razaghi Development Company, LLC

21

22           By: _____

23           Its: Vice President

24

25

26

27

28

9508355

# EXHIBIT 44



**Navajo Health Foundation**

**Sage Memorial Hospital**
POST OFFICE BOX 457 | GANADO, ARIZONA 86505 | PH (928) 7554559 | FAX (928) 7554659

Special Board of Directors Meeting
Saturday, November 14, 2015 @ 9:00 AM
FireSky Resort, Fuego Meeting Room
Scottsdale, AZ

M INUTES

Chairperson Wauneka called the meeting to order at 9:04 AM.

Ms. Ray Ann Terry conducted roll call.

Present at the meeting:

Board Members: Chairperson Mr. Stenson Wauneka, Vice Chairperson Ms. Linda
Yazzie (teleconference), Secretary Ms. Ray Ann Terry, Treasurer Ms.  April Dedman
(teleconference), Mr. Ambrose Shepherd excused absence, Mr. Andrew Simpson,
Ms. Maybelle Kelewood, Ms. Joyce Moore

Executive Leadership: Ms. Christi El-Meligi, Chief Executive Office, Ms.      Netrisha
Dalgai, Director of Operations

Management: Mr. Ahmad R. Razaghi,

Approval of Agenda
*Motion by Ms. Yazzie to approve the agenda, 2nd by Ms. Dedman. Vote 7-0-0.*

Approval of Minutes

*The Board reviewed minutes from the Regular Board Meeting on August 21, 2015, the Regular
Board Meeting on August 22, 2015, the Board Officers Meeting on August 27, 2015, the
Special Board Meeting on September 10, 2015, the Wide Ruins Work Session on September
25, 2015, the Special Board Meeting on October 7, 2015, and the Special Board Meeting on
October 30, 2015. Ms. Kelewood noted that Board Public Relations report from the August 21,
2015 Regular Board Meeting had not been approved. Mr. Wauneka stated that it can be added
to a future agenda as an annual Board Public Relations report. Mr. Simpson request to have it
noted that all Board Public Relations on August 21, 2015 agenda was necessary as a result of*

*Navajo Health Foundation Sage Memorial Hospital, Inc.
provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social and wellbeing.*

**RAZAGHI**
HEALTHCARE

**Navajo Health        Foundation | Sage Memorial Hospital**
POST OFFICE BOX 457 / GANADO, ARIZONA 86505 / PH (928) 755-4559 / FX (928) 7554659

*the extraordinary circumstances caused by the actions of the disgruntled ex employees. Mr. Razaghi added that Sage has retained expert consultants and witnesses who can attest to the necessity.*

*Motion by Ms. Yazzie to accept the Minutes with grammar corrections the changes. 2nd by Ms. Moore. Vote 7-0-0.*

October 19, 2015– The Navajo N ation Office of Labor Relations  dismissal of claims filed by Michael Katigbak

*Mr. Razaghi reported to the Board that the claim submitted by Mr. Katigbak, an employee of Razaghi Healthcare had been denied by the NN ONLR. Mr. Razaghi apologized to the Board for the inconvenience caused by the actions of Mr. Katigbak.*

*Motion by Ms. Kelewood to approve the report on the October 19, 2015 – The Navajo Nation Office of Labor Relations dismissal of claims filed by Michael Katigbak. 2nd by Ms. Moore. Vote 7-0-0.*

Razaghi Healthcare Invoice #1214, FY2014 and FY2015  $7.042 million carry forward cost

*Mr. Razaghi reported to the Board the $7.042 Million in discounts below fair market value for fiscal year 2014 and 2015.*

*Ms. Moore motioned to enter into executive session at 9:42 A.M.*
*Ms. Kelewood motioned to exit executive session at 10:13 A.M.*

*Motion by Ms. Terry to accept the discounts as discussed. 2nd by Ms. Moore. Vote 7-0-0.*

Resolution Certificate of Incumbency and Investment Statement Policy as prepared by Wells Fargo Bank, N.A. , Certificate of Incumbency, Wells F argo Philanthropic Services, Investment Policy Statement, Wells Fargo Investment Presentation for Sage Memorial Hospital, Wells Fargo Investments Account Customization Form , Wells Fargo Nonprofit Services Agreement, Wells Fargo Securities Cash Transfer Form, Navajo Health Foundation  – Sage Memorial Hospital IRS Form W9,

*Mr. Razaghi presented the Resolution Certificate of Incumbency and Investment Statement Policy as prepared by Wells Fargo Bank, N.A, Certificate of Incumbency, Wells Fargo Philanthropic Services, Investment Policy Statement, Wells Fargo Investment Presentation for Sage Memorial Hospital, Wells Fargo Investments Account Customization Form, Wells Fargo Nonprofit Services Agreement, Wells Fargo Securities Cash Transfer Form, Navajo Health Foundation Sage Memorial Hospital IRS Form W9. He explained that this will allow for the execution of the investment account and philanthropic services through Wells Fargo Bank. Ms. Terry questioned the benefit of the investment fund and where the money to fund the investments was obtained? Ms.*

*Navajo Health Foundation Sage Memorial Hospital, Inc.*
*provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well being*

Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 107 of 109
*2015.11.20 annual bod meeting packet.pdf
Page 5 of 62

**Navajo Health    Foundation | Sage Memorial Hospital**
POST OFFICE BOX 457 / GANADO, ARIZONA 86505 / PH (928) 755-4559 / FX (928) 7554659

