# EXHIBIT 70

**From:** Thomas Matenaer
**Sent:** Monday, August 27, 2018 11:00 PM
**To:** Nicole Hardy
**CC:** mary.arave@razaghihealthcare.com
**Subject:** Razaghi Invoice_$10.0+M...

Just spoke with Tausif about the large invoice.  I had sent him an earlier email requesting some sort of backup as the dollar amount is rather large and unusual.  He told me that the appropriate backup would be coming.

Thanks

**Thomas M Matenaer, MBA, CPA**
Controller
**Navajo Health Foundation-**
**Sage Hospital Campus**
SRS 191 & Highway 264
Ganado, AZ  86505
Office: (928) 755- 4615



EXHIBIT 52
HA?AN
5/7/2

# EXHIBIT 71



9/5/2018

Basic Banking | Account Details



# Account Details - Operating 7955102888

| | |
|---|---|
| Welcome | **Nicole Hardy** |
| Group | **All Accounts** |
| Date Printed | **5-Sep-2018, 01:18 PM PT** |

## Balances

| | | |
|---|---|---|
| Opening Day Balance | 109,202.37 USD | As of 09/05/2018 |
| Available Balance | 137,842.04 USD | |
| Interest Earned This Period | 0.00 USD | |
| Interest Paid Year to Date | 0.00 USD | |

## Account Activity - Deposits/Credits only; Custom Date Range

| Date | Description | Amount USD |
|---|---|---|
| 08/27/2018 | ONLINE TRANSFER TRANSFER REF #BB052GLZNF | 500,000.00 |
| 08/27/2018 | ONLINE TRANSFER TRANSFER REF #BB052GLWR8 | 10,855,000.00 |
| 08/27/2018 | PAYMENTECH DEPOSIT 180827 5805634 Sage Memorial Hospital 1020401225 5805634 R00000091004131393595 | 19.00 |
| 08/27/2018 | 08/27BANKCARD DEPOSIT -0061920214 | 174.78 |
| 08/27/2018 | NORIDIAN AZUTMT HCCLAIMPMT 180823 1477735777 TRN*1*890686555*1450173185~ 6450173185 1477735777 R00000091003838579799 | 684.82 |
| 08/27/2018 | BCBS OF ARIZONA HCCLAIMPMT 180823 1518957398 TRN*1*301828014*1860004538\ 4860004538 1518957398 O00000091003838579798 | 63.90 |
| 08/27/2018 | PALMETTO GBA HCCLAIMPMT 180822 1477735777 TRN*1*803493426*1571062326~ 9000000096 1477735777 R00000091003838579795 | 7.21 |
| 08/27/2018 | UHC COMMUNITY PL HCCLAIMPMT XXXX4364 TRN*1*2018082411100564*1860813232*000003432\ 6723957101 237314364 O00000091003838579796 | 1.10 |

Privacy, Security & Legal

© 2000 - 2018 Wells Fargo. All rights reserved.

| | |
|---|---|
| **EXHIBIT** | |
| **125** | |
| DEPONENT NAME: Hardy, N. | DATE: 10/03/2024 |

Confidential    SAGE0123047



 IMPORTANT ACCOUNT INFORMATION

In the "Available balance, posting order, and overdrafts" section of the Deposit Account Agreement under the question "How do we process (post) transactions to your account?", we are replacing the paragraph beginning with "Your available balance will be reduced by pending withdrawals" to include a new fee waiver, as follows:

Your available balance will be reduced by pending withdrawals, such as debit card transactions we have authorized and must pay when they are sent to us for payment. If your account has insufficient funds as reflected by your available balance, the bank may assess overdraft and/or non-sufficient funds (NSF) fees on transactions we pay or return during nightly processing. A pending transaction will typically remain pending until we receive it for payment from your account, but we must release the pending transaction hold after three business days for most transactions. These pending transactions may be sent to us for payment after they have dropped from your account, but we must pay them when we receive them for payment.

In some circumstances, previously-authorized transactions may be paid into overdraft if other transactions or fees have reduced your balance before the pending transactions are sent to us for payment. To minimize the number of overdraft fees in these circumstances, we track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If these transactions are presented for payment within 10 business days after they first appeared as pending, we will waive any overdraft fees on those transactions. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when the transaction was sent for authorization and we are unable to match them. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

In addition, in the "Available balance, posting order, and overdrafts" section of the Deposit Account Agreement under the heading "IMPORTANT INFORMATION ABOUT FEES," we added the following:

We track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If these transactions are presented for payment within 10 business days after they first appeared as pending, we will waive any overdraft fees on those transactions. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when the transaction was sent for authorization and we are unable to match them.

## Activity summary

| | |
|---|---|
| Beginning balance on 8/1 | $87,254,093.20 |
| Deposits/Credits | 4,383.18 |
| Withdrawals/Debits | - 2,000,000.00 |
| **Ending balance on 8/31** | **$85,258,476.38** |
| Average ledger balance this period | $86,012,157.71 |

Account number:  **6224084944**

**NAVAJO HEALTH FOUNDATION-
SAGE MEMORIAL HOSPITAL, INC.**

*Arizona account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):  122105278

For Wire Transfers use
Routing Number (RTN):  121000248

## Interest summary

| | |
|---|---|
| Interest paid this statement | $4,383.18 |
| Average collected balance | $86,012,157.71 |
| Annual percentage yield earned | 0.06% |
| Interest earned this statement period | $4,383.18 |
| Interest paid this year | $42,273.13 |

SAGE0123048

Account number: **6224084944**  ■ August 1, 2018 - August 31, 2018  ■ Page 3 of 4



WELLS
FARGO

## Transaction history

| Date | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------------|-------------------|---------------------|----------------------|
| 8/8 | ※ Online Transfer Transfer Ref #Bb04Y5Pdcn | | 1,500,000.00 | 85,754,093.20 |
| 8/27 | ※ Online Transfer Transfer Ref #Bb052Glznf | | 500,000.00 | 85,254,093.20 |
| 8/31 | Interest Payment | 4,383.18 | | 85,258,476.38 |
| Ending balance on 8/31 | | | | 85,258,476.38 |
| **Totals** | | **$4,383.18** | **$2,000,000.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

*※  Indicates transaction counts toward the Regulation D and Wells Fargo savings withdrawal and transfer limit. Except outgoing wire transfers, there is no limit on the number of withdrawals or transfers made in person at an ATM or Wells Fargo location or on any types of deposits. For more information, please refer to your Account Agreement.*

### Monthly service fee summary

For a complete list of fees and detailed account information, see the Wells Fargo Account Fee and Information Schedule and Account Agreement applicable to your account (EasyPay Card Terms and Conditions for prepaid cards) or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 08/01/2018 - 08/31/2018 | Standard monthly service fee $10.00 | You paid $0.00 |
|-------------------------------------|--------------------------------------|-----------------|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| ·  Minimum daily balance | $8,000.00 | $85,254,093.20  ☑ |
| YP/YP | | |

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|----------------------------|------------|----------------|--------------|--------------------------------------|---------------------------|
| Deposited Items | 0 | 20 | 0 | 0.50 | 0.00 |
| Cash Deposited ($) | 0 | 5,000 | 0 | 0.0030 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

Account number: **7261169416** ■ August 1, 2018 - August 31, 2018 ■ Page 2 of 4



 **IMPORTANT ACCOUNT INFORMATION**

In the "Available balance, posting order, and overdrafts" section of the Deposit Account Agreement under the question "How do we process (post) transactions to your account?", we are replacing the paragraph beginning with "Your available balance will be reduced by pending withdrawals" to include a new fee waiver, as follows:

Your available balance will be reduced by pending withdrawals, such as debit card transactions we have authorized and must pay when they are sent to us for payment. If your account has insufficient funds as reflected by your available balance, the bank may assess overdraft and/or non-sufficient funds (NSF) fees on transactions we pay or return during nightly processing. A pending transaction will typically remain pending until we receive it for payment from your account, but we must release the pending transaction hold after three business days for most transactions. These pending transactions may be sent to us for payment after they have dropped from your account, but we must pay them when we receive them for payment.

In some circumstances, previously-authorized transactions may be paid into overdraft if other transactions or fees have reduced your balance before the pending transactions are sent to us for payment. To minimize the number of overdraft fees in these circumstances, we track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If these transactions are presented for payment within 10 business days after they first appeared as pending, we will waive any overdraft fees on those transactions. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when the transaction was sent for authorization and we are unable to match them. In those cases, you may be charged an overdraft fee if the transaction is paid into overdraft.

In addition, in the "Available balance, posting order, and overdrafts" section of the Deposit Account Agreement under the heading "IMPORTANT INFORMATION ABOUT FEES," we added the following:

We track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If these transactions are presented for payment within 10 business days after they first appeared as pending, we will waive any overdraft fees on those transactions. In rare circumstances, the merchant presents transactions for payment with a different identification code than was used when the transaction was sent for authorization and we are unable to match them.

## Activity summary

| | |
|---|---|
| Beginning balance on 8/1 | $11,024,970.74 |
| Deposits/Credits | 941,812.38 |
| Withdrawals/Debits | - 10,855,000.00 |
| **Ending balance on 8/31** | **$1,111,783.12** |
| Average ledger balance this period | $9,688,209.88 |

Account number: **7261169416**

**NAVAJO HEALTH FOUNDATION-
SAGE MEMORIAL HOSPITAL, INC.**

*Arizona account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 122105278

For Wire Transfers use
Routing Number (RTN): 121000248

## Interest summary

| | |
|---|---|
| Interest paid this statement | $493.72 |
| Average collected balance | $9,668,209.88 |
| Annual percentage yield earned | 0.06% |
| Interest earned this statement period | $493.72 |
| Interest paid this year | $3,500.17 |

SAGE0123050

Account number: **7261169416** ■ August 1, 2018 - August 31, 2018 ■ Page 3 of 4



## Transaction history

| Date | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------------|-------------------|---------------------|----------------------|
| 8/3 | Ahcccs Programma Hcclaimpmt 180801 201808010720153 Trn*1*201808010720153*1866004791*Ffsv | 870.58 | | |
| 8/3 | Ahcccs Programma Hcclaimpmt 180801 201808010719962 Trn*1*201808010719962*1866004791*Ffsv | 192,849.83 | | 11,218,691.15 |
| 8/10 | Ahcccs Programma Hcclaimpmt 180808 201808080724706 Trn*1*201808080724706*1866004791*Ffsv | 656.88 | | |
| 8/10 | Ahcccs Programma Hcclaimpmt 180808 201808080724516 Trn*1*201808080724516*1866004791*Ffsv | 130,304.91 | | 11,349,652.94 |
| 8/17 | Ahcccs Programma Hcclaimpmt 180815 201808150731532 Trn*1*201808150731532*1866004791*Ffsv | 327.86 | | |
| 8/17 | Ahcccs Programma Hcclaimpmt 180815 201808150731338 Trn*1*201808150731338*1866004791*Ffsv | 192,222.66 | | 11,542,203.46 |
| 8/24 | Ahcccs Programma Hcclaimpmt 180822 201808220736457 Trn*1*201808220736457*1866004791*Ffsv | 509.64 | | |
| 8/24 | Ahcccs Programma Hcclaimpmt 180822 201808220736268 Trn*1*201808220736268*1866004791*Ffsv | 145,778.71 | | 11,688,491.81 |
| 8/27 | ⊛ Online Transfer Transfer Ref #Bb052Glwr8 | | 10,855,000.00 | 833,491.81 |
| 8/31 | Ahcccs Programma Hcclaimpmt 180829 201808290741211 Trn*1*201808290741211*1866004791*Ffsv | 356.89 | | |
| 8/31 | Ahcccs Programma Hcclaimpmt 180829 201808290741024 Trn*1*201808290741024*1866004791*Ffsv | 277,438.70 | | |
| 8/31 | Interest Payment | 493.72 | | 1,111,783.12 |
| | Ending balance on 8/31 | | | 1,111,783.12 |
| | **Totals** | **$941,812.38** | **$10,855,000.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

⊛ *indicates transaction counts toward the Regulation D and Wells Fargo savings withdrawal and transfer limit. Except outgoing wire transfers, there is no limit on the number of withdrawals or transfers made in person at an ATM or Wells Fargo location or on any types of deposits. For more information, please refer to your Account Agreement.*

## Monthly service fee summary

For a complete list of fees and detailed account information, see the Wells Fargo Account Fee and Information Schedule and Account Agreement applicable to your account (EasyPay Card Terms and Conditions for prepaid cards) or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 08/01/2018 - 08/31/2018 | Standard monthly service fee $10.00 | You paid $0.00 |
|--------------------------------------|--------------------------------------|----------------|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Minimum daily balance | $8,000.00 | $833,491.81 ☑ |
| YP/YP | | |

## Account transaction fees summary

| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|-----------------------------|------------|----------------|--------------|--------------------------------------|---------------------------|
| Deposited Items | 0 | 20 | 0 | 0.50 | 0.00 |
| Cash Deposited ($) | 0 | 5,000 | 0 | 0.0030 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

# EXHIBIT 72



**ACH Detail Report**
**NAVAJO HEALTH FOUNDATION DBA SAGE**

| | Page 1 of 2 |
|---|---|
| Run Date & Time : | 09/04/2018 5:36 PM |
| | ACH Payments |

## ACH Detail Report

| | Run Date & Time : | 09/04/2018 5:36 PM | Page 1 of 2 |
|---|---|---|---|

Batch Name:RH 1369   Payment Number:9758499

| Originating Acct Number: | 7955102888 | | Frequency: | One Time Only |
|---|---|---|---|---|
| Originating Acct Nickname: | SMH - Operating Account | | Status | Submitted |
| ACH Company ID: | 3237314364 | | Create Date: | 08/27/2018 |
| ACH Company Name: | SAGEMEMORIALHOSP | | Effective Date: | 08/27/2018 |
| Company Entry Description: | RH 1369 | | Scheduled Send Date: | 08/27/2018 |
| Offset Creation Level: | UnKnown | | CR-DR-Mixed: | Credits |
| Payment Type: | CCD - Corporate Credit or Debit | | Confidential Batch: | Non-Confidential |

| Beneficiary Name | Beneficiary ID | Bank ID / Offset Bank ID | Bank Name | Account No. / Offset Acct No. | Type | Process Control Field / Item Research Number | Disc. Data | Status | Addt. Fee | Org. Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Razaghi Healthcare | 00001 | 122105278 | WELLS FARGO BANK NA (ARIZONA) | 2022331546 | C | | | Active | | USD 10,855,134.15 |

Addenda:    Razaghi 1369

| Beneficiary Status | CR Items | Amount | DR Items | Amount |
|---|---|---|---|---|
| Active | 1 | USD 10,855,134.15 | 0 | USD .00 |
| Hold | 0 | USD .00 | 0 | USD .00 |
| Prenote | 0 | USD .00 | 0 | USD .00 |

| Login ID | Activity | Date/Time |
|---|---|---|
| BATCH_USER | Submitted as part of file 1808271325 | 08/27/2018 2:26 PM |
| HASAT646@NAVAJ505 | approve | 08/27/2018 1:59 PM |
| HARDYN@NAVAJ505 | create | 08/27/2018 1:50 PM |

### Report Totals

| Payment Type Totals: Credits / Debits | | |
|---|---|---|
| CCD: | USD 10,855,134.15 | USD .00 |
| **ACH Company ID Totals: Credits / Debits** | | |
| 3237314364: | USD 10,855,134.15 | USD .00 |
| **Credits / Debits** | | |
| Grand Totals: | USD 10,855,134.15 | USD .00 |



Confidential                                                                 SAGE0011086

Filter Criteria:

Accounts:

7955102888-USD-NAVAJO HEALTH

Originating ACH Company IDs:

Date Type:

Create Date

Date Range:

Batch Amount Range:

Batch Amount Type:

Transaction Amount Range:

Transaction Amount Type:

Beneficiary Name :

Beneficiary ID :

Statuses:

Submitted

Credit/Debit/Mixed:

Payment Types:

CCD - Corporate Credit or Debit

Confidential Batch:

Non-Confidential

Detail First Sort:

Detail Second Sort:

Beneficiary First Sort:

Beneficiary Second Sort:

**End Of Report**

©2009-2016 Wells Fargo, All rights reserved.

Confidential                    SAGE0011087

# EXHIBIT 73

9/17/2018 ·
Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 13 of 130
Mail - gary.pahe@sagememorial.com

# Re: Average last 4 years amounts paid by Navajo Sage to RH

## Gary Pahe

Mon 8/20/2018 2:02 PM ·

Sent Items

To:Ahmad R. Razaghi <Ahmad.Razaghi@razaghihealthcare.com>;

Okay Ahmad.

Thank you for the clarification.

Have a wonderful day.

Best regards,
Gary E. Pahe, MBA
Human Resources Director
Sage Memorial Hospital
T: 928.755.4552
F: 928.755.4659
www.sagememorial.com

*"The most important thing in communication is hearing what isn't said"* - Peter Drucker

Notice of Confidentiality: The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, re transmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized.

**From:** Ahmad R. Razaghi <Ahmad.Razaghi@razaghihealthcare.com>
**Sent:** Monday, August 20, 2018 2:02:15 PM
**To:** Gary Pahe
**Subject:** Re: Average last 4 years amounts paid by Navajo Sage to RH

sorry, Gary! My mistake.

That was for Gary bortotti at corporate. Please ignore.

Have a nice day,
Ahmad

**Ahmad R. Razaghi, ME, MBA, ACHE**
President, Chief Executive Officer

Razaghi Healthcare
7150 E Camelback Road, Suite 444
Scottsdale, AZ 85251
Office: (480) 477-8028
Facsimile: (480) 477-8001
www.razaghihealthcare.com





**Notice of Confidentiality:** The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized.

---

**From:** Gary Pahe <gary.pahe@sagememorial.com>
**Sent:** Monday, August 20, 2018 2:00 PM
**To:** Ahmad Razaghi; Ahmad R. Razaghi
**Subject:** Re: Average last 4 years amounts paid by Navajo Sage to RH

Hi Ahmad,

I hope this message finds you well in health and doing well. I am fine and doing well.

With regards to your message of yesterday, you made a reference to a folder to which I am to load two documents (attached to your message). I am not familiar to which folder you are referring. Please advise. Thank you very much.

Best regards,
Gary E. Pahe, MBA
Human Resources Director
Sage Memorial Hospital
T: 928.755.4552
F: 928.755.4659
www.sagememorial.com

*"The most important thing in communication is hearing what isn't said"* - Peter Drucker

**Notice of Confidentiality:** The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, re transmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized.

---

**From:** Ahmad Razaghi
**Sent:** Sunday, August 19, 2018 10:43:26 AM
**To:** Ahmad R. Razaghi
**Cc:** Gary Pahe
**Subject:** Fw: Average last 4 years amounts paid by Navajo Sage to RH

gary - please upload these reports into the folder with calculations. thanks.

---

**From:** Tausif Hasan <tausif.hasan@razaghihealthcare.com>
**Sent:** Tuesday, August 7, 2018 12:02 PM
**To:** Ahmad Razaghi
**Subject:** Re: Average last 4 years amounts paid by Navajo Sage to RH

Ahmad,
Comparison audit vs. GL. In FY 2014-2015, GL is lower than audit in 2014 over 2M (see Meditech report). Ask Tom to look into fy 2014 records. Will keep Meditech report as a back up, but calculation should be based on Audits. Attached are the report from Meditech and excel work sheet.
Thanks
Tausif

---

**From:** Tausif Hasan
**Sent:** Monday, August 6, 2018 11:09:25 AM
**To:** Ahmad Razaghi
**Subject:** Re: Average last 4 years amounts paid by Navajo Sage to RH

Ahmad,
Attached is the last four years payments/average.
Thanks
Tausif

---

**From:** Ahmad Razaghi <arr@sagememorial.com>
**Sent:** Monday, August 6, 2018 10:52:52 AM
**To:** Tausif Hasan
**Subject:** Average last 4 years amounts paid by Navajo Sage to RH

Tausif,

Please send me a note with average of last 4 years payments made by Navajo Sage to RH. See below,

2.     In the event that this Contract expires, or RH terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to expiration of this Contract for any reason other than those listed as "cause" in Section 4.A., the Corporation shall, in addition to any other amounts due under this Contract, pay RH a Termination Payment in an amount equal to the average of the amount paid to RH by the Corporation each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration or termination.

Thanks,
Ahmad

--

## Ahmad R. Razaghi
## Chief Executive Officer

Navajo Health Foundation
Sage Memorial Hospital
P.O. Box 457
Ganado, AZ 86505-0457
Phone Hospital Campus: (928) 755-4658
Phone Management Office: (480) 477-8028



**Notice of Confidentiality:** The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized

**Razaghi Healthcare**

| Management Fee | | Audited | | Difference | | As per Meditech Report | |
|---|---|---|---|---|---|---|---|
| FY 2014 | $ | 6,655,019 | $ | 2,020,174 | $ | 4,634,845 | Not recorded properly on GL. |
| FY 2015 | $ | 8,209,646 | $ | 545,048 | $ | 7,664,598 | Not recorded properly on GL. |
| FY 2016 | $ | 16,420,893 | $ | (77,622) | $ | 16,498,515 | |
| FY 2017 | $ | 11,109,846 | $ | (143,910) | $ | 11,253,756 | |
| | $ | 42,395,404 | $ | 2,343,690 | $ | 40,051,714 | |

| | | | |
|---|---|---|---|
| Average last 4 years | $ | 10,598,851.00 | |

```
RUN DATE  05/07/18                    Sage Memorial Hospital AP  **LIVE**                          PAGE 1
RUN TIME  1141                               VENDOR HISTORY
RUN USER  FIN MH
```

| FROM 2013 TO 2017 |
|---|

**VENDOR: RAZAGHI HEALTHCARE  S06026**

**TERMS:  INV NET 1**

| FISCAL YEAR | GROSS | TAX | FREIGHT | DISCOUNTS | PAYMENTS | DISCOUNTS LOST |
|---|---|---|---|---|---|---|
| 2013 | 1489792.47 | 0.00 | 0.00 | 0.00 | 3489793.47 | 0.00 |
| 2014 | 4634844.99 | 0.00 | 0.00 | 0.00 | 4357903.26 | 0.00 |
| 2015 | 7864597.85 | 0.00 | 0.00 | 0.00 | 7911539.59 | 0.00 |
| 2016 | 16498515.42 | 0.00 | 0.00 | 0.00 | 16498515.42 | 0.00 |
| 2017 | 11255755.81 | 0.00 | 0.00 | 0.00 | 10191516.28 | 0.00 |
|  | 41641507.54 | 0.00 | 0.00 | 0.00 | 40479268.01 | 0.00 |

**VENDOR: RAZAGHI HEALTHCARE  S06413**

**TERMS:  INV NET 10**

| FISCAL YEAR | GROSS | TAX | FREIGHT | DISCOUNTS | PAYMENTS | DISCOUNTS LOST |
|---|---|---|---|---|---|---|
| 2013 | 264664.51 | 0.00 | 0.00 | 0.00 | 264664.51 | 0.00 |
|  | 264664.51 | 0.00 | 0.00 | 0.00 | 264664.51 | 0.00 |

| **REPORT TOTALS:** | 41806172.05 | 0.00 | 0.00 | 0.00 | 40743932.52 | 0.00 |

# EXHIBIT 74

Resolution of the Board of Directors
Navajo Health Foundation - Sage Memorial Hospital, Inc.

**#NHF-SMH 11202015-001 – The Board of Directors of Navajo Health Foundation – Sage Memorial Hospital, Inc., duly constituted and a quorum in attendance and in accordance with Article X herein, hereby amend the Bylaws of the Corporation and restate in full the Bylaws of the Corporation as follows:**

BYLAWS

Navajo Health Foundation - Sage Memorial Hospital, Inc.

**ARTICLE** I. Purpose

The mission of Navajo Health Foundation - Sage Memorial Hospital, Inc. is to provide health services for the persons within the Hospital's service area. The Corporation shall not engage in any activity inconsistent with its intent to qualify as a tax-exempt charitable organization pursuant to subchapter 501(c)(3) of the Internal Revenue Code.

**ARTICLE** II. Governing Body

Section 1.    Definitions
The terms "Board of Directors" and "Board" shall mean the Navajo Health Foundation - Sage Memorial Hospital, Inc.'s Board of Directors. "Corporation" shall mean Navajo Health Foundation - Sage Memorial Hospital, Inc.

Section 2.    Number

Effective as of April 7, 2017, the Board of Directors consists of six (6) individuals each of whom shall have been selected in conformance with these Bylaws. Upon the first vacancy on the Board occurring on or after April 7, 2017 and from then forward, the Board of Directors shall consist of five (5) individuals, each of whom shall have been selected in conformance with these Bylaws. A quorum shall exist if majority of the Directors are present at a meeting.

Section 3.    Qualifications of Directors
A person must meet the following minimum qualifications in order to be eligible for selection to the Board of Directors:


EXHIBIT
39

1

1. Must have reached the age of 21;
2. Must not have been convicted of (or entered a plea of guilty or no contest to) any felony criminal offense or to any misdemeanor offenses involving crimes of violence, dishonesty or alcohol/ drugs within the last ten years;
3. Must have obtained at least a high school diploma or an equivalent;
4. Must have 2 years of employment experience in business, medicine, government, law or related fields.
5. Must be an enrolled member of the Navajo    Nation.

## Section 4.  Voting

A. Voting during a meeting: All Directors may vote on any matter coming before the Board for consideration. A simple majority of votes shall control unless otherwise required by law or by another provision of these bylaws.  Votes may be by voice of those present.
B. Action without meeting: Action may be taken without a meeting if the action is taken by all of the Directors. The action must be evidenced by one or more written consents describing the action taken, signed by each Director and included in the minutes filed with the corporate records reflecting the action taken. The action is effective when the last Director signs the consent, unless the consent specifies a different effective date. The consent has the effect of a meeting vote and may be described as such in any document. A Director may revoke her or his consent by delivering a signed revocation to the Chair or Secretary before the date the last Director signs the consent. A consent may be signed using an electronic signature as defined in A.R.S. §44-7002.

## Section 5.   Terms
The terms of the Members of the Board of Directors shall be four years and shall be staggered. All Directors shall be installed and shall assume office at the next Board of Director's meeting following their selection. A Director whose term has expired shall continue to hold the position of Director until her or his successor has been  installed.

## Section 6.   Evaluation
The Board of Directors shall perform a self-evaluation  annually.

2

Section 7.    Fiscal Year
The fiscal year of the Corporation shall be from October 1 to September 30.

**ARTICLE** III.    Selection of Directors

Seats on the Board of Directors are intended to be filled by persons
recommended to the Board by the Navajo Nation Chapters within the hospital's
service area (the Cornfields, Ganado, Greasewood Springs, Kinlichee, Klagetoh,
Steamboat, Wide Ruins and Nazlini chapters). No less than 90 days prior to the
expiration of a Director's term, all of the Chapters within the service area shall
be notified of the upcoming vacancy. Each Chapter within the service area may
provide the names of up to two individuals meeting the qualifications for
Directors specified in these Bylaws for the remaining Board members to
consider for selection as a Director. Recommendations must be received no later
than 30 days before the expiration of the Director's term in order to be
considered. If no recommendations are received, or if no person recommended
receives a majority vote of the remaining Directors for selection, then the Board
may select any person willing to serve who meets the qualifications specified in
these Bylaws.

A majority vote of the remaining Directors is required to select a person for the
position of Director.

**ARTICLE** IV.    Officers

Section 1.    General Provisions regarding Officers
The Corporation shall have four elected officers: Chair, Vice Chair, Secretary and
Treasurer. At the Board's discretion one individual whose title is "Secretary/
Treasurer" may occupy the offices of Secretary and Treasurer. Each officer shall
serve a term of two years commencing at the annual meeting and ending two years
thereafter or until a successor has been elected and qualified All officers of the
Corporation shall be entitled to vote on any issue coming before the Board of
Directors.

Section 2.    Chair
    a)    The Chairman of the Board shall preside at all meetings of the Board
        of Directors.

3

b) The Chair shall have such other authorities and/or perform such other duties as authorized by the Board in policies, resolutions or other enactments.

Section 3.   Vice Chair

In the event of the absence or incapacity of the Chair, the Vice Chair shall assume the duties and responsibilities of the Chair including but not limited to presiding at meetings of the Board of Directors. In the absence of both the Chair and Vice Chair from any meeting at which a quorum is present, the Directors may designate a Chair pro tempore to perform the duties and functions of the Chair during that meeting.

Section 4. Secretary/Treasurer

*[Effective as of April 7, 2017]* The Secretary/Treasurer shall:

a)   Keep the minutes of the proceedings of the Board of Directors and any committees of the Board of Directors;

b)   See that all notices are duly given in accordance with the provision of these Bylaws or as required by law;

c)   Be custodian of the Corporate records and of the seal of the Corporation; and

d)   Within five business days after each Board of Directors meeting, deliver to all members of the Board of Directors a draft of the prior meeting's minutes for comment and correction.  The Directors shall affirm and correct the draft minutes in a timely manner prior to the next regularly scheduled Board of Directors meeting to facilitate approval and acceptance of the minutes by the Board of Directors at its next regularly scheduled meeting. Assistant Secretaries, if any, may be appointed pro-tern and shall have the same duties and powers, subject to supervision by the   Secretary.

e)   Oversee, with the assistance of the CEO, CFO and staff. the safe and proper handling of the Corporation's financial accounts.   This includes, but is not limited to, maintaining a list of all assets of the Corporation, including accounts payable and current cash balances, all liabilities and pending liabilities, and any and all matters pertaining to the financial position of the Corporation.

f)   Present, on a quarterly basis, a report to the Board of Directors on the financial status of the Corporation.

4

g) At the direction of the Board, cause to be made an annual audit, which shall represent an accurate accounting of the Corporation's financial transactions and current status.

f) The Secretary/Treasurer and his/ her designee shall be bonded, with costs of bonding paid for by the Corporation. The Corporation may make such provisions for the custody and disbursement of funds as shall guarantee their safety and proper disbursement and use, and no loans, advances or promises of payments on behalf of, or in the name of the Corporation shall be made without the explicit written authorization of the Board of Directors

**ARTICLE V.** Staff

Section 1.    Chief Executive Officer
a)    The Board of Directors may employ or contract for a Chief Executive Officer who shall serve at the pleasure of the Board.
b)    The Chief Executive Officer shall be responsible for the day-to-day operations of the Corporation, in accordance with policies and procedures previously approved and transmitted by the Board.
c)    All other staff:  contractors, sub-contractors, and other employees of the Corporation, shall report directly to the Chief Executive Officer who shall have authority on the assignment and evaluation of work activities.
d)    Upon receipt of an approved budget from the Board of Directors, the Chief Executive Officer shall be responsible for the administration of day-to-day expenditures and the reconciliation of operating accounts. The Board may set a not-to-exceed check writing limitation as a fiduciary safeguard.
e)    The Chief Executive Officer, with the advice and consent of the Board of Directors, shall have the authority to employ or discharge staff in accordance with corporate policies and applicable laws.

**ARTICLE** VI.  Meetings

Section 1.  Regular meetings.
Regular meetings of the Board of Directors shall be held once per calendar quarter at the corporation's boardroom, or at such other locations as the Board may designate. The annual meeting of the corporation shall be held at a date, time and place during the months of

September, October or November designated by motion of the Board. At the annual meeting, the Board will specify, by resolution, its meeting schedule for the upcoming year. Meetings shall officially convene when a quorum is present.

Section 2.   Waiver of Notice

Attendance at a Board Meeting shall constitute waiver of notice unless the Director objects at the commencement of the meeting that the meeting is not lawfully called or convened. Any Director may waive a meeting notice by executing a written waiver of notice.

Section 3.   Executive Session

The Board, or any Committee of the Board, may, by a majority vote, declare an executive session that is closed to everyone except the Directors and anyone specifically requested by the Directors to attend the   session.

Section 4.   Compensation

The Corporation may reimburse Directors for the reasonable expense of attending a meeting of the Board of Directors.

Section 5.   Special Meetings

Special meetings may be called when deemed necessary by the Chair or by a majority of the Directors. Each call for a special meeting shall be in writing and signed by the Chair or by a majority of the Directors. Written notice (which may be delivered by any customary and available means, including facsimile and electronic mail) shall be delivered to each member of the Board at least 24 hours prior to the special meeting.  Such notice shall state the time, date and location of the meeting and shall specifically state the business proposed to be conducted during the special meeting.  No business other than the matters specified in the notice shall be transacted during the special meeting.

Section 6.   Attendance at meetings by telephone or other devices

Any Board member may attend a meeting of the Board by appearing through telephone, interactive television or any other technologies available so long as the off-site member can hear all other persons at the meeting and be heard by all other persons at the  meeting.

**ARTICLE** VII.  Vacancies, Removal, and Resignation.

6

Section 1.    Vacancies

The Board of Directors shall fill any vacancies. The Chair may call a special meeting to fill a vacancy. The person selected to fill a vacancy shall serve for the remainder of the term of the member being replaced.

Section 2.    Removal

The Board of Directors may, by an affirmative vote of two-thirds of the number of Board members present at a special meeting called for the purpose of removing any Board member, remove any member of the Board of Directors for just cause including, but not limited to, conviction of a felony or malfeasance.

If any member of the Board of Directors fails, without being excused by the Board, to attend three properly called meetings of the Board of Directors within any nine (9) month period, the post of the delinquent member shall be deemed to be vacant.

Section 3.    Resignation

Any member of the Board of Directors intending to resign from the Board of Directors shall submit a resignation in writing to the Chair of the Board of Directors.

Section 4.    Special Elections

Vacancies *in* the positions of Chair, Vice chair, Secretary and Treasurer shall be filled for the remainder of the term by new officers elected at a special election called by the Chair or Vice Chair for the purpose of filling the vacancy(ies).

Section 5.    Leave of Absence

Any member of the Board of Directors may request a leave of absence, in writing, which will be subject to approval by a majority vote of the Board of Directors. The Board of Directors, at its discretion, may make an interim appointment for the duration of the leave.

Section 6.    Conflict of Interest/ Nepotism
    1.    Conflict of Interest.

        a)    No Board Member shall use, or attempt to use, any official or apparent authority of their office or duties which places, or could reasonably be perceived as placing their private economic gain or that  of any special business  or  family

interests with which they are associated, before those of the Corporation.

b)   Board Members shall not have direct or indirect financial or economic interests nor engage in such other employment or economic activity that necessarily involves inherent or substantial conflict, appears to have such substantial conflict with their responsibilities and duties as Board Members.

c)   Board Members shall not engage in, directly or indirectly, financial or other economic transactions as a result of, or primarily depending upon, information obtained through their membership on the Board.

d)   Board Members shall not acquire any economic or other financial property, contractual, or other economic interest at a time when they believe or have reason to believe that it will directly and substantially affect or be so affected by their official actions or duties.

e)   When a Board Member is required to take official action on a matter in which the Board Member has a conflict of interest, he or she should first consider eliminating that interest. If it is not feasible to eliminate the conflicting interest, the Board Member shall:

    i)    Prepare and sign a written statement describing the matter requiring action and the nature of the potential conflict as soon as the Board Member is aware of such conflict. The Board Member shall deliver copies of the written statement to the Secretary for inclusion in the official record of any relevant vote or other decision or determination.

    ii)   Abstain from voting, sponsoring, influencing, or in any manner, attempting to influence any vote, official decision or determination in such matter.

t)   The abstention by such person from voting or otherwise from participating in the official determination or decision shall not affect the presence of such person for purposes of establishing a quorum necessary to take such action or vote upon such matter.

8

2.    Nepotism

    a)    No Board Member shall participate in the consideration of any application for employment or in any other discussion or action by the Board which involves anyone who is a member of the Board Member's same household, who has a significant relationship with the Board Member, or who is related to the Board Member within the third degree of sanguinity or affinity as described below:

        One's spouse;
        One's parent or a spouse's parent;
        One's brother or sister or a spouse's brother or sister;
        One's nieces or nephew or a spouse's nieces or nephew;
        One's grandmother or grandfather or a spouse's grandmother or grandfather;
        One's aunt or uncle or a spouse's aunt or uncle;
        One's great grandmother or great grandfather or a spouse's great grandmother or great grandfather;
        One's children or a spouse's children;
        One's stepchildren or a spouse's stepchildren;
        One's grandchildren or a spouse's grandchildren;
        One's great grandchildren or a spouse's great grandchildren

**ARTICLE VIII.**  Committees

The Board of Directors may establish such committees from time to time as it finds necessary to accomplish its business purposes. The purpose, authority, membership, duration, compensation and other matters relating to such committees shall be established in written resolutions approved by the   Board.

**ARTICLE** IX.  Dissolution

On dissolution or final liquidation of the Corporation, the Board of Directors shall, after paying and making provision for the payment of all liabilities of the Corporation , distribute all of the assets of the Corporation, exclusively for the purpose of the Corporation in such a manner, or to such organization or other organizations organized and operated exclusively for charitable and educational purposes, as shall at that time qualify as an exempt organization or organizations under Section 501 (c)(3) of the Internal Revenue Code of  1986, or

corresponding provlslons of any subsequent federal laws, as the Board of Directors shall determine. Any such assets not so distributed shall be distributed by a court of competent jurisdiction exclusively for such purpose or to such organization or organizations, as said court shall determine, which are organized or operated exclusively for such purposes.

**ARTICLE X.** Amendments

These Bylaws may be amended by an affirmative vote of two-thirds of the members of the Board present at a regularly called meeting of the Board of Directors.

**ARITCLE XI.**  Organizational Policies

The Board of Directors shall revise, as necessary, distribute and abide by the Policies and Procedures necessary for the operation of the Corporation.

**ARTICLE** XII.  Indemnification of Officers

Indemnification shall be provided to all Officers and Directors of the Corporation to the fullest extent permitted by law, including, but not limited to A.R.S. §§10-3850 to 10-3858.

**ARTICLE XIII.**  Adoption

These Bylaws may be amended by a tow-thirds vote of the Board of Directors at a regular meeting with a quorum present provided that notice of the proposed alteration, amendment or repeal shall have been given to all Members of the Board of Directors at the next preceding regular meeting of the Board of Directors. These Bylaws may also be amended at any meeting of the Board of Directors, regular or special, upon the unanimous consent of the whole Board of Directors, all of who shall be present and voting.