*Kelewood asked if there was a maturity date relating to the investments. Mr. Razaghi explained that the investment monies would be derived from the hospitals cash account and that the portfolio prepared by the bank is very conservative. The benefit would be that the investments will provide diversity of the hospital's funds. He also stated the funds were not restricted and would be invested in mutual funds and stocks therefore, no maturity date. Ms. Yazzie stated this was a move in the right direction for the hospital. Ms. El-Meligi read the resolution into the record.*

*Motion by Mr. Simpson to accept the report on the Resolution Certificate of Incumbency and Investment Statement Policy as prepared by Wells Fargo Bank, N.A. 2nd by Ms. Kelewood. Vote 7-0-0.*

Chief Executive Officer Report , Quality Council  August 26, 2015, September 23, 2015, October 28, 2015

*Ms. El-Meligi presented the report on the Quality Council meetings for August 26, 2015, September 23, 2015, and October 28, 2015. Ms. Moore, Mr. Simpson, and Ms. Kelewood reported to the Board on their attendance at the meetings. Mr. Simpson stated that the Quality Council program serves to ensure high quality patient care and continued performance improvement for the hospital.*

*Motion by Ms. Kelewood to accept the reports on Quality Council by 2nd Ms. Moore. Vote 7-0-0.*

Medical Staff Appointments, initial appointments - Sherron Cook, PAC   - Physician Assistant, Patrice Churchill, DO   – Family Practice,  Mark Lockett, MD   – Emergency Medicine,  Michael Colonna, DO   – Emergency Medicine

*Ms. El-Meligi presented to the Board, the various providers who where recommended to the Board by the Sage Hospital Medical Executive Committee for appointment to the Sage Hospital Medical Staff.*

*Motion by Mr. Simpson to approve all recommendations for initial appointment to the Sage Hospital Medical Staff, 2nd by Ms. Kelewood. Vote 7-0-0.*

Medical Staff Appointments, reappointments Edward Young, MD   – Family Practice, Robert Mahanti, MD   – Ophthalmology, Lisa York, MD   – Internal Medicine, Kathryn Wray, PAC   – Physician Assistant

*Ms. El-Meligi presented to the Board, the various providers who where recommended to the Board by the Sage Hospital Medical Executive Committee for reappointment to the Sage Hospital Medical Staff.*

*Navajo Health Foundation Sage Memorial Hospital, Inc.*
*provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well being.*



Case 3:23-cv-08072-DJH    Document 421-8    Filed 11/26/24    Page 108 of 109
*2015.11.20 annual bod meeting packet.pdf
Page 6 of 62

**Navajo Health    Foundation | Sage Memorial Hospital**
POST OFFICE BOX 457 / GANADO, ARIZONA 86505 / PH (928) 755-4559 / FX (928) 7554659

*Motion by Ms. Moore to approve all recommendations for reappointment to the Sage Hospital Medical Staff, 2nd by Ms. Dedman. Vote 7-0-0.*

Resolution Update Administrator for MGKS Employee Pension Plan

*Ms. El-Meligi presented the resolution to update the administrator for the MGKS Employee Pension Plan, as the plan administrator is no longer employed by Sage Hospital. She stated that Mr. McGee, who is Sage's CFO as provided through the Razaghi Health Management contract with the Board shall become the plan's administrator.  Mr. Razaghi reassured the Board that as the plan administrator, Mr. McGee will have authority to deposit funds into the plan account and will not have the authority to withdraw funds. Ms. Meligi read the resolution into the record.*

*Motion by Ms. Moore to approve the Resolution to update the administrator for MGKS   Employee Pension Plan, 2nd by Mr. Simpson.  Vote 7, 0, 0.*

Announcements
*Ms. Dalgai presented the announcements to the Board*
*Annual Board of Directors Meeting @ Talking Stick Resort, Scottsdale, AZ – November 18, 19, & 20, 2015*
*Sage Memorial Hospital Annual Employee Appreciation Luncheon, November 24, 2015 @ 11:00am, Sage Memorial Hospital Wellness Center*

*Trainings and Conferences*
1. *Falmouth Institute: National Indian Board and Council Members Conference, Las Vegas, NV – December 9-11, 2015*
2. *Falmouth Institute: Leadership Skills for Native Women, Las Vegas, NV December 10-11, 2015*
3. *Falmouth Institute: Strategic Planning for Tribes and Tribal Organizations, Las Vegas, NV – January 25-26, 2016*
4. *Falmouth Institute: The Indian Self-Determination Act: Contracting and Compacting Under P.L. 93-638, Las Vegas, NV – January 25-26, 2016*
5. *Falmouth Institute: Indian Water Rights and Water Law, Las Vegas, NV February 17-18, 2016*
6. *Native Nation: Third Annual Tribal Financial Management Symposium, Palm Springs, CA – December 3, 2015*
7. *Native Nation: National Native American Leadership Forum, Las Vegas, NV – December 3, 2015*
8. *Rural Health Care Leadership Conference, Arizona Grand Resort & Spa, Phoenix, AZ – February 7-10, 2016*
9. *Ms Terry recommended that the entire Board attend the Rural Health Care Leadership Conference, Arizona Grand Resort & Spa, Phoenix, AZ February 7-10, 2016*

*Navajo Health Foundation Sage Memorial Hospital, Inc.
provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being*

RAZAGHI
HEALTHCARE

**Navajo Health      Foundation | Sage Memorial Hospital**
POST OFFICE BOX 457 / GANADO, ARIZONA 86505 / PH (928) 755-4559 / FX (928) 7554659

The Board adjourned the meeting at 11:23 a.m.

*Motion by Ms. Moore to adjourn the meeting 2ⁿᵈ by Ms. Kelewood. Vote 7-0-0.*



*Navajo Health Foundation - Sage Memorial Hospital, Inc.*
*provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being.*