CERTIFICATION

I hereby certify that the foregoing resolution Amending and Restating the Bylaws of the Corporation was duly considered by the Navajo Health Foundation -- Sage Memorial Hospital, Inc. Board of Directors at a duly called meeting in Scottsdale, Arizona, on December 16, 2017 at which a quorum was   present

and that the same was adopted by a vote of ___6___ in favor, ___0___ opposed and ___

___0___ abstaining.

_____
Secretary,   RayAnn   Terry
Navajo Health Foundation -
Sage Memorial Hospital, Inc.
Board of Directors


Motioned by: Maybelle Kelewood
Seconded by: Joyce Moore

11

# EXHIBIT 75

# In the Matter of:

*Navajo Health Foundation*

*vs*

**Razaghi Development Company, LLC.**

*Tadd Greenfield*

*June 12, 2024*



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Navajo Health Foundation –      )
Stage Memorial Hospital,        )
Inc., (doing business as        )
"Sage Memorial Hospital"),      )
                                ) No. 3:23-cv-08072-DJH
        Plaintiff,              )
                                )
            vs.                 )
                                )
Razaghi Development             )
Company, LLC, (doing            )
business as "Razaghi            )
Healthcare"); Ahmad R.          )
Razaghi; Tausif Hasan; Does     )
1-10,                           )
                                )
        Defendants.             )
                                )
                                )
And related counterclaims       )
and third-party claims.         )
                                )


VIDEOCONFERENCE VIDEO RECORDED DEPOSITION OF
TADD SCOTT GREENFIELD

Libby, Montana
June 12, 2024
11:05 a.m. Mountain Daylight Time


REPORTED BY:
WILMA A. WEINREICH, CSR, RPR
Certified Stenographer
Certificate No. 50976

PREPARED FOR:


(ASCII/COPY)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Page 2

```
1              I N D E X
2  WITNESS                                    Page
3  TADD SCOTT GREENFIELD
4    Examination By Mr. Burns                   6
5
6
              E X H I B I T S
7
   Deposition
8  Exhibits:   Description                    Page
9  No. 77      Curriculum Vitae of            12
               Tadd S. Greenfield
10             (6 pages)
11 No. 78      Letter Dated July 21, 2018 to  63
               Christi El-Meligi
12             Re: Completion of Assignment
               RDC Sage 060879-888 (10 pages)
13
   No. 79      Letter Sent July 23, 2018 from 76
14             Ahmad Razaghi to Christi
               El-Meligi
15             RDC Sage 020882-883 (2 pages)
16 No. 80      Organizational Chart           80
               LBBS_000416 (1 page)
17
   No. 81      Email Sent July 24, 2018 to    81
18             Abigail Paul
               Re: Statement of Assignment
19             SAGE0024963-964 (2 pages)
20 No. 82      Meeting with Christi, Tadd,    85
               Cheryl and Netrisha Dated
21             July 23, 2018 Document
               RDC Sage 000455 (1 page)
22
   No. 83      Letter Dated August 2, 2018 to 94
23             Christi El-Meligi
               RDC Sage 000464-465 (2 pages)
24
25
```

Page 4

```
1              VIDEOCONFERENCE VIDEO RECORDED DEPOSITION OF
2  TADD SCOTT GREENFIELD was taken on June 12, 2024,
3  commencing at 11:05 a.m. Mountain Daylight Time at the
4  home of the deponent, 144 Margaret Lane, Libby, Montana,
5  before WILMA A. WEINREICH, a Certified Stenographer in the
6  State of Arizona.
7
8  COUNSEL APPEARING:
9  For the Plaintiff:
10
               DICKINSON WRIGHT
11             By:  Mr. Bradley A. Burns
                    Mr. D. Samuel Coffman
12             1850 N. Central Avenue
               Suite 1400
13             Phoenix, Arizona  85004
14
   For the Defendants:
15
16             THORPE SHWER, P.C.
               By:  Mr. Andre H. Merrett
17                  Mr. Matthew St. Martin
               3200 North Central Avenue
18             Suite 1560
               Phoenix, Arizona  85012
19
20 ALSO PRESENT:
21             Mr. Alex Marinakis, legal video specialist
               Mr. Ahmad Razaghi
22             Mr. Tausif Hasan
               Mr. Todd McGee
23
24
25
```

Page 3

```
1
              E X H I B I T S
2
   Deposition
3  Exhibits:   Description                    Page
4  No. 84      Email String Re Meeting        111
               30 July 2018
5              RDC Sage 043430-431 (2 pages)
6  No. 85      Meeting with Chairperson       148
               Document
7              RDC Sage 006776-807 (32 pages)
8  No. 86      Email String Re: Razaghi       158
               Healthcare Memorandum to the
9              Board of Directors
               RDC Sage 029416-421 (6 pages)
10
   No. 87      Affidavit of Tadd Greenfield   162
11             RDC Sage 000643-672 (30 pages)
12 No. 88      Email Sent September 27, 2018  168
               from Abigail Paul
13             Re: Confidential - Todd
               Affidavit Notes
14             RDC Sage 050635-636 (2 pages)
15 No. 89      Email Sent September 28, 2018  169
               from Ahmad Razaghi
16             Re: Confidential - Todd
               Affidavit Notes
17             RDC Sage 050630-634 (5 pages)
18 No. 90      Email String Re: Documents     170
               Pertaining to 2nd Amended CEO
19             Services Contract
               SAGE0044284-292 (9 pages)
20
   No. 91      Email Sent September 3, 2018   172
21             from Tadd Greenfield
               Re: Board of Director's Update
22             Letter
               SAGE0024484 (1 page)
23
24
25
```

Page 5

```
1       THE VIDEOGRAPHER:  We are on the record.
2  Today's date is Wednesday, June 12, 2024, and the time is
3  10:05 a.m. Arizona time.
4       This is the video recorded deposition of
5  Tadd Greenfield noticed by counsel for the Plaintiff in
6  the matter of Navajo Health Foundation - Sage Memorial
7  Hospital, Incorporated, doing business as Sage Memorial
8  Hospital vs. Razaghi Development Company, LLC, doing
9  business as Razaghi Healthcare, et al., and in related
10 counterclaims and third party claims.
11       This matter is being held in the United
12 States District Court for the District of Arizona.  The
13 case number is 3:23-cv-08072-DJH.
14       The certified court reporter is Wilma
15 Weinreich of Griffin Group International located at 3200
16 East Camelback Road, Suite 177, Phoenix, Arizona.
17       My name is Alex Marinakis.  I'm the
18 certified legal video specialist for the firm of VideoDep,
19 Incorporated, located in Phoenix, Arizona.
20       Counsel, would you identify yourselves and
21 whom you represent, starting with the Plaintiff's counsel,
22 please.
23       MR. BURNS:  Bradley Burns, and my partner
24 Sam Coffman for Plaintiff.
25       MR. MERRETT:  Andre Merrett and Matt
```

Page 6

1  St. Martin for Defendants.
2        THE VIDEOGRAPHER:  Okay, who is Bradley
3  Burns?
4        MR. BURNS:  That's me.
5        THE VIDEOGRAPHER:  Oh.  Okay.  Did we get
6  everybody then?
7        MR. BURNS:  Yes.  That's all counsel.
8        THE VIDEOGRAPHER:  Thank you, Counsel.
9        The court reporter may swear in the witness
10  at this time, please.
11        TADD SCOTT GREENFIELD,
12  a witness herein, having been first duly sworn by the
13  Arbitrator to speak the truth and nothing but the truth,
14  was examined and testified as follows:
15        EXAMINATION
16  BY MR. BURNS:
17  Q.  All right.  Good morning, everyone -- I think it
18  is still morning.
19        Mr. Greenfield, I'm trying to get some
20  timing issues down because I think we are in different
21  time zones.  Is it around 11:00 where you are?
22  **A.  It's 11:07.**
23  Q.  The plan here is to go for about an hour, take a
24  break, then go for about another hour, take a lunch
25  break -- 30 minutes, 45 minutes, you know, it depends on

Page 7

1  what everybody wants -- and then come back and finish the
2  deposition after that.  So Mr. Greenfield, just for
3  planning, it will probably be around 1:00 your time.
4        So let's start with -- let's go ahead and
5  state your full name for the record.
6  **A.  My full name is Tadd Scott Greenfield.**
7  Q.  Where do you reside?
8  **A.  I currently reside in Libby, Montana.**
9  Q.  What's the physical address where you reside?
10  **A.  My home address is 114 Margaret Lane, Libby,**
11  **Montana 59923.**
12  Q.  When is the last time you visited Arizona?
13  **A.  Oh, approximately -- I don't know the exact date**
14  **-- approximating two years ago.**
15  Q.  Do you have any kind of property or residence in
16  Arizona still?
17  **A.  I sold my -- that's when I sold my house two, two**
18  **and a half years ago.**
19  Q.  Um --
20  **A.  I don't recall the exact date.**
21  Q.  And the move.  Why did you move?
22  **A.  For a new job.**
23  Q.  Have you been deposed before?
24  **A.  I have been.**
25  Q.  How many times?

Page 8

1  **A.  One time.**
2  Q.  What was it for?
3  **A.  It was a case for another hospital I worked for**
4  **in Nebraska.**
5  Q.  How long ago was the deposition?
6  **A.  I believe it was 2018, but I can't be sure on**
7  **that date.**
8  Q.  Were you employed by Razaghi Healthcare at the
9  time that this deposition --
10  **A.  No.  No.**
11  Q.  So this deposition occurred prior to your
12  involvement with Razaghi Healthcare.  Is that right?
13  **A.  Uh-huh.**
14  Q.  I kind of need a sense of scale.  So this job in
15  Nebraska, that's the job you left to come to Razaghi
16  Healthcare, right?
17  **A.  Well, let me review my CV since you have it up**
18  **here.  It was for Regional West Health Services in**
19  **Scottsbluff, Nebraska, where I worked from 2016 to 2017.**
20  **So it was sometime after that date --**
21  Q.  So you were deposed after your employment ended?
22  **A.  After my employment there and after my employment**
23  **at Razaghi Healthcare.**
24  Q.  So you had actually ended your job at Razaghi
25  Healthcare and then you got deposed --

Page 9

1  **A.  I was working at another -- my CV isn't complete.**
2  **You are not looking at the totality of my CV.  So it was**
3  **after I worked at Razaghi Healthcare while I was working**
4  **as a CEO in another hospital in Wyoming.**
5  Q.  What was the dispute that gave rise to the
6  deposition you gave?
7  **A.  It was a contractual dispute.**
8  Q.  Was the company you worked for the plaintiff or
9  the defendant?
10  **A.  They were the -- I guess they were the --**
11  **actually I'm not sure.**
12  Q.  I am trying to get an understanding of what the
13  claims or allegations and the dispute were that gave rise
14  to this deposition.
15  **A.  It was a contractual dispute Sodexo International**
16  **against Regional West Health Services, and it was about**
17  **payment for services rendered.**
18  Q.  Okay.
19        Have you ever been a party personally to a
20  lawsuit?
21  **A.  No.**
22  Q.  I guess I do want to go over the basic ground
23  rules of a deposition.  It seems like you have done this
24  before, because you have.  The important thing especially
25  in a Zoom deposition is that there's a question and an

Page 10

1   answer and those need to be separated a little bit.
2           Talking over each other is very bad in
3   person for the court reporter and everyone else but it is
4   really bad in a Zoom deposition.  It gets really messy.
5           So far we have done well.  Today we will
6   stray from it but it's something we both have to cooperate
7   with.
8           It also allows Mr. Merrett and anybody else
9   to step in with an objection if they have one.
10  Objections, they are typically going to just take the form
11  of like object to form.
12          After that's done, you can just go ahead and
13  answer the question.  Sometimes witnesses, like, get
14  confused as to what they should do when an objection is
15  made.
16          Rarely, it's possible though, somebody will
17  try and instruct you not to answer.  Then that plays out.
18  So that's a rare circumstance.
19          But generally an objection is done, you
20  know, so it's a question, wait one second for an objection
21  to be lodged if you have it -- if somebody has it, and
22  then if there is no objection, or an objection is lodged,
23  you just go ahead and answer the question.  That gives
24  everybody time.
25          A second in conversation is -- it really is

Page 11

1   painful sometimes but it's the best way to keep the
2   deposition going.
3           Is there any -- is there anything --
4   anything at all that would impair your ability to answer
5   fully, completely, lucidly today?
6       A.  There is not.
7       Q.  I'm talking like medications or any mind-altering
8   situations.  There's nothing like that?
9       A.  No.
10      Q.  Attorneys usually try their best to make their
11  questions comprehensible.  Sometimes we all stray from
12  that.
13          If you don't understand a question, just
14  point it out.  If you need a break, just point it out.
15  I'm definitely not a task master here.  But we typically
16  ask that you not take a break while a question or a line
17  of questioning is pending.
18          Tell me about your educational background.
19      MR. BURNS:  We will go ahead and mark
20  Exhibit -- what exhibit number are we on, Sam?  Sorry, I
21  had it written down and I lost the scrap, so hold on one
22  second.  I think Andre is looking for me.
23      MR. MERRETT:  I'm sorry, what?
24      MR. BURNS:  Do you know what exhibit number
25  we are on?

Page 12

1       MR. MERRETT:  Yeah, I can tell you in just a
2   second.
3       MR. BURNS:  Great.  Thank you, Andre.
4       MR. COFFMAN:  I think we are on 76.
5       MR. MERRETT:  Yes, that's right.
6       MR. COFFMAN:  Exhibit 75 was the last
7   exhibit.  No, 76 was the last exhibit.  So the next one
8   would be 77.  Andre, is that what you have?
9       MR. MERRETT:  I thought I had 76 -- yeah, 76
10  is the last exhibit.
11      MR. BURNS:  We will mark Exhibit 77 to your
12  deposition, Mr. Greenfield.  The numbers are somewhat
13  arbitrary.  We are trying to do sequential numbering in
14  the case.
15  BY MR. BURNS:
16      Q.  Exhibit 77 is in your chat box here on Zoom.  I
17  may refer to a tab number.  A tab number is just the first
18  three digits that appear in the file name.  So if I say
19  tab 502, that's so you know what we have now marked as
20  Exhibit 77.  So tab 502 is -- what is now marked
21  Exhibit 77 to your deposition.
22          Mr. Greenfield, can you review Exhibit 77
23  which is tab 502?
24      A.  Sure.
25      Q.  The question pending is just what is Exhibit 77?

Page 13

1       A.  502 is my CV.
2       Q.  Do you know around when this CV was prepared that
3   we are looking at here?
4       A.  Oh, based on the date and the work that I have
5   done in here, probably somewhere around -- oh, I can't say
6   for sure.  I don't know.  It shows my work up to 2018, so
7   somewhere around that time.
8       Q.  Okay.  Understood.
9           Did you prepare this document?
10      A.  Yes.
11      Q.  Tell me about your -- earlier there was a mention
12  of it may not be complete.  Let we first try and
13  establish.  If you could look through it, I am trying to
14  understand is the information in it accurate -- there's
15  nothing that's inaccurate.
16      A.  It's accurate what's there, yeah, absolutely.
17      Q.  Okay.  You said it wasn't complete, I think.  So
18  I'll just ask, is Exhibit 77 complete?
19      A.  No.
20      Q.  What would be missing from it?
21      A.  My last -- my current position and the one that I
22  took directly after working for Razaghi Healthcare.
23      Q.  Okay.  So it would be like the jobs that took
24  place maybe after, you know, July/August 2018, something
25  like that?

Page 14

1    A. Yes.
2    Q. Is it incomplete in any way like prior to --
3    prior to August 2018?
4    A. I don't believe so.
5    Q. I want to understand about your education. We do
6    have the CV but I am trying to get it. Can you tell me
7    about your education after high school?
8    A. I have a -- I went to Concordia College in
9    St. Paul, Minnesota. I have a bachelor of arts in social
10   science there.
11        I went to the University of Missouri-Kansas
12   City School of Dentistry and earned a bachelor of science
13   in dental hygiene.
14        I went to William Jewell College and I have
15   a bachelor of science in nursing from William Jewell
16   College. And I went to Walden University where I earned a
17   master's degree in health care administration.
18   Q. I am looking at Exhibit 77. It's sort of Page 5
19   to 6. You first mentioned Concordia College. It reflects
20   a bachelor of arts in social science.
21        What were your career goals at the time?
22   What were you trying to do?
23   A. Well, I was in the military prior to that and I
24   was just really working on getting a college degree at
25   that point.

Page 15

1        I really didn't have a lot of direction as
2    far as what I wanted to do for my career. I was very
3    interested in political science and history and those
4    types of things so that was the focus of my degree.
5    Q. What did you do from '92 to '97?
6    A. What did I do? I worked -- I supported my wife
7    as she went through college to be a registered dental
8    hygienist.
9    Q. Tell me about the work that you did during that
10   time frame.
11   A. My in-laws, my wife's parents, owned an auto
12   parts store in Hardin, Montana, and I worked there. It
13   was close to Sheridan, Wyoming, where my wife went to
14   dental hygiene school.
15   Q. Was that the consistent job from '92 to '97
16   approximately?
17   A. Yeah.
18   Q. Any other notable jobs or education?
19   A. Right out of college I worked for a company in
20   Minnesota called ABRA Auto Body and I was their corporate
21   customer service manager. I did that first.
22   Q. I see in '97 you go to the University of Missouri
23   School of Dentistry. What made you decide to sort of
24   change careers?
25   A. Just had an interest in that.

Page 16

1    Q. Your wife was doing something similar also?
2    A. She was. She had graduated from dental hygiene
3    school and she was a dental hygienist at the time so it's
4    something I thought I might be interested in doing so I
5    went to school to do it.
6    Q. I see that you graduated in '99. And then
7    between '99 and 2003, what's your career look like?
8    A. I went -- I worked as a registered dental
9    hygienist after I graduated up until the time that I went
10   to school to be a registered nurse.
11   Q. I see on Page 5 of the resumé the University of
12   Missouri School of Dentistry faculty. What did you do as
13   faculty?
14   A. As I was working as a dental hygienist, part of
15   my time I spent as adjunct faculty at the university. I
16   taught local anesthesia, pain control, and senior dental
17   hygiene clinic.
18   Q. Were you employed by the clinic at the
19   university?
20   A. I was employed by the university part-time, yes.
21   And I worked -- was employed by a private practice dentist
22   as well.
23   Q. Okay. It looks like you go to nursing college
24   for nursing starting in 2003. Is that right?
25   A. Yes.

Page 17

1    Q. Why did you decide to change careers?
2    A. Just felt that nursing had a more variety and
3    more opportunity for upward mobility.
4    Q. After you graduate from college for nursing in
5    2004, tell me about your career from there.
6    A. I started out at Independence Regional as a staff
7    nurse. I worked in the cardiovascular ICU. I was
8    promoted up to charge nurse.
9        I went to a geropsych unit in that same
10   hospital, and then I was promoted to manager. And it was
11   at that point I wanted to -- I felt -- after the manager
12   position, I felt like that was a good track for me as
13   leadership in health care so I went to work as a head
14   nurse/nurse manager for med-surg at a veterans's hospital
15   in Columbia, Missouri, and then director of patient care
16   services at Banner Health Care in Worland, Wyoming. So
17   just progressing up through the ranks, leadership ranks
18   basically.
19   Q. What made you want to do sort of like management
20   rather than direct patient care?
21   A. Well, I felt like as a nurse you can help one
22   person at a time. As a leadership position, you can help
23   lots of patients at a time.
24        So it was really -- I felt I could have more
25   -- I could have more impact on patient care and improving



Page 18

1  things in hospital if I were in a leadership position.
2      Q.  I see that you went to Walden University starting
3  in 2008 and then you got a master's in health care
4  administration.  What made you want to do that?
5      **A.  I wanted to get into higher levels of hospital**
6  **leadership, and you have to have a master's degree in**
7  **order to do things like that.  To be a CNO or a chief**
8  **operating officer or CEO, you have to have a master's**
9  **degree.**
10     Q.  So when you start going for your master's, you
11  are aspiring to rise in hospital administration, right?
12     **A.  Yes.**
13     Q.  I guess the question is, when was your first
14  hospital administration job that wasn't managing nurses?
15     **A.  When I wasn't managing nurses.  Well, I feel like**
16  **-- I think I always am.**
17     Q.  Fair enough.
18     **A.  In one way or another you do.  I mean -- so I**
19  **guess I don't understand the question.**
20     Q.  Sure.  I see here in the CV, in the early career
21  zone, from approximately 2006 to 2010 I see some kind of
22  management job that appears to be overseeing nurses.  Is
23  that a fair way to put that?
24     **A.  I'm sorry, could you say that again?**
25     Q.  From around 2006 to around 2010, I see some kind

Page 19

1  of management jobs where you appear to be overseeing
2  nurses.  Is that a fair characterization?
3      **A.  Yes.**
4      Q.  You weren't like overseeing doctors or something
5  like that, right?
6      **A.  No.**
7      Q.  You weren't overseeing HR or something like that,
8  right?
9      **A.  No.**
10     Q.  I'm trying to understand when you became in
11  management for more than just overseeing nursing or the
12  department involving nursing.
13     **A.  That would be in director of patient care**
14  **services 2010-2011 on my early career information on my**
15  **CV.**
16     **I had more than nursing departments.  I had**
17  **other departments like respiratory therapy and physical**
18  **therapy and those types of clinical departments.**
19     Q.  Okay.  How long did that job last?  I see 2010 to
20  '11.  Was it two years long, or approximately when to
21  approximately when?
22     **A.  I worked for Banner for about three years so I**
23  **would say it was -- I don't have the months on there so I**
24  **can't say for sure, but it was, I don't know, a year and a**
25  **half maybe.  I can't say for sure.  I don't have the**

Page 20

1  months on there.
2      Q.  I'm going to move up to Page 4 to the next job.
3  Starting at the bottom it seems to be the oldest job and
4  then as it moves up it gets more recent, which is typical
5  for a CV.
6      On Page 4 I see a reference to chief nursing
7  officer.  Was that job different than director of patient
8  care services?
9      **A.  Yes.  That's actually the senior portion of the**
10  **hospital in the C suite.**
11     Q.  What is chief nursing officer?
12     **A.  It's the required position that every hospital**
13  **has to have to maintain licensure.  It's the only position**
14  **in a hospital where you have to have a license -- I mean**
15  **in a C suite where you have to have a license to hold that**
16  **position.**
17     Q.  What is the scope of the responsibilities for the
18  chief nursing officer?
19     **A.  Clinical quality, quality improvement, budgets**
20  **for all of the nursing departments.  Just general**
21  **management of the hospital in concert with the CEO.**
22     Q.  I just want to -- you are working with the CEO,
23  right, in that role?
24     **A.  Yes.**
25     Q.  But the -- I mean, for lack of a better word, the

Page 21

1  department you oversee is like all nursing activities,
2  right?
3      **A.  No.  All clinical activities and budget for all**
4  **of the departments.**
5      Q.  This hospital you are working at at this time, is
6  it a for-profit or non-profit hospital?
7      **A.  Not-for-profit.**
8      Q.  Does this hospital have management that is
9  contracted around this time?
10     **A.  No.  These were all employed by Banner Health**
11  **Care.**
12     Q.  And Banner Health Care is managing its own
13  facilities, right?
14     **A.  Yes.  It's a huge company and based in Arizona.**
15  **You've probably heard of it.**
16     Q.  Running back -- here we are in, you know, the
17  chief nursing officer job in around 2011 to 2012.  Running
18  backwards in your career, had you worked at a hospital
19  before where it was managed by a contractor?
20     **A.  No.**
21     Q.  Moving -- moving to the next job you have, so
22  departing Page 4 of Exhibit 77 and going to Page 3 of
23  Exhibit 77, I see Great Plains Health, and the dates on
24  that appear to be March 2012 to March 2016.
25     What did you do at Great Plains Health?



Page 22

1    A.  I was a chief clinical officer, so all the
2  clinical departments reported up through me as well as
3  information technology.
4    Q.  How is it different than chief nursing officer?
5    A.  It was just an expanded role.  This is a bigger
6  hospital.
7    Q.  Like you have more departments reporting to you?
8    A.  Many more.
9    Q.  Does the chief nursing officer report to you?
10   A.  The chief nursing officer reported to me in this
11  role.
12   Q.  Tell me about how Great Plains Health was
13  administered.  Who managed that hospital?
14   A.  It's a private not-for-profit corporation.
15   Q.  But like the management team wasn't contracted,
16  right?
17   A.  Everyone's employed.
18   Q.  Why do you -- why do you decide -- how do you
19  decide going from the chief nursing officer job in
20  Wyoming?  Why do you end up doing the chief clinical
21  officer job in Nebraska?
22   A.  Career progression.
23   Q.  I think I know what you mean but I do want to put
24  some color on it.  It was a better job?
25   A.  Better job, more money, and getting closer to

Page 23

1  being a CEO of a hospital.
2    Q.  But through this point, and we are talking about
3  2016 now, you have never worked at a hospital that had
4  private management -- contracted management managing it,
5  right?
6    A.  Up to this point, no.
7    Q.  So why do you -- the job changes again and now we
8  are moving on to Page 2 of the CV.  I see the Regional
9  West Health Services in Scottsbluff, Nebraska, starting in
10  March 2016 and running through May of '17.  It says
11  executive vice president chief operating officer.  Do you
12  see that?
13   A.  Yes.
14   Q.  Why did you make this career change?
15   A.  More responsibility, higher level job, more
16  compensation, career -- so same thing.  Career
17  progression.
18   Q.  Tell me what the role of executive vice president
19  and COO was at Regional West.
20   A.  I was the hospital president of the Level II
21  trauma center and all of the clinical departments, HR
22  functions, IT, everything reported up through me.
23   Q.  Management at Regional West, was it contracted
24  management?
25   A.  No.  We were all employed.

Page 24

1    Q.  The next job moves on to the first page running
2  on to the second.  Canyon Vista Medical Center in Sierra
3  Vista, Arizona, May 2017 through October 2017, and then I
4  think there's reference to chief operating officer.
5        Why the career change there?
6    A.  Really the same thing.  This was a for-profit
7  company, and there's lots of opportunity with that
8  company.  It was growing and expanding so I was recruited
9  to that position and my first job there was at Canyon
10  Vista Medical Center.
11   Q.  The management at Canyon Vista Medical Center,
12  was it contracted management?
13   A.  No.  It was all -- we were all employed.
14   Q.  That job, it appears to just be five months.  Why
15  so short?
16   A.  I ended up -- well, I ended up really not liking
17  that position very well and so I decided to make a change.
18  I actually needed some time off from health care
19  operations.
20   Q.  What did you not like about the job at Canyon
21  Vista Medical Center?
22   A.  I didn't like working seven days a week.
23   Q.  Anything else?  Was it just the schedule?
24   A.  It was -- yeah, it was just a really demanding
25  job.

Page 25

1    Q.  Okay.  So you take some time off starting in
2  October of 2017.  Is that right?
3    A.  Yes.
4    Q.  And then I see here you start working at Razaghi
5  Healthcare around January of 2018.  Is that right?
6    A.  Approximately, yes.
7    Q.  Okay.  How do you first become acquainted with
8  Razaghi Healthcare?
9    A.  As a consultant through a company.
10   Q.  Tell me about the details on that, sort of like
11  who, what, and where.
12   A.  I am trying to remember the name of the company.
13  I was contacted through a consulting company.  Honestly,
14  the name slips me right now.
15        But they contacted me about the job and I
16  interviewed at Razaghi Healthcare and ended up taking the
17  position.
18   Q.  I want to -- I want to understand.  Around when
19  did you first hear of Razaghi Healthcare?
20   A.  Probably in -- probably November of '17 when I
21  was first contacted not by Razaghi but by the temporary
22  company.
23   Q.  Okay.  So the job at Canyon Vista Medical Center
24  had ended around November of 2017, right?
25   A.  Uh-huh.



Page 26

1    Q.   You are taking some time off but you are also
2  starting to look for a job?
3    A.   Once you have a lot of experience in hospitals,
4  you get a lot of people reaching out to you asking you
5  about positions and things like that.  That's an ongoing
6  thing.
7    Q.   So a job headhunter reaches out to you?
8    A.   Basically, yes.
9    Q.   And they first expose you to Razaghi Healthcare,
10  right?
11    A.   Uh-huh.
12    Q.   Had you heard of them, Razaghi Healthcare, prior
13  to?
14    A.   Never, no.
15    Q.   Okay.  I keep using the word Razaghi Healthcare.
16  Are you familiar with Razaghi Development Company?
17    A.   Yes.
18    Q.   What was Razaghi Development Company?
19    A.   So Razaghi Development is a comprehensive part of
20  the company where we wouldn't just do health care
21  management.  We would do other things like, you know,
22  develop other health systems or -- potentially or assist
23  with building new hospitals.  Really anything health care
24  related.
25    Q.   Okay.  When you got a check during your time

Page 27

1  working at a Razaghi related entity, where did it come
2  from?  What company paid you?
3    A.   I believe it was Razaghi Healthcare.
4    Q.   Okay.  When I refer to Razaghi Healthcare today,
5  I'm referring to your employer.  Are we on the same page
6  with that?
7    A.   Yes.
8    Q.   Okay.  I think I said this but I can't remember
9  if I did.
10        You had not heard of Razaghi Healthcare --
11  had you heard of Razaghi Healthcare before a headhunter
12  reached out in approximately November 2017?
13    A.   No.
14    Q.   What did you first learn about Razaghi
15  Healthcare?  Tell me how you decided you would interview.
16    A.   Just talking to the recruiter, it was an
17  opportunity for me to work -- continue my career in health
18  care as a consultant, not make a commitment really to
19  another hospital, and still work in health care in really
20  a different capacity.  That was the attraction for me.
21    Q.   Okay.  Prior to this point you hadn't done any
22  consulting?
23    A.   No.
24    Q.   And you hadn't done any contracted managing,
25  right?

Page 28

1    A.   No.
2    Q.   And you didn't work with any hospitals where the
3  management was contracted, right?
4    A.   Correct.
5    Q.   So in one sense you are working in the same
6  industry; in another sense you are changing the type of
7  company quite a bit, aren't you?
8    A.   Well, I don't know.  I did this -- you do the
9  same things in a hospital I did in this capacity as I did
10  in all the other hospitals.
11        So hospitals are pretty much run the same no
12  matter where you are.  So, I guess contractually things
13  are different.  But for me, working in the hospital, no,
14  it was the same stuff.
15        It's people, it's quality improvement, it's
16  patients, it's -- it's really just computer systems and
17  the revenue cycle is the same no matter where you go, so I
18  would say it's very similar.
19    Q.   The operational side is very similar, right?
20    A.   Yes.
21    Q.   To what you did -- let me ask again.  The
22  operational side is very similar to what you had done in
23  your career up to this point?
24    A.   Yes.
25    Q.   But the relationship between Razaghi Healthcare

Page 29

1  and entities it managed, that's new to you, isn't it?
2    A.   I would say so, yes.
3    Q.   What's your understanding of the business
4  organization called Navajo Health Foundation - Sage
5  Memorial Hospital, Incorporated?
6    A.   I just know it as Sage Memorial Hospital.
7    Q.   Today we will call it Sage Memorial, Sage
8  Memorial Hospital, whichever you want, but you'll know I
9  am referring to that company I just mentioned, right?
10    A.   Yes.
11    Q.   Okay.  Getting back to Razaghi Healthcare.  So
12  you end up interviewing at some point in late 2017.  Who
13  do you interview with?
14    A.   Christi El-Meligi.
15    Q.   Anyone else?
16    A.   I believe Netrisha was in on part of the
17  interviews.  I can't remember her last name.
18    Q.   It's usually -- just in this case we also call
19  them Christi and Netrisha.  But you know who I'm talking
20  about when I say Christi, right?
21    A.   Yes.
22    Q.   And the same with Netrisha?
23    A.   Yes.
24    Q.   Okay.  Anyone else interview you?
25    A.   Well, I interviewed basically with those two in



Page 30

1  Scottsdale, and then they wanted me to interview with the
2  leadership team at Sage Memorial Hospital, which I did do.
3      Q.  We will come back to the leadership team.  What I
4  want to understand is what you thought you would be doing
5  as a result of these interviews, like what was your task
6  going to be.
7      A.  It was going to be -- really it was not clear but
8  there would be a lot of the things that I have a lot of
9  experience in doing.
10         It would be, you know, quality improvement.
11  I wrote a quality manual for them the first few months for
12  Sage Memorial while I was there.
13         I attended some of the quality meetings.
14  Just generally assisting with whatever was -- whatever
15  gaps were there that needed to be filled.
16     Q.  Okay.  This is going to be a silly question,
17  given what we all in this room know, but eventually this
18  will be a judge and jury that don't know anything.
19         I'm trying to understand.  Who did you think
20  you would be doing those services for?
21     A.  I thought -- I thought I was there to help Sage
22  Memorial get better, improve their quality.
23     Q.  The specific idea was that you would be working
24  on Sage Memorial projects, right?
25     A.  Exactly.

Page 31

1      Q.  How many hospitals was Razaghi Healthcare
2  managing during -- when you interviewed?
3      A.  Just this one.
4      Q.  And did it manage any other hospitals during your
5  time at Razaghi Healthcare?
6      A.  No.
7      Q.  Okay.  Let's go back to the meeting of the
8  leadership team.  You interviewed with Christi and
9  Netrisha in Scottsdale and then I think you said you
10  wanted -- they wanted you to meet with the leadership
11  team.  Tell me how that goes.  What happens next?
12     A.  I drove down -- they gave me directions to Sage
13  in Ganado, Arizona, and I drove out there and met with the
14  leadership team.
15     Q.  Who did you meet with on the leadership team?
16     A.  Specifically names I can't say for sure.  But I
17  mean the CNO, the human -- director of human resources,
18  the clinical managers.  Those types of folks.
19     Q.  How did those interviews go?
20     A.  They went very well.
21     Q.  Obviously you eventually get offered the job,
22  right?
23     A.  Yes.
24     Q.  How did you decide it's a job you wanted to take?
25     A.  It was really for me just something new and

Page 32

1  different and still related to health care, health care
2  management.
3      Q.  When you take this job, where are you living?
4      A.  When I took this job I was living in Billings,
5  Montana.
6      Q.  Did it involve -- did taking this job involve a
7  move?
8      A.  At first I didn't move; I traveled.
9      Q.  When you traveled, where would you travel?
10     A.  I would travel from Billings to -- it would
11  depend on where I was needed, where Christi wanted me to
12  go.  I would travel either to Phoenix or I would go
13  directly to Ganado depending on where she felt I should
14  be.
15     Q.  Is Ganado the location of Sage Memorial Hospital?
16     A.  Yes.  Uh-huh.
17     Q.  How many days a month -- so you started in
18  approximately January.  How many days a month during that
19  first time -- first few months of working would you spend
20  in Ganado?
21     A.  I can't say for sure.  I spent -- I split my
22  time.  I know this is new -- this is new and in your minds
23  at the top of it.
24         This is six years ago for me and I have had
25  two CEO jobs.  So I'm not trying to be difficult, but the

Page 33

1  specificity of how many days I worked here, how many days
2  I worked there I just can't -- I can't truthfully answer
3  that.
4         I split my time.  I spent some time in
5  Scottsdale and I spent some time in Ganado at Sage
6  Memorial, but I can't truthfully say I know exactly the
7  time split.  It's just not possible for me to do that and
8  tell the truth.
9      Q.  When you visited Ganado, about how many days
10  would you say?  Let me rephrase that.
11         You didn't have a house in Ganado, right?
12     A.  No.  It's on the Indian --
13     Q.  If you spent the night, where would you stay?
14     A.  Usually I stayed on campus or I would stay in a
15  hotel in Gallup.
16     Q.  So the typical visit when you are in Gallup or
17  Ganado, how many days would that be?
18     A.  Probably two or three days in a row.
19     Q.  You weren't spending multiple weeks there at a
20  time, though?
21     A.  No.
22     Q.  And then when you visited Scottsdale, why
23  Scottsdale?
24     A.  That's where Razaghi Healthcare offices are.
25     Q.  Had you worked at a hospital before where the



1  CEOs didn't work on site?
2  **A.  No.**
3     Q.   What did you think of that when you first were
4  exposed to it?
5     **A.  You are asking for my opinion?**
6     Q.   I am asking what you thought at the time when you
7  were first exposed to it.
8     **A.  Well, this was a new -- so I'm giving you my**
9  **opinion which you asked for.  Hospitals work in different**
10 **ways.  Things seemed to be going pretty well there so I**
11 **really didn't think that much about it.**
12    Q.   What was normal or good for a hospital's
13 relationship with its contracted management?
14          You were learning that on the job here in
15 2018, right?
16    **A.  Uh-huh.**
17    Q.   I forgot to go over one more ground rule.
18 Uh-huhs, they just don't come through in a transcript, so
19 I am going to re-ask the question.
20          What was normal or good for contracted
21 management with a hospital, you were learning that on the
22 job in 2018, right?
23          MR. MERRETT:  Form.
24          **THE WITNESS:  I guess, could you phrase that**
25    **in a different way?**

1  BY MR. BURNS:
2     Q.   Sure.  This finding out that contracted
3  management can work in a different city than the hospital
4  is located, that's new to you at your new job in 2018,
5  right?
6     **A.  Yes.**
7     Q.   And whether or not that's good or not, you're
8  learning that on the job in 2018, aren't you?
9     **A.  Yes.**
10    Q.   Who's teaching you what's normal or good?
11    **A.  Well --**
12          MR. MERRETT:  Form.
13          **THE WITNESS:  Could you state that in a**
14    **different way?**
15 BY MR. BURNS:
16    Q.   Sure.  Is there anyone that's teaching you what's
17 normal or good for management behavior for a contracted
18 management company?
19          MR. MERRETT:  Form.
20          **THE WITNESS:  Most of what you learn working**
21    **in hospitals you learn for yourself on the job, so it's --**
22    **you know, you get to a certain point you don't have**
23    **somebody "teaching" you.**
24          **I mean companies have cultures and you sort**
25    **of meld with the culture and over time you determine what**

1  works and what doesn't work.
2  BY MR. BURNS:
3     Q.   And do you think you melded with the Razaghi
4  Healthcare culture?
5     **A.  I think I did pretty well, yes.**
6     Q.   I'd like to talk about what you did to prepare
7  for today's deposition.  Tell me what you did.
8     **A.  I met with Andre and we reviewed some documents.**
9     Q.   Just for the record you are referring to
10 Mr. Andre Merrett who is on this deposition as well?
11    **A.  That's correct.**
12    Q.   How many documents did you review?
13    **A.  The most accurate answer I can give you is**
14 **numerous documents.**
15    Q.   How long did you meet with Mr. Merrett?
16    **A.  Approximately two hours.**
17    Q.   When did this occur?
18    **A.  Friday.  This past Friday.**
19    Q.   How much time have you spent reviewing documents
20 in preparation for your meeting with Mr. Merrett or after
21 your meeting with Mr. Merrett?
22    **A.  None.  You don't have to prepare to tell the**
23 **truth.**
24    Q.   I thought you said you reviewed documents.
25    **A.  With Mr. Merrett.  You said outside of that.**

1     Q.   So no review of documents outside of that?
2     **A.  I have not reviewed documents.**
3     Q.   Did you meet with any attorneys other than
4  Mr. Merrett?
5     **A.  No.**
6     Q.   Did you meet with anyone else other than
7  Mr. Merrett?
8     **A.  Related to?**
9     Q.   To prepare for your deposition today.
10    **A.  No.**
11    Q.   You were aware at some point that a lawsuit got
12 filed that has generated this deposition today, right?
13    **A.  Yes.**
14    Q.   Have you talked to anyone about the subject of
15 that lawsuit other than Mr. Merrett?
16    **A.  Yes.**
17    Q.   Who?
18    **A.  Ahmad Razaghi.**
19    Q.   Have you communicated with Mr. Razaghi about the
20 subject of the suit?
21    **A.  Over the past probably few months I guess, maybe**
22 **a little bit longer.**
23    Q.   How would you communicate with him?
24    **A.  I'm sorry?**
25    Q.   How would you communicate with Mr. Razaghi?

Case 3:23-cv-08072-DJH     Document 421-12     Filed 11/26/24     Page 44 of 130

Navajo Health Foundation vs                                              Tadd Greenfield
Razaghi Development Company, LLC.

Page 38

1   A.  This way, Zoom meetings.
2   Q.  Did Mr. Razaghi share or show you documents
3   during Zoom meetings?
4       MR. MERRETT:  Object to form.
5       And I am going to instruct the witness not
6   to testify as to any Zoom meetings at which counsel for
7   the Defendants were present.
8   BY MR. BURNS:
9   Q.  I'll -- I just want a clear record,
10  Mr. Greenfield.  Mr. Merrett has just given you
11  instruction.  You are following that instruction, right?
12  A.  I'm sorry, what did you say?
13  Q.  Mr. Merrett has --
14  A.  I am having trouble hearing you.
15  Q.  Can you hear me okay now?
16  A.  Uh-huh.
17  Q.  Mr. Merrett just gave an instruction.  I just
18  need a clear record.  Are you following that instruction?
19  A.  Yes.
20  Q.  I'm not asking you to give me the content of
21  conversations but I need to understand these
22  conversations.
23      Were there meetings at which Mr. Razaghi and
24  Mr. Merrett were present?
25  A.  Yes.

Page 39

1   Q.  At those meetings, did you communicate with
2   Mr. Razaghi about the subject of these lawsuits?
3   A.  Yes.
4   Q.  Now, after I ask this question I am going to ask
5   you to pause to allow Mr. Merrett to make an objection.
6       I would like you to tell me everything you
7   remember about your conversations with Mr. Razaghi at
8   those meetings.
9       MR. MERRETT:  Object to form and instruct
10  the witness not to answer as to anything discussed with
11  Mr. Razaghi during those meetings involving counsel for
12  Defendants.
13  BY MR. BURNS:
14  Q.  Mr. Greenfield, are you going to follow
15  Mr. Merrett's instruction?
16  A.  I am.
17  Q.  So now I'm going to talk about communications
18  with Mr. Razaghi that didn't involve Mr. Merrett.  Did you
19  have -- since January 1, 2023, so any time in the last
20  18 months or so, have you had communications with
21  Mr. Razaghi at which an attorney was not present?
22  A.  Yes.
23  Q.  Okay.  Tell me about those.
24  A.  In general most of the meetings were -- I'm not
25  involved, you know, in a lot of these things.  For the

Page 40

1   most part, I was an observer in these.
2       I didn't work for the company long enough to
3   really have any input, and I'm not an expert in Title 638,
4   you know.
5       I was the CEO there for a short period of
6   time, I guess that's my value here now, but I mean I
7   wasn't intimately involved in any of the billing or
8   invoicing or those types of things.  So I would say that
9   for the most part I was an observer in most of those
10  meetings.
11  Q.  Okay.  I'm talking about your conversations with
12  Mr. Razaghi in the last 18 months.  Like during this
13  lawsuit.  Okay?  Let me rephrase that.
14      I want to know about conversations you had
15  with Mr. Razaghi since you became aware of this lawsuit.
16  Tell me about those conversations with Mr. Razaghi.
17      MR. MERRETT:  Keeping in mind the objection
18  and previous instructions.
19  BY MR. BURNS:
20  Q.  Good point.  Let me rephrase the question.
21      I'm talking about conversations you had with
22  Mr. Razaghi that Mr. Merrett was not present at since you
23  became aware of this lawsuit.
24      Can you tell me about those communications?
25  A.  Again, most of those conversations there were

Page 41

1   other people there, and I really didn't have a lot of
2   input into anything.  Just listening, just listening in.
3   I wasn't really an active participant.
4   Q.  What would Mr. Razaghi talk about?
5   A.  The court case and strategy and understanding,
6   things like that.
7   Q.  What was the strategy?
8   A.  What was the strategy?
9   Q.  Yeah.
10  A.  In general I guess.
11      MR. MERRETT:  Just a second, Tadd.  Before
12  you answer that question, I'm going to object to the form
13  of the question to the extent it calls for
14  Mr. Greenfield's disclosure of privileged communications
15  that was protected by attorney-client privilege other than
16  myself.  Mr. Greenfield cannot waive that privilege on
17  behalf of Mr. Razaghi or RDC.
18      MR. BURNS:  You can answer, Mr. Greenfield.
19      MR. MERRETT:  But Mr. Greenfield, you should
20  consider whether or not your answer will disclose
21  confidential information shared to you by RDC from any
22  prior counsel.
23      THE WITNESS:  I am going to follow Andre's
24  advice and not answer.
25

Navajo Health Foundation vs.
Razaghi Development Company, LLC.

Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 45 of 130    Ladd Greenfield

Page 42

1  BY MR. BURNS:
2      Q.  At the time of these conversations with
3  Mr. Razaghi that we have been talking about here, you were
4  no longer employed by Razaghi Healthcare, correct?
5      **A.  Correct.**
6      Q.  Okay.  And an attorney was not present, correct?
7      **A.  Sometimes correct.**
8      Q.  So I'm talking about the times where an attorney
9  was not present.
10         What did Mr. Razaghi say in those
11  conversations?  I need to know everything you can
12  recollect.
13     **A.  Again, I'm going to follow Andre's advice.**
14     Q.  Mr. Razaghi discussed things that were not the
15  advice from an attorney, correct?  He discussed things
16  other than advice from an attorney, correct?
17     **A.  I don't answer that for sure.  I can't answer what**
18  **advice he had from his attorney.**
19     Q.  He discussed facts of the case, didn't he?
20     **A.  I'm sure he did at times.**
21     Q.  Tell me about when he discussed facts.
22     **A.  I'm going back to -- I'm going to follow Andre's**
23  **advice.  He's advised me not to answer questions that**
24  **violate attorney-client privilege.**
25     Q.  Well, I'm asking about -- not about

Page 43

1  communications with attorneys.  I'm not asking about
2  advice from attorneys.
3         I'm asking about facts that Mr. Razaghi
4  discussed in your presence outside of the presence of an
5  attorney.  So I want you to tell me about that.
6         MR. MERRETT:  Brad, I'm sorry, I don't mean
7  to interrupt your deposition.  I just want to make clear
8  my last objection in counsel to Mr. Greenfield was based
9  on your question asking what Mr. Razaghi said about
10  strategy which I think is privileged information or
11  dangerously close to.  My instructions do not relate to
12  basic factual discussions.
13        MR. BURNS:  Thanks for clarifying.
14  BY MR. BURNS:
15     Q.  So, Mr. Greenfield, tell me about what
16  Mr. Razaghi said about facts in these conversations.
17     **A.  Most of the discussions were about -- were about**
18  **-- need to think about this for a second.  Again, I'm on**
19  **the periphery of this thing so it's hard to recollect back**
20  **about what specifically we talked about.**
21        **But I would just say about -- we talked a**
22  **lot about when the -- when the contract was terminated and**
23  **he felt -- a lot of it was just recollecting back about**
24  **the work that we were doing when the contract was**
25  **terminated.**

Page 44

1         We were, you know, talking about what our
2  responsibility was.  We -- when the contract was
3  terminated, we just discussed things like responsibility,
4  making sure that everything kept working well in the
5  hospital.
6         We were nervous about not having access
7  there and something, you know, going wrong or something
8  getting omitted.
9         So a lot of the conversations were about
10  things like that, operational-type things.  So we were --
11  it was kind of scary, scary for me, that one day you're
12  managing a hospital; the next day you can't even be on
13  campus.
14         So, you know, when you care about what you
15  do, you are concerned about those types of things.  So we
16  had conversations about things like that.
17         And then there was some contractual
18  conversations.  Again, I'm in the periphery of these
19  things, you know, about what would be, you know --
20  what would be the right -- what would be the right
21  situation for us to be in given that the contract was
22  terminated.
23         MR. BURNS:  Okay.  I have run over my
24  intended break time so let's take a -- let's call it a
25  ten-minute break.  We will come back in Phoenix time

Page 45

1  11:15.  So that's ten minutes from now.  We will go off
2  the record and see you all in ten minutes.
3         THE VIDEOGRAPHER:  We are going off the
4  record.  The time is 11:05 a.m.
5         (Recess 12:05 p.m. - 12:19 p.m.
6         Mountain Daylight Time)
7         THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 11:19 a.m.
9  BY MR. BURNS:
10     Q.  We are back on the record.  I have been asked by
11  the court reporter, Mr. Greenfield, to ask where you're
12  physically located right now just for absolute clarity.
13     **A.  Where I'm physically located?**
14     Q.  Yeah.
15     **A.  In Libby, Montana.**
16     Q.  Is that your residence there that we talked about
17  earlier?
18     **A.  It's at my residence.**
19     Q.  I'm not asking you about the content of
20  conversations, I want to be clear about that, but during
21  this break did you have a conversation with Mr. Merrett?
22     **A.  Yes, I did.**
23     Q.  About how long did that conversation last?
24     **A.  Three minutes.**
25     Q.  I'm going to put in front of you Exhibit 59 on



Page 46

1  Zoom.  It's going to go into the chat there.  Exhibit 59
2  has already been marked in this case so others have it.
3  Let me know, Mr. Greenfield, when you have Exhibit 59.
4    **A.  It's downloading.  It's asking me to save this,**
5    **which I don't want to do on this computer.  Is there any**
6    **way you can share the document?**
7    Q.  Well, it's all going to be something that ends up
8  on that computer in order for you to be able to look at
9  the document.
10           I can show it page by page as a presenter
11  but you wouldn't be able to manipulate the document
12  yourself.
13           So usually if you just click on sort of the
14  PDF symbol there, it will just open the document.  I will
15  send it again.
16    **A.  There we go.  It just opened up.**
17    Q.  Probably some kind of download issue.  Okay.
18           So I'm looking at Exhibit 59.  Do you see,
19  sir, a document, and the caption page says Defendants'
20  First Supplemental Responses to Plaintiff's First Set of
21  Interrogatories.  Do you see that there?
22    **A.  Uh-huh.  Yes.**
23    Q.  I want to know if you have seen this document
24  before.
25    **A.  I can't recall.**

Page 47

1    Q.  Did you review this document in preparation for
2  your testimony today?
3    **A.  No, I did not.**
4    Q.  Okay.  I'll just orient you to a date that
5  appears on -- towards the end so you can scroll down.
6  It's on Page 23 in the middle of the page.  It references
7  dated April -- 15th day of April, 2024.  You can scroll to
8  Page 23 to see that.
9           The point is it's a somewhat recent
10  document.  What I want you to do is look at it.  And tell
11  me, did you provide anyone any factual material to create
12  this document?
13    **A.  No.**
14    Q.  I'm trying to understand if you were involved in
15  the creation of this document at all.
16    **A.  No.**
17    Q.  Did you edit the document?
18    **A.  Did I edit the document?**
19    Q.  Did you edit the document that is Exhibit 59?
20    **A.  No.  I don't recall seeing this document ever.**
21    Q.  Did you talk to anyone about the details of the
22  case in March or April of 2024?
23    **A.  The details of this case?**
24    Q.  Yes.
25    **A.  Other -- I guess a few details of the case which**

Page 48

1  I don't recall, but it was certainly with Andre.
2    Q.  I'm not going to ask about the content of those.
3           When you first started working at Razaghi
4  Healthcare -- what was the formal position?
5    **A.  Formal position?  I don't recall the title.**
6    **Consultant I guess.  That would be fair.**
7    Q.  What was the scope of the responsibilities?
8    **A.  It was -- my first -- my first job was to work in**
9    **the quality department.**
10    Q.  Okay.  Doing what?
11    **A.  Improving their quality improvement plan, helping**
12    **everyone understand what quality was and what quality**
13    **improvement encompassed, and helping the departments, all**
14    **departments, develop a plan that was reasonable and**
15    **appropriate and meaningful.**
16    Q.  This is like operationally a hospital, right?
17    **A.  Uh-huh.  Right.**
18    Q.  What's the difference between that and like an
19  executive management function that you have done before?
20    **A.  It's probably more in the weeds, I guess, at a**
21    **lower level.  I managed all the departments before but I**
22    **was actually meeting with staff members and guiding them**
23    **through processes.**
24           **They would bring me their plan and we would**
25    **discuss it and talk about what was relevant to their**

Page 49

1  department and, you know, changes that could be made to
2  make it more thoughtful and more purposeful.
3    Q.  Do you have any executive decision-making
4  authority in this consulting role?
5    **A.  No.**
6    Q.  Who has, like, executive decision-making
7  authority?
8           MR. MERRETT:  Form.
9           **THE WITNESS:  Are you asking who was in**
10    **charge of me?**
11  BY MR. BURNS:
12    Q.  No.  It's a little different.  For the hospital
13  operation, who were the executives?  You referenced
14  something called the C suite earlier.
15           Who were the top executives for Sage
16  Memorial Hospital while you -- when you started your job
17  as a consultant?
18    **A.  Christi.**
19    Q.  Anyone else?
20    **A.  Christi was the CEO and she was pretty much in**
21    **charge, I mean, from my perspective.**
22    Q.  Was there another CEO?
23    **A.  There was a -- well, Christi was in charge and**
24    **Netrisha was the chief operating officer.**
25    Q.  Who did --

Case 3:23-cv-08072-DJH   Document 421-12   Filed 11/26/24   Page 47 of 130

Navajo Health Foundation vs                                                    Ladd Greenfield
Razaghi Development Company, LLC.

Page 50

1    A. I'd say Christi and Netrisha as we discussed
2  before.
3    Q. Who did Christi report to?
4    A. She reported to Ahmad Razaghi.
5    Q. If Ahmad Razaghi and Christi were to disagree on
6  a decision, who was in charge?
7          MR. MERRETT: Form and foundation.
8          THE WITNESS: I didn't have a lot of
9  interaction. In fact, none with Ahmad Razaghi when I
10 first went to work there. My interactions were --
11 exclusively I was directed by Christi.
12 BY MR. BURNS:
13   Q. So let me ask a different question then. Did you
14 have an understanding when you started of who was in
15 charge of Razaghi Healthcare?
16   A. I knew the guy whose name was on the stationery
17 that he was in charge but I didn't interact with him on a
18 regular basis.
19   Q. You knew that Ahmad Razaghi was in charge of
20 Razaghi Healthcare, right?
21   A. Yes.
22   Q. Okay. Is there a reason you are trying to
23 downplay his co-CEO role today?
24        MR. MERRETT: Form and foundation.
25        THE WITNESS: I don't understand the

Page 51

1  question.
2  BY MR. BURNS:
3    Q. Is there a reason you are trying to downplay his
4  role as co-CEO today?
5          MR. MERRETT: Same objection.
6          THE WITNESS: I'm not trying to downplay
7  anything. I'm trying to tell you the truth. I have never
8  seen them get into a disagreement. I wasn't privy to
9  those types of conversations.
10          Christi was in charge of me and that's who I
11 took my direction from. That's it.
12 BY MR. BURNS:
13   Q. Did you know whether or not Mr. Razaghi had
14 preferences about the way things would go?
15   A. No.
16   Q. How often was Mr. Razaghi onsite in Ganado?
17   A. I can't say for sure.
18   Q. In this management role you started in, how were
19 you compensated?
20   A. How was I compensated?
21   Q. Yeah.
22   A. With I guess -- I don't understand the question.
23   Q. You worked as a consultant?
24   A. Uh-huh.
25   Q. And you were paid by someone for the work, right?

Page 52

1    A. I was paid by the management company.
2    Q. Was it a flat salary, hourly?
3    A. A consulting company. Yeah, hourly.
4    Q. What were you paid per hour?
5    A. I don't recall.
6    Q. Approximately?
7    A. I honestly don't recall.
8    Q. Okay. We talked about one of your roles as a
9  consultant in operations. What other roles did you have
10 as a consultant?
11   A. As a consultant, that's pretty much it.
12   Q. How many different roles did you end up playing
13 at Razaghi Healthcare?
14   A. I started off as a consultant and then I ended up
15 taking a position that they had open with Razaghi as the
16 executive vice president and chief operating officer.
17   Q. So executive VP and COO of what?
18   A. Razaghi Healthcare.
19   Q. So you were the chief operating officer of the
20 management company?
21   A. Yes.
22   Q. And you were the executive vice president of the
23 management company, right?
24   A. Yes.
25   Q. And who did you report to in this new role?

Page 53

1    A. Ahmad Razaghi.
2    Q. When did this new role develop?
3    A. I don't recall the exact date.
4    Q. You started in January of 2018. About how many
5  months go by before this changes that?
6    A. I don't recall the exact timing.
7    Q. You eventually become co-CEO of the hospital,
8  right?
9    A. Yes.
10   Q. Is it before or after you become co-CEO of the
11 hospital that you become COO of Razaghi Healthcare?
12   A. Before.
13   Q. How long before?
14   A. I don't recall the exact time.
15   Q. Was it days?
16   A. I don't recall the exact time.
17   Q. So I'm not looking for the exact time. I am
18 looking for an approximation. Days, weeks, months? About
19 how long before?
20   A. I don't recall the exact time.
21   Q. Approximately how long had you been COO of
22 Razaghi Healthcare when you became co-CEO of Sage Memorial
23 Hospital?
24   A. I don't recall the exact time.
25   Q. I'm not looking for exact. It was some amount of



Page 54

1  time, right?
2  **A.  Yes, it was before.  I can definitively say it**
3  **was before I became co-CEO.**
4  Q.  What did your responsibilities become at Razaghi
5  Healthcare when you became executive VP and COO?
6  **A.  I had an expanded role in decision-making, I**
7  **guess, for the company and the hospital.**
8  Q.  For both Razaghi Healthcare and Sage Hospital,
9  right?
10  **A.  Yes.**
11  Q.  I understand they relate a lot but there are also
12  different things, right?
13  **A.  Well, not for me, no.**
14  Q.  Didn't you become involved in the finances of
15  Razaghi Healthcare?
16  **A.  Well, we have a chief financial operator -- chief**
17  **financial officer, so I'm still -- I was hired as the**
18  **hospital guy.  That's where my experience is.  That's**
19  **where my strength is.  So -- and we only had one in the**
20  **hospital.  So no.**
21  Q.  When did it become your job to try to fix the
22  accounting department at Sage Memorial Hospital?
23  MR. MERRETT:  Form.
24  **THE WITNESS:  When I took over as the**
25  **co-CEO.**

Page 55

1  BY MR. BURNS:
2  Q.  Not before?
3  **A.  Well, maybe before. I'm just -- the timing for**
4  **me I'm not certain on as far as those two roles. I'm not**
5  **certain on.**
6  Q.  Sure.  A lot happens in a few months.  I guess
7  what I'm trying to understand is, when you first were
8  tasked with doing something in the accounting department
9  at Sage Memorial Hospital, what was it?
10  MR. MERRETT:  Brad, are you referring to the
11  finance department or the accounting department?  The
12  latter I have not heard of.
13  MR. BURNS:  Sure.
14  BY MR. BURNS:
15  Q.  Sage Memorial Hospital, it had a department that
16  handled money.  What was it called?
17  **A.  Well, it would be -- I would call it revenue**
18  **cycle, is what I would call it.  There's different pieces**
19  **in a hospital, you know, of finance and accounting and**
20  **they are all parts of the revenue cycle.**
21  Q.  Let's just say finance because we are going to
22  trust that Mr. Merrett has it right.
23  We will just call that the finance
24  department.  What was your involvement in the finance
25  department when you first got involved with it?

Page 56

1  **A.  My involvement was to -- to help -- my**
2  **involvement was to shore up any issues or any gaps in that**
3  **department in the revenue cycle in finance.**
4  Q.  There were problems in the finance department,
5  right?
6  MR. MERRETT:  Form and foundation.
7  **THE WITNESS:  What do you mean -- I don't**
8  **understand what you mean by problems.**
9  BY MR. BURNS:
10  Q.  What was your understanding as to any problems
11  the finance department had when you first got involved
12  with it?
13  **A.  Well, all hospitals have issues in their --**
14  **because the revenue cycle is so complicated in a hospital**
15  **finance, all hospitals have issues.**
16  **So my job was to -- well, the long-term**
17  **goal -- my job was to help set it up in a way that the**
18  **hospital could take it over, get it so efficient, write**
19  **desk procedures down for all the elements of a revenue**
20  **cycle so the hospital could take over, you know, and folks**
21  **in that community that we hired in could actually take**
22  **over and run the revenue cycle without a lot of oversight**
23  **from Razaghi Healthcare.**
24  **So the job was to really get it so it would**
25  **help them get independent in running their own finance**

Page 57

1  **department revenue cycle.**
2  Q.  Because the finance department was being managed
3  mostly by Razaghi Healthcare, right?
4  **A.  Well, I think it was more of a -- you still have**
5  **a board of directors, they have to approve things, and we**
6  **had staff from the community that were in the finance**
7  **department, so I would say it was a partnership.**
8  Q.  But Razaghi Healthcare was more involved than was
9  desirable.  That needed to change, correct?
10  **A.  No.  I wouldn't -- you are characterizing that in**
11  **a way that's not true.**
12  Q.  Why does the hospital's finance department -- why
13  did it need to be independent?
14  **A.  When you are a management company, part of your**
15  **role is -- that's why you hire them, to help shore up your**
16  **finance department, so, your revenue cycle, making sure**
17  **you're billing appropriately, making sure you're paying**
18  **your bills and getting invoices out and things like that.**
19  Q.  You just talked about independence.  Why should
20  the finance department of a hospital be independent from
21  the management company?
22  **A.  No.  As independent as possible.  We just --**
23  Q.  Why?
24  **A.  Well, our goal was to make -- to improve the**
25  **finance department.  I guess I don't understand the**

Page 58

1  question.
2         Our goal was to get in there and make sure
3  everything was done appropriately and that at a certain
4  point, when we felt comfortable that they could take over
5  most of the functions, then we would let them do that.
6     Q.  But I'm asking a question about independence.
7  Why was independence for Sage Memorial Hospital's finance
8  department sought?
9     A.  Because it's the right thing to do.
10    Q.  Why is it the right thing to do?
11    A.  They would -- we believe that they would still
12  need some high-level oversight, but we also believed that,
13  you know, people we could hire in from the community we
14  could get the expertise to do things, you know, like the
15  materials management person.  We could hire in somebody
16  that could take over that and do a good job when we set it
17  up correctly.
18         So even in corporations that I have worked
19  in before, there's still corporate oversight of
20  everything.
21         Budgets are approved at the corporate level,
22  you know, and they roll on down to the individual
23  hospitals and things, so there's really -- it's really --
24  again, it's a partnership.
25         It's trying to make things as good as you

Page 59

1  possibly can, trying to hire as many Navajo people as we
2  could in the organization to help the organization to
3  provide jobs and help train and get people expertise so
4  they could be successful.  So it was really about being
5  partners with them.
6         I mean, I wouldn't characterize it taking
7  over things.  I wouldn't say things like that.
8     Q.  You mentioned the role of the board of directors.
9  What was your understanding when you became executive vice
10  president/COO?  What was your understanding of the role of
11  the board of directors with regard to the finances at
12  Sage?
13    A.  I'm not certain what their role is -- was, as far
14  as the board of directors.  I didn't have a lot of
15  interaction with the board of directors.
16    Q.  Did you have an understanding of the board of
17  directors' role?
18    A.  I have an understanding in general of what a
19  board of directors would do.  But of that specific board,
20  no.
21    Q.  Do you think a board of directors is entitled to
22  information about the finances of the company?
23    A.  The management always -- it's been my
24  experience -- always presents the month-end financials to
25  the board of directors.

Page 60

1     Q.  I'm talking about any financials they want to
2  see.
3     A.  All they have to do is request it.
4     Q.  You have never denied financial information to
5  the board of directors, right?
6     A.  No.
7     Q.  And why is that?
8     A.  Part of their role is reviewing and approving,
9  you know.  They have to approve the month-end financials.
10  Every year there's a yearly audit that not-for-profits do,
11  and the auditor outside of management presents the audit
12  to the board of directors.  So those are normal functions
13  in every hospital.
14    Q.  When you became executive vice president and COO,
15  what was your understanding of who oversees the management
16  company?
17    A.  I guess I don't understand the question.
18    Q.  Is there -- for Sage Memorial Hospital, was there
19  a person or body that monitored or oversaw what the
20  management company was doing?
21    A.  I think that's a multi -- there's more than one
22  answer to that.
23    Q.  Let's break it down.  Was the management company
24  free to do whatever it wanted?
25    A.  No.  There's lots of rules and regulations in

Page 61

1  hospitals from, you know, the departments of health at the
2  state, CMS, Medicare and Medicaid services.  There's
3  independent audits that occur every single year.  So --
4  and then the board has some oversight as well.
5     Q.  What was your understanding of the board's
6  oversight?
7     A.  This board in particular, I can't say for sure.
8     Q.  You didn't have an understanding when you were
9  the executive vice president of the oversight role the
10  board of directors have of the management company?
11    A.  Specifically that board, no.  Generally I have
12  already articulated what a board's responsibilities would
13  be in general.
14    Q.  It includes oversight of management, right?
15    A.  Well, a board's job is governance and
16  management's job is operations which includes finance.
17    Q.  But if someone is concerned that management's
18  doing something incorrectly or something unethical, who
19  investigates that?
20    A.  The board -- all the boards have to do is request
21  information if there are any issues and meet with the
22  leadership team and discuss whatever the concerns or
23  issues are.
24    Q.  What if it's the leadership team that's being
25  investigated?



Page 62

1    A.  Well, certainly it wouldn't be everyone on the
2  leadership team.  If you suspected there was an issue with
3  one member of the leadership team, then you would go to
4  another member of the leadership team.
5    Q.  And if it's like the top group of the leadership
6  team, does the board have to meet with the leadership
7  team?
8    A.  They would express -- I think a professional
9  board would express their concerns with at least one
10  member of the leadership team, not make assumptions that
11  the -- I have never seen a situation where the entire
12  leadership team is suspect of doing something nefarious.
13  So no, I can't imagine that situation.
14    Q.  You had been a vice president and COO for some
15  amount of time.  That also eventually changes, right?
16    A.  What do you mean?
17    Q.  That job changes into something else, some other
18  job at Razaghi Healthcare, doesn't it?
19    A.  No.  I ended up leaving the company after the
20  contract was terminated.
21    Q.  So you remained executive vice president and COO
22  of Razaghi Healthcare until you leave, right?
23    A.  Right.
24    Q.  At some point after you are made executive
25  vice-president at Razaghi Healthcare, you take on new

Page 63

1  responsibilities at Sage Memorial Hospital, right?
2    A.  Yes.  That's true.
3    Q.  What role changed there?
4    A.  I became the co-CEO.
5    Q.  When did you first hear about the possibility
6  that might happen?
7    A.  I can't say for sure.
8    Q.  How long before it happens did you first hear
9  about it?
10    A.  I can't say for sure.
11    Q.  Was it like a surprise when you heard about it?
12    A.  I'm trying to think back to those times.  Again,
13  this was six years ago.  I guess being in health care for
14  a long time, the fact that changes are made in leadership
15  is not that surprising in general.
16    Q.  I will go ahead and mark Exhibit -- I think
17  Exhibit 78.  It will have tab No. 515 in the digital.
18  Just let me know when you have that up.
19    A.  I have it up.
20    Q.  I'm looking at the second page of Exhibit 78.  At
21  the bottom right -- there's a thing we called a Bates
22  number, and it starts with RDC Sage and a number ending in
23  880.  Do you see that at the bottom right?
24    A.  Yeah.  880, yes.
25    Q.  That just orients us we are on the same page.  If

Page 64

1  I say Bates number ending in 880, that's where you'll
2  look.
3          I guess I'm looking at a letter.  It appears
4  to be a two-page letter.  Can you tell me if you ever saw
5  this letter before?
6          MR. MERRETT:  Form.
7          THE WITNESS:  Could you restate the
8  question, please?
9  BY MR. BURNS:
10    Q.  Did you ever see this letter when it was sent?
11    A.  I don't recall.
12    Q.  So we are looking at a letter dated July 21,
13  2018.  Is that approximately when you became -- you
14  replaced Christi as co-CEO?
15    A.  That appears to be true, yes.
16    Q.  The letter references in the first sentence
17  "plans, meetings, and discussions over the last several
18  months that your assignment as Navajo Sage administrator
19  will end effective 8:00 a.m. on Monday, July 23rd."
20          Do you see that there?
21    A.  Uh-huh.
22    Q.  What was the role of administrator versus co-CEO,
23  same thing, different?
24    A.  Yes.  Same thing.
25    Q.  Okay.  So for these month-long conversations

Page 65

1  that's being referenced in this letter, when do you get
2  involved with that?
3          MR. MERRETT:  Form and foundation.
4          THE WITNESS:  Could you please restate the
5  question?
6  BY MR. BURNS:
7    Q.  When do you get involved in the conversations
8  that Christi's time as administrator is ending and your
9  time as administrator is beginning?
10          MR. MERRETT:  Same objection.
11          THE WITNESS:  I don't recall.
12  BY MR. BURNS:
13    Q.  I mean this was a big moment for you, wasn't it?
14    A.  No.
15    Q.  You described earlier a goal of becoming a COO of
16  a hospital, didn't you?
17    A.  Yeah, but I have had a lot bigger jobs than this.
18  So no, it wasn't a big moment for me.
19    Q.  How do you find out that you are going to become
20  co-CEO?
21    A.  I believe it was a phone call.
22    Q.  Tell me who?
23    A.  From Ahmad.
24    Q.  I'm sorry, I didn't catch it.
25    A.  I believe it was through a phone call from Ahmad.



Page 66

1    Q.  That's Mr. Razaghi?
2    A.  Yes.
3    Q.  What did he tell you?
4    A.  That I would be replacing Christi as the co-CEO
5  temporarily at Sage.
6    Q.  Why were you replacing Christi?
7    A.  I don't -- I don't recall for sure what the
8  specifics were.
9    Q.  What was your understanding of the deficiency in
10  Christi's performance that led to her demotion?
11        MR. MERRETT:  Form.
12        THE WITNESS:  I don't believe I ever
13  understood the specific things why.  I was informed that I
14  would be doing this, and it was a role that I was more
15  than qualified to do so, and I know it was going to be a
16  temporary thing so I did as instructed.
17  BY MR. BURNS:
18    Q.  Tell me what you understood -- what Mr. Razaghi
19  told you about its temporariness.
20    A.  He just told me this would be a temporary job and
21  that's all I recall.
22    Q.  Why couldn't Christi stay on until a permanent
23  person was found?
24        MR. MERRETT:  Form and foundation.
25        THE WITNESS:  I don't recall the specifics.

Page 67

1  BY MR. BURNS:
2    Q.  Did you have an understanding of Christi
3  badmouthing Razaghi Healthcare?
4    A.  There were -- there were one -- well, actually I
5  don't recall specifically.
6    Q.  You just started to talk about something and then
7  you held yourself back.  What were you thinking of?
8    A.  Well, I'm thinking that if I don't know for sure
9  I shouldn't make something up or try to piece together
10  some random thoughts because that wouldn't be truthful.
11  So I'm saying I don't specifically recall comments.
12    Q.  I'm asking you what you started to answer today
13  and then held yourself back.
14    A.  And I'm respectfully telling you that I don't
15  recall specifically.
16    Q.  You replaced a CEO of an organization you were
17  working at and you don't have any recollection of
18  deficiencies in that CEO's performance.  Is that what
19  you're telling me?
20    A.  I think if you look at my timeline of how long I
21  was with the company that would be completely
22  understandable.
23    Q.  You had been working at the company for six
24  months at this point and your direct report was this CEO,
25  correct?

Page 68

1    A.  I don't recall.
2    Q.  I will rephrase the question.
3    A.  I don't recall at what point the number of months
4  that I was -- the time that I was made the chief executive
5  -- or the executive vice president and the time that
6  Christi was let go.  I don't recall the number of months
7  that was.
8    Q.  You directly reported to Christi for some amount
9  of time, right?
10    A.  Yes.
11    Q.  This is the person that hired you, right?
12    A.  Uh-huh.
13    Q.  You had worked at Razaghi Healthcare under her
14  direction since January 2018, right?
15        Is that correct?
16    A.  Yes.  I'm saying I don't know what the number of
17  months was between the time I was consultant, took the EVP
18  job and from that point the time that Christi was let go.
19  So I'm just trying to answer your question.  That's all
20  I'm trying to do.
21    Q.  Listen, I think we have a full map of what you're
22  saying you don't recall.  I'm trying to establish things
23  that you can recall.  Okay?
24        So you started at Razaghi Healthcare in
25  January 2018, correct?

Page 69

1    A.  Yes.
2    Q.  You became co-CEO in late July 2018, correct?
3    A.  Yes.
4    Q.  And during all that time you worked under Christi
5  at Sage Memorial Hospital, right?
6    A.  Up until that time, yes.
7    Q.  And this was the person that hired you, right?
8    A.  Yes.
9    Q.  And you have decades of experience in hospitals,
10  right?
11    A.  Yes.
12    Q.  And in what ways was Christi's performance at
13  co-CEO deficient, sir?
14        MR. MERRETT:  Form and foundation.
15        THE WITNESS:  There's a lot of different
16  ways of managing hospitals.  And, um, the other part of
17  that is the complexities that you add with cultures.
18  Different hospitals have different cultures.  I'm not just
19  specifically about the Navajo culture.  Each
20  hospital has its own culture.
21        I have been at many hospitals where I
22  haven't agreed with the way things were run, and by that I
23  mean I would do it in a different way, so I try not to be
24  too judgmental on the way people do things.  When I was
25  hired -- when I took over, I did things in a different



Page 70

1  way.
2  BY MR. BURNS:
3     Q.  I'm still asking the same question.  In what ways
4  were Christi's performance deficient?
5        MR. MERRETT:  Still making the same
6  objection.
7        THE WITNESS:  I feel like I have answered
8  that question.
9  BY MR. BURNS:
10    Q.  You haven't given a single deficiency in her
11  performance.  Is your testimony that there's no
12  deficiencies in her performance?
13    A.  No, that's not my testimony.  My testimony is
14  there's nine ways to skin a cat and I would do it in a
15  different way.
16    Q.  So in which ways did Christi do it sub-ideally?
17    A.  Again, there's different ways of doing things,
18  and I don't know that I would categorize it that way.  I
19  could tell you what I did when I was there and the
20  decisions I made and how I do things.
21        I can't speak to her -- to her performance
22  specifically.  That would be something you would probably
23  ask the guy that was in charge of her.
24    Q.  No.  I'm asking you.  You witnessed her
25  performance, correct?

Page 71

1     A.  I wouldn't even -- I wouldn't even say that for a
2  long period of time.  She -- for the bulk of the time
3  between January and July, she was giving me tasks to do.
4        I wasn't involved in conversations with, you
5  know, the senior leaders of the organization of Razaghi
6  Healthcare.  I had no involvement with the board of
7  directors or anything.
8        I was the boots on the ground, that guy.  So
9  I didn't have the perspective of what went on between --
10  with Christi between January and July.
11    Q.  What did Mr. Razaghi tell you about Christi's
12  communications with the board of directors?
13    A.  I don't recall specifically.
14    Q.  I'm asking generally, what did Mr. Razaghi tell
15  you?
16    A.  I just don't recall.
17    Q.  That topic came up before you were made co-CEO,
18  correct?
19    A.  I don't recall actually when it came up.
20    Q.  Mr. Razaghi at some point expressed concerns
21  about Christi's communication with the board of directors,
22  correct?
23    A.  I just don't recall the conversation.
24    Q.  Did he express any concerns about Christi's
25  communications with the board of directors?

Page 72

1     A.  I don't recall specifically.
2     Q.  Did Mr. Razaghi ask you to take over
3  communications with the board of directors?
4     A.  That would be a role that I would have as the
5  administrator, yes.
6     Q.  I'm asking what Mr. Razaghi told you.
7     A.  That would be part of my role.  I'm answering
8  your question.  Part of the role of administrator would be
9  communicating with the board.
10    Q.  Did Mr. Razaghi tell you that that would be your
11  role?
12    A.  That's the role of every hospital administrator.
13    Q.  I understand what you contend the role
14  objectively is.  That's not what I'm asking.  I'm
15  asking about what Mr. Razaghi told you.
16    A.  He told me that I was going to take over as the
17  administrator there until we could hire someone else to
18  take over permanently.
19    Q.  And what did he tell you about communications
20  with the board?
21    A.  That's part of the role.  We didn't have a
22  conversation where he said you're going to do this, you're
23  going to do this, you're going to do this.
24        If he had to do that, then I wouldn't have
25  been the right person for the job.

Page 73

1     Q.  What did he tell you about stopping Christi from
2  having communications with the board?
3     A.  I don't recall specifically.
4     Q.  That topic came up, though, with Mr. Razaghi,
5  right?
6     A.  You know, I just don't recall specifically the
7  conversation.
8     Q.  I'm not asking specifically.  The topic of
9  getting Christi to stop communicating with the board of
10  directors came up, didn't it?
11    A.  My concern was more about doing a good job at the
12  hospital, so I wasn't focused on what had happened before.
13  I was focused on what we are going to do going forward.
14    Q.  You are not answering my question.
15    A.  I'm trying to.  You want me to tell you something
16  that I don't remember.
17    Q.  Mr. Greenfield, is there a reason why you are
18  trying to avoid answering questions about what Mr. Razaghi
19  told you?
20    A.  I am trying to be truthful and tell you I don't
21  recall specifics of conversations.  I was hired to do a
22  job and that's what I did.
23    Q.  Has anyone asked you to not relay the words of
24  Mr. Razaghi in today's deposition?
25    A.  No.

Page 74

1    Q.  Has anyone coerced or threatened you?
2    **A.  No.  That's ridiculous.**
3    Q.  So I'm asking you now, and I would like you to
4    try to not avoid the question again, did the topic of
5    preventing Christi from communicating with the board of
6    directors come up in conversations with Mr. Razaghi?
7    **A.  And I'm going to tell you one last time that I do**
8    **not recall that specifically.**
9    Q.  I'm asking generally if the topic came up.
10   **A.  And I'm telling you one last time, because you**
11   **are badgering me at this point in time to make a point, I**
12   **don't recall.**
13   Q.  So when you decided to tell Christi to not
14   communicate with the board of directors, was that your
15   decision or did someone else tell you to do that?
16       MR. MERRETT:  Form.
17       **THE WITNESS:  I don't believe -- I don't**
18   **recall telling her not to communicate with the board.  I**
19   **don't recall that.**
20   BY MR. BURNS:
21   Q.  You don't recall.  Are you sure one way or the
22   other?
23   **A.  I don't recall.**
24   Q.  Did you launch an investigation into
25   communications that Christi had had with the board of

Page 75

1    directors?
2    **A.  I think -- with the board of directors?  No.  I**
3    **don't recall that.  I recall -- I recall --**
4        MR. MERRETT:  Brad, you are going to need to
5    let him answer the question.
6    BY MR. BURNS:
7    Q.  Go ahead.
8    **A.  I recall assigning someone to investigate the**
9    **situation with Christi, but that's all I recall.**
10   Q.  Let's go back to Exhibit 78.  I'm looking at the
11   first page.  It's an email from Mr. Razaghi.  I want to
12   ask you about some of the bullet points.
13   **A.  Okay.  So where are we at now?**
14   Q.  I'm on the first page of Exhibit 78.  That's
15   tab 515.  The Bates number at the bottom right ends in
16   879.  Let me know when you're there.
17   **A.  879.  Okay.  I'm there.  The one that says Dear**
18   **Madam Secretary and Board Members?**
19   Q.  Yes.  If we you could look at the third bullet
20   point, it says:  "The Navajo Sage position description
21   highlights that the administrator/co-CEO, Christi
22   El-Meligi, reports directly to the chief executive
23   officer."  Do you see that?
24   **A.  Yes.**
25   Q.  When you became administrator/co-CEO, the role

Page 76

1    was the same as that, right?
2    **A.  Yes.**
3    Q.  You reported to Ahmad Razaghi, right?
4    **A.  Yes.**
5    Q.  If Ahmad Razaghi wanted something done, did you
6    do it?
7    **A.  Yes.**
8    Q.  Did you ever refuse to do something that
9    Mr. Razaghi asked you to do?
10       MR. MERRETT:  Form.
11       **THE WITNESS:  Not that I recall.**
12   BY MR. BURNS:
13   Q.  What did Christi's role become after she was
14   removed as co-CEO?
15   **A.  I don't recall what her role or title was.**
16   Q.  We will mark Exhibit 79.  It will be tab 508 in
17   the chat.
18   **A.  Are you wanting me to go somewhere and look at**
19   **something?**
20   Q.  Please open Exhibit 79.  In the Zoom chat it
21   starts with the number 508.
22   **A.  At the bottom does it say 882 on the first page?**
23   Q.  We are on the same page.  Looking at Exhibit 79,
24   Bates number ending in 882, what is this document?
25   **A.  It appears to be a letter from Ahmad to Christi.**

Page 77

1    Q.  Is that your email in the "cc" line?
2    **A.  Yes.**
3    Q.  Did you receive this email?
4    **A.  It appears that I did, yes.  I'm cc'd on it.**
5    Q.  Would you ignore an email from Mr. Razaghi?
6    **A.  No.**
7    Q.  Okay.  Two sentences, but I'm looking at the
8    second sentence that says:  You are now assigned to Navajo
9    Sage as one of its management consultants reporting to
10   Todd.  Right?
11   **A.  To Tadd, yes.**
12   Q.  Tadd.  My apologies.  That's on me.
13       Is that your understanding of Christi's new
14   role after you became co-CEO?
15   **A.  I don't recall.**
16   Q.  I mean, you basically turned into Christi as
17   co-CEO, right?  You replaced her?
18   **A.  Yes.**
19   Q.  And she was dropped down into the position that
20   you previously held before you became executive vice
21   president, right?
22   **A.  According to this email, yes.**
23   Q.  Do you have any reason to doubt that that's what
24   happened?
25   **A.  I do not.**

Page 78

1        MR. BURNS:  I think it's a good time to
2  pause for lunch.  Let's try to be back at -- we will go
3  off the record.
4        THE VIDEOGRAPHER:  We are going off the
5  record.  The time is 12:08 p.m.
6        (Lunch taken 1:08 p.m. - 2:08 p.m.
7        Mountain Daylight Time)
8        THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 1:08 p.m.
10  BY MR. BURNS:
11    Q.  We are back on the record.  I'm going to mark
12  Exhibit 80 to the deposition.  It's loaded in the chat
13  screen.  It's tab 501.  Let me know when you have it up,
14  Mr. Greenfield.
15    A.  Brad, could I say something first, please,
16  related to your last line of questioning?
17        MR. MERRETT:  There is not a question
18  pending, Tadd, so --
19        THE WITNESS:  Could I make a statement?  Is
20  that okay?
21  BY MR. BURNS:
22    Q.  What would you like to tell me about your
23  previous testimony?
24    A.  I would like to tell you, just to be clear, I had
25  no role or influence in reassigning Christi or firing her,

Page 79

1  and so I mean those weren't my decisions and I didn't have
2  -- I wasn't part of the decision-making process for that.
3        But I also know that there was no nefarious
4  intent behind that.  I think Ahmad did it because he
5  thought I could do a better job given my experience.
6  That's it.
7    Q.  Whose decision was it?
8    A.  It was Ahmad's.
9    Q.  Okay.  That's Mr. Razaghi?
10    A.  Yes.
11    Q.  You said there was no nefarious intent.  Earlier
12  you struggled to remember conversations with Mr. Razaghi
13  about why, so how exactly do you know Mr. Razaghi's
14  intent?
15    A.  That's why I said I believe that he felt I was
16  the better candidate, I could do a better job.  That's why
17  I said that I believe that.  I'm not speaking for him but
18  I believe that's what his intent was.
19    Q.  You are just surmising --
20    A.  Better qualified.  I mean, look at our two
21  resumés.  You could see why he would believe that.
22    Q.  But you are just surmising or guessing, because
23  earlier you told us you didn't know, correct?
24    A.  Yes.  That's exactly what I'm doing.  But to be
25  clear, I wasn't a part of the decision to reassign her or

Page 80

1  to terminate her.
2    Q.  We are looking at Exhibit 80 which at the bottom
3  right the Bates number ends in 416.  Do you see that, sir?
4    A.  Yes.
5    Q.  This is an organizational chart, correct, at the
6  time you became co-CEO?
7    A.  Yes.  It shows that I'm co-CEO.
8    Q.  This is your division you were put in charge of,
9  right?
10    A.  Say that again?  I'm sorry.  I am having a little
11  bit of trouble.  Can you turn your volume up just a little
12  bit, please?
13    Q.  We will work with you on any kind of Zoom
14  concerns.  Thank you for pointing it out.  On my end I
15  can't make the microphone more sensitive.  Maybe you can
16  turn up the volume a little bit on your end.  I pulled the
17  camera a little bit closer.  Maybe that will help.
18    A.  Okay, I think so.
19    Q.  So I'm looking at this organizational chart,
20  though.  This accurately reflects the organization that
21  you took over in late July 2018, right?
22    A.  Yes.
23    Q.  We will mark Exhibit 80.  It's in the chat.  It's
24  tab 525 -- sorry.  Exhibit 81 is tab 525 and it's in the
25  chat.

Page 81

1        The button is in the bottom in the middle of
2  the page of the Zoom screen.
3    A.  It's just that the screen is real small on the
4  right-hand side.  Here, let me do that.
5        There we go.  Okay.  525?
6    Q.  Tab 525 is Exhibit 81 to your deposition and the
7  first page has a Bates number ending in 4963.
8    A.  Okay.  I'm there.
9    Q.  All right.  You are not on this email so I won't
10  ask you about it.  I want to look at the attachment, Bates
11  page ending in 4964.  It's the second page of Exhibit 81.
12    A.  Okay.
13    Q.  This Statement of Assignment, what were these
14  used for?
15    A.  What was I what for?
16    Q.  This document is entitled Statement of
17  Assignment.  What were these documents used for?
18    A.  I don't -- I don't know.
19    Q.  Did you ever see a document like this when you
20  were COO of Razaghi Healthcare?
21    A.  No.
22    Q.  Did you ever see a document like this when you
23  were co-CEO of Sage Memorial Hospital?
24    A.  Not that I recall.
25    Q.  Who would have made documents like this within



Page 82

1  Razaghi Healthcare?
2           MR. MERRETT:  Foundation.
3           THE WITNESS:  Could you say that again?
4  BY MR. BURNS:
5    Q.  Who would have made documents like the Statement
6  of Assignment within Razaghi Healthcare?
7           MR. MERRETT:  Same objection.
8           THE WITNESS:  The company.  Specifically I
9  don't know who made this document.
10 BY MR. BURNS:
11   Q.  Okay.
12   A.  I know I didn't.
13   Q.  I just -- I guess I want to confirm a few things
14 are accurate.  July 24, 2018, approximately right for your
15 start date in the administrator/co-CEO role?
16   A.  I can't be certain on the date exactly.
17   Q.  Any reason to think that's wrong?
18   A.  No.  There is no reason for me to think this is
19 inaccurate or wrong.
20   Q.  There's an end date on here of December 31, 2018.
21 I know we talked about temporariness earlier.
22        Was there a specific end date that was in
23 mind when you started?
24   A.  No.
25   Q.  Okay.  The title, does it have your title right?

Page 83

1    A.  I don't see where it says.
2    Q.  Position title.
3    A.  Oh.  Yes.
4    Q.  Administrator/co-CEO, that's correct?
5    A.  Yes.
6    Q.  The last kind of row says Reports To Chief
7  Executive Officer Ahmad Razaghi.  Do you see that there?
8    A.  Yes.
9    Q.  That's correct, that was who you reported to?
10   A.  Yes.
11   Q.  Let's go back to your replacing Christi.  How did
12 that transition go?
13   A.  It was difficult.
14   Q.  Why?
15   A.  Speaking to someone about a change in their job
16 or a termination from their job is a terrible thing to do.
17   Q.  Did you meet with Christi around the time you
18 took over?
19   A.  I met with Christi.  I don't know the date that I
20 met with her.
21   Q.  How did that meeting go?
22   A.  It was difficult.
23   Q.  Why was it difficult?
24   A.  Because it's hard to change people's jobs.  It's
25 hard to let people go.  It's hard to reassign them.  You

Page 84

1  have to think about, you know, even in the worst of
2  circumstances, and I'm not saying this is the worst of
3  circumstances, but even in the worst of circumstances it's
4  just very hard to do and you don't take these things
5  lightly.  This is a human being I'm talking about.
6    Q.  Was Christi upset that she was being demoted,
7  fired, whatever?
8    A.  Of course she was.
9    Q.  What complaints did she have about the situation?
10   A.  I don't recall specifically.
11   Q.  Did she complain about the process by which she
12 was terminated?
13   A.  I don't recall.
14   Q.  Did she complain about Navajo preferences?
15   A.  I don't understand what that means.
16   Q.  Do you have an understanding of what Navajo
17 preference is in employment in tribal organizations?
18   A.  Oh.  I don't recall.
19   Q.  Do you have an understanding of what Navajo
20 preference is in tribal organizations?
21   A.  At a high level, yeah.
22   Q.  Did Christi bring that up in your transition
23 meeting with her?
24   A.  I don't recall.
25   Q.  Did she talk about Mr. Razaghi in your transition

Page 85

1  meeting with her?
2    A.  I don't recall.
3    Q.  Was she upset at Mr. Razaghi for making this
4  decision?
5    A.  She was very upset about the whole situation.
6    Q.  But specifically regarding Mr. Razaghi?
7    A.  Yes.
8    Q.  What about Mr. Razaghi was she upset about?
9    A.  I don't recall.
10   Q.  Not a single thing?
11   A.  I don't recall, no.
12   Q.  Was Christi's interaction with the board of
13 directors discussed at this meeting?
14   A.  I don't recall.
15   Q.  Okay.  We will mark Exhibit 82.  This will be tab
16 530.  Let me know when you have Exhibit 82 up.  The Bates
17 number ends in 455 in the bottom right.
18   A.  I have it up.
19   Q.  This document is entitled Meeting with Christi,
20 Tadd, Cheryl and Netrisha.  Do you see that?
21   A.  Yes, I do.
22   Q.  Where is the CEO's office?
23   A.  This would have been -- I believe that this would
24 have been at Sage, at the hospital at Sage, I believe.
25   Q.  Is there a CEO --



Page 86

1    A.   I can't be certain.
2        There is a CEO office there, yes.
3    Q.   The transition meeting you had with Christi, how
4  many did you have?
5    A.   How many meetings?
6    Q.   Yeah.
7    A.   I can't recall.
8    Q.   Is this July 23, 2018, timeline consistent of
9  when you believe you met with Christi to transition?
10   A.   It appears to be.  I have no reason to believe
11 this is inaccurate.
12   Q.   These notes, do you know who took them?
13   A.   Cheryl Bailey took those.
14   Q.   Did you review them after Cheryl Bailey took
15 them?
16   A.   I can't recall.
17   Q.   I'm going to -- it seems to have an account of
18 comments, and so I'm going just going to ask you to review
19 it and then we will talk about it, so just take a second
20 and read it.  It is just one page, fortunately.
21   A.   Sure.
22   Q.   Before you review it, did you review this
23 document in preparation for your testimony here today?
24   A.   I don't recall.
25   Q.   Okay.  I'm sorry I interrupted your review.

Page 87

1    A.   Okay.  I have read the entire document.
2    Q.   Okay.  Christi was fairly critical of you during
3  this meeting, wasn't she?
4    A.   There are some negative references towards me in
5  the document, yes.
6    Q.   I'm asking if this document helped refresh your
7  recollection.  Is there anything in this document that you
8  think is inaccurate?
9    A.   I have no reason to believe that it is
10 inaccurate.
11   Q.   Okay.  I mean, Christi did say to you that she
12 has been doing this a lot longer than you have, right?
13   A.   It appears -- it says so in the document, yes.
14   Q.   I'm not asking what the document says.  I'm
15 asking if she said that to you.
16   A.   I don't recall her saying that.
17   Q.   She was critical of the decision to replace her
18 with you, right?
19   A.   According to the document, I would say yes.
20   Q.   I'm not asking what the document says.  I'm
21 asking what the conversation was.
22   A.   I don't recall the specifics of the conversation
23 but it's very clear that she was in the document, the
24 notes that were taken.
25   Q.   You see, I'm talking about the criticalness of

Page 88

1  you.  You recall her being critical of you personally,
2  right?
3    A.   Well, here's the thing.  So, have you ever fired
4  anybody?
5    Q.   Yes.
6    A.   I have fired lots of people and they are always
7  critical of the person firing them.  So could I assume
8  that she was critical like everybody else who is getting
9  reassigned or fired?  The answer would be absolutely
10 100 percent yes.
11   Q.   How many people did you fire at Razaghi
12 Healthcare?
13   A.   Um.  Just one.  Christi.  At Ahmad's request.
14   Q.   So --
15   A.   I have fired many, many people.
16   Q.   So do you think that your firing of one person at
17 Razaghi Healthcare is going to blend together with others
18 at Razaghi Healthcare?
19   A.   I do, because everybody reacts the same way.  So
20 yes, I do believe so.
21   Q.   How did Christi react to you personally when you
22 had this meeting with her?
23   A.   She was upset.  That was totally understandable.
24   Q.   She criticized you personally, right?
25   A.   That's not -- when you are terminating someone,

Page 89

1  you are the focus of their anger so that's not unusual.
2    Q.   And that happened here, right?
3    A.   It is documented that she was critical of me in
4  this paper.
5    Q.   You have no recollection of whether or not she
6  was critical of you?
7    A.   That's why we take notes and that's why we codify
8  things so we don't have to rely on our memories so we can
9  look at the documents and make a definitive statement one
10 way or the other.
11   Q.   I'm not asking why somebody thinks this.  I'm
12 asking you, do you recollect or not that Christi was
13 critical of you?
14   A.   I do recollect that she was angry at the meeting.
15   Q.   About you specifically, right?
16   A.   About many things.  If you look at the document.
17   Q.   I'm asking about you specifically, sir.
18   A.   I don't recall this meeting.  That's why we took
19 notes for the meeting, which is standard operating
20 procedure any time you are making a change.
21   Q.   And does looking at these notes refresh your
22 recollection about Christi's criticism of you?
23   A.   She was -- according to this document, she was
24 critical of me, yes.
25   Q.   I'm asking a specific question.



Page 90

1    A.  And I'm giving you a specific answer.  I don't
2  recall.
3    Q.  I'm asking -- it's a yes-or-no question.  Does
4  looking at this document refresh your recollection about
5  whether or not Christi was critical of you?
6    A.  No.  But it validates that she was, if you will
7  just look at the notes.
8    Q.  If you look towards the middle of the page, they
9  are not numbered, but there's a three-ring binder hole in
10  the middle of the page, and then if you go right from
11  there the second bullet point down from that starts with
12  the word "board."  Do you see that there?
13    A.  I see that, yes.
14    Q.  She brought up that Mr. Razaghi was angry about
15  her communicating with the board, right?
16        MR. MERRETT:  Form, foundation.
17        THE WITNESS:  She says specifically -- the
18  note says:  "Email to staff and the board hasn't met yet.
19  Do they not deserve that respect?  Why is he doing this?
20  Not reasonable.  Doing for him."
21        So I don't understand the question based on
22  that bullet point what you are asking me.  If you could
23  restate it in a different way, I will do my best to answer
24  it.
25

Page 91

1  BY MR. BURNS:
2    Q.  Christi brought up her communications with the
3  board of directors during this meeting, correct?
4    A.  I don't recall.  I believe what she is saying
5  here is that Ahmad hadn't even let the board know that she
6  was being terminated.  But I'm just making an assumption
7  there.  From this note it would lead me to believe that.
8    Q.  But you don't remember one way or the other?
9    A.  No.  But I think it's pretty clear from that
10  bullet point that that's exactly what she was saying.
11    Q.  If you look -- after all the bullet points,
12  there's a sentence that is just sort of the first textual
13  sentence after the bullet point:  "Behavior was erratic,
14  very upset, angry.  Trying get Tadd to say things against
15  Ahmad.  He did not."
16        Do you see that there?
17    A.  Yes.
18    Q.  Is that accurate?  Is that what happened during
19  the conversation?
20    A.  I can validate that she was angry and upset.
21    Q.  Was she trying to get you to say things against
22  Mr. Razaghi?
23    A.  I don't recall.
24    Q.  What do you do with Christi, you know, in the
25  time after this meeting?

Page 92

1    A.  Well, according to this note I told her to have a
2  transition plan ready this afternoon and she was to work
3  from home from this point going forward.
4    Q.  Did that -- did you instruct her to do that?
5    A.  According to this note, I did.  I don't recall
6  saying that.
7    Q.  Okay.  Let's talk about independent of this
8  document.  What did you do with Christi?
9    A.  I don't recall this conversation and I don't
10  recall what I told her.  But according to the notes that
11  were taken by somebody that was in there taking notes, she
12  was asked to have a transition plan ready and to work from
13  home.
14    Q.  Did she do that?
15    A.  As far as I know she did.  But I can't say for
16  sure.
17    Q.  You are the new co-CEO at this point, right?
18    A.  Yes.
19    Q.  And you have this angry ex-CEO just hanging
20  around, right?
21    A.  She wasn't at the hospital after this point.
22    Q.  But she's free to talk to people at the hospital,
23  right?
24        MR. MERRETT:  Form and foundation.
25        THE WITNESS:  When -- we couldn't -- I

Page 93

1  couldn't keep her from talking to other people, no.
2  BY MR. BURNS:
3    Q.  Why couldn't you?
4    A.  Well, because you can't falsely imprison people.
5  You can't kidnap them.  People are free to say what they
6  want to say.
7    Q.  Did you instruct her to not talk to people?
8    A.  I don't recall.
9    Q.  If she was instructed, whose decision would that
10  have been?
11        MR. MERRETT:  Form and foundation.
12        Guess if you can.
13        THE WITNESS:  You cannot keep people from
14  communicating with other people.  It is impossible.
15  BY MR. BURNS:
16    Q.  You can instruct them --
17    A.  Did somebody else tell her to not talk to anyone?
18  There's no way for me to answer that question.  I don't
19  know.
20    Q.  You don't recall whether or not you instructed
21  her to stop talking to people at the hospital.  Is that
22  correct?
23    A.  I don't recall.
24    Q.  You might have done that, right?
25    A.  I would -- I have never done that before in my



Page 94

1  history of terminating people and things, and you don't
2  say those types of things because there are phones and
3  texting and all these other things.
4         It is impossible to do so. It is a waste of
5  your time to say something like that. So no, I don't
6  recall saying something like that.
7     Q.  We will mark Exhibit 83. Exhibit 83 will be tab
8  531.
9     A.  Okay, I have it.
10    Q.  Let's look at the second page of 531.
11        MR. MERRETT:  I don't yet. Just one second.
12        MR. BURNS:  Andre, do you have it?
13        MR. MERRETT:  I do now.
14 BY MR. BURNS:
15    Q.  Mr. Greenfield, do you have tab 531?
16    A.  I do.
17    Q.  Let's look at the second page, Bates number
18 ending in 465. Do you see that there?
19    A.  Yes.
20    Q.  Is that your signature there in the middle of the
21 page?
22    A.  Yes, it is.
23    Q.  Looking at the first page, I see a document dated
24 August 2, 2018, to Christi from Tadd Greenfield. Do you
25 see that there?

Page 95

1     A.  Yes.
2         MR. MERRETT:  Did you say 7-20?
3         MR. BURNS:  August 2, 2018, is the date on
4  the document.
5  BY MR. BURNS:
6     Q.  Did you send this communication?
7     A.  I don't -- I'm reading it. I don't recall how it
8  was delivered to Christi.
9     Q.  Sure. But you signed it, right?
10    A.  Yes.
11    Q.  And you understand that Christi signed it with
12 the words "in protest," right?
13    A.  Uh-huh.
14    Q.  So this is a communication you authored, right?
15    A.  That what?
16    Q.  That you authored, right?
17    A.  I would say it's a communication that I delivered
18 to Christi.
19    Q.  Who authored it?
20    A.  I don't recall authoring it.
21    Q.  Who authored it?
22    A.  I can't say for sure. Someone in the company.
23    Q.  Did Mr. Razaghi author this?
24    A.  Can I have a moment to read through it?
25    Q.  Sure.

Page 96

1     A.  Okay.
2     Q.  Who authored this?
3     A.  I didn't author this.
4     Q.  Who did?
5     A.  I can't be sure. Someone in the company. The
6  company did.
7     Q.  Okay. You wouldn't sign something you disagreed
8  with, correct?
9     A.  Oh, disagreed with?
10    Q.  You wouldn't write something and sign it if it
11 was false, right?
12    A.  I would never do that.
13        But also we sign things as executives in
14 health care all the time that are authored by other people
15 that we assume that they are relevant and accurate. Like
16 audits. I do it multiple times a year. Multiple times a
17 month.
18    Q.  This communication says it's from you. So you
19 wouldn't sign a communication from you that contained
20 false statements, right?
21    A.  I would never make a false statement.
22    Q.  Okay. So let's look at the first sentence.
23 "Effective immediately you shall be on paid administrative
24 leave pending an investigation by a neutral investigator."
25 Do you see that there?

Page 97

1     A.  Yes.
2     Q.  Moving to the second paragraph: "The
3  investigation will consider whether you have violated any
4  fiduciary, contractual, or other duty to your employer,
5  Razaghi Development Company."
6         Do you see that there?
7     A.  Yes.
8     Q.  "Including but not limited to duties of loyalty,
9  honesty, confidentiality, candor and care."
10        Do you see that there?
11    A.  Yep.
12    Q.  Did Christi owe those duties to Razaghi
13 Healthcare?
14        MR. MERRETT:  Foundation.
15        THE WITNESS:  Could you say that in another
16 way, please?
17 BY MR. BURNS:
18    Q.  Did Christi owe those duties to Razaghi
19 Healthcare?
20        MR. MERRETT:  Foundation.
21        THE WITNESS:  I'm not sure I understand the
22 question.
23 BY MR. BURNS:
24    Q.  Did Christi -- you listed several duties in this
25 document, right?



Page 98

1    A.  Yes.
2         MR. MERRETT:  Object to form.
3  BY MR. BURNS:
4    Q.  Did Christi owe those duties that you listed to
5  Razaghi Healthcare?
6         MR. MERRETT:  Same objection.  Foundation.
7         THE WITNESS:  Are you asking me to speculate
8  on these or provide an opinion?
9  BY MR. BURNS:
10   Q.  No.  Why are these duties listed in your letter?
11  Are they irrelevant to Christi's duties to Razaghi
12  Healthcare?
13        MR. MERRETT:  Form.
14        THE WITNESS:  I believe they are relevant to
15  every working relationship in any context or any job.
16  BY MR. BURNS:
17   Q.  So help me understand.  Every job the employee
18  owes these -- loyalty, honesty, confidentiality, candor
19  and care -- to their employer, right?
20   A.  Yes.
21   Q.  And so as a result, because everyone owes that to
22  all their employers, Christi owed it to Razaghi
23  Healthcare, right?
24   A.  Yes.
25   Q.  And she owed the same duties to Sage Memorial

Page 99

1  Hospital, didn't she?
2         MR. MERRETT:  Foundation.
3         THE WITNESS:  Yes, I believe so.  I don't
4  see how you can have a good working relationship and
5  actually function without loyalty and -- I don't even know
6  why this is a question.  Yes.  Loyalty, honesty are
7  unbelievably important in a work environment.
8         And those -- those things aren't mutually
9  exclusive to either side.  Yes, we owe each other that
10  always.
11  BY MR. BURNS:
12   Q.  Okay.  And that applies to you, too, right?  You
13  owed those duties to Razaghi Healthcare?
14   A.  Yes.
15   Q.  And you owed those duties to Sage Memorial
16  Hospital?
17   A.  Yes.
18   Q.  I'm moving to the middle of Paragraph 2.  It's
19  sort of after the definition of Navajo Sage in the middle.
20  The next sentence starts "as you know."  Just tell me when
21  your eyes are there.  I'll read it.
22   A.  I'm there.
23   Q.  "As you know, RDC and its predecessors assumed
24  management functions at Navajo Sage when the then CEO had
25  prepared a close-out plan for the board of director's

Page 100

1  consideration, and when the purchase of postage stamps was
2  a matter of board concern."
3         What does that mean?
4         MR. MERRETT:  Foundation.
5         THE WITNESS:  I can speculate to what that
6  means.
7  BY MR. BURNS:
8    Q.  It's a document that purports to be from you with
9  your signature on it.  I am asking you if you have any
10  idea what it means.
11   A.  I did tell you I didn't author this document.
12   Q.  Right.  But who -- you weren't there when there
13  was a former CEO, right?
14   A.  The point that is being made there is that it was
15  managed so poorly in the past you couldn't even buy
16  postage stamps and now things are a lot better.
17   Q.  You couldn't buy postage stamps without the board
18  of directors' approval, right?
19   A.  No.  No.  No.  It was a matter of -- any
20  expenditure was a matter of board concern.  That's what it
21  says.  And that means because there was no money to do
22  that.
23        I have been in situations where you had --
24  if you were buying paper, you had to come and ask me
25  before because money was so tight.

Page 101

1    Q.  Okay.  Looking at the last sentence of
2  Paragraph 2, "RDC cannot allow that progress to be
3  reversed or stymied by dissension or by RDC employees who
4  may have ulterior plans."
5         What dissension is that referring to?
6         MR. MERRETT:  Foundation.
7         THE WITNESS:  I don't know.
8  BY MR. BURNS:
9    Q.  What ulterior plans does that refer to?
10        MR. MERRETT:  Same objection.
11        THE WITNESS:  I have no idea.
12  BY MR. BURNS:
13   Q.  Looking at the third paragraph.  "The following
14  conditions shall apply to your paid administrative leave.
15  You shall not enter any building or other facility of
16  Navajo Sage subject to the RDC management agreement unless
17  authorized and accompanied by me or unless you require
18  medical help."
19        Do you see that there?
20   A.  Yes.
21   Q.  That's an instruction you gave her, right?
22   A.  It's an instruction in this letter, yes.
23   Q.  "You must maintain confidentiality of all of
24  RDC's and Navajo-Sage's proprietary information and
25  documents, including contracts."



Page 102

1        Do you see that sentence there?
2   A.   Yeah.
3   Q.   What contracts are being referred to?
4        MR. MERRETT:  Foundation.
5        THE WITNESS:  I don't know.
6   BY MR. BURNS:
7   Q.   You knew that Christi was talking about Razaghi
8   Healthcare not operating properly under contracts, right?
9        MR. MERRETT:  Form.
10       THE WITNESS:  Could you restate that in
11  another way, please?
12  BY MR. BURNS:
13  Q.   You knew that Christi was making allegations
14  against Razaghi Healthcare, correct?
15  A.   What do you mean by I knew or I know?
16  Q.   At the time this letter was written, you knew
17  that Christi was making allegations against Razaghi
18  Healthcare, correct?
19  A.   I knew that she was saying inappropriate things
20  about Razaghi Healthcare.
21  Q.   To who?
22  A.   The specific statement she was making I didn't
23  know.
24  Q.   To who was she making inappropriate statements?
25  A.   All I know is she was making inappropriate

Page 103

1   statements.
2   Q.   But to who?
3   A.   I don't know.
4   Q.   How did you come to learn that she was making
5   inappropriate statements?
6   A.   Through -- I guess through our discussions at
7   corporate.
8   Q.   So who's "our" in our discussions?
9   A.   Through discussions with Ahmad.
10  Q.   That's Mr. Razaghi, right?
11  A.   That's Mr. Razaghi, yes.
12  Q.   So it's Mr. Razaghi that informed you that
13  Christi was making inappropriate statements about Razaghi
14  Healthcare, right?
15  A.   Yes.
16  Q.   And did he give you the details of the
17  inappropriate statements?
18  A.   No.
19  Q.   So you didn't actually know whether the
20  statements were inappropriate or not, right?
21  A.   I had no reason to believe they would not be.
22  Again, we rely -- lots is gathered -- information is
23  gathered when you work in organizations like this and
24  every other one I have been in and you rely on what people
25  tell you.  So yes.

Page 104

1   Q.   And you relied on Mr. Razaghi for this one,
2   right?
3   A.   Yes.
4   Q.   Okay.  Moving to the next sentence.  "You shall
5   avoid any communications involving the business of either
6   Navajo Sage or RDC or its officials and employees with
7   Navajo Sage staff and its board members unless authorized
8   by me for particular purposes to further the mission of
9   Navajo Sage."
10       Do you see that next clause?
11  A.   Yes.
12  Q.   You instructed her to not talk to the board of
13  directors of Navajo Sage, didn't you?
14       MR. MERRETT:  Form and foundation.
15       THE WITNESS:  This letter instructs her not
16  to do that.  Any time you fire anyone anywhere -- I mean I
17  know you are trying to make some grandiose point about
18  this, but the fact of the matter is when you fire someone,
19  when somebody gets let go from their position, you would
20  ask them to do things like this.
21       This is not -- this is not some unusual
22  situation.  A lot of organizations won't let you even back
23  in the hospital because they became a safety risk and they
24  could potentially do some harm to an individual in their
25  anger and confusion.  So --

Page 105

1   BY MR. BURNS:
2   Q.   We established earlier that you -- this was the
3   first job you had for a management company for running a
4   hospital, right?
5   A.   Yes.
6   Q.   So what is normal --
7   A.   But pardon me.  But I was running the hospital,
8   not the management company.  That was my job.  I ran the
9   hospital.  I knew the operational stuff.  I take care of
10  those things.
11       So I mean -- so no, it is the first
12  management company I have worked for but it's not the
13  first hospital I have managed in.  So --
14  Q.   But we are talking about -- you are talking about
15  muzzling someone who is talking to the board of directors,
16  right?
17  A.   No.  You are talking about a disenfranchised
18  employee who is very, very angry.  And people in general
19  are willing to say and do lots of things in order to hurt
20  the people that they perceived hurt them.  It's nothing
21  more than that.
22  Q.   And --
23  A.   I know you want it to be but it's not.
24  Q.   But Razaghi Healthcare felt like it needed to
25  prevent her from talking to the board of directors?



Page 106

1    A.  Every organization would want to do the same.
2           MR. MERRETT:  Foundation.
3           Just take a beat, Tadd, please.
4   BY MR. BURNS:
5    Q.  Mr. Razaghi was concerned about what Christi was
6   saying to the board of directors, wasn't he?
7           MR. MERRETT:  Foundation.
8           THE WITNESS:  I have no idea what he was
9   thinking.
10  BY MR. BURNS:
11   Q.  Did you ask the board of directors if they wanted
12  to talk to Christi?
13   A.  I went to two board of directors' meetings as the
14  CEO, I believe it was two, and they would not engage with
15  me nor would they allow me to talk.
16   Q.  You know how to email the board of directors,
17  don't you?
18   A.  Of course.
19   Q.  Did you tell the board of directors that you had
20  instructed Christi to not talk to them?
21   A.  That would not be my role to do that.
22   Q.  Whose role would it have been?
23   A.  That would have been Ahmad's.  That's
24  Mr. Razaghi.
25   Q.  You can call him Ahmad.  I just have to clarify

Page 107

1   for the record.
2           MR. MERRETT:  Just to make sure, we are not
3   referring to the other Ahmad?
4           MR. BURNS:  We want to be absolutely clear
5   in circumstances like this, Andre.  I think you understand
6   why.
7           THE WITNESS:  I will say Mr. Razaghi going
8   forward.
9   BY MR. BURNS:
10   Q.  You can call him whatever.
11          This investigation that's launched -- there
12  is an investigation launched after this letter is sent,
13  isn't it?
14   A.  I can't recall what we did post this termination
15  letter.  I'm assuming but I can't recall.
16   Q.  The plan is to have this investigation take a
17  little while while Mr. Razaghi terminates the Razaghi
18  Healthcare contract with Sage, right?
19          MR. MERRETT:  Form and foundation.
20          THE WITNESS:  No.
21  BY MR. BURNS:
22   Q.  That's not the plan?
23   A.  The plan was never to terminate the relationship
24  with Sage.
25   Q.  You are sure about that?

Page 108

1    A.  I'm sure about that.
2    Q.  Did you know that on the same day you signed this
3   letter, August 2, 2018, Mr. Razaghi sent a notice of
4   breach to Sage threatening to terminate the contract?
5           MR. MERRETT:  Form.
6           THE WITNESS:  I'm going to tell you what I
7   know and what I can say.  The plan -- I wish we were still
8   there managing the hospital and maybe a couple others.
9           There was no plan to terminate the contract
10  with Sage from my perspective from what I know.
11          MR. BURNS:  Okay.
12          THE WITNESS:  -- liked working there.  As a
13  CEO I was onsite there several days a week, Tuesday
14  through Thursday.  I took those staff members on site
15  visits to another hospital.
16          We were working really hard to make sure the
17  finance department was good.  I'd hired a bunch of other
18  people in just to help manage things and to help get
19  things straightened out.
20          We were looking at their pump house, how we
21  could shore that up, because it served water for the
22  entire community.
23          I was there for all of that stuff.  We were
24  trying to open their OR and get their operating room going
25  so they could do procedures there.

Page 109

1           I mean we were all dreaming about a brand
2   new hospital that we could build.  That's why I was there.
3   None of this stuff that you are talking about.  I mean --
4   BY MR. BURNS:
5    Q.  I think we can agree that your work and
6   Mr. Razaghi's plans are different things, right?
7           MR. MERRETT:  Foundation.
8           THE WITNESS:  Yeah, I know he was concerned.
9   He wanted things to run well; we all did.  And I'm saying
10  that not as conjecture because if I didn't feel he was in
11  it for the right reason, I wouldn't have went to work
12  there.  I have a great resumé.  I can go work anywhere.
13          So I just -- I want to make it clear we
14  loved those people down there.  If you ask the managers,
15  the management team, about me that work there and ask them
16  if we cared about them and we really tried do a good job,
17  they would tell you yes.  Without a doubt.
18  BY MR. BURNS:
19   Q.  Let me get back to the question.  Did you know
20  that on the same date as Exhibit 83, August 2, 2018, on
21  that same date Mr. Razaghi sent a notice of breach to Sage
22  Memorial Hospital?  Did you know that?
23   A.  No.
24          MR. MERRETT:  Form.
25



Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 62 of 130

Navajo Health Foundation vs                                                    Tadd Greenfield
Razaghi Development Company, LLC.

Page 110

1  BY MR. BURNS:
2     Q.  Did you just find that out today?
3     A.  Yes.  I mean I did not know that this was sent
4  the same day, no.
5     Q.  You knew a notice of breach was sent, right?
6     A.  At a certain point in time, yes.  But I wasn't
7  involved in that.  I don't author stuff like that and I
8  don't -- it's not my decision to do things like that.
9     Q.  We will look at Exhibit 55.  It's already been
10  marked in other depositions.  I dropped it into the chat.
11     A.  Is this the one that says 4484?
12     Q.  Yeah.  It's -- actually I clicked on the wrong
13  thing so hold one on second.  I have to reorganize the
14  numbers.  I was a couple off with them.  I'll have to come
15  back to that.  We will come back to it after the break.
16         We have been talking about the plan.  You
17  knew that Mr. Razaghi wanted to leave Sage behind and go
18  work with other non-profits in the Navajo Nation, right?
19         MR. MERRETT:  Form and foundation.
20         THE WITNESS:  I can tell you that's not
21  true.  We wanted to stay at Sage and we wanted to expand
22  enterprise to other -- to others to have the opportunity
23  to have better health care.  So our plan was never to
24  leave Sage.  Why would we do that?
25

Page 111

1  BY MR. BURNS:
2     Q.  There was a meeting in late July -- what's a team
3  huddle?
4     A.  I'm sorry, what's that?
5     Q.  Was there a term called a team huddle that
6  existed within Razaghi Healthcare?
7     A.  It exists in my hospital now.  We huddle all the
8  time.  We do a safety huddle in the mornings.  That's a
9  totally legitimate health care thing.
10     Q.  And at Razaghi Healthcare the executive team
11  huddled sometimes, too, right?
12     A.  Yeah, of course.
13     Q.  And in late July there was an executive team
14  huddle about ditching Sage and just going and working with
15  non-profits without Sage, right?
16     A.  No.  That is not right.
17     Q.  We will mark Exhibit 84 as tab 510.  I'm looking
18  at Exhibit 84, tab 510, Bates number ending in 430.  Do
19  you see that, sir?
20     A.  Yes.
21     Q.  I'm looking at a July 31, 2018 email 2:35 p.m.
22  In the "to" line, the second email, is that your email?
23     A.  It looks like Ahmad, Ira, Ahmad, and then -- is
24  there another page?
25     Q.  No.  We are looking at --

Page 112

1     A.  I wasn't included on the emails.
2     Q.  Sure.  But that's your email, correct?
3     A.  The very first one?
4     Q.  There is an email
5  tadd.greenfield@razaghihealthcare.com.  That was your
6  email at the time, right?
7     A.  Yes.  That's my email address, yes.  I'm sorry.
8     Q.  So you received this e-mail, didn't you?
9     A.  Yes.
10     Q.  You ended up attending this July 31st meeting,
11  right?
12     A.  Let me read through it.  I don't recall the
13  meeting.  Yeah, I don't recall the email but clearly I was
14  on it.
15     Q.  Let's look at the bottom email.  This is one
16  where maybe starting at the bottom helps.  It's at the
17  bottom of Page 1 and runs on to Page 2.  It's from Stenson
18  Wauneka, Monday, July 30, 2018, 9:35 p.m.
19         Do you see that there?
20     A.  Yes.
21     Q.  You knew that the board of directors was just
22  trying to hire its own attorney, right?
23     A.  I'm trying to read through this e-mail and come
24  up with some context for it.
25         MR. MERRETT:  Why don't you answer his

Page 113

1  question.  I don't think he was --
2         THE WITNESS:  No.
3         MR. MERRETT:  -- referring to the exhibit.
4         THE WITNESS:  Okay.
5         I don't recall.
6  BY MR. BURNS:
7     Q.  You knew that there was fighting going on between
8  the board of directors and Razaghi Healthcare, right?
9     A.  Fighting?
10     Q.  There was acrimony, correct?
11     A.  Disagreement?
12     Q.  Sure.  Was there disagreement?
13     A.  I think it's safe to say that there was some type
14  of disagreement.
15     Q.  And you knew that the board of directors was
16  trying to hire its own attorney of its own choice, right?
17     A.  I just can't recall.  I'm trying to read through
18  this email, but I just don't recall.  Again, I wasn't in
19  the nuts and bolts of this stuff.
20         I am trying to make sure that Sage is okay
21  because they lost their CEO and COO and we had to -- my
22  focus was to maintain operations there and making sure
23  that there were no hiccups or misses.  So I mean this
24  wasn't a focus of my -- this wasn't the focus of my work.
25     Q.  Okay.  You understood that the board of directors



Page 114

1  had disputes among the members of the board of directors,
2  right?
3        MR. MERRETT: Foundation.
4        THE WITNESS: Could you repeat that again,
5  please?
6  BY MR. BURNS:
7    Q. You knew that the board of directors had disputes
8  among members of the board of directors, right?
9        MR. MERRETT: Foundation and form.
10       THE WITNESS: I guess I -- I just don't -- I
11  just don't recall. I recall there was some acrimony, some
12  disagreement, but I don't recall specificity or reasons.
13  BY MR. BURNS:
14   Q. Okay. We move up one email from Ahmad Razaghi to
15  Tadd Greenfield and others on Monday, July 30th, at
16  11:05 p.m. Do you see that there?
17   A. Yes.
18   Q. So less than an hour and a half after Mr. Wauneka
19  sends the email, Mr. Razaghi sends it to you, right?
20   A. It looks like it, yes.
21   Q. You'd review an email like this, wouldn't you?
22   A. Probably, yes.
23   Q. You weren't in the habit of ignoring
24  Mr. Razaghi's emails, were you?
25   A. No. But I will tell you sometimes it take a week

Page 115

1  or more to get to them and read them. I don't sit by my
2  computer and wait for somebody to email me.
3        So what appears to be an hour could have
4  been a week. I'm not saying that it was. I'm just saying
5  that I don't know when I reviewed this or if I did.
6    Q. Mr. Greenfield, you are a professional, right?
7    A. Yes.
8    Q. You pride yourself in your competence and
9  diligence?
10   A. I try to, yes.
11   Q. You don't expect anybody to believe you didn't
12  read this e-mail, do you?
13   A. I said I'm sure that I did. I can't say for sure
14  when I read it. It could have been a day later. It could
15  have been two hours later. I just don't know.
16   Q. Moving up one more level, who's Ira Vandever?
17   A. I don't recall who that is.
18   Q. The email writes: "There he is -- onward and
19  upward said the boss. Let's keep going. He knows what he
20  is doing. Bravo Stenson. Bravo."
21        Do you see that there?
22   A. Yes, I do.
23   Q. Was closeness with Mr. Wauneka a thing within
24  Razaghi Healthcare?
25   A. I don't -- I don't believe so, no.

Page 116

1    Q. Was Mr. Wauneka close with Mr. Razaghi?
2        MR. MERRETT: Foundation.
3        THE WITNESS: I couldn't speculate whether
4  they are close or not.
5  BY MR. BURNS:
6    Q. You don't know one way or the other?
7    A. I don't.
8    Q. Okay. Let's go to the top level email. First of
9  all, Ira, she has a Razaghi Healthcare email. Do you see
10  that there?
11   A. Yeah, I do. I still don't know who that is,
12  though. I don't recall.
13   Q. You don't know what her role was?
14   A. I don't remember an Ira Vandever.
15   Q. Mr. Razaghi writes: Good morning. Ira, we have
16  it backwards. You shouldn't go to Sage. We should go
17  north and east. Help other 638s without Sage.
18        Do you see that there?
19   A. Yes, I do see that.
20   Q. What's a 638?
21   A. It is a -- it is a hospital that has been -- this
22  is probably the most crude definition. Again, this isn't
23  my thing.
24        But basically it's a hospital that's been
25  converted from an Indian Health Service hospital to a

Page 117

1  private not-for-profit. It still getting funding from the
2  Indian Health Service.
3    Q. It's a type of non-profit hospital, right?
4    A. Yes.
5    Q. The Navajo Nation has many of these around,
6  right?
7        MR. MERRETT: Foundation.
8        THE WITNESS: I know Sage was one.
9  BY MR. BURNS:
10   Q. And you know there's others, right?
11   A. Um. Actually no. This is the only hospital --
12   Q. What did you think that -- when Mr. Razaghi said
13  we need to go north and east and help other 638s without
14  Sage? What did you think of that?
15       MR. MERRETT: Form.
16       THE WITNESS: I think that -- you are trying
17  to say that that is us wanting to -- Razaghi Healthcare
18  wanting to abandon Sage completely?
19  BY MR. BURNS:
20   Q. I'm not saying anything.
21       What was this conversation about,
22  Mr. Greenfield?
23   A. I believe that this was about going forward with
24  other 638s without any financial support from Sage.
25   Q. And again, you didn't know until today that two

Page 118

1  days after this top email Mr. Razaghi starts notice steps
2  to terminate the contract with Sage.  You didn't know that
3  until today?
4      A.  No.  No.
5      Q.  The plan was to leave you behind working as CEO
6  at Sage, right?
7          MR. MERRETT:  Form and foundation.
8          THE WITNESS:  No.  The CEO job at Sage was
9  always meant to be temporary so we can hire someone else
10  in.
11  BY MR. BURNS:
12      Q.  We are going to talk more about it.  At some
13  point -- what did your job at Razaghi Healthcare turn into
14  after the contract with Sage was terminated?
15      A.  Just really winding things down, agreements down,
16  letting staff go, those types of functional things.  We
17  had hired a CFO.  I had to let him go.  We had a CNO,
18  Cheryl.  We had to have discussions about that.
19          We had a lot of -- you know, we had a lot of
20  resources there at Sage which, you know, we were paying
21  for, a couple accountants, a CFO.  I was dealing with all
22  of those things.
23          I was fielding a lot of calls.  People hear
24  things quickly about, you know, when bad things like
25  contract terminations are happening and they were

Page 119

1  concerned they weren't going to get paid, you know,
2  contractors that we hire in.  So that's really cleaning
3  up.
4          And then honestly, starting buffing up the
5  resumé and reaching out and focusing on finding our next
6  job.
7          I mean, I'm not wealthy so it was a big
8  concern, I bought a house and everything, that I have
9  employment as quickly as possible after this happened.
10      Q.  What about preparing to defend the $10.8 million
11  Razaghi Healthcare took on its way out?  That was part of
12  your job, right?
13          MR. MERRETT:  Form.
14          THE WITNESS:  No.
15  BY MR. BURNS:
16      Q.  You didn't discuss the preparation of the
17  defense?
18      A.  I didn't -- I didn't -- I didn't do any invoicing
19  for Sage.  I didn't make any -- help with any
20  calculations.  No, I didn't do -- I wasn't involved in any
21  of that stuff.  That was not my role.
22      Q.  You are denying things I didn't ask you about.
23  Is there a reason that your mind went where you're going?
24      A.  Yeah, because I know where you're going.
25      Q.  Why do you know --

Page 120

1      A.  What I did, I was helping to wind the company
2  down.
3      Q.  Why do you know I'm going there?
4      A.  Because I'm not an idiot.  I don't know.  Maybe.
5      Q.  These are areas of concern for you, right?
6      A.  No.  Actually no.
7      Q.  You want everyone to know you weren't involved
8  with the invoice for $10.8 million, right?
9      A.  I wasn't involved with it.
10      Q.  And you want everyone to know you weren't
11  involved with the taking of the $10.8 million, right?
12      A.  I wasn't involved with it.
13      Q.  Why do you want everyone to know that?
14      A.  Because I could see where you were going with all
15  of this.  That's why.
16      Q.  It's a matter of concern for you, right?
17      A.  And I am trying to save time -- no, I'm not
18  concerned.  You are never concerned about what you have
19  nothing to do with.
20      Q.  Did you review the deposition of Mr. Hasan?
21      A.  I did not.
22      Q.  Do you have any understanding of what Mr. Hasan
23  testified to?
24      A.  I do not.
25      Q.  Did you know that he testified that you directed

Page 121

1  the $10.8 million payment and he was following your
2  directions?
3          MR. MERRETT:  Form.
4          THE WITNESS:  Perhaps he misspoke.
5  BY MR. BURNS:
6      Q.  Did you know that?
7      A.  I did not know that.
8      Q.  You are just finding that out right now?
9      A.  Just this second.
10      Q.  Is that true?
11      A.  That's true.
12      Q.  Okay.  Did you direct Mr. Hasan to cause the
13  $10.8 million payment?
14      A.  I did not do that.
15      Q.  Did you direct Nicole Hardy to make the
16  $10.8 million payment?
17      A.  I did not do that.  I don't know who Nicole Hardy
18  is.
19      Q.  Did you regularly give Mr. Hasan directions?
20      A.  Rarely, if ever.
21      Q.  I'm jumping back to your time after Razaghi
22  Healthcare.  Let's just stay with the questions.
23          You did help prepare defense for the
24  $10.8 million payment, right?
25          MR. MERRETT:  Form, foundation.



Page 122

1        THE WITNESS: So ask the question again?
2   BY MR. BURNS:
3        Q.   You did help the company prepare the defense for
4   taking $10.8 million, right?
5        MR. MERRETT: Same objection.
6        THE WITNESS: I guess I'm going to answer it
7   in a way that -- so our -- right after that termination
8   payment our main thing was trying to really try to recover
9   and stay with Sage. It wasn't to get away from Sage.
10       The goal wasn't to take whatever amount of
11  money that was in the termination payment. The
12  calculations of all that stuff and the requests for that
13  and all that, I had nothing to do with any of that thing.
14       I'm not saying it was the wrong thing
15  either. I'm just saying I had no part in that.
16  BY MR. BURNS:
17       Q.   The question is very specific. You helped the
18  company prepare defense for taking $10.8 million after the
19  contract was terminated, correct?
20       MR. MERRETT: Foundation.
21       THE WITNESS: I think -- no. I would say
22  that I helped try to -- try to, I don't know, save the
23  contract I guess in the days after that, not get
24  $10 million, whatever it is.
25

Page 123

1   BY MR. BURNS:
2        Q.   Mr. Razaghi asked you to make an affidavit about
3   the events leading up to the contract termination, didn't
4   he?
5        A.   I did sign an affidavit. Actually --
6        Q.   I saw you signed an affidavit. Who authored it?
7        A.   Ahmad did. Mr. Razaghi.
8        Q.   Mr. Razaghi authored the affidavit you signed?
9        A.   Yes.
10       Q.   Did you review the affidavit in preparation for
11  your testimony today?
12       A.   Let me see. Yes, I did.
13       MR. BURNS: We have gone about an hour since
14  we came back. Let's take a ten-minute break. Let's come
15  back at 2:23 Phoenix time. We will go off the record.
16       THE VIDEOGRAPHER: We are going off the
17  record. The time is 2:14 p.m.
18       (Recess taken 3:14 p.m. - 3:21 p.m.
19       Mountain Daylight Time)
20       THE VIDEOGRAPHER: We are back on the
21  record. The time is 2:21 p.m.
22  BY MR. BURNS:
23       Q.   We are back on the record.
24       What -- what brought about the end of your
25  job at Razaghi Healthcare? How did that happen?

Page 124

1        A.   It was clear that that issue wasn't going to be
2   resolved and that we were -- the contract termination was
3   not going to be resolved so I left the company.
4        Q.   You -- you left. You were not terminated. Is
5   that right?
6        A.   No, I was terminated.
7        Q.   What was the reason given for your termination?
8        A.   Loss of the contract.
9        Q.   One second.
10       What's your current relationship with the
11  Razaghi Healthcare?
12       A.   Ahmad is my friend and I maintain a relationship
13  with him.
14       Q.   Do you have any business relationship with
15  Mr. Razaghi?
16       A.   A couple of years ago I signed a consulting
17  agreement with him, and we have always had the thought
18  that -- not anymore -- but that we could do some more
19  stuff on the Navajo Nation like bring up some more --
20  another 638, something like that, so. None of that's come
21  to fruition.
22       Q.   How are you compensated under the consulting
23  agreement?
24       MR. MERRETT: Form.
25       THE WITNESS: I was compensated just the one

Page 125

1   time, I don't know the exact date, over a year ago. I was
2   given a lump sum payment. Just once.
3   BY MR. BURNS:
4        Q.   How much?
5        A.   Pardon me?
6        Q.   How much?
7        A.   $10,000.
8        Q.   That was about a year ago?
9        A.   It was more than a year ago.
10       Q.   It was while this lawsuit was pending, right?
11       A.   Yes.
12       Q.   Any other business involvement with Mr. Razaghi?
13       A.   No.
14       Q.   Do you know what indemnification is?
15       A.   Why don't you explain it to me. I'd appreciate
16  that.
17       Q.   Has anyone agreed to pay your legal bills for
18  you?
19       A.   No.
20       Q.   Not even as a part of that consulting agreement
21  you talked about?
22       A.   I'm sorry?
23       Q.   Not even as a part of that consulting agreement
24  you talked about?
25       A.   No.

1    Q.   Has anyone offered to pay any judgments that are
2  rendered against you?
3    A.  No.
4    Q.   Has anyone agreed to defend you if a lawsuit ends
5  up involving you?
6    A.  No.
7    Q.   When you became co-CEO you were aware that
8  Razaghi Healthcare had a contractual relationship with
9  Sage, right?
10   A.  Yes.
11   Q.   I am going to drop Exhibit 4 into the chat.  I'm
12  looking at Exhibit 4, a CEO Services Contract, Bates
13  number ending in 244.  Do you see that, sir?
14   A.  Yes.
15   Q.   When you became co-CEO -- let me strike that.
16       During any time during your employment at
17  Razaghi Healthcare or Sage, did you review the document
18  that is Exhibit 4?
19   A.  I don't recall viewing this ever.
20   Q.   I mean, who handled the contractual relationship
21  between Sage and Razaghi Healthcare?
22       MR. MERRETT:  Form and foundation.
23       THE WITNESS:  Will you restate the question,
24  please?
25

1  BY MR. BURNS:
2    Q.   Did you handle the details of the contractual
3  relationship between Sage and Razaghi Healthcare?
4    A.  No.
5    Q.   Who did handle those?
6       MR. MERRETT:  Form and foundation.
7       THE WITNESS:  I'm just looking through the
8  agreement here.
9       I did not handle those details, the
10  contractual relationship.
11  BY MR. BURNS:
12   Q.   Who did?
13       MR. MERRETT:  Form and foundation.
14       THE WITNESS:  Well, it looks like according
15  to this contract that Ahmad would handle -- Mr. Razaghi
16  would handle those details.
17  BY MR. BURNS:
18   Q.   Let's look at Exhibit 11 that just got dropped
19  into the chat.  I'm looking at Amendment No. 2 to CEO
20  Services Contract, Bates number ending in 710.
21   A.  Okay.
22   Q.   Do you see that document?
23   A.  Yes.
24   Q.   It's really the same set of questions.  During
25  your time working at Razaghi Healthcare, did you ever

1  review the document that is Exhibit 11?
2    A.  I don't recall reviewing this.
3    Q.   Did you ever gain an understanding -- there's a
4  Section 5D, and that Section 5 starts on Page 8 and runs
5  past Page 10 but Section 5D is on Page 10.  Let me know
6  when you find it.
7    A.  Okay, I'm there.
8    Q.   Did you ever review Section 5D here in
9  Exhibit 11?
10       MR. MERRETT:  Form.  Asked and answered.
11       THE WITNESS:  No.
12  BY MR. BURNS:
13   Q.   Did you ever have an understanding of how the
14  termination payment described in Section 5D was supposed
15  to work?
16   A.  No.
17   Q.   So if the termination payment was made, you have
18  no idea one way or the other whether it was done
19  correctly?
20   A.  It wasn't in my purview.  I have no idea.
21   Q.   So the $10.8 million payment that occurs, you
22  don't know if that was proper or not, do you?
23   A.  No, I didn't participate in the calculation of
24  any of the payments, so no.
25   Q.   You don't even know how it should be calculated,

1  do you?
2    A.  I don't.
3    Q.   Did you ever look into how it should be
4  calculated sort of after the fact?
5    A.  Not in any detail.  I mean -- after the fact,
6  yes.  It was supposed to be an average of a certain number
7  of years.  That's all I really know.
8    Q.   Did you verify it was correct then?
9    A.  No.
10   Q.   Don't you think you owed that to Sage as co-CEO?
11       MR. MERRETT:  Form.
12       THE WITNESS:  That wasn't -- that wasn't my
13  part of the business to manage.
14  BY MR. BURNS:
15   Q.   Whose part of the business to manage was it?
16       MR. MERRETT:  Form and foundation.
17       THE WITNESS:  Not mine.  I was operational
18  guy and the hospital guy.  So I'm sure --
19  BY MR. BURNS:
20   Q.   Who handled the termination payment at Razaghi
21  Healthcare?
22       MR. MERRETT:  Foundation.
23       THE WITNESS:  Well, I would have to say that
24  I didn't participate in this, but I have -- I would have
25  say that, you know, Mr. Razaghi handled it, I'm sure with

Page 130

1  help from others. I don't know.
2  BY MR. BURNS:
3     Q. Who was protecting Sage if this $10.8 million
4  shouldn't have been paid?
5        MR. MERRETT: I'm sorry. Before you answer
6  that, Wilma, can I hear that question back, please. I
7  don't think I caught all of it.
8        (Record read by the certified
9        stenographer as follows:
10        "Q. Who was protecting Sage if this
11        $10.8 million shouldn't have been paid?")
12        MR. MERRETT: Unfortunately I did hear all
13  of it. Form and foundation.
14        THE WITNESS: Well, if the termination would
15  have been handled differently and there was a period of
16  time where all the details could have been worked out, I
17  think that, you know, the board bears some responsibility
18  for the way things occurred and I think Razaghi Healthcare
19  does as well. I mean there's no cut and dry answer for
20  that.
21  BY MR. BURNS:
22     Q. Who should have been protecting Sage if the
23  payment shouldn't have been made?
24        MR. MERRETT: Form and foundation.
25        THE WITNESS: I don't understand

Page 131

1  "protecting." I don't know what that means.
2  BY MR. BURNS:
3     Q. Razaghi Healthcare is paying itself
4  $10.8 million, isn't it?
5     A. It appears so, yes.
6     Q. So who approved that from Sage on Sage's behalf?
7        MR. MERRETT: Form and foundation.
8        THE WITNESS: I don't know the nuances of
9  the contract how that works.
10  BY MR. BURNS:
11     Q. I mean the answer is nobody was protecting Sage
12  because the board of directors didn't even know about it.
13        MR. MERRETT: Foundation.
14        Brad, it's not a question just because you
15  testify --
16        MR. BURNS: Andre, you are generally very
17  good, but none of that. Okay? You can lodge your
18  objections all you want. Wilma, can you read the
19  question --
20        MR. MERRETT: The jury performance might
21  save us some time if you saved that for the jury.
22  BY MR. BURNS:
23     Q. Mr. Greenfield, are you planning on attending
24  trial?
25     A. No.

Page 132

1     Q. Have you been asked to attend trial?
2     A. No.
3        MR. BURNS: Okay. Wilma, can you read the
4  question back, please.
5        (Record read by the certified
6        stenographer as follows:
7        "Q. I mean the answer is nobody was
8        protecting Sage because the board of directors
9        didn't even know about it.")
10  BY MR. BURNS:
11     Q. Is that correct?
12     A. I don't know.
13        MR. MERRETT: Same objection.
14  BY MR. BURNS:
15     Q. You weren't protecting Sage, right?
16        MR. MERRETT: Form and foundation.
17        THE WITNESS: While I was at Sage,
18  absolutely.
19  BY MR. BURNS:
20     Q. What did you do to stop the payment of the
21  $10.8 million?
22        MR. MERRETT: Form and foundation.
23        THE WITNESS: There was nothing I could do
24  because I didn't know that was all going on.
25

Page 133

1  BY MR. BURNS:
2     Q. If you had known it was going on, would you have
3  told the board of directors?
4        MR. MERRETT: Form.
5        THE WITNESS: If I would have felt it was
6  something improper, yes.
7  BY MR. BURNS:
8     Q. If you knew that Razaghi Healthcare was paying
9  itself $10.8 million in the acrimony that was going on,
10  would you have told the board of directors if you had
11  found out about it?
12        MR. MERRETT: Form.
13        THE WITNESS: I told you the two board
14  meetings I was at no one would even talk to me and they
15  wouldn't accept reports and things like that.
16        I don't know the nuance of the contract so I
17  couldn't make that decision where -- whether it was
18  improper or not so I couldn't make the decision where they
19  needed protected or not.
20  BY MR. BURNS:
21     Q. I'm not asking if it was improper or not. I'm
22  just asking, would you have told the board of directors
23  that Razaghi Healthcare paid itself $10.8 million?
24        MR. MERRETT: Same objection.
25        THE WITNESS: So again, I don't know the

Page 134

1 nuance of the agreement. If I felt -- let me put it this
2 way. If I felt something improper was going on and I had
3 firsthand knowledge of it, I would let a board know that,
4 absolutely.
5 BY MR. BURNS:
6    Q. Okay. And if the board started to look into it
7 you would have helped them look into it, wouldn't you
8 have?
9        MR. MERRETT: Form.
10       THE WITNESS: If I had committed to that it
11 was improper -- I'm just speaking in generalities. If I
12 had committed to that and they were receptive to it, yeah,
13 I would have in any situation.
14 BY MR. BURNS:
15    Q. I'm -- I'm trying to understand. If a board of
16 directors just wanted to look into a $10.8 million
17 payment, not your opinion of about whether it's proper or
18 not -- strike all that.
19       If the board of directors started looking
20 into the propriety of the $10.8 million payment, you would
21 provide them information about it, wouldn't you?
22    A. I probably would, yeah. Personally I would. If
23 it was asked personally of me, if they would have reached
24 out and said we need help with this, I would have provided
25 them information, yes.

Page 135

1    Q. And if they had asked for the invoices where it
2 was paid, you would have provided those, right?
3    A. If they would have asked me personally for that,
4 yes.
5    Q. What do you mean "personally"?
6    A. If a board member would have reached out and said
7 we have a question about this, Tadd, can you help us with
8 this, I would have a duty and responsibility to answer the
9 questions and provide them whatever they needed.
10   Q. And what if they reached out to the finance
11 department directly?
12   A. I'm talking about me directly.
13   Q. Let's say the board of directors reached out to
14 the finance department and asked for invoices.
15   A. I don't think it's ever proper to withhold
16 information from a board that they went for information
17 that they request.
18   Q. And you wouldn't instruct the finance department
19 to withhold requested invoices by a board member, would
20 you?
21   A. No. I might want it done in a certain way or I
22 might want -- I probably would want to relay -- want to
23 know what the request was so I could relay the proper
24 information, because sometimes people don't understand
25 what's being asked of them.

Page 136

1        So I may have wanted to follow a certain
2 process for that, which is reasonable and actually
3 responsible and necessary, but I would have never withheld
4 it as long as it was done appropriately and we received
5 the request and the proper channels were followed and
6 chain of command. Yeah, I would give them the
7 information.
8    Q. When the finance department was asked by Ray Ann
9 Terry for invoices, you told the finance department to not
10 provide them, right?
11   A. No.
12       MR. MERRETT: Form and foundation.
13       THE WITNESS: No, I did not.
14 BY MR. BURNS:
15   Q. You told the finance department to refer Ray Ann
16 Terry to you, right?
17   A. That's following chain of command and that's
18 ensuring the board gets information that they are asking
19 for. So no, that's just -- that's a process thing.
20   Q. When you understood that the board member was
21 looking for invoices, did you go ahead and send them over?
22   A. I don't recall what happened with that. I don't
23 even recall what the invoices were for.
24   Q. What role did you have in approval of invoices
25 generally at Razaghi Healthcare?

Page 137

1    A. I didn't have a role in approving any of the
2 invoices for company billing or any of those types of
3 things.
4        Now, I would handle invoices at the hospital
5 to pay bills and sign off on things related directly to
6 the hospital. That was my role.
7    Q. So like third-party vendors, a large invoice,
8 would you be in the approval chain for that?
9    A. If it was like, I don't know, for supplies or
10 furniture or medication or things like that, I would be
11 involved in that. Operational things.
12   Q. What about the invoices of Razaghi Healthcare
13 that were sent to Sage, did you approve those?
14   A. No.
15   Q. Not a single time?
16   A. I don't recall. I don't recall ever approving an
17 invoice related to Razaghi billing to Sage.
18   Q. Was that outside the scope of your authority?
19   A. That wasn't -- I would say yes, but that wasn't
20 our process.
21   Q. What was the process?
22   A. The process is I would operationally take care of
23 those things for the short amount -- at Sage for the short
24 amount of time I was there. But other than that, that was
25 handled through finance.

Page 138

1    Q.   Who handled the approval of Razaghi Healthcare
2  invoices to Sage?
3    A.   I believe that the CFO did.
4    Q.   That's Mr. Hasan in August 2018, correct?
5    A.   I don't know about the dates.  But yes, he was
6  the CFO.  Tausif Hasan was the CFO.
7    Q.   I understand that you said you had no role in
8  calculating the termination payment, but when did you
9  become aware that a termination payment was being
10 calculated?
11   A.   I don't recall the date.
12   Q.   It was sometime before the termination payment
13 was made, right?
14   A.   I don't -- I don't recall.
15   Q.   If you look at Exhibit 24, I dropped it in the
16 chat?
17   A.   Okay, I have it open.
18   Q.   Who's Thomas Matenaer?
19   A.   He's the CFO that I hired to help clean up the
20 finances at -- to help with developing the finance team, I
21 should say, at Sage.
22   Q.   Did you know Mr. Matenaer prior to hiring him in
23 this role?
24   A.   No.
25   Q.   Why did you hire him?

Page 139

1    A.   We were looking for an onsite CFO and he had lots
2  of good experience so we hired him.
3    Q.   What did you think of his competence?
4    A.   I think he was a competent CFO.  He worked at
5  Banner Health Care, which is a large company there in
6  Arizona, and most of those guys do pretty well so I think
7  I felt like he had good competence.
8    Q.   Did he do a good job when he was working at Sage?
9    A.   From my perspective I feel like he did, yes.
10   Q.   Did you ever see him do anything dishonest?
11   A.   No.
12   Q.   I'm just trying to find out if you have any
13 reason to doubt his integrity.
14   A.   I don't.  If I would have seen him doing
15 something dishonest, I would have let him go.
16   Q.   We see an email here in Exhibit 24 from
17 Mr. Matenaer to Mr. Razaghi and Mr. Greenfield and
18 Mr. Hasan.  Do you see that there?
19   A.   Yes.
20   Q.   Why was Mr. Matenaer assembling Razaghi invoices
21 from years previous?
22        MR. MERRETT:  Foundation.
23        THE WITNESS:  I don't know.
24 BY MR. BURNS:
25   Q.   This is how the termination payment was

Page 140

1  calculated, right?
2        MR. MERRETT:  Foundation.
3        THE WITNESS:  I don't know.
4  BY MR. BURNS:
5    Q.   Doesn't your affidavit address how the
6  termination payment is calculated?
7    A.   I don't know.
8    Q.   When you got this e-mail, what did you think the
9  purpose of it was?
10   A.   I don't recall the email.
11   Q.   Did you talk to Mr. Razaghi about calculating the
12 termination payment in July of 2018?
13   A.   I don't recall doing that.
14   Q.   Did you talk to Mr. Hasan about calculating the
15 termination payment in July of 2018?
16   A.   I don't recall doing that.
17   Q.   What role did you have in calculating the
18 termination payment?
19   A.   I had no role in calculating the termination
20 payment.
21   Q.   Did you help gather data that turned into the
22 calculation?
23   A.   No.
24   Q.   Who did?
25        MR. MERRETT:  Foundation.

Page 141

1        THE WITNESS:  It was a corporate function.
2  BY MR. BURNS:
3    Q.   Is there a person that did it that you know
4  about?
5    A.   I believe that the CFO did it.
6    Q.   At this time of this email, Exhibit 24, that's
7  Mr. Hasan, right?
8    A.   Yes.
9    Q.   Let's look at Exhibit 30.  I dropped it into the
10 chat.  Let me know when you have Exhibit 30 open.
11   A.   I have it.
12   Q.   We are looking at page Bates number ending in
13 767.  Do you see that there?
14   A.   Yes.
15   Q.   Who used the email account
16 Acc@razaghihealthcare.com?
17   A.   It's the accounting email address, I believe.
18   Q.   Who had control of it to send emails?
19   A.   I don't recall for sure.
20   Q.   We see an August 28, 2018, email, 4:49 p.m.  Do
21 you see that there?
22        MR. MERRETT:  Form.
23        THE WITNESS:  I see that email, yes.
24 BY MR. BURNS:
25   Q.   I might have gotten the date wrong.  It's



Page 142

1    August 27th.
2        That's your email there in the "cc" line,
3    right?
4    **A.  Yes.**
5    Q.  What did you think when you saw an invoice for
6    $10.8 million?
7    **A.  I thought that's a lot of money.**
8    Q.  A large payment for a hospital the size of Sage,
9    right?
10   **A.  Yeah.  It's large for any hospital.**
11   Q.  Sage is a particularly small hospital in 2018,
12   isn't it?
13   **A.  It's a critical access hospital.  Twenty-five**
14   **beds.**
15   Q.  Other hospitals you had worked for in rural
16   areas, how many beds did they have?
17   **A.  All critical access hospitals have 25 beds or**
18   **less.**
19   Q.  But you had worked in hospitals with many more
20   beds than that, right?
21   **A.  Yes.**
22   Q.  What did you do when you saw this large invoice?
23   **A.  I didn't do anything.**
24   Q.  Did you know this invoice was coming?
25   **A.  No.**

Page 143

1    Q.  Had you talked to anyone at all about a number
2    around $10.8 million?
3    **A.  No.**
4    Q.  So this invoice was a complete surprise to you?
5    **A.  I mean, I understood that there was a termination**
6    **amount in the contract.  I didn't know how it was**
7    **calculated.  But I mean, again, I have no reason to doubt**
8    **the accuracy of this invoice.**
9    Q.  Had the contract been terminated on August 27,
10   2018?
11   **A.  I don't know.**
12   Q.  You didn't know anything about it being
13   terminated on August 27, 2018, right?
14   **A.  No.**
15   Q.  Did you ask anyone why a large payment was being
16   made when the contract hadn't even been terminated yet?
17   **A.  I didn't.**
18   Q.  Did you tell the board of directors this was
19   happening?
20   **A.  No.  Board of directors wouldn't talk to me.**
21   Q.  You had their emails, though, right?
22   **A.  Yeah.  I could have access to them, yes.**
23   Q.  I guess what I'm asking is, on August 27, 2018,
24   you had no idea one way or the other whether or not this
25   money was owed, right?

Page 144

1    **A.  No.**
2    Q.  Did it concern you that a management company was
3    presenting a $10.8 million invoice and you had no idea
4    whether or not it was justified?
5    **A.  Again, I had no reason to believe that it wasn't.**
6    **I feel that there was an amount in there, you know, that**
7    **would kick in if the contract was terminated so I had no**
8    **reason to -- I wasn't privy to, you know, conversations**
9    **with the board of directors or any of those types of**
10   **things so I would have no reason other than the general**
11   **knowledge there was -- if the contract was terminated**
12   **there was a payment.  I had no reason to believe that this**
13   **wasn't an accurate amount.**
14   Q.  Did you eventually learn who directed that this
15   invoice be sent?
16   **A.  I'm sorry, would you say that again, please?**
17   Q.  Did you eventually learn who directed that this
18   invoice be sent?
19   **A.  Yes.**
20   Q.  Who directed?
21   **A.  Mr. Razaghi.**
22   Q.  You understood around August 27, 2018, that the
23   $10.8 million was paid that same day, right?
24        MR. MERRETT:  Foundation.
25        THE WITNESS:  No.

Page 145

1    BY MR. BURNS:
2    Q.  When did you find out the $10.8 million had been
3    paid on August 27th?  When did you find that out?
4    **A.  August 27?  Just now.**
5    Q.  You did not know until today that the payment was
6    actually made on August 27th?
7    **A.  I never -- I never asked.**
8    Q.  That's interesting.
9    **A.  I just don't recall the date, and I'm looking at**
10   **this email and I am trying to recall it.  I just don't**
11   **recall.  I just don't recall that invoice.**
12   Q.  Let's go back to August 2018.  You knew at some
13   point after this invoice, the $10.8 million-plus, gets
14   paid, right?
15   **A.  Yeah.**
16   Q.  But you didn't know the date on which it
17   occurred?
18   **A.  No.**
19   Q.  And you didn't know that it was -- you didn't
20   know that the payment was made on August 27th until today?
21   **A.  I don't recall knowing when that was paid until**
22   **I'm seeing this invoice today.**
23   Q.  Okay.  Let's look at Exhibit 53.  I put it up in
24   the chat.
25   **A.  I have it open.**



Page 146

1    Q.   This document is from earlier depositions.  You
2  see in the report totals there's a reference to
3  $10,855,000 and some change.  Do you see that there?
4    A.   Yes, I see that.
5    Q.   Do you see -- this is -- it's on the right column
6  towards the top of the page.  So under ACH Detail Report,
7  the top of the column says Frequency, One Time Only.  Do
8  you see that there?  It's on the right column.
9    A.   I'm looking for it.
10   Q.   It's a lot of data on the page.  If you look at
11  the top block of texts in the right column, it will say
12  Frequency, One Time Only?
13   A.   I see it.
14   Q.   If you go down from there it says Create Date,
15  Effective Date, Scheduled Send Date.  Do you see that
16  there?
17   A.   Yep, I see that.
18   Q.   Are you familiar with ACH payments from your
19  profession?
20   A.   Yes.
21   Q.   You have sent and received ACH payments before as
22  a part of your job?
23   A.   Of course.
24   Q.   Do you understand now that this $10.8 million was
25  sent to whoever got it on August 27, 2018?

Page 147

1    A.   I do understand that.
2    Q.   Then sort of in the center block of text, it is
3  the widest row, it says Beneficiary Name on the left.  Do
4  you see it there?
5    A.   Yes.
6    Q.   The beneficiary name is listed as Razaghi
7  Healthcare.  And as you go right in the row, there's some
8  account numbers, and then you can see the 10,855,000-plus
9  goes there.  Do you see that there?
10   A.   Yes.
11   Q.   I want to be absolutely clear, because it's going
12  to matter, you didn't know that this had been sent
13  actually on August 27th?
14   A.   I don't recall, no.
15   Q.   So in the days that followed August 27th, do you
16  have any recollection of your understanding of whether or
17  not the payment had been sent?
18        What I mean is this.  When did you first
19  become aware that the payment had actually been sent?
20   A.   I don't recall that.  I don't recall the exact
21  date.
22   Q.   Did you ever talk to Ahmad Razaghi about why this
23  $10.8 million had been paid?
24   A.   My knowledge of this was that it was a
25  termination payment.  Contract --

Page 148

1    Q.   And Mr. Razaghi told you that's what it was?
2    A.   Yes.
3    Q.   Did he say why it was justified in taking it?
4    A.   It was in the contract.  It was the termination
5  payment.  It was spelled out in their contract.
6    Q.   Did he tell you it had been properly calculated?
7    A.   He didn't tell me how it was calculated.  We
8  didn't talk about calculations.
9        MR. BURNS:  Let's take a five-minute break.
10  I need to reorganize some exhibits.  I should have an
11  hour-ish left when we come back.  We will go off the
12  record.
13        THE VIDEOGRAPHER:  We are going off the
14  record.  The time is 2:58 p.m.
15        (Recess taken 3:58 p.m. - 4:05 p.m.
16        Mountain Daylight Time)
17        THE VIDEOGRAPHER:  We are going on the
18  record.  The time is 3:05 p.m.
19  BY MR. BURNS:
20   Q.   I have shared what will be Exhibit 85.  It's tab
21  506.  It's large so it could take a minute to load.
22   A.   Okay, I have it open.
23   Q.   I'm looking at a document titled Meeting With
24  Chairperson, Bates number ending in 6776.  Do you see that
25  there?

Page 149

1    A.   Yes.
2    Q.   There's a list of names and some signatures.  The
3  third is Tadd Greenfield and then there's a signature.  Is
4  that your signature?
5    A.   Yes.
6    Q.   Did you attend this meeting with the chairperson?
7    A.   Yes.  It says P for present.
8    Q.   I'm trying to get a sense of how this worked.  I
9  seen that Mr. Wauneka attends via teleconference on the
10  top line.
11        Is that your recollection of how this
12  meeting went?
13   A.   I don't recall the meeting.
14   Q.   You don't recall meeting with Mr. Wauneka?
15   A.   I don't.
16   Q.   Let's go down to the agenda which is on the
17  second page.  There's sort of a list of things that's an
18  agenda.  It's -- one of the items under Section ii(b) is
19  to review Razaghi Healthcare severance invoice 1369,
20  $10.8 million.
21        Do you see that there?
22   A.   Yes, I do.
23   Q.   Do you recall having a discussion and a meeting
24  about the $10.8 million invoice, right?
25   A.   No, I don't.  I don't recall this meeting at all.



Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 72 of 130

Navajo Health Foundation vs                                                    Tadd Greenfield
Razaghi Development Company, LLC.

Page 150

1    Q.   How many times did you meet with a member of the
2    board of directors at Sage?
3    A.   I don't know.  I know I went to two, maybe three
4    board meetings.
5    Q.   Did you ever have a telephone call with any
6    member of the board of directors of Sage?
7    A.   Not that I recall.
8    Q.   Do you think you were present at this meeting?
9    A.   I would have to say I definitely was because of
10   the attendance roster.  This was six years ago.  I have
11   had two jobs since then.  I'm sorry, I don't recall the
12   meeting.
13   Q.   How many $10.8 million payments have you been
14   around that were disputed?
15   A.   I work with hundreds of millions of dollars.
16   Q.   That were disputed.
17   A.   None.  But again, this is just -- no.  You have
18   been in this, you have been looking at the evidence and
19   all these things.  I haven't given this a second thought
20   until I got involved in this.
21        Really, I mean it's six years ago, two jobs.
22   I have lots of other things that I have been working on
23   and doing.  And asking me if I recall a meeting from
24   August 30, 2018, at 4:00 p.m., no, I'm sorry, I don't.
25   Q.   Let's talk about what we do now.  On August 30th,

Page 151

1    did you know whether or not the $10.8 million had been
2    paid?
3    A.   I don't recall.
4    Q.   Earlier you told me you just found out about it
5    that it was paid on August 27th.  So when the 30th rolls
6    around, did you find out the payment had been made just a
7    few days after?
8    A.   I don't -- I don't recall.  I don't recall the
9    meeting.  I don't recall any date specific to the invoice
10   1369 or whatever it is.  I just don't recall.
11   Q.   I want to turn you to Bates number ending in 786
12   at the bottom right.  It's maybe 11 pages down.
13   A.   In that same document?
14   Q.   Yeah.
15   A.   Okay.  Where do you want me to be?
16   Q.   It's the number ending in 786.
17   A.   Okay.  I'm there.
18   Q.   At the bottom of the page there's an email from
19   Nicole Hardy to Tadd Greenfield.  Do you see that there?
20   A.   Yes.
21   Q.   Do you have any recollection of who Nicole Hardy
22   is?
23   A.   I don't.
24   Q.   She wrote:  "Good afternoon, Tadd.  I received a
25   call" --

Page 152

1        THE VIDEOGRAPHER:  Excuse me, Counsel.  I
2    apologize.  I just lost my connection for about, I don't
3    know, two minutes.
4        MR. BURNS:  Let us know when you are
5    recording again.  We will just have to deal with it.
6        THE VIDEOGRAPHER:  I actually am recording
7    again but my point being is that I just missed about two
8    minutes of the testimony.
9        MR. BURNS:  Yeah.  It happens.  Thank you
10   for letting us know.  It looked like Wilma was on the
11   whole time so we will just have the transcript of that.
12       THE VIDEOGRAPHER:  I'm not sure exactly what
13   happened either because it wasn't like I had to log back
14   in.  It just went away and came back on its own.  Anyway,
15   I apologize.
16       MR. BURNS:  Thank you for letting us know.
17   BY MR. BURNS:
18   Q.   So we are back at the email at the bottom of the
19   Bates number ending in 786.  "I received a call from board
20   member Ms. Ray Ann Terry.  She requested for me to send
21   her the last three months of invoices for Razaghi
22   Healthcare."
23        You knew on August 29th that there was a
24   $10.8 million invoice out there, right?
25   A.   I don't recall the date.  I think I have stated

Page 153

1    that many, many times.  I don't know exactly when I
2    learned that there was a -- what the date was for the
3    invoice.
4    Q.   You received that email on August 27th with the
5    $10.8 million invoice, though?
6    A.   Uh-huh.
7    Q.   And it was notably a large amount, right?
8    A.   That I don't recall.  In a meeting that I don't
9    recall, yes.
10   Q.   I'm not talking about the meeting.  I am talking
11   about when you received the invoice.  It was August 27th,
12   wasn't it?
13   A.   I don't know.  I am getting confused with the
14   dates and the times and all these things.
15   Q.   Let's look back at Exhibit 30 which is just in
16   the chat box here I believe three up from the bottom.
17   A.   Is that in tab 506?
18   Q.   It is not.  It starts with Razaghi A Exhibit 30.
19   I sent it at 2:46 p.m.
20   A.   I deleted all those.  Could you resend it?
21   Q.   No problem.  Exhibit 30 has been re-sent.  Let me
22   know when you have it open.
23   A.   Okay, I have it open.
24   Q.   I'm just trying to establish that you at your
25   email received invoice 1369 of 10.8-plus million dollars

Page 154

1 on August 27th in the afternoon, right?
2         MR. MERRETT:  Asked and answered.
3         THE WITNESS:  Yes, I received that email.
4 BY MR. BURNS:
5     Q.  On August 27th, right?
6     A.  That's what it says in the "sent" line.
7     Q.  Let's go back to Exhibit 85, which is tab 506 in
8 the Zoom chat here, and we're on Page Bates number ending
9 786.
10    A.  Okay.
11    Q.  At the bottom of that page there's an email from
12 Nicole Hardy on August 29th.  On August 29th a
13 $10.8 million invoice is sitting in your inbox, right?
14        MR. MERRETT:  Form.
15 BY MR. BURNS:
16    Q.  You could just forward that to whoever you want,
17 right?
18        MR. MERRETT:  Form.
19        THE WITNESS:  No.
20 BY MR. BURNS:
21    Q.  What prevents you from sending that to Ms. Ray
22 Ann Terry?
23    A.  I would need to get approval before doing that as
24 well.
25    Q.  From who?

Page 155

1     A.  From Mr. Razaghi.
2     Q.  Did you seek that approval?
3     A.  I don't recall.
4     Q.  You knew he didn't want you sharing it, right?
5         MR. MERRETT:  Form.
6         THE WITNESS:  I don't want to speculate on
7 that at what time.  I don't know.
8 BY MR. BURNS:
9     Q.  So on August 29th you get this e-mail from Nicole
10 Hardy where Ms. Ray Ann Terry -- is she a member of the
11 board of directors?
12    A.  Yes, I believe so.
13    Q.  Ms. Ray Ann Terry is seeking the last three
14 months of invoices for Razaghi Health Care.
15        When you received this email, you know that
16 it does get send -- Ms. Ray Ann Terry is going to see that
17 $10.8 million has been invoiced, right?
18    A.  Of course.
19    Q.  Do you have any understanding of how long ACH
20 payments can be reversed?
21    A.  No.
22    Q.  Do you have some concept that ACH payments can be
23 reversed sometimes for some amount of time?
24        MR. MERRETT:  Foundation.
25        THE WITNESS:  I'm not an accountant or a

Page 156

1 banker.  No, I don't.
2 BY MR. MERRETT:
3     Q.  If we move up one email, we are still on the
4 Bates number 786, we look at the top email on that page
5 and it's an email from Tadd Greenfield to Nicole Hardy.
6 It appears to be eight minutes later at 3:20 p.m.
7         Do you see that there?
8     A.  Yes.
9     Q.  Your response is:  Such requests as these need to
10 go through me.  Please ask her to reach out to me for any
11 and all requests including this one.  When that occurs, I
12 will get the invoice from you and send them to her myself.
13 That is the proper procedure.
14        Do you see that there?
15    A.  I do.
16    Q.  Did you forward the invoices to Ray Ann Terry
17 when you knew she wanted them?
18    A.  She did not reach out to me as I recall.
19    Q.  You were going to make her ask again.  Is that
20 right?
21    A.  I strictly follow process and procedure and she
22 didn't -- I don't recall her reaching out to me.  Had she
23 reached out to me, for sure I would have, to get a better
24 understanding of what she wanted.
25    Q.  Were you unclear that she wanted the last three

Page 157

1 months of invoices from Razaghi Healthcare?
2     A.  We're following a process and procedure.  We
3 don't do thing things willy-nilly in health care because
4 there's a lot of quality and safety and money involved.
5         So I believe it was very clear.  Please ask
6 her to reach out to me and I will give her the
7 information.  That's the proper procedure.
8     Q.  What does this do for anyone except slow down Ray
9 Ann Terry?
10    A.  I can't speculate on that.  We follow a process
11 and a procedure for a reason.  We follow processes and
12 procedures.
13        I know you want to think this is some
14 glorious piece of great information, but at the end of the
15 day I asked her to reach out and I will provide the
16 information.  That's it.  That simple.
17    Q.  At the end of the day this kept the board in the
18 dark, didn't it?
19        MR. MERRETT:  Foundation.
20        THE WITNESS:  I don't -- I don't know if it
21 did or not.  That was not the intention.  The intention is
22 to follow established process.  That way the board gets
23 exactly what they need.
24 BY MR. BURNS:
25    Q.  Why didn't you just send the invoices when you



Case 3:23-cv-08072-DJH     Document 421-12     Filed 11/26/24     Page 74 of 130

Navajo Health Foundation vs                                                    Tadd Greenfield
Razaghi Development Company, LLC.

Page 158

1  knew she wanted them?
2      A.  Well, I think if you refer back to my email,
3  please ask her to reach out to me and I will provide the
4  information.
5      Q.  We will mark Exhibit 86.  It's going to take a
6  minute to load.  Exhibit 86 is now in the chat and it's
7  tab 509.
8      A.  I have it open.
9      Q.  Looking at the top page of Exhibit 86, the Bates
10  number ends in 9416.  Do you see that there?
11     A.  Yes.
12     Q.  This is an email from Ahmad Razaghi on
13  September 1, 2018, at 4:49 a.m.  Do you see that there?
14     A.  Yes.
15     Q.  There is a large list of people that received
16  this, but sort of at the bottom right there is a list of
17  Tadd Greenfield.  Do you see that there?
18     A.  Yes.
19     Q.  The text of the email says, "please find attached
20  the August 30th Chair, Management meeting."  Do you see
21  that there?
22     A.  Yes.
23     Q.  I'm trying to determine if anything will refresh
24  your recollection about this meeting that your signature
25  appears on the attendance sheet.

Page 159

1          Go down to the third page, and the Bates
2  number ends in 9418.
3      A.  I'm there.
4      Q.  This document is entitled Minutes, and then the
5  meeting beginning at 4:05 p.m.  Present at the meeting:
6  Board members, there's a single board member listed.  And
7  executive leadership includes your name there.
8          So I just want to give you a minute to look
9  at this.  It has minutes of an over 30-minute meeting and
10  I'm trying to see if it refreshes your recollection about
11  this meeting at all.
12     A.  I don't recall the meeting.
13     Q.  Okay.  Let's look at the discussion attributed to
14  Mr. Razaghi on the first page of 4 under Paragraph 1.
15  There is a paragraph talking about a memorandum that
16  includes a number of discussions about the board's
17  activities.
18          Did you ever hear Mr. Razaghi talk about
19  such topics with anyone?
20     A.  I don't recall.
21     Q.  Moving on to the second page, there are four
22  paragraphs starting at the top of the page and working
23  down to Section 2.  If you can take a minute to review
24  those.
25          Do you have any recollection of Mr. Razaghi

Page 160

1  talking to anyone about those topics at all?
2      A.  I don't recall.
3      Q.  So I'm now talking about the totality of
4  Section 1 that starts on Page 1 and goes on to Page 2.
5  You have no reason to believe the minutes reflected here
6  are inaccurate, do you?
7      A.  I don't.
8      Q.  It's really going to be the same set of questions
9  for Section 2.  If you could review it.  It runs from
10  Page 2 to Page 3, with three paragraphs on each page.
11     A.  I don't have recollection of this meeting.
12     Q.  What about the topics that are attributed to
13  Mr. Razaghi?  Have you ever heard him talk about why the
14  termination payment was made?
15     A.  The only thing that I recollect about that is
16  that one of the board members, and I'm not sure who, who
17  told Mr. Razaghi that the board had met and terminated the
18  contract.  I don't know who that was, I don't know when
19  the date was, but I do remember hearing that in a
20  conversation.
21     Q.  I'm looking at the fifth page of the exhibit.
22  Let's just be exact.  It's the Bates number ending in
23  9420.  Let me know when you're on that page.
24     A.  Okay, I'm there.
25     Q.  In the second paragraph it starts:  "Mr. Razaghi

Page 161

1  stated that RH is giving courtesy notice to the chair
2  today that RH will be providing written notice to
3  terminate the contract."  Do you see that there?
4      A.  I do.
5      Q.  Do you have any recollection of Mr. Razaghi ever
6  saying anything like that?
7      A.  I don't.
8      Q.  We talked about earlier how these minutes were
9  attached to an email you received.  If you had received an
10  email with inaccurate minutes, what would you have done?
11     A.  If I knew for certain they were inaccurate?  We
12  have somebody in there always typing these minutes up, so
13  if I am in the meeting I don't review the minutes so --
14     Q.  If you had seen inaccurate minutes, what would
15  you have done?
16     A.  I would have noted and tried to correct it.
17     Q.  Okay.
18     A.  I never read the minutes of the meetings that I'm
19  in because I'm in the meeting.
20     Q.  I'm looking at the second sentence of the same
21  paragraph we were just looking at.  "The payment will be
22  contemporaneous with the notice."
23          Do you ever -- did you ever hear Mr. Razaghi
24  say anything like that?
25     A.  No.  The only thing I ever heard about that --



Page 162

1  anything in that regard would be that in the contract it
2  was immediately -- the termination, it was immediately
3  payable.
4     Q.  You did hear that from Mr. Razaghi?
5     A.  I heard that, yes.
6     Q.  In this first sentence of the minutes, is it a
7  surprise to you to find out that somebody is logging
8  Mr. Razaghi's words to say that Razaghi Healthcare would
9  be terminated in the contract?
10    A.  Yeah, I don't -- I just don't recall.  I just
11 don't recall this stuff.
12    Q.  Okay.  It's the same set of questions with
13 Section 3.  If you can review it and let me know if it
14 refreshes your recollection about conversations.  If you
15 could review Section 3 and let me know if it refreshes
16 your recollections about statements made by Mr. Razaghi.
17    A.  The only thing I recall from this is that Ahmad,
18 Mr. Razaghi, had told me that his brother was suing him.
19 I don't know the context around that, or I have no
20 knowledge of his indemnification or insurance coverage.
21    Q.  We will mark Exhibit 87.  It's tab 503 which is
22 in the chat box.
23    A.  I'm there.
24    Q.  I'm looking at a document titled Affidavit of
25 Tadd Greenfield.  Bates number at the bottom right is 643.

Page 163

1  Do you see that there?
2     A.  Yes.
3     Q.  It starts in Section 1:  "I am over 21 years of
4  age.  I have personal knowledge of the facts stated
5  herein."
6        But then the next number of paragraphs 1-5
7  talk about things -- and I'm starting at Paragraph 1 --
8  happened in 2017 and '18, 2016 and '17, 2016 and '18, and
9  then 2017.
10       Were you in any way affiliated with Razaghi
11 Healthcare in 2016?
12    A.  No.
13    Q.  What about in 2017?
14    A.  No.
15    Q.  Maybe starting December 29, 2017, you started?
16    A.  Yeah, December 2017/January 2018.
17    Q.  Looking at Paragraph 3 it says:  On June 16,
18 2017, Razaghi Healthcare and Navajo Sage executed
19 Amendment No. 2 effective as of July 6, 2016.
20       You had no personal knowledge of what was
21 executed in July, did you?
22    A.  No.  This was documents prepared for me.
23    Q.  We talked about that earlier.  But who prepared
24 this document for you?
25    A.  I believe the company did.

Page 164

1     Q.  That's Razaghi Healthcare?
2     A.  Yes.
3     Q.  And Mr. Razaghi himself was involved in the
4  preparation of this document, right?
5        MR. MERRETT:  Foundation.
6        THE WITNESS:  I'm actually not certain who
7  made it up, who prepared it.
8  BY MR. BURNS:
9     Q.  Moving to the second sentence of Section 3, it's
10 referenced that something is at the end of the sentence a
11 true and correct copy of the contract.
12       You don't know what a true and correct copy
13 of the contract is, right?
14    A.  No, but I would have no reason to believe that
15 this document was inaccurate and truthful.
16    Q.  Do you know there's allegations that signature
17 pages have been switched on documents?
18    A.  No, I don't know that.
19    Q.  So you don't know what is a true and correct copy
20 or not with regard to which signature page is correct, do
21 you?
22    A.  No.
23    Q.  Do you think that should have been explained to
24 you when you signed this?
25    A.  I think so.

Page 165

1     Q.  Let's turn to the second page of Exhibit 87,
2  Bates number ending in 644.  Let me know when you're
3  there.  Are you there?
4     A.  Yes.  Second page.
5     Q.  Section 7 in the second paragraph -- the first
6  paragraph talks about Christi being reassigned to other
7  corporate assignment and I was assigned as administrator
8  of Navajo Sage.  We talked a lot about that.
9        The second sentence says the planning for
10 this transition had been taking place for many months
11 Christi had been involved in the meetings and discussions
12 regarding the reassignment and transition.
13       Did you know that the transition was going
14 to take place for months?
15    A.  No.
16    Q.  I'm going to start Paragraph 11 on Bates number
17 ending 645.  Earlier we talked about a contract and
18 whether or not you reviewed it.  Now I'm looking at
19 Section 11 of your affidavit and it has extensive
20 discussion about what the contract says.
21       Was this testimony of yours suggested to you
22 or did you actually know that it said that?
23    A.  This document was prepared for me.  Again, when
24 your company -- I sign lots of stuff like audits and
25 things like that.  When those are presented, I have no



Navajo Health Foundation vs                    Ladd Greenfield
Razaghi Development Company, LLC.

Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 76 of 130

Page 166

1  **reason to believe that they wouldn't be accurate and**
2  **precise.**
3      Q.   I think the point I'm asking is for Paragraphs 11
4  and 12 you are just not comfortable with the subject
5  matter to testify what is correct or not?
6  **A.   No.**
7      Q.   Okay.   Same for Paragraph 13 on the next page.
8  Bates number ending 646.   There's a date of August 7,
9  2018, and then a discussion, the termination payments
10 estimate.
11          Did you know that was going on on
12 August 7th?
13 **A.   Again, I don't recall the exact dates.**
14     Q.   But you weren't involved in the termination
15 payment, right?
16 **A.   Right.**
17     Q.   You weren't involved with the estimation of the
18 termination payment, right?
19 **A.   No.**
20     Q.   So Exhibit 1 says is a true and correct copy of
21 said estimate.   Do you know that one way or the other?
22 **A.   No.   But again, if your company prepares**
23 **something for you, there's no reason to believe that it**
24 **wouldn't be true.**
25          **There's got to be some trust with the**

Page 167

1  **company that you work with and so I have no reason to**
2  **believe this to be inaccurate or untrue.**
3      Q.   And you were trusting that here with regard to
4  Section 13, right?
5  **A.   Absolutely.**
6      Q.   And again, you don't know anything in there is
7  correct from your own personal knowledge, right?
8  **A.   No.**
9      Q.   Same question for Paragraph 14.   Is this
10 something that you personally know?
11 **A.   No.**
12     Q.   I want to go ahead and look at Exhibit 2 to this
13 document.   The document has exhibits attached to it.   I'll
14 get you the Bates number.   We will look at that another
15 way actually.   I don't want to have to do it twice.
16          At Paragraph 15, there is a discussion of
17 invoice 1369, the $10.8 million-plus invoice.   Do you see
18 that there?
19 **A.   Yes.**
20     Q.   How or when that invoice was approved is
21 addressed in the last sentence of Paragraph 15.   Do you
22 know that one way or the other from your personal
23 knowledge?
24 **A.   No.**
25     Q.   How about Paragraph 16 about apparent termination

Page 168

1  of the contract?   Do you have any personal knowledge of
2  about what the board did or didn't do?
3  **A.   I do not.**
4      Q.   Do you have any personal knowledge about whether
5  Razaghi Healthcare was the party that actually terminated
6  the contract?
7  **A.   I don't know.   I don't know the sequence of**
8  **events that led up to all this stuff, who did what, when,**
9  **you know, who was first, who was second.   I just don't**
10 **recall those dates and the timeline.**
11     Q.   Okay.   Exhibit 88 will be tab 512.   It's in the
12 chat.
13 **A.   I'm there.**
14     Q.   Exhibit 88 is an email Bates number ending in
15 635.   It's sent from Abigail Paul.   Who is Abigail Paul?
16 **A.   She was one of our project managers.**
17     Q.   She worked closely with Mr. Razaghi, right?
18 **A.   Yes.**
19     Q.   Sent September 27, 2018, at 11:34 p.m.   Do you
20 see that there?
21 **A.   Yes.**
22     Q.   And then there should be Mr. Razaghi.   Do you see
23 that there?
24 **A.   Yes.**
25     Q.   Subject says Confidential - Todd Affidavit Notes.

Page 169

1  Do people frequently call you Todd?
2  **A.   No.**
3      Q.   Does it happen occasionally?
4  **A.   Occasionally.**
5      Q.   I mean, I say earlier today.   But I guess looking
6  at this, what do you understand -- when you were looking
7  at this email in September 2018, what did you understand
8  it to be?
9  **A.   Honestly, again, I don't recall this.   It just**
10 **looks like a narrative of Razaghi Healthcare's**
11 **relationship with Sage.**
12     Q.   The reference to Todd's affidavit.   Mr. Razaghi
13 and Ms. Paul helped write the affidavit, didn't they?
14          MR. MERRETT:   Foundation.
15          **THE WITNESS:   I'm not certain who did.**
16 BY MR. BURNS:
17     Q.   And we will mark Exhibit 89.   It will be tab 513
18 in the chat.
19 **A.   Okay.**
20     Q.   Did you receive this email?
21 **A.   From Abigail, it appears that I did, yes.**
22     Q.   So I'm looking at Exhibit 89 which is tab 513
23 Bates number ending in 630.   Do you see that there?
24 **A.   Yes.**
25     Q.   It's an email from Mr. Razaghi.   Do you see that

Page 170

1  there?
2   **A.  Yes.**
3   Q.  To Abigail Paul and you.  Do you see that there?
4   **A.  Uh-huh.**
5   Q.  It has an attachment that says Todd.docx.  Do you
6  see that there?
7   **A.  Uh-huh.  Yes.**
8   Q.  If we scroll down, attached to this email
9  starting at Bates number 633, there is an attachment.  I
10  guess the question is, do you recall Mr. Razaghi
11  participating in the drafting of your affidavit?
12   **A.  No.  I'm not sure this is my -- this is mine.  Or**
13  **has anything to do with me, honestly.  This is -- this**
14  **looks like -- this isn't mine.  This looks like it's Todd**
15  **McGee's.**
16   Q.  Are you involved in drafting Mr. McGee's
17  affidavit?
18   **A.  No.**
19   Q.  Why were you being copied on that?
20      MR. MERRETT:  Foundation.
21      **THE WITNESS:  I don't know.**
22  BY MR. BURNS:
23   Q.  We will mark Exhibit 90.  It will be tab 527.
24   **A.  Okay, I'm there.**
25   Q.  The top page has an email it's Bates number

Page 171

1  ending in 4284.  It's an email from you to several people
2  including members of the board of directors.  Do you see
3  that there?
4   **A.  Yes.**
5   Q.  Did you send this e-mail?
6   **A.  It appears that I did, yes.**
7   Q.  Why didn't you mention the $10.8 million invoice
8  in this communication with the board of directors?
9   **A.  Because I told you on several occasions I don't**
10  **recall the date when I knew all this stuff was going on**
11  **and I think -- well, this was just an introductory email**
12  **from me to the board of directors.**
13   Q.  Do you think you didn't know about the
14  $10.8 million invoice on the 28th of August?
15   **A.  I don't think I did.**
16   Q.  If you had known about it, you would have told
17  the board of directors about it, right?
18   **A.  I think it would have been a different email.**
19   Q.  But you would have sent that, right?
20   **A.  If I would have thought that it was inappropriate**
21  **or unethical, I would have mentioned something of course.**
22  **I would have wanted to talk to them about it in person.**
23   Q.  You weren't in Ganado in late August, 2018, were
24  you?
25   **A.  I can't recall the last time I was in Ganado, the**

Page 172

1  date.
2   Q.  So if you weren't in Ganado, how would you have
3  communicated with the board of directors if you wanted to
4  tell them something?
5   **A.  I think I would have reached out to them and**
6  **asked for a meeting if I thought something inappropriate**
7  **was going on.**
8      **This is not something -- if I felt that**
9  **something was bad or nefarious or unethical going on, I**
10  **would have requested a meeting and talked to them about**
11  **it.  You can't -- that's not something you would discuss**
12  **over email or even a phone call.**
13   Q.  But for the subject meeting you would have
14  emailed them the subject invoice, right?
15   **A.  I don't know what I would have done.  If I**
16  **thought -- again, if I thought something was going on, I**
17  **would have let them know.**
18   Q.  What's your relationship with Stenson Wauneka?
19   **A.  With who?**
20   Q.  Stenson Wauneka.
21   **A.  I have no relationship with him.**
22   Q.  I am going to mark 91 as tab I in the chat.
23   **A.  I have it open.**
24   Q.  I just really need to confirm that you sent this
25  email.

Page 173

1   **A.  I don't recall the email but it states clearly**
2  **that I did.**
3   Q.  Do you have any reason to believe you didn't send
4  this email?
5   **A.  No.**
6      MR. BURNS:  Let's go off the record for five
7  minutes.
8      THE VIDEOGRAPHER:  We are going off the
9  record.  The time is 3:56 p.m.
10      (Recess taken 4:56 p.m. - 5:08 p.m.
11      Mountain Daylight time)
12      THE VIDEOGRAPHER:  We are back on the
13  record.  The time is 4:08 p.m.
14  BY MR. BURNS:
15   Q.  Back on the record.  I'm going to mark -- I am
16  going to provide Exhibit 56.  It's in the chat.  The Bates
17  number on the exhibit ends in 4968.
18      Let me know when you have it,
19  Mr. Greenfield.
20   **A.  Is it the one titled Hasan 0/5/07/24?**
21   Q.  Yes.  Although that title is somewhat arbitrary,
22  just understand that.
23   **A.  Okay.**
24   Q.  When you are looking at a letter with a Bates
25  number ending in 4968 at the bottom right, let me know.

Navajo Health Foundation vs.
Razaghi Development Company, LLC.

Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 78 of 130

Ladd Greenfield

Page 174

1    A. I have it up.
2    Q. Looking at the third page of this, the last page,
3 Page 4970, is that your signature?
4    A. Yes.
5    Q. Going back to the top, the question is did you
6 send this letter?
7    A. I am up there.
8        MR. MERRETT: I'm sorry, is there a question
9 pending?
10 BY MR. BURNS:
11    Q. Yeah. Did you send this letter?
12    A. I'm sorry, I didn't hear you ask that.
13    Q. That's okay. Did you send this letter?
14    A. Yes.
15    Q. Okay. Who supplied the information that went
16 into this letter?
17    A. The company.
18    Q. Mr. Razaghi was involved in crafting this letter?
19    A. Yes.
20        MR. MERRETT: Foundation.
21 BY MR. BURNS:
22    Q. I want to look at the third paragraph. "As
23 background, prior to our termination, there was a
24 scheduled finance meeting on Tuesday, September 3rd, with
25 Sage's CFO, controller, and accounting clerk to ensure

Page 175

1 that invoice 1369 does not contain any clerical errors.
2 That meeting never happened because we were fired within a
3 transition period." Do you see that there?
4    A. Yes, I see that.
5    Q. Shouldn't invoice 1369 have been checked for
6 clerical errors before it was paid?
7        MR. MERRETT: Form and foundation.
8        THE WITNESS: I don't know what process they
9 used to determine the accuracy of the document.
10 BY MR. BURNS:
11    Q. Why are you in this letter blaming Sage for not
12 checking for clerical errors in this invoice when it's
13 already been paid?
14        MR. MERRETT: Form.
15        THE WITNESS: I don't know that I would use
16 the word "blaming." I think both sides need to agree to
17 what the actual amount is, and the purpose was to set up a
18 meeting to discuss what the termination payment would be.
19 That's what I'm surmising from the email, but I wouldn't
20 say blaming.
21 BY MR. BURNS:
22    Q. The letter goes on to have a string of bullet
23 points. Do you see that there?
24    A. Yes.
25    Q. I'm trying to understand who supplied you these

Page 176

1 bullet points. Or maybe you wrote them yourself.
2    A. I didn't write them.
3    Q. Who did?
4    A. This information was supplied to me.
5    Q. By who?
6    A. By the company.
7    Q. What individual in the company was involved?
8        MR. MERRETT: Foundation.
9        THE WITNESS: I believe this came from
10 Ahmad, Mr. Razaghi.
11 BY MR. BURNS:
12    Q. Okay. I'm looking at the second bullet point:
13 "August 2, 2018, letter from RH counsel Osborne Maledon to
14 Chair Wauneka with the following concerns."
15        Then the white bullet point: RH is aware of
16 unauthorized communication and actions between certain
17 board members and Christi and Netrisha spreading internal
18 strife and discord among RH management consultants with
19 respect to their authority and duties to corporation as
20 assigned to them from time to time by RH.
21        Do you see that there?
22    A. Yes.
23    Q. That was supplied to you by Mr. Razaghi, right?
24    A. Yes.
25    Q. The same goes for the next three white bullet

Page 177

1 points?
2    A. Yes.
3    Q. Moving on to the second page, Bates number ending
4 in 4969. I'm looking at the second black bullet point
5 that states: "August 30, 2018, RH meeting with board
6 chair meeting notes." Do you see that there?
7    A. Yes.
8    Q. Then it has four white bullet points and some
9 sub-points under it. Go ahead and review that. And who
10 supplied you this information?
11    A. Again, it was the company.
12    Q. Was there an individual that supplied this
13 information?
14    A. I believe it was Mr. Razaghi.
15    Q. Now, this letter is dated September 8th which is
16 not long after August 30th where this meeting was
17 purportedly held, and we talked about earlier how you
18 signed a sheet.
19        If you had seen something that inaccurately
20 described the meeting that had been held nine days
21 previous, what would you have done?
22    A. I would have -- I probably would have let Ahmad
23 know that this wasn't accurate or true.
24    Q. You wouldn't have signed it if a meeting you were
25 at was inaccurately described, right?



Case 3:23-cv-08072-DJH    Document 421-12    Filed 11/26/24    Page 79 of 130

Navajo Health Foundation vs    Ladd Greenfield
Razaghi Development Company, LLC.

Page 178

1  A.  No.
2  Q.  And then I am looking at the final black bullet
3  point -- well, it's kind of hard.  Sometimes the numbering
4  is better.
5      There's a bullet point that says, toward the
6  bottom of 4969, September 1st, 2018, and a letter.  Do you
7  see that there?
8  A.  Yes.
9  Q.  Then there is a number of things that follow, and
10 it runs onto the next page, so I am looking at that
11 section that refers to the September 1st letter.
12     How did you obtain that information of this
13 letter?
14 A.  It was provided to me.
15 Q.  By who?
16 A.  Mr. Razaghi.
17 Q.  I am going to go back to the first page of
18 Exhibit 56, the very bottom bullet point.  August 20,
19 2018, board of directors meeting notes.  Do you see that?
20 A.  I see that, yes.
21 Q.  That board meeting I will supply you Exhibit 29.
22 It's going to go in the chat in a second.
23 A.  Okay, I have it open.  It says Attachment 5 on
24 the first page.
25 Q.  Sure.  We got it as an attachment to your letter.

Page 179

1      If you look at the second page of
2  Exhibit 29, there is an email from Ahmad Razaghi to
3  Stenson Wauneka and cc's other people including you.  Do
4  you see that there?
5  A.  Yes.
6  Q.  "Dear Chair Wauneka and board members," the email
7  says, "I received these notes from the staff."  Do you see
8  that there?
9  A.  Yes.
10 Q.  Going down to the third page of Exhibit 29,
11 there's a document titled Special Board of Directors
12 Meeting August 20, 2018 at 4:00 p.m.  Do you see that
13 there?
14 A.  Yes.
15 Q.  Now, a couple times today you mentioned that the
16 board wouldn't talk to you.  These board meetings you did
17 go to, how did those go?
18     MR. MERRETT:  Form.
19 THE WITNESS:  The two that I went to as the
20 interim CEO, the co-CEO, they were just -- they didn't
21 engage with the team, with the leadership team at all.
22 They were very tense.
23 BY MR. BURNS:
24 Q.  Were you prepared to present something to the
25 board of directors at these meetings?

Page 180

1  A.  We are required to present at every board meeting
2  month-end financials, any audits that are done.  New
3  things that we are working on.
4      Quality has to be in every board meeting.
5  Reporting any quality measures, anything that were
6  exciting that happens.  Things like that.  Everything that
7  happened during the month.
8  Q.  Instead of presenting such information at the
9  board meeting that you went to, what did you do?
10 A.  I sat through the board meeting.  I was never
11 recognized or acknowledged.  There was a lot of chatter in
12 Navajo that of course I don't understand, and the board
13 meetings were over and we left.  It was very weird and
14 uncomfortable.
15 Q.  During one of these meetings, did you wait in the
16 hallway?
17 A.  I believe we did.  I don't know which one it was.
18 Maybe it was the last one that we -- we were onsite.  I
19 believe it was the last one we were onsite.  We did wait
20 in the hallway and we were never invited in.
21 Q.  What's your understanding of what executive
22 session is for a board of directors?
23 A.  Executive session is the board and the CEO.
24 Q.  Does it always have to be with the CEO?
25 A.  No.

Page 181

1  Q.  So what's your understanding of what the purpose
2  of the executive session is?
3  A.  Most of the time it's to talk about contractual
4  things.  There are any -- that would be the time if the
5  board had any issues with Razaghi or the management
6  company that they would discuss that with him and with
7  Ahmad, with Mr. Razaghi, and they try to address those
8  issues.
9      There might be some -- there might be a new
10 board member that they want to discuss in executive
11 session they wouldn't want the CEO in on necessarily.
12 Things like that.
13     Things -- their evaluation of the CEO.  That
14 would be another time that the CEO would be sent out and
15 then come back in for the discussion.
16 Q.  So you have an understanding that sometimes the
17 board of directors might not want the CEO present or the
18 management company present when they are talking about the
19 CEO or management company, right?
20 A.  That would be reasonable, yes.
21 Q.  When you were waiting in the hallway at one of
22 these meetings, did you understand that an executive
23 session was going on?
24 A.  I did not.  Normally the executive session isn't
25 the whole board meeting because we were required to



Page 182

1  **present to the board every month, so that wouldn't be**
2  **normal.**
3      Q.   Did you review the document we are looking at now
4  that's Page 3 of Exhibit 29 in preparation for your
5  testimony today?
6      **A.   No.**
7      Q.   I guess I'm trying to figure out what happens in
8  this hallway.  Did you overhear an executive session when
9  you were waiting in the hallway?
10     **A.   No.**
11     Q.   Who were you waiting in the hallway with?
12     **A.   I don't recall everyone, but I believe that**
13  **Cheryl Bailey was there, our CNO.**
14         **And then we were just spending a lot of time**
15  **out there waiting to come in, chatting with other leaders**
16  **in the organization.  You make lots of friends in**
17  **hospitals and things and just chatting, chatting it up**
18  **with them.**
19     Q.   Okay.  So let's look at Page 3 of Exhibit 29.
20  Present at the meeting, there's board members listed.
21  This may be obvious to you but I need to establish it.
22         Did any of the board members come into the
23  hallway with you?
24     **A.   Not that I recall.**
25     Q.   Then there is executive leadership, Mr. Tadd

Page 183

1  Greenfield, Mr. Hasan.  Do you see that there?
2      **A.   Hang on.  You are on Page 3?**
3      Q.   Page 3 of Exhibit 29.
4      **A.   What paragraph?**
5      Q.   You know, it's under the Notes section.  Present
6  at the meeting.  Do you see that there?  I'm sorry, we
7  don't have a Bates number on this one.
8      **A.   Oh.  Yes.  Yes, I see that.  Under Notes, uh-huh.**
9      Q.   There is a list of executive leadership.  Do you
10  see that there?
11     **A.   Yes.**
12     Q.   It lists you and Mr. Hasan.  Is that correct?
13     **A.   It does.**
14     Q.   Was Mr. Hasan in the hallway with you?
15     **A.   I don't recall.**
16     Q.   Then there is a number of people listed as
17  management.  Some are teleconference; some are physically
18  present.  Did any of those people wait in the hallway with
19  you?
20     **A.   I can't say for sure.**
21     Q.   You said that there was some chatter going on in
22  the hallway.  You were talking to people in the hallway,
23  right?
24     **A.   Uh-huh.  Yes.**
25     Q.   Could you hear the executive session that was

Page 184

1  going on while you chatted in the hallway?
2      **A.   No.**
3      Q.   Could you hear it at any point?
4      **A.   No.**
5      Q.   Were they speaking loudly and it was clearly
6  audible in the hallway?
7          MR. MERRETT:  Asked and answered.
8  BY MR. BURNS:
9      Q.   You can answer.
10     **A.   Far enough away -- there is a transition area in**
11  **between the executive team hallway where the executive**
12  **suite is and the board room is, and we were down in there.**
13  **So no, I didn't overhear anything about that.**
14     Q.   Was anyone waiting right by the door?
15     **A.   I don't recall.**
16     Q.   Would that have stood out to you that someone is
17  sitting right by the door?
18     **A.   I believe it would have.  I just don't recall**
19  **that.  Again, we were in that little transition hallway in**
20  **between.  But I don't recall anybody eavesdropping or any**
21  **of those types of things.  We couldn't hear anything.**
22     Q.   You said eavesdropping.  I mean, your
23  understanding of this was that executive sessions are
24  supposed to be private, right?
25     **A.   Yes.**

Page 185

1      Q.   And, you know, you talked a number of times today
2  about doing the right thing.  What would have been the
3  right thing if you had overheard executive session when
4  you were waiting in the hallway?
5      **A.   We would have went down to my office where I was**
6  **or we moved further down.**
7      Q.   If you had seen someone eavesdropping like right
8  by the door, would you have reported it?
9      **A.   I would have probably moved them myself.**
10     Q.   And you didn't see anything like that?
11     **A.   No.**
12     Q.   So this document -- and I'm starting at Page 3 of
13  Exhibit 29.  First of all, it logs that the meeting starts
14  at 4:40 p.m.  That says that at the top.  And then a
15  little over halfway down it says the board entered
16  executive section at 4:42 p.m.
17         Do you recall this meeting where they
18  basically moved into executive session immediately?
19     **A.   I don't recall whether we even entered the board**
20  **room at all and were sent out at 4:42.  I don't recall how**
21  **that actually happened.**
22     Q.   There's a narrative here.  Do you know who wrote
23  this document?
24     **A.   I do not know who wrote this document.**
25     Q.   There's a narrative.  I'm looking at the second

Page 186

1  paragraph from the bottom that says:  "The conversation
2  taking place in the executive conference room was very
3  loud and portions of it could be overheard by the group
4  waiting in the hall."
5        That was not your experience, was it?
6  **A.  I don't recall that.**
7  Q.  Just looking at the rest of this document, it's
8  sort of an account of an executive session.  Do you know
9  one way or the other whether this conversation that's
10  recorded actually occurred?
11  **A.  I don't.**
12  Q.  I am going to Exhibit 10 into the chat.  With
13  some luck it will be our last exhibit.
14  **A.  Okay, I have it open.**
15  Q.  Earlier there was some discussion about
16  Mr. Razaghi saying that a termination payment was
17  immediately payable.  Do you remember that discussion?
18  **A.  I do.**
19  Q.  Okay.  Do you have any knowledge -- I am looking
20  at Exhibit 10, Bates number ending in 1096, a document
21  entitled Escrow Agreement.
22        Do you have any knowledge of the escrow
23  agreement that was in place in 2018 when the relationship
24  ended?
25  **A.  I don't.**

Page 187

1  Q.  Did you know that the termination payment was
2  supposed to be made through a notice in an escrow payment
3  process?
4  MR. MERRETT:  Form.
5  **THE WITNESS:  I have no knowledge of this**
6  **document or the process.**
7  BY MR. BURNS:
8  Q.  Did Mr. Razaghi ever tell you why he just
9  short-cutted the escrow process?
10  MR. MERRETT:  Form.
11  **THE WITNESS:  I don't -- we didn't have a**
12  **conversation about the escrow agreement.**
13  BY MR. BURNS:
14  Q.  I'm asking if he told you why he didn't follow
15  the escrow process.
16  MR. MERRETT:  Same objection.
17  **THE WITNESS:  We never discussed the escrow**
18  **agreement.**
19  BY MR. BURNS:
20  Q.  Were you aware there was an escrow account?
21  **A.  Um.  No, I don't recall ever having a discussion**
22  **about an escrow agreement or an escrow account.**
23  MR. BURNS:  We are going to go off the
24  record for two minutes.  I should come back with no
25  questions, but we'll see.  We are off record.

Page 188

1        THE VIDEOGRAPHER:  We are going off the
2  record.  The time is 4:31 p.m.
3        (Recess taken 5:31 p.m. - 5:35 p.m.
4        Mountain Daylight Time)
5        THE VIDEOGRAPHER:  We are back on the
6  record.  The time is 4:35 p.m.
7  BY MR. BURNS:
8  Q.  We are back on the record.  Maybe one or two
9  follow-up questions.
10        Mr. Greenfield, I'm trying to determine when
11  you actually left Razaghi Healthcare.  Do you know the
12  approximate date of that?
13  **A.  I don't.  I can't tell you right off the top of**
14  **my head.**
15  Q.  Once you left Razaghi Healthcare, you stopped
16  sending emails using Razaghi Healthcare email, right?
17  **A.  Yes.**
18  Q.  Did you ever send an email from Razaghi
19  Healthcare again after you left?
20  **A.  I don't believe so.  I don't see how I could.**
21  Q.  Okay.  If I find an email from you on a date,
22  that's because you were still working at Razaghi
23  Healthcare at the time, right?
24  **A.  Yes, that would be accurate.**
25  Q.  During this last break, did you have a

Page 189

1  conversation with Mr. Merrett?
2  **A.  I did not.**
3        MR. BURNS:  I pass the witness.
4        MR. MERRETT:  I don't have any questions for
5  Mr. McGee -- I'm sorry -- Mr. Greenfield.
6        MR. BURNS:  Mr. Greenfield, thank you for
7  coming today.  We can go off the record.
8        MR. MERRETT:  Wilma, we will read and sign.
9        THE VIDEOGRAPHER:  This concludes the video
10  recorded deposition of Tadd S. Greenfield.  The time is
11  4:36 p.m.
12        (Deposition concluded at 5:36 p.m.
13        Mountain Daylight Time)
14
15
16        _____
        TADD SCOTT GREENFIELD
17
18
19
20
21
22
23
24
25



Page 190

```
 1   STATE OF ARIZONA   )
                        )   ss.
 2   COUNTY OF MARICOPA )
 3           BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7
             I CERTIFY that I am in no way related to any of
 8   the parties hereto, nor am I in any way interested in the
     outcome hereof.
 9
10       [X]  Review and signature was requested; any
     changes made by the witness will be attached to the
11   original transcript.
         [ ]  Review and signature was waived/not
12   requested.
         [ ]  Review and signature not required.
13
             I CERTIFY that I have complied with the ethical
14   obligations set forth in ACJA 7-206(F)(3) and
     ACJA 7-206 J(1)(g)(1) and (2).
15
             DATED at Phoenix, Arizona, this 17th day of June,
16   2024.
17
                 /s/ Wilma A. Weinreich_
18               WILMA A. WEINREICH
                Certified Stenographer
19             Arizona CR No. 50976
20
             *       *       *       *       *
21
         I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
22   complied with the ethical obligations set forth in ACJA
     7-206 (J)(1)(g)(1) through (6).
23
24               /s/ Pamela A. Griffin_
                GRIFFIN GROUP INTERNATIONAL
25             Registered Reporting Firm
                Arizona RRF No. R1005
```

Page 191

```
 1   GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

 2   3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

 3   Tadd-Greenfield-June 12, 2024

 4   Errata & Signature due no later than July 19, 2024.

 5

 7     PAGE  LINE  CORRECTIONS/CHANGES          REASON

 8     ____  ____  _____  _____

 9     ____  ____  _____  _____

10     ____  ____  _____  _____

11     ____  ____  _____  _____

12     ____  ____  _____  _____

13     ____  ____  _____  _____

14     ____  ____  _____  _____

15     ____  ____  _____  _____

16     ____  ____  _____  _____

17     ____  ____  _____  _____

18     ____  ____  _____  _____

19     ____  ____  _____  _____

20     ____  ____  _____  _____

21     ____  ____  _____  _____

22     ____  ____  _____  _____

23     ____  ____  _____  _____

24     _____       _____

25     SIGNATURE OF WITNESS              DATE
```



# EXHIBIT 76



**Razaghi Healthcare**
7150 E Camelback Rd
Suite 444
Scottsdale, AZ  85251-1257 US
(480) 477-8028
acc@razaghihealthcare.com
www.razaghihealthcare.com

# INVOICE

**BILL TO**
Navajo Health Foundation -
Sage Memorial Hospital
PO Box 457
Ganado, AZ  86505

**INVOICE #** 1367
**DATE** 08/27/2018

**TERMS** Due on receipt

| PROFESSIONAL SERVICE | CHARGE |
|---|---|
| **Reimbursable Legal & Professional Expenses**<br>Pass-Through Expenses<br>Interest charges for late payment September 10, 2014 to August 23, 2018 | 215,661.54 |
| **Professional Services Discount**<br>Professional Services Discount<br>Courtesy 5 day grace period discount | -79,249.28 |

BALANCE DUE          **$136,412.26**

RDC Sage_006796

2018.08.30 chair management meeting

## Navajo Sage Late Payment Interest Charges

| Date invoice | Inv # | Costs Paid | Date Paid | Days late | Interest Total | Courtesy 5 day grace period | |
|---|---|---|---|---|---|---|---|
| | | | | | | Days charged | Interest Courtesy |
| 9/10/14 | 1187 | 226,102.42 | 9/16/14 | 6 | 678.31 | 1 | 113.05 |
| 9/22/14 | 1189 | 193,781.59 | 9/23/14 | 1 | 96.89 | - | - |
| 10/7/14 | 1190 | 187,208.41 | 10/9/14 | 2 | 187.21 | - | - |
| 10/22/14 | 1191 | 206,783.22 | 10/23/14 | 1 | 103.39 | - | - |
| 11/3/14 | 1192 | 332,535.46 | 11/4/14 | 1 | 166.27 | - | - |
| 11/23/14 | 1193 | 187,586.10 | 11/24/14 | 1 | 93.79 | - | - |
| 12/1/14 | 1194 | 347,581.77 | 12/3/14 | 2 | 347.58 | - | - |
| 1/1/15 | 1195 | 543,450.96 | 1/2/15 | 1 | 271.73 | - | - |
| 1/13/15 | 1196 | 683,349.27 | 1/14/15 | 1 | 341.67 | - | - |
| 1/26/15 | 1197 | 261,989.24 | 1/28/15 | 2 | 261.99 | - | - |
| 2/3/15 | 1198 | 286,281.69 | 2/4/15 | 1 | 143.14 | - | - |
| 2/10/15 | 1199 | 244,502.44 | 2/11/15 | 1 | 122.25 | - | - |
| 2/23/15 | 1200 | 210,993.83 | 2/24/15 | 1 | 105.50 | - | - |
| 3/9/15 | 1201 | 227,069.02 | 3/12/15 | 3 | 340.60 | - | - |
| 3/9/15 | 1202 | 202,435.45 | 4/4/15 | 26 | 2,631.66 | 21 | 2,125.57 |
| 4/6/15 | 1203 | 468,161.31 | 4/8/15 | 2 | 468.16 | - | - |
| 4/21/15 | 1204 | 199,620.07 | 4/23/15 | 2 | 199.62 | - | - |
| 5/5/15 | 1205 | 180,518.87 | 5/8/15 | 3 | 270.78 | - | - |
| 5/20/15 | 1206 | 288,985.02 | 5/22/15 | 2 | 288.99 | - | - |
| 6/2/15 | 1207 | 259,061.20 | 6/8/15 | 6 | 777.18 | 1 | 129.53 |
| 6/16/15 | 1208 | 287,943.79 | 6/18/15 | 2 | 287.94 | - | - |
| 6/30/15 | 1209 | 221,810.88 | 7/6/15 | 6 | 665.43 | 1 | 110.91 |
| 7/15/15 | 1210 | 269,275.37 | 7/20/15 | 5 | 673.19 | - | - |
| 7/29/15 | 1211 | 188,715.75 | 8/3/15 | 5 | 471.79 | - | - |
| 8/11/15 | 1212 | 254,356.83 | 8/18/15 | 7 | 890.25 | 2 | 254.36 |
| 8/25/15 | 1213 | 269,840.74 | 8/31/15 | 6 | 809.52 | 1 | 134.92 |
| 9/8/15 | 1215 | 286,490.23 | 9/10/15 | 2 | 286.49 | - | - |
| 9/23/15 | 1216 | 568,216.87 | 9/28/15 | 5 | 1,420.54 | - | - |

RH Invoice 1367 - page 2 of 7

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/7/15 | 1217 | 281,437.34 | 10/13/15 | 6 | 844.31 | 1 | 140.72 |
| 10/18/15 | 1218 | 273,287.29 | 10/26/15 | 8 | 1,093.15 | 3 | 409.93 |
| 11/1/15 | 1219 | 339,246.55 | 11/10/15 | 9 | 1,526.61 | 4 | 678.49 |
| 11/16/15 | 1220 | ######### | 11/24/15 | 8 | 4,341.28 | 3 | 1,627.98 |
| 12/1/15 | 1221 | 396,056.06 | 12/3/15 | 2 | 396.06 | - | - |
| 12/15/15 | 1222 | 276,396.08 | 12/17/15 | 2 | 276.40 | - | - |
| 12/28/15 | 1223 | 287,270.81 | 12/30/15 | 2 | 287.27 | - | - |
| 1/11/16 | 1224 | 363,468.30 | 1/19/16 | 8 | 1,453.87 | 3 | 545.20 |
| 1/25/16 | 1225 | 337,943.05 | 1/27/16 | 2 | 337.94 | - | - |
| 2/8/16 | 1226 | 339,289.45 | 2/16/16 | 8 | 1,357.16 | 3 | 508.93 |
| 2/22/16 | 1227 | 404,366.57 | 2/24/16 | 2 | 404.37 | - | - |
| 3/7/16 | 1228 | 398,902.47 | 3/9/16 | 2 | 398.90 | - | - |
| 3/21/16 | 1229 | 321,798.93 | 3/23/16 | 2 | 321.80 | - | - |
| 4/4/16 | 1230 | 240,403.43 | 4/7/16 | 3 | 360.61 | - | - |
| 4/18/16 | 1231 | 359,932.32 | 4/20/16 | 2 | 359.93 | - | - |
| 5/2/16 | 1232 | 240,169.53 | 5/5/16 | 3 | 360.25 | - | - |
| 5/16/16 | 1233 | 347,075.18 | 5/19/16 | 3 | 520.61 | - | - |
| 5/31/16 | 1234 | 601,851.10 | 6/3/16 | 3 | 902.78 | - | - |
| 6/13/16 | 1235 | 270,287.78 | 6/15/16 | 2 | 270.29 | - | - |
| 6/27/16 | 1236 | 254,421.55 | 6/30/16 | 3 | 381.63 | - | - |
| 7/11/16 | 1237 | 627,887.11 | 7/16/16 | 5 | 1,569.72 | - | - |
| 7/21/16 | 1238 | ######### | 8/3/16 | 13 | 44,102.50 | 8 | 27,140.00 |
| 7/25/16 | 1239 | 354,579.22 | 7/27/16 | 2 | 354.58 | - | - |
| 8/8/16 | 1240 | 352,759.66 | 8/11/16 | 3 | 529.14 | - | - |
| 8/22/16 | 1241 | 293,487.19 | 8/25/16 | 3 | 440.23 | - | - |
| 9/6/16 | 1242 | 346,095.42 | 9/9/16 | 3 | 519.14 | - | - |
| 9/19/16 | 1243 | 319,784.07 | 9/22/16 | 3 | 479.68 | - | - |
| 10/4/16 | 1244 | 283,985.64 | 10/6/16 | 2 | 283.99 | - | - |
| 10/18/16 | 1245 | 361,417.48 | 1/4/17 | 78 | 14,095.28 | 73 | 13,191.74 |
| 10/31/16 | 1246 | 244,426.72 | 1/4/17 | 65 | 7,943.87 | 60 | 7,332.80 |
| 11/13/16 | 1247 | 327,777.23 | 1/12/17 | 60 | 9,833.32 | 55 | 9,013.87 |
| 11/28/16 | 1248 | 258,164.45 | 1/18/17 | 51 | 6,583.19 | 46 | 5,937.78 |
| 12/12/16 | 1249 | 374,747.61 | 1/26/17 | 45 | 8,431.82 | 40 | 7,494.95 |

RDC Sage_006798

2018.08.30 chair management meeting

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/27/16 | 1250 | 329,803.43 | 2/9/17 | 44 | 7,255.68 | 39 | 6,431.17 |
| 1/9/17 | 1251 | 398,961.31 | 1/12/17 | 3 | 598.44 | - | - |
| 1/23/17 | 1252 | ######### | 2/1/17 | 9 | 5,763.75 | 4 | 2,561.66 |
| 2/6/17 | 1253 | 580,900.32 | 2/10/17 | 4 | 1,161.80 | - | - |
| 2/21/17 | 1254 | 361,221.59 | 2/27/17 | 6 | 1,083.66 | - | - |
| 3/6/17 | 1255 | 294,273.70 | 3/9/17 | 3 | 441.41 | - | - |
| 3/20/17 | 1256 | 334,525.85 | 3/23/17 | 3 | 501.79 | - | - |
| 4/10/17 | 1257 | 360,000.43 | 4/12/17 | 2 | 360.00 | - | - |
| 4/18/17 | 1258 | 544,138.17 | 4/20/17 | 2 | 544.14 | - | - |
| 5/1/17 | 1259 | 581,305.81 | 5/9/17 | 8 | 2,325.22 | 3 | 871.96 |
| 5/17/17 | 1260 | 502,236.07 | 5/22/17 | 5 | 1,255.59 | - | - |
| 6/1/17 | 1261 | 499,617.92 | 7/17/17 | 46 | 11,491.21 | 41 | 10,242.17 |
| 6/29/17 | 1262 | 654,070.06 | 8/3/17 | 35 | 11,446.23 | 30 | 9,811.05 |
| 7/13/17 | 1263 | 458,447.07 | 8/10/17 | 28 | 6,418.26 | 23 | 5,272.14 |
| 7/23/17 | 1264 | 426,850.63 | 8/16/17 | 24 | 5,122.21 | 19 | 4,055.08 |
| 8/11/17 | 1265 | 297,735.69 | 9/14/17 | 34 | 5,061.51 | 29 | 4,317.17 |
| 8/24/17 | 1266 | 431,944.01 | 9/29/17 | 36 | 7,774.99 | 31 | 6,695.13 |
| 9/7/17 | 1267 | 338,848.45 | 9/28/17 | 21 | 3,557.91 | 16 | 2,710.79 |
| 9/25/17 | 1268 | 488,709.06 | 9/29/17 | 4 | 977.42 | - | - |
| 9/29/17 | 1269 | 230,549.32 | 9/29/17 | - | - | - | - |
| 10/20/17 | 1270 | 55,735.75 | 10/25/17 | 5 | 139.34 | - | - |
| 10/20/17 | 1271 | 68,145.30 | 10/25/17 | 5 | 170.36 | - | - |
| 10/20/17 | 1272 | 74,676.93 | 11/6/17 | 17 | 634.75 | 12 | 448.06 |
| 10/20/17 | 1273 | 103,095.60 | 10/25/17 | 5 | 257.74 | - | - |
| 11/1/17 | 1274 | 58,646.39 | 11/13/17 | 12 | 351.88 | 7 | 205.26 |
| 11/1/17 | 1275 | 57,383.95 | 11/13/17 | 12 | 344.30 | 7 | 200.84 |
| 11/1/17 | 1276 | 74,676.93 | 11/13/17 | 12 | 448.06 | 7 | 261.37 |
| 11/1/17 | 1277 | 81,926.74 | 11/13/17 | 12 | 491.56 | 7 | 286.74 |
| 11/20/17 | 1278 | 56,778.16 | 11/21/17 | 1 | 28.39 | - | - |
| 11/20/17 | 1279 | 64,570.14 | 11/21/17 | 1 | 32.29 | - | - |
| 11/20/17 | 1280 | 74,676.93 | 11/21/17 | 1 | 37.34 | - | - |
| 11/20/17 | 1281 | 69,422.64 | 11/21/17 | 1 | 34.71 | - | - |
| 11/28/17 | 1282 | 52,131.15 | 11/29/17 | 1 | 26.07 | - | - |

RDC Sage_006799

2018.08.30 chair management meeting

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/28/17 | 1283 | 46,627.98 | 11/29/17 | 1 | 23.31 | - | - |
| 11/28/17 | 1284 | 74,676.93 | 11/29/17 | 1 | 37.34 | - | - |
| 11/28/17 | 1285 | 133,198.81 | 11/29/17 | 1 | 66.60 | - | - |
| 12/12/17 | 1287 | 57,327.02 | 12/19/17 | 7 | 200.64 | 2 | 57.33 |
| 12/12/17 | 1288 | 39,019.57 | 12/22/17 | 10 | 195.10 | 5 | 97.55 |
| 12/12/17 | 1286 | 42,815.54 | 12/19/17 | 7 | 149.85 | 2 | 42.82 |
| 12/12/17 | 1289 | 74,676.93 | 12/22/17 | 10 | 373.38 | 5 | 186.69 |
| 1/3/18 | 1292 | 759,428.16 | 1/3/18 | - | - | - | - |
| 1/3/18 | 1293 | 74,676.93 | 1/3/18 | - | - | - | - |
| 1/3/18 | 1294 | 64,412.99 | 1/3/18 | - | - | - | - |
| 1/3/18 | 1295 | 85,545.23 | 1/3/18 | - | - | - | - |
| 1/3/18 | 1296 | 46,780.60 | 1/4/18 | 1 | 23.39 | - | - |
| 1/7/18 | 1297 | 74,448.08 | 1/31/18 | 24 | 893.38 | 19 | 707.26 |
| 1/21/18 | 1298 | 74,448.08 | 1/31/18 | 10 | 372.24 | 5 | 186.12 |
| 2/1/18 | 1300 | 31,421.82 | 2/6/18 | 5 | 78.55 | - | - |
| 2/14/18 | 1301 | 35,306.63 | 2/22/18 | 8 | 141.23 | 3 | 52.96 |
| 2/14/18 | 1302 | 81,143.19 | 2/22/18 | 8 | 324.57 | 3 | 121.71 |
| 2/14/18 | 1303 | 52,990.36 | 2/27/18 | 13 | 344.44 | 8 | 211.96 |
| 2/14/18 | 1304 | 46,033.10 | 2/22/18 | 8 | 184.13 | 3 | 69.05 |
| 2/14/18 | 1305 | 73,928.66 | 2/22/18 | 8 | 295.71 | 3 | 110.89 |
| 2/14/18 | 1306 | 89,094.51 | 2/27/18 | 13 | 579.11 | 8 | 356.38 |
| 2/16/18 | 1307 | 43,601.84 | 2/22/18 | 6 | 130.81 | 1 | 21.80 |
| 2/26/18 | 1308 | 51,824.12 | 2/27/18 | 1 | 25.91 | - | - |
| 2/22/18 | 1309 | 93,780.34 | 2/27/18 | 5 | 234.45 | - | - |
| 2/22/18 | 1310 | 76,826.12 | 2/27/18 | 5 | 192.07 | - | - |
| 2/23/18 | 1311 | 74,448.08 | 2/27/18 | 4 | 148.90 | - | - |
| 3/5/18 | 1312 | 74,448.08 | 3/5/18 | - | - | - | - |
| 3/5/18 | 1313 | 95,607.46 | 3/6/18 | 1 | 47.80 | - | - |
| 3/5/18 | 1314 | 76,992.38 | 3/6/18 | 1 | 38.50 | - | - |
| 3/19/18 | 1315 | 34,061.53 | 3/23/18 | 4 | 68.12 | - | - |
| 3/19/18 | 1316 | 74,448.08 | 3/20/18 | 1 | 37.22 | - | - |
| 3/20/18 | 1318 | 107,774.91 | 3/23/18 | 3 | 161.66 | - | - |
| 3/21/18 | 1317 | 65,160.58 | 3/27/18 | 6 | 195.48 | 1 | 32.58 |

RH Invoice 1367 - page 5 of 7

2018.08.30 chair management meeting

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4/2/18 | 1319 | 74,448.08 | 4/17/18 | 15 | 558.36 | 10 | 372.24 |
| 4/2/18 | 1320 | 41,448.24 | 4/17/18 | 15 | 310.86 | 10 | 207.24 |
| 4/2/18 | 1322 | 53,521.18 | 4/17/18 | 15 | 401.41 | 10 | 267.61 |
| 4/2/18 | 1321 | 88,633.23 | 4/17/18 | 15 | 664.75 | 10 | 443.17 |
| 4/2/18 | 1323 | 74,448.08 | 4/17/18 | 15 | 558.36 | 10 | 372.24 |
| 4/16/18 | 1324 | 81,013.55 | 4/19/18 | 3 | 121.52 | - | - |
| 4/16/18 | 1325 | 62,490.38 | 4/19/18 | 3 | 93.74 | - | - |
| 4/16/18 | 1326 | 24,737.87 | 4/19/18 | 3 | 37.11 | - | - |
| 4/30/18 | 1327 | 74,448.08 | 5/4/18 | 4 | 148.90 | - | - |
| 4/30/18 | 1328 | 28,065.00 | 5/4/18 | 4 | 56.13 | - | - |
| 4/30/18 | 1329 | 80,342.72 | 5/11/18 | 11 | 441.88 | 6 | 241.03 |
| 4/30/18 | 1330 | 75,020.76 | 5/11/18 | 11 | 412.61 | 6 | 225.06 |
| 5/11/18 | 1331 | 74,448.08 | 5/18/18 | 7 | 260.57 | 2 | 74.45 |
| 5/14/18 | 1332 | 13,204.35 | 5/18/18 | 4 | 26.41 | - | - |
| 5/14/18 | 1333 | 93,934.53 | 5/18/18 | 4 | 187.87 | - | - |
| 5/14/18 | 1334 | 72,178.49 | 5/18/18 | 4 | 144.36 | - | - |
| 5/25/18 | 1335 | 74,448.08 | 6/1/18 | 7 | 260.57 | 2 | 74.45 |
| 5/25/18 | 1336 | 164,609.35 | 6/1/18 | 7 | 576.13 | 2 | 164.61 |
| 5/29/18 | 1337 | 115,136.71 | 6/1/18 | 3 | 172.71 | - | - |
| 5/29/18 | 1338 | 63,430.29 | 6/1/18 | 3 | 95.15 | - | - |
| 6/8/18 | 1340 | 74,448.08 | 6/15/18 | 7 | 260.57 | 2 | 74.45 |
| 6/8/18 | 1341 | 70,919.79 | 6/15/18 | 7 | 248.22 | 2 | 70.92 |
| 6/11/18 | 1342 | 144,673.72 | 6/15/18 | 4 | 289.35 | - | - |
| 6/11/18 | 1343 | 61,657.11 | 6/15/18 | 4 | 123.31 | - | - |
| 6/22/18 | 1344 | 74,448.08 | 6/29/18 | 7 | 260.57 | 2 | 74.45 |
| 6/22/18 | 1345 | 184,829.24 | 6/29/18 | 7 | 646.90 | 2 | 184.83 |
| 6/25/18 | 1347 | 54,185.77 | 6/29/18 | 4 | 108.37 | - | - |
| 6/25/18 | 1346 | 109,323.80 | 6/25/18 | - | - | - | - |
| 7/6/18 | 1348 | 74,448.08 | 7/9/18 | 3 | 111.67 | - | - |
| 7/6/18 | 1349 | 22,656.01 | 7/9/18 | 3 | 33.98 | - | - |
| 7/10/18 | 1350 | 112,633.92 | 7/11/18 | 1 | 56.32 | - | - |
| 7/10/18 | 1351 | 68,209.67 | 7/11/18 | 1 | 34.10 | - | - |
| 7/17/18 | 1352 | (6,000.00) | credit memo | - | - | - | - |

RH Invoice 1367 - page 6 of 7

RDC Sage_006801

2018.08.30 chair management meeting

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7/19/18 | 1353 | 74,448.08 | 7/20/18 | 1 | 37.22 | - | - |
| 7/19/18 | 1354 | 32,775.89 | 7/20/18 | 1 | 16.39 | - | - |
| 7/30/18 | 1355 | 109,447.29 | 7/31/18 | 1 | 54.72 | - | - |
| 7/30/18 | 1356 | 67,126.53 | 7/31/18 | 1 | 33.56 | - | - |
| 8/3/18 | 1357 | 74,448.08 | 8/8/18 | 5 | 186.12 | - | - |
| 8/3/18 | 1358 | 105,174.13 | 8/8/18 | 5 | 262.94 | - | - |
| 8/6/18 | 1359 | 163,100.02 | 8/8/18 | 2 | 163.10 | - | - |
| 8/6/18 | 1360 | 124,729.95 | 8/8/18 | 2 | 124.73 | - | - |
| 8/17/18 | 1361 | 74,448.08 | 8/23/18 | 6 | 223.34 | 1 | 37.22 |
| 8/17/18 | 1362 | 23,720.97 | 8/23/18 | 6 | 71.16 | 1 | 11.86 |
| 8/20/18 | 1363 | 122,226.88 | 8/23/18 | 3 | 183.34 | - | - |
| 8/20/18 | 1364 | 91,135.03 | 8/23/18 | 3 | 136.70 | - | - |
| 8/23/18 | 1365 | 40,437.50 | 8/23/18 | - | - | - | - |

Total Interest Charges    215,661.54                136,412.26

RH Invoice 1367 - page 7 of 7

RDC Sage_006802

# EXHIBIT 77



**Razaghi Healthcare**
7150 E Camelback Rd
Suite 444
Scottsdale, AZ 85251-1257 US
(480) 477-8028
acc@razaghihealthcare.com
www.razaghihealthcare.com

# INVOICE

**BILL TO**
Navajo Health Foundation -
Sage Memorial Hospital
PO Box 457
Ganado, AZ 86505

**INVOICE #** 1368
**DATE** 08/27/2018

**TERMS** Due on receipt

| PROFESSIONAL SERVICE | CHARGE |
|---|---|
| **Reimbursable Legal & Professional Expenses**<br>Pass-Through Expenses<br>AIG coverage Navajo Sage no. 2147071623US, Self Insured Retention | 50,000.00 |

BALANCE DUE          **$50,000.00**

RDC Sage_006803

AIG Property Casualty
175 Water Street, 5th Floor
New York, NY 10038
www.aig.com

Matlie White
Analyst
Financial Lines
T 212 458 1561
F 844 763 0754
matlie.white@aig.com

July 20, 2018

taylor.fox@razaghihealthcare.com

Taylor Fox
Razaghi Healthcare
Highway 264 & Junction 191
Ganado, AZ 86505

RE:  **Claim:**       **Kory Razaghi**
     **Insured:**     **Navajo Health Foundation - Sage Memorial Hospital**
     **Policy No.:**  **02-245-97-21**
     **Our File #:**  **2147071623US**

Dear Ms. Fox:

Please be advised that I am the adjustor handling this matter and all future
correspondence should be directed to my attention. The purpose of this letter is to 1)
advise you of the preliminary coverage position for this matter under the policy,
which is subject to a mutual reservation of rights, 2) inform you about the
assignment of panel counsel and 3) request additional information as more fully set
forth below. Our coverage position is explained below.

AIG Claims, Inc. is the claims administrator handling claims arising under insurance
policy number 02-245-97-21 issued to Navajo Health Foundation – Sage Memorial
Hospital, Inc. by National Union Fire Insurance Company of Pittsburgh, PA,
("National Union"), a member underwriting company of American International
Group. This Not-for-Profit Risk Protector has a Policy Period effective from
September 30, 2017 to September 30, 2018 and is subject to a single aggregate limit
of liability of $5,000,000 applicable to indemnity and defense costs for all coverage
sections. As this Claim is defined to be a D&O Claim, there is a Separate Limit of
Liability in the amount of $2,000,000. We note that any Loss incurred against the
D&O limit will erode the policy aggregate limit. The self-insured retention for this
Claim is $50,000. The self-insured retention must be exhausted before any defense
and/or indemnity obligation exists.

We would like you to know that we appreciate you as a customer and are committed
to working closely with you in the defense of this matter. We expect that you may
have questions after reading this letter regarding our position and the practical
impact of the reservation of rights. Please feel free to contact me regarding any
questions about our coverage position as well as to discuss a plan of action for the
subject claim.

In considering your request for coverage, we have reviewed the insurance policy
referenced above, as well as the allegations asserted. No other policies were

RDC Sage_006804

considered. If you assert a right to coverage under another policy issued by any other member company of American International Group, please submit notice pursuant to the notice provisions contained in that policy.

Based on the information we have received to date, the following sets forth a summary of the allegations. On June 20, 2018, Kory Razaghi ("Plaintiff") filed a complaint in the District Court of Clark County, Nevada against Ahmad Razaghi ("Razaghi"), Manuel Morgan ("Morgan"), Morgan & Razaghi Healthcare, LLC ("MRH"), Razaghi Healthcare, LLC ("Razaghi Healthcare"), and Razaghi Development Company, LLC ("Razaghi Development") (collectively, "Defendants"). The complaint states that in February 2007, Navajo Health Foundation-Sage Memorial Hospital ("Sage") entered into a Contract (the "Sage Contract") with Morgan (UT), an entity formed by Plaintiff and Defendants Razaghi and Morgan. The Sage Contract was further amended to extend to September 30, 2013, but disputes arose between the parties and after litigation was commenced, a Settlement Agreement (the "Agreement") was signed in January 2013. The Agreement provided that Plaintiff was to be paid a one-sixth (16.67%) percentage of all development and management fees and that they were to be administered by a third-party administrator. Plaintiff alleges that one or all Defendants have received development fees, management fees and bonuses and failed to account these amounts to Plaintiff. Plaintiff asserts the following Causes of Action: (1) Breach of Agreement; and (2) Breach of the Duty of Good Faith and Fair Dealing and Accounting and seeks compensatory damages. Please advise if this is inaccurate or if there is additional information with regard to this matter.

Our preliminary view is that coverage is potentially afforded to Ahmad Razaghi for Loss, subject to our continuing analysis and reservations contained herein. Please note that no coverage is available for Manuel Morgan or Morgan & Razaghi Healthcare, LLC, as they are not Insureds under the policy. Relevant policy provisions are referenced below; please refer to the policy for its complete terms and conditions.

**Definitions**
Please note the definition of "Loss" contained in the D&O Coverage Section of the policy, which states in relevant part:

    (u)    **"Loss"** means damages, judgments, settlements, pre- and post-judgment interest, Defense Costs and Crisis Management Loss; however, Loss shall not include: (1) any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds; (2) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed; (3) civil or criminal fines or penalties; (4) taxes or tax penalties […]

RDC Sage_006805

**Exclusions**

Please note the exclusionary effect of Exclusion 3(e) of the D&O coverage section, as amended by Endorsement #11, which states in relevant part that with respect to Coverage B(i) only:

> The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

> (e)   alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an Insured under any express contract or agreement; provided, however, that this exclusion shall not apply to:

>> (i)   to the extent that any liability does not arise from such express contract or agreement; or

>> (ii)  Loss constituting **Defense Costs** of **Individual Insureds**;

Plaintiff's allegations solely arise out of the January 2013 Settlement Agreement. Since all allegations arise out of this Agreement, Exclusion 3(e) bars coverage for the Organization. Pursuant to subparagraph (ii), coverage is available to Ahmad Razaghi only for Loss constituting Defense Costs.

To the extent there are claims brought against non-Insureds and there are covered and uncovered matters, National Union reserves the right to an appropriate allocation of the Defense Costs. We shall contact you directly to further discuss a fair and reasonable allocation.

Clause 6 of the policy provides that Panel Counsel shall be utilized for all claims. It is further provided that the selection of a panel counsel firm shall be from the jurisdiction in which the claim is brought. A Panel Counsel list may be found attached to your policy as Appendix A, as well as on the website www-238.aig.com. Please identify the name of the Panel Counsel law firm you've retained to protect your interests in this claim and provide me with the name of the contact person and their contact information.

The policy provides that National Union has the right to effectively associate in the defense and settlement of this claim. To do so, we shall need to obtain additional information and updates. We request that defense counsel provide us a status report within 30 days from the receipt of this letter. Moreover, we ask for quarterly status updates, or more frequently as events arise.

The status reports should include: (a) the factual background of the case, including the relationship of the parties and chronology of events; (b) an assessment of liability; (c) an evaluation of damages; (d) the insured's position and defenses; (e) a

RDC Sage_006806

synopsis of significant depositions and an evaluation of witnesses; (f) likelihood of settlement; (g) scheduling orders; (h) an estimated litigation budget through discovery and trial; and (i) any important dates or deadlines including, but not limited to, any firm trial or mediation dates.

Please note that Clause 8, provides that the "Insured shall not admit or assume any liability or incur any Defense Costs without the prior written consent of the Insurer". Accordingly, only those Defense Costs incurred subsequent to June 22, 2018 shall be considered as Loss under the Policy and erode the retention, unless insurance provided under any other policy provides coverage for such Defense Costs.

Should a settlement demand be received or if the Insured is contemplating making an offer, please contact me at (212) 458-1561 or via e-mail at mattie.white@aig.com to further discuss the foregoing.

National Union's preliminary coverage position is based on the information presently available to us. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by National Union or any of its affiliates. National Union expressly reserves all of its rights under the Policy, at law or in equity, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.

Should you have any additional information that you feel would either cause us to review our position or would assist us in our investigation or determination, we ask that you advise us as soon as possible. Also, if you are served with any additional demands or amended complaints or pleadings, please forward them to us immediately, so that we can review our coverage position.

If you have any other insurance policies which may respond to this claim asserted, you should report this matter to the issuing carrier[s] immediately.

In closing, allow me to reiterate that we value you as a customer and encourage you to contact us should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Very truly yours,

Mattie White

*This correspondence is sent by AIG Claims, Inc. as authorized administrator for National Union Fire Insurance Company of Pittsburgh, Pa.

cc:    brad@buckner.com

RDC Sage_006807

# EXHIBIT 78

2018.08.30 chair management meeting

**From:** Tadd Greenfield
**Sent:** Wednesday, August 29, 2018 3:28 PM
**To:** Nicole Hardy
**Cc:** Thomas Matenaer
**Subject:** Re: Request from Board Member

Hi Nicole,

Requests such as these need to go through me. Please ask her to reach out to me for any and all requests including this one. When that occurs, I will get the invoices from you and send to her myself. That is the proper procedure.

Thank you for letting me know Nicole. Have a great day!

Tadd

Tadd S. Greenfield, BA, BSDH, BSN, MHA
Executive Vice President/Chief Operating Officer

Razaghi Healthcare
7150 E. Camelback Rd., Suite 444
Scottsdale, AZ 85251
Office: (480) 477-8028 | Facsimile: (480) 477-8001
www.razaghihealthcare.com



**Notice of Confidentiality:** The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized.

---

**From:** Nicole Hardy <nicole.hardy@sagememorial.com>
**Sent:** Wednesday, August 29, 2018 3:20:00 PM
**To:** Tadd Greenfield
**Cc:** Thomas Matenaer
**Subject:** Request from Board Member

Good afternoon Tadd,

I received a call from board member Ms. Ray Ann Terry. She requested for me to send her the last three months of invoices for Razaghi Healthcare.

I was not sure on what I should do as I did not want to get in trouble on both sides, meaning with my superiors and the board members. So I am asking for your advice as to how I am suppose to handle this request from our board member.

Thanks!

Confidential

*Nicole Hardy*

**Finance Department**

**Sage Memorial Hospital**

**PO Box 457**

**Ganado, Az 86505**

**Phone:** *(928)755-4866*

**Fax:** *(928)755-4610*

**Cellphone:** *(505)209-5842*

*Notice of Confidentiality: The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized*

SAGE0034705

# EXHIBIT 79

EXHIBIT 87
Witness: T. Greenfield
Date: June 12, 2024
Stenographer: Wilma Weinreich, #50976

## AFFIDAVIT OF TADD GREENFIELD

State of _Arizona_ )
                              ) ss.
County of _Maricopa_ )

Tadd Greenfield, being duly sworn, deposes and says:

1. I am over 21 years of age. I have personal knowledge of the facts stated herein.

2. I am the Executive Vice President/Chief Operating Officer of Razaghi Development Company, LLC, a Nevada limited liability company, dba Razaghi Healthcare ("RH"). From December 29, 2017 until August 31, 2018, I was a Consultant/Administrator of Navajo Health Foundation-Sage Memorial Hospital, Inc., an Arizona nonprofit corporation, located in Ganado, Arizona ("Navajo Sage").

3. On June 16, 2017, RH and Navajo Sage executed Amendment No. 2 to CEO Services Contract (the "Contract") effective as of July 6, 2016. Attached to the accompanying Affidavit of Ahmad R. Razaghi ("Razaghi Aff.") as Exhibit 3 is a true and correct copy of the Contract. The Contract referred to and amended a certain CEO Services Contract dated as of March 18, 2011, as previously amended on May 17, 2013. See Razaghi Aff., Ex. 3, p. 1; see also Razaghi Aff., Exs. 1 & 2.

4. From July 6, 2016 through August 31, 2018, when Navajo Sage terminated the Contract, RH provided management services to Navajo Sage under the Contract, and RH served as Navajo Sage's CEO under the Contract.

5. When I was hired by RH in December 2017, Ahmad R. Razaghi, the CEO of RH and Navajo Sage, had assigned RH's employees Christi El-Meligi and Netrisha Dalgai as Administrator and Interim Director of Operations of Navajo Sage, respectively. Later, Tausif Hasan ("Hasan") was assigned as Chief Financial Officer ("CFO") of Navajo Sage.

1

RDC Sage_000643

6. In July 2018, RH, through Ahmad R. Razaghi, assigned me as Administrator of Navajo Sage. Regarding personnel management, RH is responsible for overseeing the recruitment, hiring, promotion, disciplining, and firing of key corporate executives that report to the CEO, including the Administrator/Co-CEO. See Razaghi Aff., Ex. 3 § 2.C.2. The Position Description of the Administrator/Co-CEO states the position will, under the supervision of the CEO, be accountable for all hospital services and is responsible for the on-site direction for the Hospital including the staffing of the Hospital with adequate, qualified individuals.

7. RH, through Ahmad R. Razaghi, reassigned Christi El-Meligi to another corporate assignment when I was assigned as Administrator of Navajo Sage. The planning for this transition had been taking place for many months, and Christi El-Meligi had been involved in the meetings and discussions regarding the reassignment plan and transition.

8. At the time of my hire, Ahmad R. Razaghi had been working with the CPA firm BDO to complete a finance department restructuring and turnaround plan for Navajo Sage. Over the next few months, I was closely involved with the BDO CPA team as they conducted an in-depth finance department assessment and assisted RH in developing a restructuring plan to fix what have been damaged by the Indian Health Service's contract termination and underfunding of Navajo Sage since late 2014.

9. Around March 2018, Hasan was assigned by RH, through Ahmad R. Razaghi, to the CFO position to complete the FY 2017 audit and the BDO finance department restructuring plan. I worked with Hasan to hire and manage temporary consultants who fulfilled the roles of controller, revenue cycle manager, two accountants, and a short-term supply chain resource to assess the finance department to implement the restructuring plan outlined in the BDO report. These

RDC Sage_000644

positions had previously been empty. These consultants were forced to leave by Navajo Sage upon the termination of the RH contract on August 31, 2018.

10. Regarding Contract Management, the Contract authorizes RH to negotiate, enter into, terminate, delegate, and administer all contracts to discharge the scope of services required in the Board-approved capital expenditure and operating budgets. Ahmad R. Razaghi provided many of RH's own contracted resources to further support Navajo Sage without any markup on those services. These services included contracting with strategic partners to obtain human capital resources, specifically, clinical and operational expertise.

11. Section 4.C. of the Contract states in part: "In the event that this Contract expires, or RH terminates this contract for cause, or the Corporation elects to terminate this Contract at any time prior to termination of this Contract for any reason other than those listed as 'cause' in Section 4.A., the Corporation shall pay to RH (a) a sum equal to the entire compensation outlined in this Contract up to the date of such expiration or termination plus (b) the Termination Payment." Razaghi Aff., Ex. 3, p. 8.

12. Section 5.D.2. of the Contract states: "In the event that this Contract expires, or RH terminates this Contract for cause, or the Corporation elects to terminate this Contract at any time prior to expiration of this Contract for any reason other than those listed as 'cause' in Section 4.A., the Corporation shall, in addition to any other amounts due under this Contract, pay RH a Termination Payment in an amount equal to the average of the amount paid to RH by the Corporation each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration or termination." Razaghi Aff., Ex. 3, p. 10.

RDC Sage_000645

13. On August 7, 2018, Navajo Sage's finance department estimated the Termination Payment under the Contract would be $10,598,851.00. Attached hereto as Exhibit 1 is a true and correct copy of said estimate.

14. At a Navajo Sage Board of Directors ("Board") meeting on August 20, 2018, Jeffrey Davis, an attorney who had been purportedly hired by the Board, said that there is a termination clause in the Contract which would require Navajo Sage to pay RH $7-8 million if the Contract is terminated early. Attached hereto as Exhibit 2 is a true and correct copy of an email dated August 29, 2018 from Ahmad R. Razaghi to the Chair and other Board members with attached Notes from the staff concerning the Special Board of Directors Meeting on August 20, 2018 reflecting Attorney Davis's statement about the Termination Payment. I attended part of the August 20, 2018 Navajo Sage Board meeting, at which management was not allowed by the Board to report on their audited financial statements for FY 2017 or the IRS Form 990.

15. On August 27, 2018, RH emailed to Navajo Sage RH's Invoice #1369 dated August 27, 2018 showing a balance due of $10,855,134.15 as the Termination Payment under the Contract. Attached hereto as Exhibit 3 is a true and correct copy of said email and said invoice. The invoice was approved by Sage's Finance Department and paid in the ordinary course.

16. On August 31, 2018, the Board adopted a resolution terminating the Contract. Attached hereto as Exhibit 4 is a true and correct copy of said Board Resolution dated August 31, 2018.

17. On September 2, 2018, Navajo Sage management scheduled a Navajo Sage/RH finance meeting on September 4, 2018 to reconcile any discrepancies in RH invoice #1369 of $10.8 million and Navajo Sage finance estimate of $10.6 million for the Termination Payment.

4

Attached hereto as Exhibit 5 is a true and correct copy of an Agenda for the September 4, 2018

Sage Finance Department Executive Meeting.

18.  By memorandum dated September 3, 2018, Gary Pahe, Navajo Sage's Interim Chief

Executive Officer, informed Navajo Sage staff that effective August 31, 2018 the Navajo Sage

Board enacted a resolution to terminate the Contract and that the Board directs the staff to cease

all communications with RH employees.  Attached hereto as Exhibit 6 is a true and correct copy

of said memorandum.  Navajo Sage accordingly canceled the September 4, 2018 reconciliation

meeting.

19.  Further affiant sayeth naught.

_____
Tadd Greenfield

Subscribed and sworn to before me this **2 7** day of *October*, 2018



Notary Public

My commission expires: ____6-14-2021____

OFFICIAL SEAL
**ALLISON KIRTS**
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Commission Expires June 14, 2021

5

# EXHIBIT 1

RDC Sage_000648

Razaghi Healthcare

| Management Fee | | Audited |
|---|---|---|
| FY 2014 | $ | 6,655,019 |
| FY 2015 | $ | 8,209,646 |
| FY 2016 | $ | 16,420,893 |
| FY 2017 | $ | 11,109,846 |
| | $ | 42,395,404 |
| | | |
| Average last 4 years | $ | 10,598,851.00 |

RDC Sage_000649

# EXHIBIT 2

RDC Sage_000650

9/13/2018                              Razaghi Healthcare Memorandum to the Board of Directors

↩ Reply | ˅    🗑 Delete    Junk | ˅    •••

# Razaghi Healthcare Memorandum to the Board of Directors

AR    **Ahmad R. Razaghi**                                      👍    ↩ Reply | ˅
       Wed 8/29/2018 12:42 PM
       To:  Stenson D. Wauneka <stenson.wauneka@sagememorial.com>; rat2011.01@gmail.com; maykelewood@gmail.com
       Cc:  Stephen Hoffman <stephen.hoffman@lewisbrisbois.com>; Paul Frye <pef@fryelaw.us>;
            Colin Campbell <ccampbell@omlaw.com>; Chris Stachowiak <cstachowiak@omlaw.com>;    Tadd Greenfield;
            ˒ Cheryl Bailey ˄

Sent Items

   This message was sent with high importance.

   You replied on 9/1/2018 4:49 AM.

   Label: entire never delete (Never) Expires: Never

   ┌─────────────────────────────┐
   │  BOD Memo August 29 ...    ˅ │
   │  290 KB                      │
   └─────────────────────────────┘

   ˄ 1 attachments (290 KB)   Download    Save to OneDrive - Razaghi Corporations

Chair Wauneka,

Please find attached memorandum.

As discussed in the attached memorandum, there is no funding or staff support for the proposed
meetings tonight and this weekend.

Thank you,
Ahmad

**Ahmad R. Razaghi, ME, MBA, ACHE**
President, Chief Executive Officer

Razaghi Healthcare
7150 E Camelback Road, Suite 444
Scottsdale, AZ  85251
Office: (480) 477-8028
Facsimile: (480) 477-8001
www.razaghihealthcare.com



RDC Sage_000651

9/13/2018                    Razaghi Healthcare Memorandum to the Board of Directors

↩ Reply | ⌄     🗑 Delete     Junk | ⌄     •••

dissemination or other use of, or taking any action in reliance upon, this information by anyone other than
the intended recipient is not authorized.

RDC Sage_000652



7150 E. Camelback Road, Suite 444
Scottsdale, AZ 85251
Office:     (480) 477-8028
Facsimile: (480) 477-8001
www.razaghihealthcare.com

August 29, 2018

M E M O R A N D U M

TO:    Hon. Stenson Wauneka, Chair
       Ms. Ray Ann Terry, member
       Mr. Andrew Simpson, member
       Ms. Maybelle Kelewood, member

CC:    Christopher S. Stachowiak, Esq.
       Hon. Colin Campbell, Esq.
       Stephen D. Hoffman, Esq.
       Paul E. Frye, Esq.
       Mr. Tadd Greenfield
       Ms. Cheryl Bailey

FR: Ahmad R. Razaghi

RE: Recent Activities of Board of Directors or Individual Members Thereof

I write to express concerns over the state of the Board of Directors (where only four members remain and where all of the terms of these four have expired), the actions of individual members of the Board, excessive special Board meetings likely conducted in violation of the Bylaws of the Navajo Health Foundation - Sage Memorial Hospital, Inc. ("Navajo Sage"), and an invalid purported agreement with a Michigan attorney. In sum, management intends to deal with these and related issues by, among other things, promptly facilitating the seating a seven-member Board, informing the Michigan attorney (Jeff Davis) that he has no authority to represent Navajo Sage under governing Navajo law and will not be paid, paying stipends and expenses only for duly called regular Board meetings, and communicating with the Board only through the Chairperson or the Board's authorized legal counsel.

The contract with the Michigan attorney, of the firm of Barnes & Thornburg, is invalid under Navajo law, even if (for the sake of argument only) it had been approved by a majority of the Board of Directors at a duly called meeting. The Navajo Business Opportunity Act ("NBOA") prescribes RFP and bidding procedures that apply to all professionals. See, e.g., Iina Ba, Inc. v. Navajo Business Regulatory, No. SC-CV-60-10 (Nav. Sup. Ct. Sept. 3, 2015). In addition, I have checked with the Arizona State and Navajo Nation Bar Associations, and Jeff Davis is not a member in good

Healthcare Executive Leadership and Consulting

SCOTTSDALE, ARIZONA                                          NAVAJO NATION, ARIZONA



7150 E. Camelback Road, Suite 444
Scottsdale, AZ 85251
Office:    (480) 477-8028
Facsimile: (480) 477-8001
www.razaghihealthcare.com

standing of either and therefore does not meet the minimum qualifications to serve as counsel for Navajo Sage. Management will not pay any invoices from Mr. Davis or his firm, and he will be notified of that fact promptly. If any individual Board member wants to retain the services of Mr. Davis (at $550 per hour, far above the rates paid to other Navajo Sage special or general counsel), that member may do so at his or her personal expense, of course.

I understand that certain Board members have often met recently, apparently in the belief that these meetings constituted special Board meetings. These meetings were not conducted in conformity with Article VI, Section 5 of the Navajo Sage Bylaws. To be consistent with Navajo Sage's governing documents, its ISDEAA contract, and IRS guidance, management will not pay stipends or expenses incurred by Board members for their attendance at meetings not conducted in accordance with the Bylaws. Because of the dysfunctionality of the current four-member Board (where one member admits to being often confused and easily manipulated), management will pay stipends and expenses for duly called regular Board meetings at which a quorum is present.

Navajo Sage does need its own corporate counsel. In conformity with the NBOA, management will promptly begin the RFP process to assist the Board in selecting a firm or an attorney licensed in the Navajo Nation. I understand that Mr. Hoffman has already provided to the Board a form of RFP that will streamline this process. Under subsection 2.C.6 of the management agreement, Razaghi Healthcare has determined that it is necessary to retain special counsel to assist the Board in the interim, and I have selected the firm of Lewis Brisbois to serve as counsel for Navajo Sage until the Board is properly constituted and functioning. You are aware of the capabilities of that firm, as its partner Stephen Hoffman recently negotiated the $210 million settlement in favor of Navajo Sage with the Indian Health Service. Management will look to Mr. Hoffman or others in his firm for guidance on any matters of controversy.

The Board has received opinions from its former general counsel Franklin Hoover, your special counsel Stephen Hoffman, and Razaghi Healthcare's counsel Christopher Stachowiak of Osborn Maledon, all confirming the propriety of management's actions in its deployment of RH employees and related decisions. Nonetheless, it appears that certain Board members are unconcerned with the Board's contractual obligations to RH. Thus, this Memorandum is sent reserving all rights of RH.

Thank you for your consideration.

* * *

Healthcare Executive Leadership and Consulting

SCOTTSDALE, ARIZONA                                    NAVAJO NATION, ARIZONA

# EXHIBIT 3

RDC Sage_000655

9/18/2018                    Navajo Sage invoice 1369 now due [total $10,855,134.15]

🔁 Reply all | ⌄      🗑 Delete    Junk | ⌄    •••

# Navajo Sage invoice 1369 now due [total $10,855,134.15]

A    **Acc**                                                    ✎      🔁 Reply all  | ⌄
     Mon 8/27, 9:49 AM
     accountspayable@sagememorial.com; Tausif Hasan; Tadd Greenfield  ⌄

Inbox

          📄 2018.08.27 Invoice 1369...      ⌄
             910 KB

     ⌄ Show all 1 attachments (910 KB)   Download

     Please see attached invoice for approval and payment.


     Kind regards!


     —
     **Financial Accounting**

     Razaghi Healthcare
     7150 E Camelback Road, Suite 444
     Scottsdale, AZ  85251
     Office: (480) 477-8028
     Facsimile: (480) 477-8001
     www.razaghihealthcare.com
     acc@razaghihealthcare.com



**Notice of Confidentiality:** The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking any action in reliance upon, this information by anyone other than the intended recipient is not authorized.

RDC Sage_000656

9/18/2018                          Navajo Sage Invoice 1369 now due [total $10,855,134.15]

↺ Reply all | ⌄      🗑 Delete     Junk | ⌄     •••

RDC Sage_000657



Razaghi Healthcare
7150 E Camelback Rd
Suite 444
Scottsdale, AZ  85251-1257 US
(480) 477-8028
acc@razaghihealthcare.com
www.razaghihealthcare.com

# INVOICE

BILL TO

Navajo Health Foundation ·
Sage Memorial Hospital
PO Box 457
Ganado, AZ  86505

INVOICE # 1369
DATE 08/27/2018

TERMS  Due on receipt

| PROFESSIONAL SERVICE | CHARGE |
|---|---|
| Reimbursable Legal & Professional Expenses<br>Pass-Through Expenses<br>Contract Termination Fee, Section 5.D<br>September 01, 2014 to August 27, 2018 | 15,937,168.45 |
| Professional Services Discount<br>Professional Services Discount<br>Discount below Fair Market Value | -5,082,034.30 |

BALANCE DUE          **$10,855,134.15**

RDC Sage_000658

Razaghi Healthcare Severance Calculations

|  | Costs Incurred | Costs Paid | Costs not paid |
|---|---|---|---|
| 4 year total | 63,748,673.81 | 43,420,536.60 | 20,328,137.21 |
| 4 year average | 15,937,168.45 | 10,855,134.15 | 5,082,034.30 |

| Date Invoice | Inv # | Total Costs | Costs Paid | Costs not paid | Date Paid |
|---|---|---|---|---|---|
| 9/10/14 | 1187 | 402,821.42 | 226,102.42 | 176,719.00 | 9/16/14 |
| 9/22/14 | 1189 | 377,009.84 | 193,781.59 | 183,228.25 | 9/23/14 |
| 10/7/14 | 1190 | 365,819.21 | 187,208.41 | 178,610.80 | 10/9/14 |
| 10/22/14 | 1191 | 408,453.72 | 206,783.22 | 201,670.50 | 10/23/14 |
| 11/3/14 | 1192 | 577,182.96 | 332,535.46 | 244,647.50 | 11/4/14 |
| 11/23/14 | 1193 | 356,732.85 | 187,586.10 | 169,146.75 | 11/24/14 |
| 12/1/14 | 1194 | 916,652.77 | 347,581.77 | 569,071.00 | 12/3/14 |
| 1/1/15 | 1195 | 886,239.46 | 543,450.96 | 342,788.50 | 1/2/15 |
| 1/13/15 | 1196 | 845,779.87 | 683,349.27 | 162,430.60 | 1/14/15 |
| 1/26/15 | 1197 | 431,586.24 | 261,989.24 | 169,597.00 | 1/28/15 |
| 2/3/15 | 1198 | 294,158.88 | 286,281.69 | 7,877.19 | 2/4/15 |
| 2/10/15 | 1199 | 450,939.94 | 244,502.44 | 206,437.50 | 2/11/15 |
| 2/23/15 | 1200 | 390,068.83 | 210,993.83 | 179,075.00 | 2/24/15 |
| 3/9/15 | 1201 | 416,820.07 | 227,069.02 | 189,751.05 | 3/12/15 |
| 3/9/15 | 1202 | 418,452.65 | 202,435.45 | 216,017.20 | 4/4/15 |

RDC Sage_000659

| | | | | | |
|---|---|---|---|---|---|
| 4/6/15 | 1203 | 630,742.81 | 468,161.31 | 162,581.50 | 4/8/15 |
| 4/21/15 | 1204 | 358,334.57 | 199,620.07 | 158,714.50 | 4/23/15 |
| 5/5/15 | 1205 | 339,314.87 | 180,518.87 | 158,796.00 | 5/8/15 |
| 5/20/15 | 1206 | 476,708.27 | 288,985.02 | 187,723.25 | 5/22/15 |
| 6/2/15 | 1207 | 412,771.45 | 259,061.20 | 153,710.25 | 6/8/15 |
| 6/16/15 | 1208 | 458,345.29 | 287,943.79 | 170,401.50 | 6/18/15 |
| 6/30/15 | 1209 | 361,561.63 | 221,810.88 | 139,750.75 | 7/6/15 |
| 7/15/15 | 1210 | 421,249.62 | 269,275.37 | 151,974.25 | 7/20/15 |
| 7/29/15 | 1211 | 362,446.00 | 188,715.75 | 173,730.25 | 8/3/15 |
| 8/11/15 | 1212 | 441,341.08 | 254,356.83 | 186,984.25 | 8/18/15 |
| 8/25/15 | 1213 | 463,684.74 | 269,840.74 | 193,844.00 | 8/31/15 |
| 9/8/15 | 1215 | 455,740.98 | 286,490.23 | 169,250.75 | 9/10/15 |
| 9/23/15 | 1216 | 1,016,383.42 | 568,216.87 | 448,166.55 | 9/28/15 |
| 10/7/15 | 1217 | 481,053.59 | 281,437.34 | 199,616.25 | 10/13/15 |
| 10/18/15 | 1218 | 409,720.49 | 273,287.29 | 136,433.20 | 10/26/15 |
| 11/1/15 | 1219 | 638,289.56 | 339,246.55 | 299,043.01 | 11/10/15 |
| 11/16/15 | 1220 | 1,265,532.59 | 1,085,318.93 | 180,213.66 | 11/24/15 |
| 12/1/15 | 1221 | 591,439.21 | 396,056.06 | 195,383.15 | 12/3/15 |
| 12/15/15 | 1222 | 455,912.74 | 276,396.08 | 179,516.66 | 12/17/15 |
| 12/28/15 | 1223 | 511,702.00 | 287,270.81 | 224,431.19 | 12/30/15 |
| 1/11/16 | 1224 | 536,852.42 | 363,468.30 | 173,384.12 | 1/19/16 |
| 1/25/16 | 1225 | 520,444.69 | 337,943.05 | 182,501.64 | 1/27/16 |
| 2/8/16 | 1226 | 552,435.07 | 339,289.45 | 213,145.62 | 2/16/16 |
| 2/22/16 | 1227 | 586,404.48 | 404,366.57 | 182,037.91 | 2/24/16 |
| 3/7/16 | 1228 | 578,539.92 | 398,902.47 | 179,637.45 | 3/9/16 |
| 3/21/16 | 1229 | 469,302.21 | 321,798.93 | 147,503.28 | 3/23/16 |
| 4/4/16 | 1230 | 365,794.85 | 240,403.43 | 125,391.42 | 4/7/16 |
| 4/18/16 | 1231 | 590,116.36 | 359,932.32 | 230,184.04 | 4/20/16 |
| 5/2/16 | 1232 | 385,992.67 | 240,169.53 | 145,823.14 | 5/5/16 |
| 5/16/16 | 1233 | 498,990.09 | 347,075.18 | 151,914.91 | 5/19/16 |
| 5/31/16 | 1234 | 839,613.35 | 601,851.10 | 237,762.25 | 6/3/16 |
| 6/13/16 | 1235 | 418,112.28 | 270,287.78 | 147,824.50 | 6/15/16 |
| 6/27/16 | 1236 | 410,087.30 | 254,421.55 | 155,665.75 | 6/30/16 |
| 7/11/16 | 1237 | 858,808.11 | 627,887.11 | 230,921.00 | 7/16/16 |
| 7/21/16 | 1238 | 6,785,000.00 | 6,785,000.00 | - | 8/3/16 |
| 7/25/16 | 1239 | 560,988.72 | 354,579.22 | 206,409.50 | 7/27/16 |
| 8/8/16 | 1240 | 502,078.16 | 352,759.66 | 149,318.50 | 8/11/16 |
| 8/22/16 | 1241 | 481,392.44 | 293,487.19 | 187,905.25 | 8/25/16 |
| 9/6/16 | 1242 | 520,314.17 | 346,095.42 | 174,218.75 | 9/9/16 |
| 9/19/16 | 1243 | 474,493.82 | 319,784.07 | 154,709.75 | 9/22/16 |
| 10/4/16 | 1244 | 480,987.89 | 283,985.64 | 197,002.25 | 10/6/16 |
| 10/18/16 | 1245 | 515,309.08 | 361,417.48 | 153,891.60 | 1/4/17 |
| 10/31/16 | 1246 | 406,485.97 | 244,426.72 | 162,059.25 | 1/4/17 |
| 11/13/16 | 1247 | 498,237.12 | 327,777.23 | 170,459.89 | 1/12/17 |
| 11/28/16 | 1248 | 403,745.95 | 258,164.45 | 145,581.50 | 1/18/17 |

RDC Sage_000660

| | | | | | |
|---|---|---|---|---|---|
| 12/12/16 | 1249 | 557,050.36 | 374,747.61 | 182,302.75 | 1/26/17 |
| 12/27/16 | 1250 | 470,955.43 | 329,803.43 | 141,152.00 | 2/9/17 |
| 1/9/17 | 1251 | 512,029.31 | 398,961.31 | 113,068.00 | 1/12/17 |
| 1/23/17 | 1252 | 1,549,181.14 | 1,280,832.39 | 268,348.75 | 2/1/17 |
| 2/6/17 | 1253 | 761,761.07 | 580,900.32 | 180,860.75 | 2/10/17 |
| 2/21/17 | 1254 | 617,176.59 | 361,221.59 | 255,955.00 | 2/27/17 |
| 3/6/17 | 1255 | 466,260.70 | 294,273.70 | 171,987.00 | 3/9/17 |
| 3/20/17 | 1256 | 565,334.35 | 334,525.85 | 230,808.50 | 3/23/17 |
| 4/10/17 | 1257 | 617,998.83 | 360,000.43 | 257,998.40 | 4/12/17 |
| 4/18/17 | 1258 | 811,274.27 | 544,138.17 | 267,136.10 | 4/20/17 |
| 5/1/17 | 1259 | 833,454.96 | 581,305.81 | 252,149.15 | 5/9/17 |
| 5/17/17 | 1260 | 813,494.82 | 502,236.07 | 311,258.75 | 5/22/17 |
| 6/1/17 | 1261 | 748,269.37 | 499,617.92 | 248,651.45 | 7/17/17 |
| 6/29/17 | 1262 | 1,088,083.66 | 654,070.06 | 434,013.60 | 8/3/17 |
| 7/13/17 | 1263 | 676,406.82 | 458,447.07 | 217,959.75 | 8/10/17 |
| 7/23/17 | 1264 | 687,184.38 | 426,850.63 | 260,333.75 | 8/16/17 |
| 8/11/17 | 1265 | 460,142.89 | 297,735.69 | 162,407.20 | 9/14/17 |
| 8/24/17 | 1266 | 672,420.06 | 431,944.01 | 240,476.05 | 9/29/17 |
| 9/7/17 | 1267 | 559,713.75 | 338,848.45 | 220,865.30 | 9/28/17 |
| 9/25/17 | 1268 | 682,544.76 | 488,709.06 | 193,835.70 | 9/29/17 |
| 9/29/17 | 1269 | 396,877.87 | 230,549.32 | 166,328.55 | 9/29/17 |
| 10/20/17 | 1270 | 102,688.25 | 55,735.75 | 46,952.50 | 10/25/17 |
| 10/20/17 | 1271 | 188,326.60 | 68,145.30 | 120,181.30 | 10/25/17 |
| 10/20/17 | 1272 | 74,676.93 | 74,676.93 | - | 11/6/17 |
| 10/20/17 | 1273 | 103,095.60 | 103,095.60 | - | 10/25/17 |
| 11/1/17 | 1274 | 102,797.39 | 58,646.39 | 44,151.00 | 11/13/17 |
| 11/1/17 | 1275 | 145,791.95 | 57,383.95 | 88,408.00 | 11/13/17 |
| 11/1/17 | 1276 | 74,676.93 | 74,676.93 | - | 11/13/17 |
| 11/1/17 | 1277 | 171,471.05 | 81,926.74 | 89,544.31 | 11/13/17 |
| 11/20/17 | 1278 | 107,651.16 | 56,778.16 | 50,873.00 | 11/21/17 |
| 11/20/17 | 1279 | 172,427.39 | 64,570.14 | 107,857.25 | 11/21/17 |
| 11/20/17 | 1280 | 74,676.93 | 74,676.93 | - | 11/21/17 |
| 11/20/17 | 1281 | 69,422.64 | 69,422.64 | - | 11/21/17 |
| 11/28/17 | 1282 | 94,179.40 | 52,131.15 | 42,048.25 | 11/29/17 |
| 11/28/17 | 1283 | 118,143.63 | 46,627.98 | 71,515.65 | 11/29/17 |
| 11/28/17 | 1284 | 74,676.93 | 74,676.93 | - | 11/29/17 |
| 11/28/17 | 1285 | 133,198.81 | 133,198.81 | - | 11/29/17 |
| 12/12/17 | 1287 | 101,663.52 | 57,327.02 | 44,336.50 | 12/19/17 |
| 12/12/17 | 1288 | 39,019.57 | 39,019.57 | - | 12/22/17 |
| 12/12/17 | 1286 | 116,329.04 | 42,815.54 | 73,513.50 | 12/19/17 |
| 12/12/17 | 1289 | 74,676.93 | 74,676.93 | - | 12/22/17 |
| 1/3/18 | 1292 | 759,428.16 | 759,428.16 | - | 1/3/18 |
| 1/3/18 | 1293 | 74,676.93 | 74,676.93 | - | 1/3/18 |
| 1/3/18 | 1294 | 110,639.74 | 64,412.99 | 46,226.75 | 1/3/18 |
| 1/3/18 | 1295 | 85,545.23 | 85,545.23 | - | 1/3/18 |

RDC Sage_000661

| 1/3/18 | 1296 | 123,371.85 | 46,780.60 | 76,591.25 | 1/4/18 |
|---|---|---|---|---|---|
| 1/7/18 | 1297 | 74,873.00 | 74,448.08 | 424.92 | 1/31/18 |
| 1/21/18 | 1298 | 74,873.00 | 74,448.08 | 424.92 | 1/31/18 |
| 2/1/18 | 1300 | 31,421.82 | 31,421.82 | | 2/6/18 |
| 2/14/18 | 1301 | 81,235.13 | 35,306.63 | 45,928.50 | 2/22/18 |
| 2/14/18 | 1302 | 190,444.69 | 81,143.19 | 109,301.50 | 2/22/18 |
| 2/14/18 | 1303 | 147,725.11 | 52,990.36 | 94,734.75 | 2/27/18 |
| 2/14/18 | 1304 | 83,269.60 | 46,033.10 | 37,236.50 | 2/22/18 |
| 2/14/18 | 1305 | 132,454.91 | 73,928.66 | 58,526.25 | 2/22/18 |
| 2/14/18 | 1306 | 156,430.76 | 89,094.51 | 67,336.25 | 2/27/18 |
| 2/16/18 | 1307 | 43,601.84 | 43,601.84 | - | 2/22/18 |
| 2/26/18 | 1308 | 51,824.12 | 51,824.12 | - | 2/27/18 |
| 2/22/18 | 1309 | 240,972.59 | 93,780.34 | 147,192.25 | 2/27/18 |
| 2/22/18 | 1310 | 140,361.62 | 76,826.12 | 63,535.50 | 2/27/18 |
| 2/23/18 | 1311 | 74,873.00 | 74,448.08 | 424.92 | 2/27/18 |
| 3/5/18 | 1312 | 74,873.00 | 74,448.08 | 424.92 | 3/5/18 |
| 3/5/18 | 1313 | 236,455.46 | 95,607.46 | 140,848.00 | 3/6/18 |
| 3/5/18 | 1314 | 129,982.38 | 76,992.38 | 52,990.00 | 3/6/18 |
| 3/19/18 | 1315 | 34,061.53 | 34,061.53 | - | 3/23/18 |
| 3/19/18 | 1316 | 74,873.00 | 74,448.08 | 424.92 | 3/20/18 |
| 3/20/18 | 1318 | 257,569.91 | 107,774.91 | 149,795.00 | 3/23/18 |
| 3/21/18 | 1317 | 120,312.58 | 65,160.58 | 55,152.00 | 3/27/18 |
| 4/2/18 | 1319 | 74,873.00 | 74,448.08 | 424.92 | 4/17/18 |
| 4/2/18 | 1320 | 41,448.24 | 41,448.24 | - | 4/17/18 |
| 4/2/18 | 1322 | 110,933.68 | 53,521.18 | 57,412.50 | 4/17/18 |
| 4/2/18 | 1321 | 226,257.23 | 88,633.23 | 137,624.00 | 4/17/18 |
| 4/2/18 | 1323 | 74,873.00 | 74,448.08 | 424.92 | 4/17/18 |
| 4/16/18 | 1324 | 211,454.55 | 81,013.55 | 130,441.00 | 4/19/18 |
| 4/16/18 | 1325 | 115,497.88 | 62,490.38 | 53,007.50 | 4/19/18 |
| 4/16/18 | 1326 | 24,737.87 | 24,737.87 | - | 4/19/18 |
| 4/30/18 | 1327 | 74,873.00 | 74,448.08 | 424.92 | 5/4/18 |
| 4/30/18 | 1328 | 28,065.00 | 28,065.00 | - | 5/4/18 |
| 4/30/18 | 1329 | 212,282.72 | 80,342.72 | 131,940.00 | 5/11/18 |
| 4/30/18 | 1330 | 137,234.51 | 75,020.76 | 62,213.75 | 5/11/18 |
| 5/11/18 | 1331 | 74,873.00 | 74,448.08 | 424.92 | 5/18/18 |
| 5/14/18 | 1332 | 13,204.35 | 13,204.35 | - | 5/18/18 |
| 5/14/18 | 1333 | 239,495.35 | 93,934.53 | 145,560.82 | 5/18/18 |
| 5/14/18 | 1334 | 132,434.74 | 72,178.49 | 60,256.25 | 5/18/18 |
| 5/25/18 | 1335 | 74,873.00 | 74,448.08 | 424.92 | 6/1/18 |
| 5/25/18 | 1336 | 164,609.35 | 164,609.35 | - | 6/1/18 |
| 5/29/18 | 1337 | 264,168.21 | 115,136.71 | 149,031.50 | 6/1/18 |
| 5/29/18 | 1338 | 115,642.79 | 63,430.29 | 52,212.50 | 6/1/18 |
| 6/8/18 | 1340 | 74,873.00 | 74,448.08 | 424.92 | 6/15/18 |
| 6/8/18 | 1341 | 70,919.79 | 70,919.79 | - | 6/15/18 |
| 6/11/18 | 1342 | 306,684.22 | 144,673.72 | 162,010.50 | 6/15/18 |

RDC Sage_000662

| | | | | | |
|---|---|---|---|---|---|
| 6/11/18 | 1343 | 121,519.61 | 61,657.11 | 59,862.50 | 6/15/18 |
| 6/22/18 | 1344 | 74,873.00 | 74,448.08 | 424.92 | 6/29/18 |
| 6/22/18 | 1345 | 184,829.24 | 184,829.24 | - | 6/29/18 |
| 6/25/18 | 1347 | 92,913.27 | 54,185.77 | 38,727.50 | 6/29/18 |
| 6/25/18 | 1346 | 237,240.05 | 109,323.80 | 127,916.25 | 6/25/18 |
| 7/6/18 | 1348 | 74,873.00 | 74,448.08 | 424.92 | 7/9/18 |
| 7/6/18 | 1349 | 22,656.01 | 22,656.01 | - | 7/9/18 |
| 7/10/18 | 1350 | 277,083.42 | 112,633.92 | 164,449.50 | 7/11/18 |
| 7/10/18 | 1351 | 142,320.92 | 68,209.67 | 74,111.25 | 7/11/18 |
| 7/17/18 | 1352 | (8,800.00) | (6,000.00) | (2,800.00) | credit memo |
| 7/19/18 | 1353 | 74,873.00 | 74,448.08 | 424.92 | 7/20/18 |
| 7/19/18 | 1354 | 32,775.89 | 32,775.89 | - | 7/20/18 |
| 7/30/18 | 1355 | 257,546.04 | 109,447.29 | 148,098.75 | 7/31/18 |
| 7/30/18 | 1356 | 142,990.28 | 67,126.53 | 75,863.75 | 7/31/18 |
| 8/3/18 | 1357 | 74,873.00 | 74,448.08 | 424.92 | 8/8/18 |
| 8/3/18 | 1358 | 105,174.13 | 105,174.13 | - | 8/8/18 |
| 8/6/18 | 1359 | 246,556.52 | 163,100.02 | 83,456.50 | 8/8/18 |
| 8/6/18 | 1360 | 189,768.70 | 124,729.95 | 65,038.75 | 8/8/18 |
| 8/17/18 | 1361 | 74,873.00 | 74,448.08 | 424.92 | 8/23/18 |
| 8/17/18 | 1362 | 23,720.97 | 23,720.97 | - | 8/23/18 |
| 8/20/18 | 1363 | 332,182.50 | 122,226.88 | 209,955.62 | 8/23/18 |
| 8/20/18 | 1364 | 144,335.00 | 91,135.03 | 53,199.97 | 8/23/18 |
| 8/23/18 | 1365 | 67,677.50 | 40,437.50 | 27,240.00 | 8/23/18 |
| 8/24/18 | 1366 | 6,971.00 | 6,971.00 | - | |
| 8/27/18 | 1367 | 215,661.54 | 136,412.00 | 79,249.54 | |
| 8/27/18 | 1368 | 50,000.00 | 50,000.00 | - | |

RDC Sage_000663

# EXHIBIT 4

RDC Sage_000664



## NAVAJO HEALTH FOUNDATION

### SAGE MEMORIAL HOSPITAL
POST OFFICE BOX 457 | GANADO, ARIZONA 86505 | PH (928) 755-4559 | FAX (928) 755-4659

Resolution
Of the
Board of Directors
Navajo Health Foundation, Inc. – Sage Memorial Hospital

The undersigned, representing the Directors of Navajo Health Foundation, Inc. – Sage Memorial Hospital, an Arizona nonprofit corporation (the "Corporation"), hereby take the following actions and adopt the following resolution:

WHEREAS

1.  The Articles of Incorporation and the Bylaws of the Navajo Health Foundation – Sage Memorial Hospital, provide that the Board of Directors may enter into and make contracts of every kind and nature with any person, firm, association, corporation, municipality, nation, Indian Tribe, state or body politic; and

2.  Navajo Health Foundation – Sage Memorial Hospital is a community owned and operated, private, nonprofit 501(c)(3) corporation that functions under the direction of a 100% Navajo Board of Directors; and the Corporation desires to improve the healthcare services for the 18,000 -21,000 residents of its service area that include the Ganado, Kinlichee, Klagetoh, Wide Ruins, Greasewood, Cornfields, Nazlini, and Steamboat Chapters; and

3.  The Corporation is responsible for the management and administration of millions of federal dollars received through its self-determination contract with the Department of Health and Human Services, Indian Health Services, to residents in the defined service area; and

4.  The Corporation has an existing contractual agreement with an outside management firm, Razaghi Development Company, LLC, dba Razaghi Healthcare ("RH"), to provide administrative and management services for Sage Memorial Hospital; and

5.  On August 30, 2018, the Board was provided with documents informing them that Razaghi Healthcare, through Ahmad R. Razaghi, invoked the termination provisions of the purported contract with the Corporation, Amendment No.2 to CEO Services Contract, on August 27, 2018; and

*Navajo Health Foundation – Sage Memorial Hospital, Inc.*
*provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being.*

RDC Sage_000665

NAVAJO HEALTH FOUNDATION | SAGE MEMORIAL HOSPITAL
POST OFFICE BOX 457 / GANADO, ARIZONA 86505 / PH (928) 755-4602 / FX (928) 755-4659

6. The Board has retained independent legal counsel to review the legal effect of the purported Amendment, and does not take a position at this time on its legal effect; and

7. On August 30, 2018, the Board was provided with documents showing that Razaghi Healthcare, at the direction of Ahmad R. Razaghi, submitted an invoice on August 27, 2018, due upon receipt in the amount of $10, 855,134.15, to Accounts Payable, Navajo Heath Foundation – Sage Memorial Hospital; and

8. On August 30, 2018, the Board was provided with documents showing that Razaghi Healthcare, at the direction of Ahmad R. Razaghi, wire-transferred $10, 855,134.15; and

9. Tausif Hasan and Tadd Greenfield, employees of Razaghi Healthcare were provided with copies of the documents identified in paragraphs 5, 6, and 7, on August 27, 2018;

NOW, THEREFORE, be it hereby RESOLVED:

1. **Termination of Razaghi HealthCare Inc.** The Board orders effective immediately termination of the purported contract between Navajo Health Foundation – Sage Memorial Hospital and Razaghi Development Company, LLC, dba Razaghi Healthcare; and

2. **Removal of Access/Authority.** The Board orders effective immediately that the Finance Office of the Navajo Health Foundation – Sage Memorial Hospital Finance Office, terminate any and all signatory authority of representatives of Razaghi Development Company, LLC, dba Razaghi Healthcare, including but not limited to Mr. Ahmad Razaghi, Mr. Tausif Hasan, and Mr. Tadd Greenfield; and

3. **Notice to Banking Institutions including Wells Fargo.** The Board orders effective immediately that the Finance Office of the Navajo Health Foundation –Sage Memorial inform Wells Fargo Bank, and any other banking institution that Navajo Health Foundation – Sage Memorial Hospital has accounts with, that signatory authority of Razaghi Healthcare or any employee of Razaghi Healthcare, including of Mr. Ahmad Razaghi, Mr. Tausif Hasan, and Mr. Tadd Greenfield, is hereby suspended; and

4. **Preservation of Records.** The Board notifies Razaghi Healthcare and all employees of Razaghi Healthcare that have responsibilities to Navajo Health Foundation –Sage Memorial that they are to preserve any and all matters, to include but not limited to:

*Navajo Health Foundation – Sage Memorial Hospital, Inc.*
*provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being.*

RDC Sage_000666

## NAVAJO HEALTH FOUNDATION | SAGE MEMORIAL HOSPITAL
POST OFFICE BOX 457 / GANADO, ARIZONA 86505 / PH (928) 755-4602 / FX (928) 755-4659

records of documents, correspondence, e-mail exchanges and any other forms of electronic transmission, regarding Navajo Health Foundation – Sage Memorial Hospital; and

5. **Continuing Operations**. The Board orders effective immediately that the Finance Office will submit any and all invoices from Razaghi Healthcare, or any employee of Razaghi Healthcare to the Board, including independent contractors and/or consultants of Razaghi Healthcare to the Board for review and approval prior to disbursement of payment;

## CERTIFICATION

The undersigned, *Absent without Cause*, certifies that I am the duly appointed Chairman of Navajo Health Foundation, Inc. – Sage Memorial Hospital, Board of Directors and that the above is a true and correct resolution presented and approved at a duly called meeting of the Board of Directors thereof, convened and held in accordance with the law and the Bylaws of said Corporation by a vote of *3* in favor *O* opposed and *O* abstained on ~~September 1,~~ *August 31,* 2018, and that such resolution is now in full force and effect.

IN WITNESS THERE OF, I have affixed my name as Chairman of the Navajo Health Foundation, Inc. – Sage Memorial Hospital Board of Directors to this resolution.

Motion:

Second:

_____ Date: 09/01/2018
Board Member
Navajo Health Foundation – Sage Memorial Hospital, Inc.
P. O. Box 457
Ganado, AZ 86505

_____ Date: 09/01/2018
Board Member
Navajo Health Foundation – Sage Memorial Hospital, Inc.
P. O. Box 457
Ganado, AZ 86505

_____ Date: 09/01/2018
Board Member
Navajo Health Foundation – Sage Memorial Hospital, Inc.

Page 3 of 2

*Navajo Health Foundation – Sage Memorial Hospital, Inc.*
*provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being.*

RDC Sage_000667

## NAVAJO HEALTH FOUNDATION | SAGE MEMORIAL HOSPITAL
POST OFFICE BOX 457 , GANADO, ARIZONA 86505 / PH (928) 755-4602 / FX (928) 755-4659

P. O. Box 457
Ganado, AZ  86505

_____ Date: 09/01/2018
Board Member

Navajo Health Foundation – Sage Memorial Hospital, Inc.
provides quality healthcare services in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being.

RDC Sage_000668

# EXHIBIT 5

RDC Sage_000669



7150 E. Camelback Road, Suite 444
Scottsdale, AZ 85251
Office:      (480) 477-8028
Facsimile: (480) 477-8001
www.razaghihealthcare.com

September 04, 2018

RE:  Sage Finance Department Executive Meeting

Attendees:      Tadd Greenfield, Tausif Hasan, Tom Maetner

Cheryl Bailey

## Agenda

1. Review CEO Services Contract severance clause, termination notice, and invoice 1369
2. IHS report: Compilation of Sage records, RH invoices 1187 to 1368
3. Heather Gretch request Sage turnaround plan, BDO and policies
4. Sage records and document control responsibility of onsite finance department, what is the current approach?

# EXHIBIT 6

RDC Sage_000671



Navajo Health Foundation

**Sage Memorial Hospital**

POST OFFICE BOX 457 | GANADO, ARIZONA 86505 | PH (928) 755-4500 | FAX (928) 755-4659

## MEMORANDUM

Date:       September 3, 2018

To:         Navajo Health Foundation/Sage Memorial Hospital Staff

From:       *grary g pale*
            Gary E. Pahe, BSB/A, MBA/HRM
            NHF/SMH Interim Chief Executive Officer

Subject:    Termination of the Razaghi Healthcare Contract & Interim NHF/SMH CEO Appointment

Please be informed that effective August 31, 2018, the NHF/SMH Board of Directors enacted a resolution to terminate the contract between the Board and Razaghi Development, dba Razaghi Healthcare. Further, effective August 31, 2018, I have been appointed by the NHF/SMH Board of Directors as the Interim Chief Executive Officer until further notice.

With regards to the termination of the contract, the Board of Directors respectfully directs the staff to **CEASE** all communication with Razaghi Healthcare employees. This includes Mr. Ahmad Razaghi, Mr. Tadd Greenfield, Ms. Cheryl Bailey, Ms. Abigail Paul, Mr. Guang Liu, Mr. Tausif Hasan and others. Furthermore, you are directed NOT to provide any documents to anyone requesting such from Razaghi Healthcare, including the media.

Should you receive communication from anybody from Razaghi Healthcare do not respond or return their request(s) for communication, they are not to access any buildings unless they are seeking medical treatment. Please forward any inquiries to the Administration Department for further action. As always, please notify the Administration Department immediately regarding any concerns or issues.

Thank you for your support and continued dedication to the community served by Sage Memorial Hospital. The Board sincerely appreciates your efforts!

cc:  Navajo Health Foundation/Sage Memorial Hospital Board of Directors

Page 1 of 1

*Navajo Health Foundation – Sage Memorial Hospital, Inc.
provides quality healthcare service in a fiscally responsible manner, focusing on the patient's physical, social, and spiritual well-being.*

RDC Sage_000672