1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Navajo Health Foundation-Sage Memorial          No. CV-23-08072-PCT-DJH
     Hospital Incorporated,
10                                                     **ORDER**
                         Plaintiff,
11
     v.
12
     Razaghi Development Company LLC, et al.,
13
                         Defendants.
14

15          Plaintiff Navajo Health Foundation-Sage Memorial Hospital Inc. ("Sage") has filed

16   two motions for summary judgment.[1]   The first seeks partial summary judgment on its

17   claims that Defendants Razaghi Development Company, LLC ("RDC")[2], Ahmad R.

18   Razaghi ("Razaghi"), and Tausif Hasan ("Hasan") (collectively, "Defendants") had no

19   entitlement to a $10.8 million "Termination Payment" paid from Sage accounts in August

20   2018.  (Doc. 422).  Defendants have filed a Response (Docs. 430, 431, 432)[3] and Sage has

21

22   _____

     [1] Sage submitted the same 83 exhibits—amounting to over 1600 pages—to support both
23   its motions, rending its filings unnecessarily voluminous.  The Court notes that among the
     83 exhibits attached to both motions are 13 complete deposition transcripts, the bulk of
24   testimony which is neither cited to nor relevant to the issues on which Sage moves for
     summary judgment.  *See* LRCiv. 56.1(f) (stating that "an *excerpt* of the document may be
25   submitted that includes the pages providing the evidentiary support for which the document
     is referenced) (emphasis added); (Doc. 303 at 5 (evidence attached to a motion for
26   summary judgment "may include only relevant excerpts rather than full documents").

27   [2] The Court's use of "RDC" is inclusive of all discussions of predecessor entities including
     Razaghi Healthcare LLC, Razaghi Healthcare AZ, and Razaghi Healthcare NV.

28   [3] Defendants have requested oral argument.  The request is denied because the parties have
     had an adequate opportunity to discuss the law and evidence and oral argument will not
     aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*,

1    filed a Reply (Doc. 440) and a Supplemental Reply (Doc. 447).[4]

2         Sage's second Motion seeks summary judgment on RDC's counterclaims.

3    (Doc. 423).  RDC responds by agreeing to dismiss its Count I (first breach of contract for

4    failing to allow RDC to perform its management functions); Count VIII (aiding and

5    abetting breach of contract and breach of fiduciary duties); and Count IX (tortious

6    interference with contractual relations).  (Doc. 428 at 2).  It disputes, however, that Sage is

7    entitled to judgment as a matter of law on Count II (second breach of contract for failing

8    to pay RDC the entire compensation due up to date of its termination) or Count III (breach

9    of covenant of good faith and fair dealing).  (*Id.*)  Sage has filed a Reply.  (Doc.  411).

10   **I.     Legal Standards**

11        "The court shall grant summary judgment if the movant shows that there is no

12   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

13   of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence

14   is such that a reasonable jury could return a verdict for the nonmoving party," and material

15   facts are those "that might affect the outcome of the suit under the governing law."

16   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). At the summary judgment

17   stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are

18   to be drawn in his favor." *Id.* at 255 (citations omitted).  A court does not weigh evidence

19   to discern the truth of the matter; it only determines whether there is a genuine issue for

20   trial.  *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).

21        The summary judgment standard operates differently depending on whether the

22   _____

     933 F.2d 724, 729 (9th Cir. 1991).  *See also* LRCiv 7.2(f) ("The Court may decide motions
23   without oral argument.").

24   [4] Upon review of the briefing, the Court notified Defendants that they had failed to properly
     attach two exhibits cited in their Response—a Declaration from Razaghi and Amended
25   Minutes from an August 6, 2012, Sage Board of Directors Meeting.  The Court allowed
     Defendants to correct the scrivener's errors (Doc. 443), and Defendants did so. (*See* Docs.
26   444, 445).   Sage subsequently filed a Motion for Leave to File Supplemental Reply
     (Doc. 446) to clarify for the Court that the "new material does not create material fact
27   issues, and is irrelevant in ways that are best understood via argument from Sage."
     (Doc. 446 at 2).  Defendants did not oppose the Motion (Doc. 449) and the Court granted
28   Sage leave to file.  The Court has therefore also considered Sage's Supplemental Reply
     (Doc. 447).

moving or non-moving party has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When the movant bears the burden of proof on a claim at trial, the movant "must establish 'beyond controversy every essential element' " of the claim based on the undisputed material facts. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). *See also United States v. Dibble*, 429 F.2d 598, 601 (9th Cir. 1970) ("the moving party must offer evidence sufficient to support a finding upon every element of his claim for relief, except those elements admitted by his adversary in his pleadings, or by stipulation, or otherwise during the course of pretrial"). If the movant fails to make the required showing, summary judgment is inappropriate, even if the non-moving party has not introduced contradictory evidence in response. Thus, it is generally a "heavy burden" for a plaintiff to seek summary judgment. *Barnes v. Sea Hawaii Rafting*, LLC, 889 F.3d 517, 538 (9th Cir. 2018).

Conversely, when the non-movant bears the burden of proof on a claim at trial, the movant may prevail either by citing evidence negating an essential element of the non-movant's claim or by showing the non-movant's proffered evidence is insufficient to establish an essential element of the non-movant's claim. *See Celotex*, 477 U.S. at 322–23; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727.1 (4th ed. 2022).

## II.    Factual Background

Sage is a private, nonprofit corporation, governed by an all-Navajo Board of Directors that operates a 25-bed hospital in Ganado, Arizona, within the Navajo Nation. (Doc. 422 at 4; Doc. 430 at 2). It is the Navajo Nation's first Native-managed comprehensive health care system serving multiple Navajo communities in northeastern Arizona.[5]

The relationship between Sage and Razaghi started in or around 2007, when Sage

---

[5] Sage's website provides that "Navajo Health Foundation – Sage Memorial Hospital, Inc. is a private, nonprofit 501(c)(3) corporation. It is the first Native-managed private comprehensive health care system in the country, and has been managed since 1978 by an independent, entirely Navajo Board of Directors." (*See* Sage Memorial Hospital Website, last visited September 19, 2025.

1  sought to build a new hospital.  (*Id.*)  Sage entered into an agreement with Navajo-owned

2  firm Manuel Morgan and Associates ("MMA"), of whom Razaghi was a principal, to

3  finance and build the new hospital.  (Doc. 430 at 3).  Defendants say that when it became

4  apparent that Sage's financial and operating conditions rendered it incapable of obtaining

5  financing for the construction of a new hospital, Sage and MMA pivoted to developing a

6  plan to improve Sage's oversight and monitoring in hopes of improving Sage's financial

7  condition.  (*Id.* at 3).  Thereafter Sage and MMA entered into at least two agreements by

8  which Sage delegated "all decisions relating to corporate and operational activities" to

9  MMA.  (Doc. 422-2, Ex. 1, Kelewood Decl. ¶ 6).  Sage specifically requested that Razaghi

10  serve as its interim Chief Executive Officer ("CEO") and Razaghi agreed.  (Doc. 430 at 3–

11  4).  Razaghi served as CEO from 2007 through 2010.  (Doc. 430 at 4).

### A.    The 2011 CEO Service Contract and 2013 Amendment

13      Razaghi's falling out with MMA led to a similar management contract between

14  Sage and Razaghi's company Razaghi Healthcare, LLC[6] in March 2011.  (Doc. 422 at 4–

15  5; Doc. 430 at 5).  In this original 2011 CEO Services Contract, Sage retained RDC and

16  Razaghi's services as Sage's Chief Executive Officer ("CEO") through February 28, 2015.

17  (*See* Doc. 422-10 at 107, Ex. 59, 2011 CEO Services Contract).  On May 17, 2013, Sage's

18  Board approved a First Amendment and Extension to the CEO Services Contract ("FAC")

19  that extended the agreement to September 30, 2020.  (Doc. 422-2 at 33, Ex. 3, FAC; Doc.

20  430 at 5).[7]

### B.    Defendant Tausif Hasan

22      In September 2015, RDC hired Defendant Hasan as a healthcare consultant.

23  (Doc. 422-8 at 11, 21–24, 31; 430 at 4).  In or around April 2016, RDC hired Hasan as

24  Sage's Director of Finance.  (*Id.*; Doc. 432-8, Ex. Y, Hasan Decl. ¶¶ 5–6).  RDC then hired

---

26  [6] At all relevant times herein, Razaghi served as the sole member and Chief CEO of RDC and its predecessor entities.  (Doc. 430-7).

27  [7] Razaghi Healthcare, LLC was the signatory on the 2011 CEO Services Contract with Sage; RDC was the signatory on the subsequent amendment to the CEO Services Contract with Sage in 2013.  All parties recognize that the two entities are operated by Razaghi and are hereafter collectively referred to as RDC.  (Doc. 422 n.3).

1    Hasan to serve as Sage's Chief Financial Officer ("CFO") from approximately January to

2    September 2017, and again from April to August 31, 2018.  (*Id.*)

3    **C.    2017 Amendment to the CEO Services Contract**

4    Though the FAC was not set to expire until 2020, on June 16, 2017, Sage's Board

5    approved a Second Amendment to the CEO Services Contract ("SAC") that extended the

6    contract to September 30, 2025.  (Doc. 422-5 at 2–3, Ex. 18, SAC; Doc. 430 at 6).  Sage

7    attorney  Stephen  Hoffman  ("Hoffman")  represented  Sage  in  negotiating  the  SAC.

8    (Doc. 217 ¶ 22).

9    The SAC states that RDC "is willing to serve as CEO of [Sage], in a manner that

10   will not constitute or create a conflict of interest, violation of fiduciary duty, or appearance

11   of impropriety, all on the terms and conditions stated herein; and . . . [RDC] will initially

12   dedicate the services of [Razaghi] as its Chief Executive Officer to [Sage] as set forth in

13   this Contract."  (Doc. 422-5 at 2–3, Ex. 18, SAC).  The broad management authority and

14   responsibilities given to RDC remained much the same under the SAC as the prior two

15   contracts.  The SAC provides that RDC "shall have the right and commensurate authority

16   and  responsibility,  express  or  implied,  to  oversee  the  supervision  and  effective

17   management of the day-to-day business and operations of [Sage]" and stated that "[a]ny

18   powers not specifically delegated or granted by the Board to [RDC] shall remain with the

19   Board." (*Id.* § 2.C).

20   Under the SAC, Sage delegated to RDC the responsibility "for overseeing the

21   recruitment, hiring, promotion, disciplining and firing of" key Sage executives, including

22   its CEO, Chief Financial Officer ("CFO"), Medical Director, Chief Operations Officer

23   ("COO") and any healthcare consultants hired to assist Sage's executives, directors, and

24   managers.  (*Id.* § 2.C.2).  Sage was required to pay RDC the cost of the services of any

25   employees, consultants, or independent contractors "based on the fair market value of their

26   services consistent with [Sage's] budget."  (*Id.*)  The SAC also provided that RDC was

27   responsible for overseeing accounting procedures, submitting annual budgets to the Sage

28   board, overseeing "the issuance of bills for services and materials" and collecting on those

accounts, and overseeing the payment of payroll and amounts due on short and longterm indebtedness, and the maintenance of bank accounts. (*Id*. § 2.C.3). The SAC gave RDC the authority to "negotiate, enter into, terminate, delegate, and administer all contracts to discharge the scope of services required in the Board approved capital expenditure and operating budgets." (*Id*. § 2.C.4).

The SAC also included provisions for a "Termination Payment" to RDC under certain circumstances. Section 5.D.2 provided:

> In the event that this Contract expires, or [RDC] terminates this Contract for cause, or [Sage] elects to terminate this Contract at any time prior to expiration of this Contract for any Reason other than those listed as "cause" in Section 4.A, [Sage] shall, in addition to any other amounts due under this Contract, pay [RDC] a Termination Payment in an amount equal to the average of the amount paid to [RDC] by [Sage] each year during the most recent four years of service, including the year of expiration or termination, which shall be prorated through the actual date of such expiration or termination.

(*Id*. § 5.D.2). In relevant part, the SAC defines for "cause" as a "non-criminal material breach of this Contract that is not cured within thirty (30) days after the breaching party receives written notice thereof from the non-breaching party." (*Id*. § 4.A.4).

The SAC, approved by the Board on June 16, 2017, states that "Razaghi, in tandem with Christi El-Meligi as Administrator and Co-Chief Executive Officer, shall perform" the CEO duties on behalf of RDC (*id*. at 4, § 2.C.1), and provides for a base pay of $175.00 for Razaghi's services (*id*. at 9, § 5.A). Defendants say these two provisions were changed in December 2017. Defendants say that on December 7, 2017, Razaghi emailed Sage's attorney Hoffman with suggested "nits" to the SAC that he wanted to discuss with the Sage Board. (Doc. 444, Razaghi Decl. ¶ 4; Doc. 422-5 at 20, Ex. 19, Dec. 7, 2017, email exchange between Razaghi and Hoffman). Among the red-line changes Razaghi wanted made was to increase his service rates from $175 per hour to $495 per hour and to remove a reference to Christi El-Meligi ("El-Meligi") as Sage's Co-CEO. (*Id*.) Defendants say that the changes were "reviewed at Sage's annual meeting [on December 15, 2017], and Sage's Chairperson, Stenson Wauneka, and Mr. Razaghi initialed the updated version of

the Second Amended Contract to distinguish it from the SAC signed on June 16, 2017."
(Doc. 444, Razaghi Decl. ¶¶ 5–6; Doc. 217-1 at 35, Ex. C, initialed SAC with changes;
Doc. 422-11 at 267–82, Ex. 67, initialed SAC with changes).  Sage maintains that no
changes to the SAC were ever approved by the Board and the Board did not authorize
Chairperson Wauneka to execute the unapproved revised version of the SAC.  (Doc. 422-
2, Ex. 1, Kelewood Decl. ¶ 17).

### D.    Events Leading Up to $10.8 Million Termination Payment

The events leading up to the August 27, 2018, withdrawal of the $10.8 million
Termination Payment are largely disputed.

#### 1.    RDC Reassigns Sage's Co-CEO and COO

RDC says that around October 2017, RDC began to consider reassigning Sage's
Co-CEO El-Meligi and Sage's COO Netrisha Dalgai ("Dalgai") to new positions at Sage.
(Doc. 430 at 7).[8]  RDC says both El-Meligi and Dalgai knew they were being reassigned
and were actively involved in identifying and recruiting their successors during the spring
of 2018.  (*Id*. citing emails from Razaghi to team members regarding the staffing changes).

Sage paints a different picture.  It says that starting in 2017 and 2018, El-Meligi
began having concerns about RDC's management of Sage, including the Board's lack of
understanding of the SAC and what she perceived were financial improprieties.  El-Meligi
testified she spoke to Chairperson Wauneka in December 2017, during which he told her
that neither he nor the Board understood that the SAC had been changed to remove her as
Co-CEO or that Razaghi's hourly compensation had changed from $175 per hour to $495
per hour after its December 2017 Board meeting.  (Doc. 422-3, Ex. 11, El-Meligi Dep. at
90:16–91:12, 94:8–15).  She said that around April 2018, as an audit of Sage was being
conducted, she also brought financial inconsistencies and "issues with the finance
department" to Wauneka's attention.  (*Id*. at 97:22–98:4).  At some point after that, El-
Meligi said Wauneka's loyalties shifted to Razaghi and he refused to talk or meet with her.

---

[8] Razaghi explained in his deposition that though both El-Meligi and Dalgai were officers of Sage, they were paid as RDC employees.  (Doc. 422-3, Ex. 13, Razaghi Dep. at 66:6–67:7).

(*Id*. at 99:2–11).　El-Meligi said she then started meeting with the three other Board members Kelewood, Andrew Simpson ("Simpson") and Ray Ann Terry ("Terry") about Sage's financial issues and their understanding of the SAC.　(*Id*. at 99:2–24).　In these meetings, El-Meligi told the Board she thought it should retain independent counsel to review the SAC.　(*Id*. at 100:11–13).　Razaghi testified that he was aware that El-Meligi and Dalgai were having these conversations with the Board and El-Meligi told him, "I'm going to get you."　(Doc. 422-3 at 113, Ex. 13, Razaghi Dep. at 67:11–20).

It is undisputed that on July 23, 2018, Razaghi replaced El-Meligi with Tadd Greenfield ("Greenfield") as Sage's Administrative CEO.　(Doc. 422-6 at 35, Ex. 21, July 23, 2018, email from Razaghi to El-Meligi; *id*. at 38, Ex. 22, July 24, 2018, letter from Greenfield to Sage staff announcing El-Meligi's reassignment; Doc. 430 at 7).　Razaghi then assigned El-Meligi to Sage as a management consultant reporting to Greenfield.　(*Id*.)

### 2.　The Sage Board of Directors Hires Independent Counsel Amid Conflict of Interest Concerns

On July 23, the same day that Razaghi replaced El-Meligi with Greenfield, Sage's Board held a Special Board of Directors Meeting during which Kelewood asked Razaghi for budgets and questioned him on whether there was a conflict of interest in having the same attorneys work for both Sage and RDC.　(Doc. 422-6 at 40, Ex. 23, July 23, 2018, Sage Board Meeting Minutes).　Following this meeting, Razaghi says he had a conversation with Chairperson Wauneka that led him to believe that Sage was terminating the SAC. (Doc. 430 at 8; Doc. 422-3, Razaghi Dep. at 76:24–77:24).　The next day, Sage board members started inquiring about having an independent attorney review the SAC. (Doc. 422-6 at 45, Ex. 24, July 24, 2018, email chain).　Razaghi responded to the Board's query by saying Hoffman would conduct the review.　(*Id*.)

Another Sage Board Meeting was held on July 30, 2018, to discuss Sage's authorization to contract with attorney Jeffrey R. Davis ("Davis") "to act as the Governing Board's Counsel to provide legal representation in seeking a second opinion for the purpose of reviewing and advising the Governing Board regarding the [SAC]."　(Doc. 422-6 at 58, Ex. 26, July 30, 2018, Sage Board Meeting Minutes).　The minutes from that meeting

reflect that Kelewood asked to table Mr. Hoffman's Special Report on the SAC "because she believe[d] Mr. Hoffman has a conflict in this matter since his firm is contracted through [RDC] and he collaborated with Management to revise the [SAC] that he presented to the Board during the June 6, 2017 Board of Directors meeting." (*Id.*)

On August 3, 2018, the Sage Board passed a resolution, over Chairperson Wauneka's objection, to retain attorney Davis "to act as the Governing Board's Counsel to provide legal representation in seeking a second opinion for the purpose of reviewing and advising the Governing Board regarding [the SAC]." (Doc. 422-6 at 66, Ex. 29, Aug. 3, 2018, Sage Meeting Minutes). Wauneka provided RDC employee Abigail Paul ("Paul") with the engagement letter for RDC's review and approval. (*Id.*)

### 3.    RDC Tells Sage it is in Breach of the SAC and Puts El-Meligi and Dalgai on Administrative Leave

On August 2, 2018, RDC's attorney notified Sage that it was in "prospective breaches or and/or interference with the [SAC]." (Doc. 422-6 at 63–64, Ex. 28, Aug. 2, 2018, RDC Letter to Sage). The letter states that RDC

> is concerned that the Board, as currently comprised, is interfering with [RDC] management consultants in contravention of their employment agreements with [RDC] and the [SAC]. Specifically, [RDC] is aware of unauthorized communication and actions between certain Board members and Christi El-Meligi and Netrisha Dalgai, spreading internal strife and discord among [RDC] management consultants with respect to their authority and duties to [Sage] as assigned to them from time to time by [RDC]. Accordingly, pending investigation by a neutral investigator, [RDC] has placed [Meligi] and [Dalai] on paid administrative leave.

(*Id.*) The letter further informed Sage that "[RDC] view[s] unauthorized communications and actions as contract interference and a material breach of the Contract." (*Id*.)    RDC sought assurances that

> (a) no unauthorized communications or actions are contemplated, (b) if such communications or actions have already occurred, such communications and actions will immediately cease, (c) [Sage] will continue to comply with the terms and conditions of the [SAC], and (d) the Board will endeavor to act in a commercially reasonable manner and discontinue the inappropriate comments that smear or slander Razaghi, [RDC] or [RDC] management consultants.

1  (*Id.*)

2      As stated in its letter to Sage, RDC put El-Meligi and Dalgai on administrative leave

3  on August 4 and instructed them to "avoid any communications" with Sage staff and Board

4  members unless authorized by Razaghi.  (Doc. 422-6 at 61, Ex. 27, Aug. 2, 2018, Letter

5  from Greenfield to El-Meligi).

6      On August 9, 2018, the Sage Board sent a letter to Razaghi, asking, among other

7  things, that going forward, RDC communicate with the full Board in writing; to work with

8  Sage employee Rachael Nez to schedule meetings and to take minutes; and "to provide the

9  functions of the CEO, in a manner that will not constitute or create a conflict of interest,

10 violation of fiduciary duty, or appearance of impropriety." (Doc. 422-7 at 2–3, Ex. 30, Aug.

11 9, 2018, Sage Letter to RDC).

12          **4.      Razaghi Seeks Financial Data Related to Termination Payment
                     and Wauneka Questions the Relationship between Sage and RDC**

13      On August 6, 2018, Razaghi emailed Hasan asking for the "average last 4 years

14 amounts paid by Navajo Sage to RH," and quoted the language from the SAC stating that

15 a Termination Payment would be owed to RDC.  (Doc. 422-12 at 13–18, Ex. 73, email

16 exchange between Razaghi and Hasan).  Hasan responded to Razaghi by attaching "the last

17 four years payments/average."  (*Id.* at 15–18).

18      On August 13, 2018, Wauneka sent an email to Sage's attorney Davis and copied

19 Razaghi and the remaining Board members.  (Doc. 422-7, Ex. 31, Aug. 13, 2018, Email

20 Exchange).  Wauneka questioned Davis about whether Sage wished to continue its

21 relationship with RDC.  (*Id.*)  In his response, Davis disagreed with Wauneka's suggestion

22 that the Sage Board was seeking to discontinue its relationship with RDC.  (*Id.*)

23          **5.      Sage Board Holds an Executive Session with its Auditor and Davis**

24      On August 20, 2018, the Sage Board entered into an Executive Session during a

25 Special Board of Directors Meeting.  Everyone was asked to leave the room except Sage's

26 auditor and Mr. Davis, who was on the phone.  (Doc. 422-7 at 10, Ex. 32, "Notes" from

27 Aug. 20, 2018, Executive Session of Sage Board).  Though she was asked to leave, RDC

28 employee Abigal Paul ("Paul") listened in on the Executive Session from the hallway and

1    provided her notes from the meeting to Razaghi, who subsequently emailed a copy of the

2    notes to the Sage Board.  (Doc. 422-7, Ex. 33, Aug. 29, 2018, Email and Notes on

3    Executive Session).  Paul's notes reflect that the auditor "recommended that the board

4    needs to be approving each invoice from [RDC] before it is paid," and that Mr. Davis told

5    the Board that after his review of the SAC, he felt it was a "very one-sided agreement and

6    that it would put Sage in a weak position if there were a conflict.  (*Id.*)  He said that there

7    is a termination clause in the agreement which would require the organization to pay $7–8

8    million if the management contract is terminated early."  (*Id.*)

9              **6.      Davis Seeks Documentation Supporting Razaghi's Rate Change**

10             On August 26, 2018, Davis asked Greenfield and Razaghi for documentation

11   showing the Board had approved a rate change for his pay from $175 per hour to $495 per

12   hour.  (Doc. 422-11 at 286, Ex. 68, Aug. 26, 2018, Davis Email).  Invoices from 2014 and

13   2015 show Razaghi billing Sage at rates of $355 and $495 for his services.  (Doc. 422-13

14   at 12–13, Ex. 82, July 14, 2014, Invoice 1183; Doc. 422-2, Ex. 1, Kelewood Decl. ¶ 14).

15   Sage says that in response to Davis's inquiry, Razaghi improperly took the Termination

16   Payment the next day.  (Doc. 422 at 12).

17         **E.     The August 27 $10.8 Million Termination Payment**

18             On August 27, 2018, Sage accounting employee Nicole Hardy ("Hardy") says she

19   got a call from CFO Hasan letting her know that an invoice was coming into accounts

20   payable from RDC and that she needed to get it ready for payment "right away."

21   (Doc. 422-11 at 303, Hardy Dep. at 36:11–16; 37:23–38:1; 40:17–25).  When Hardy

22   checked the accounts payable account, she found an email with the subject line "Navajo

23   Sage invoice 1369 now due (total $10,855,134.15)" sent from RDC's accounting

24   department.  (Doc. 422-11 at 247–48, Ex. 63, Aug. 27, 2018, Email and Invoice 1369

25   ("Invoice 1369")).  The invoice was titled "2018.08.27 Invoice 1369 pass-through

26   ($10,855,134.15)."  (*Id.*; *see also* Doc. 444, Razaghi Decl. ¶¶ 9-10).[9]  Invoice 1369 charged

27   $15,937,168.45 for "Reimbursable Legal and Professional Expenses Pass-Through

28   _____
     [9] Sage has also attached a copy of the Invoice 1369 at Doc. 422-7 at 19, Ex. 34.

Expenses Contract Termination Fee, Section 5.D September 01, 2014 to August 27, 2018" and discounted $5,082,034.30 from that amount as a "Professional Services Discount, Discount below Fair Market Value." (*Id.*)

### 1. Sage Accounting Processes and Pays Invoice 1369

Defendants say the amount in Invoice 1369 represented the Termination Payment calculated by RDC under Section 5.D. of the SAC. (Doc. 430 at 8). Hardy testified that when she received the invoice, however, "there wasn't any backup to it." (Doc. 422-11 at 304, Ex. 69, Hardy Dep. at 41:12–42:8). Because of this, Hardy did not know how to code the invoice and went to the Sage comptroller Thomas Matenaer ("Matenaer") for advice. (Doc. 422-11 at 304–05, Ex. 69, Hardy Dep. at 41:12–42:8). Hardy said Matenaer was "shocked" by the amount and asked if she knew why RDC was terminating their contract with Sage. (*Id.*) Unable to assist her, Hardy then emailed Hasan to ask about the correct coding. (*Id.* at 42:11–17). Hardy says Hasan instructed her to code it under management fees and to get the ACH[10] payment set up right away. (*Id.* at 40:11–25; 42:9–43:12) Hardy says as she was finishing inputting the invoice for payment, Matenaer came in and said Hasan would be sending over the backup documentation shortly. (*Id.* at 43:15–25; *see also* Doc. 422-12 at 2, Ex. 70, Aug. 27, 2018, email from Matenaer to Hardy). Hardy said even though she never received the backup information, she proceeded with setting up the ACH payment to Razaghi. (*Id.*)

### 2. Sage CFO Hasan's Involvement in Processing Invoice 1369

To ensure Sage had the balance to pay out the $10.8 million from its operating account, Hasan transferred in $500,000.00 from Sage's Indian Healthcare Savings Funding Account. (*Id.* at 66:1-69:21; Doc. 422, Ex. 71, Sept. 5, 2018, Account Details at 3; Doc. 422-8 at 23, Ex. 40, Hasan Dep. at 82:11–83:2). This account was funded through settlement proceeds Sage had received from its lawsuit with Indian Healthcare Services ("IHS"), and contained express restrictions that it was *not to be used* to pay any

---

[10] An ACH transaction is an electronic money transfer made between banks across a network called the Automated Clearing House ("ACH"). (*See* Doc. 422-8 at 22, Ex. 40, Hasan Dep. at 82:10–11).

compensation "to any management company or affiliated entity."  (Doc. 422-2, Ex. 1, Kelewood Decl. ¶ 11; *id*. at 49, Ex. 5, *Sage v. Burwell* Settlement Agreement § C.ii–iii (emphasis added)).  Hasan was aware of these restrictions.  (Doc. 422-8 at 23, Ex. 40, Hasan Dep. at 82:11-83:2).

When asked what he did to figure out the legitimacy of Invoice 1369, Hasan said he just reviewed "the total amounts" on the invoice itself.  (*Id*. at 61:15-19).  He did not verify the accuracy of the supporting invoices RDC provided as documentation.  (*Id*. at 68:9–69:20 (stating he did not know who created the supporting documentation and had no way of knowing whether the information was accurate)).  Hasan said he sent the invoice to Sage Co-CEO Greenfield, who he said looked at it and approved it.  (Doc. 422-8 at 16, Ex. 40, Hasan Dep. at 61:15-19).  Greenfield denied receiving the invoice or directing Hasan to pay the $10.8 million payment and testified that it was not his role to approve invoices related to RDC billing to Sage.  (Doc. 422-12 at 64, 68, Ex. 75, Greenfield Dep. at 121:12–13; 137:1–25)).  Hasan said he paid the $10.8 million Termination Payment from Sage's general operating account to RDC.  (Doc. 422-8, Ex. 40, Hasan Dep. at 61:6–8).  Hasan did not utilize an escrow account Sage says the parties had set up for the purpose of paying the Termination Payment.  (Doc. 422-3 at 176, Ex. 16, Escrow Agreement).  Neither Hasan nor Greenfield informed the Sage Board that it had paid RDC a $10.8 million Termination Payment on August 27.  (Doc. 422-8 at 16, Ex. 40, Hasan Dep. at 81:17–22; Doc. 422-12 at 64, 68, Ex. 75, Greenfield Dep. at 142:22–23; 143:15–17).

## F.    Both Parties Give Notices of Termination of the SAC

Three days later, on August 30, 2018, Razaghi, Hasan, and Greenfield had a teleconference with Chairperson Wauneka. (Doc. 422-13 at 250–53, Ex. 80, Aug. 30, 2018, Meeting Minutes).  The "Minutes" from that meeting say

> Mr. Razaghi stated that [RDC] is giving courtesy notice to the Chair today that [RDC] will be providing written notice to terminate the Contract.  [RDC] has issued invoice 1369 with a total due of $10.8 Million net with a $5.08 Million discount. . . The payment will be contemporaneous with the notice to terminate to prevent over $3,000 per day in interest charges to [Sage] for late payments.

(*Id*.)  The Minutes also reviewed other invoices RDC submitted to Sage, including "Invoice 1367 for late payment interest charges of $136,412, net of $79,249 discount (simple interest only; not compounded) which were accrued over the past 4 years" and "invoice [] 1368 regarding AIG coverage no. 2147071623US Kory v. Razaghi for self-insured retention of $50,000." (*Id*.)

On August 30, Hardy informed Kelewood and Terry that she had been directed by her supervisors to pay the $10.8 million invoice to RDC on August 27.  (Doc. 422-2, Ex. 1, Kelewood Decl. ¶ 36).  The Sage Board held an emergency meeting the following day. The Meeting Minutes state that the Board "was provided with documents informing them that [RDC], through [Razaghi] invoked the termination provisions of the [SAC] on August 27, 2018."  [Doc. 422-7 at 77, Ex. 38, Aug. 31, 2018, Meeting Minutes and Resolution]. The Board approved a resolution that "order[ed] effective immediately termination of the purported contract between [Sage] and [RDC]" and "terminate[s] any and all signatory authority of representatives of [RDC] to confirm termination of the SAC and immediately remove Defendants' access and authority to Sage's bank accounts." (*Id*. at 78).  The Board further instructed Sage staff to secure its bank accounts.  (*Id*. at 78–79).  Sage did not immediately communicate its resolution to RDC.   (Doc. 430 at 8).

On September 1, 2018, counsel for RDC emailed Sage a letter notifying Sage that RDC was terminating the SAC due to Sage's material breach of engaging in unauthorized communications as stated in its August 2nd letter.  (Doc. 422-7 at 22, Ex. 35, Sept. 1, 2018, letter from RDC counsel Stachowiak to Sage).  The letter also attached RDC's "detailed invoice comprising the Termination Payment in the total amount of $10,855,134.15, which amount was paid by [Sage] to [RDC] contemporaneously with the invoice date." (*Id*.)  Five pages titled "Razaghi Healthcare Severance Calculations" were attached to the email. (*Id*. at 27–31).  Counsel noted in his letter that "[t]he Board had previously budgeted $13.8 million for the Termination Payment, and [Sage] benefits from not having to pay interest on any late payment, which would approximate $200,000 per month." (*Id*.)

On September 3, 2018, RDC received notice the Sage Board had passed a resolution

- 14 -

1   on August 31 to terminate the SAC.  (Doc. 430 at 8; Doc. 422-11 at 245, Ex. 62, Sept. 4,

2   2018, letter from RDC counsel to Sage).

3   **III.    Sage's Partial Motion for Summary Judgment ("PMSJ")**

4          The Court will first address Sage's PMSJ, which seeks judgment on some of its own

5   claims.  Viewing the evidence in the light most favorable to Defendants, the Court must

6   determine whether a dispute exists as to any material fact, and whether Sage is entitled to

7   judgment as a matter of law on these claims.  As the party with the burden of persuasion at

8   trial on these claims, Sage must establish "beyond controversy every essential element" of

9   the claims at issue.  *S. Cal. Gas Co.*, 336 F.3d at 888.  Defendants "can defeat summary

10  judgment by demonstrating that the evidence, taken as a whole, could lead a rational trier

11  of fact to find in its favor."  *Id.*

12         Since this matter was initiated in the District of Nevada on February 22, 2019

13  (Doc. 1), the parties have made multiple amendments to their pleadings.  Sage's Fourth

14  Amended Complaint (Doc. 338) brings claims for federal RICO violations and conspiracy

15  against Razaghi and Hasan (Counts One and Two, respectively); fraud, civil conspiracy

16  and aiding and abetting, breach of fiduciary duties, constructive fraud and unjust

17  enrichment against all three Defendants (Counts Three, Four, Five, Six, Seven, Nine, and

18  Ten, respectively); and breach of covenant of good faith and fair dealing and breach of

19  contract against RDC (Count Eight and Eleven, respectively).

20         Sage's PMSJ seeks summary judgment only to those "portions of its claims that

21  relate to the $10.8 million Termination Payment," including (1) Count Eleven for breach

22  of the SAC; (2) Count Ten for unjust enrichment; (3) "portions of Count One premised on

23  the seizure of the $10.8 million being a RICO violation"; (4) Count Three for fraud related

24  to the $10.8 million Termination Payment; and (5) Counts Five, Six, and Seven related to

25  the breach of fiduciary duties for taking the $10.8 million.  (Doc. 422 at 3–4).  The Court

26  will address each claim in turn.

27     **A.    Sage's Claim that RDC Breached the SAC When it Took a $10.8 Million Termination Payment on August 27, 2018 (Count Eleven)**

28  In its Fourth Amended Complaint, Sage alleges that RDC breached the SAC when,

"for reasons that did *not* give rise to a Termination Payment being owed to [RDC][,] . . . [RDC] took from Sage [] and/or caused Sage [] to pay a Termination Payment." (Doc. 338 ¶¶ 226–67).

The SAC provides, and the parties agree, that Arizona law governs the breach of contract claim. (Doc. 422-5 at 15, Ex. 18 § 12.D). Under Arizona law, "the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages." *Mehlschau v. Costco Wholesale Corp.*, 634 F. Supp. 3d 658, 663 (D. Ariz. 2022) (quoting *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004)). "[I]nterpretation of a contract is generally a matter of law." *Powell v. Washburn*, 125 P.3d 373, 375 (Ariz. 2006). "A party breaches a contract when it 'fail[s], without legal excuse, to perform any promise which forms the whole or part of a contract.' " *IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1185 (D. Ariz. 2019) (quoting *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986)). Whether a party has breached a contract is a question of fact. *See Great W. Bank v. LJC Dev., Ltd. Liab. Co.*, 362 P.3d 1037, 1045 (Ariz. Ct. App. 2015).

It is undisputed that the parties entered into the SAC as a binding contract. At issue here is whether RDC's taking of the $10.8 million Termination Payment on August 27, 2018, was a breach of the SAC and whether Sage suffered $10.8 million in damages as a result.

### 1.    Whether RDC's August 27 Taking was a Breach of the SAC

Sage says RDC breached the SAC when it took the Termination Payment on August 27, 2018. RDC says there was no breach because it was ultimately entitled to the Termination Payment under the SAC.

For the most part, the parties do not dispute the relevant sections of the SAC and their meanings. Sections 4.A (For "Cause") and 5.D ("Termination Payment") govern the circumstances under which RDC would be entitled to a Termination Payment under the SAC. (Doc. 422-5 at 8–9, Ex. 18, SAC § 4.A & 5.D). Relevant here, the SAC provides that either party may terminate the contract "for cause," defined as "a non-criminal material breach of this Contract that is not cured within thirty (30) days after the non-breaching

1   party receives written notice thereof from the non-breaching party." (*See id.* § 4.A.5).[11]

2   Under Section 4.C, RDC is entitled to a Termination Payment if RDC terminates with

3

_____

4   [11] The entirety of Section 4, titled "Breach, Remedies, and Termination of Contract,"

5   provides:

6        All of the obligations, covenants, representations, and duties of the Parties
         hereunder are material terms of this Contract.  Any breach of any such terms shall constitute

7        a default of this Contract by the breaching party.

8        A.      For "Cause."   This Contract may be terminated for cause by either Party.
         The Party which gives notice of termination shall be referred to herein as the "Terminating

9        Party."  Except in the case of termination pursuant to subsection (4) or (5) below, written
         notice of termination for cause shall be given by the Terminating Party to the other Party

10       by certified mail (return receipt requested) no later than 120 days prior to the intended
         termination date, in which event this Contract shall terminate upon the intended termination

11       date, or earlier by mutual agreement of both Parties.  In the case of termination pursuant to
         subsection (4) below, the written notice of termination may be given immediately.  In the

12       case of termination pursuant to subsection (5) below, the written notice of termination may
         be given following the expiration of the 30 day curative period if the material brech has

13       not been cured during that period.

14          "For cause" is defined as:
            (1) the cessation of operations of [Sage], for whatever reason;

15          (2) the bankruptcy, insolvency, or dissolution of either party to this
                contract

16          (3) the sale or lease of [Sage] to a third party;
            (4) a material breach of this Contract that results in a criminal conviction or entry

17          of a plea of guilty or nolo contendere to any crime <u>only</u> with respect to Ahmad R.
            Razaghi (for the avoidance of doubt, excluding any other person affiliated with

18          [RDC's] management); or
            (5) A non-criminal material breach of this Contract that is not cured within thirty

19          (30) days after the breaching party receives written notice thereof from the non-
            breaching party.

20       B.      In the event that the [Sage] terminates this Contract for cause as previously
         defined in Sections 4.A.1, 4.A.2 or 4.A.3, [Sage] shall pay [RDC] (a) sum equal to the

21       compensation described in this Contract up to the date of termination plus (b) the
         termination payment as set forth in Section 5.D of this Contract (the "Termination

22       Payment"); provided however that [RDC] shall not be entitled to the Termination Payment
         if [Sage] terminates this Contract for cause as previously defined in Section 4.A.4. . .

23

24       C.      In the event that this Contract expires, or [RDC] terminates this Contract for
         cause, or the [Sage] elects to terminate this Contract at any time prior to termination of this

25       Contract for any reason other than those listed as "cause" in Section 4.A., [Sage] shall pay
         to [RDC] (a) sum equal to the compensation described in this Contract up to the date of

26       termination plus (b) the Termination Payment . . .

27       D. In the event that [RDC] terminates this Contract without "cause" as previously
         defined in Section 4.A., [RDC] shall not be entitled to the Termination Payment.

28   (Doc. 422-5 at 8, SAC, § 4 "Breach, Remedies, and Termination of Contract").

cause or if Sage terminates without cause.  (*Id.* § 4.C).[12]  Section 4.D clarifies that if RDC terminates without cause, it is not due a Termination Payment.  (*Id.* § 4.D).  Thus, two circumstances under the SAC allowed for RDC to receive a Termination Payment on August 27 such that its taking would not be considered a breach: if RDC had terminated the SAC for cause by August 27, or if Sage had terminated without cause by August 27.

### a. RDC Did Not Terminate the SAC for Cause on or before August 27

Sage says RDC has offered no facts supporting its contention that it was justified in taking the Termination Payment on August 27 on the grounds that RDC had terminated the SAC for cause by that date.  The SAC required either party terminating for cause to provide the breaching party written notice of any non-criminal material breach and 30 days to cure.  (Doc. 422-5 at 9, Ex. 18, SAC, § 4.A.5).  Thus, the timeline of events is material.

On August 2, 2018, RDC's counsel sent Sage a written notice that Sage was in material breach of the SAC and would be terminating if Sage did not provide assurances that the Board would cease engaging in "unauthorized communications" with Sage employees.  (Doc. 422-6 at 63, Ex. 28, Aug. 2, 2018, letter from RDC counsel to Chairperson Wauneka).  RDC says that it never received assurances from Sage within that 30-day period and Razaghi avers that he believed RDC was "or would soon be entitled to" terminate the SAC for cause.  (Doc. 444, Razaghi Decl. ¶ 8).  But it is undisputed that the 30-day cure period had not expired on August 27 when RDC directed the processing of the $10.8 million Termination Payment from Sage.  Indeed, on September 1, several days after the August 27 taking, RDC sent a letter informing Sage that it was terminating the SAC pursuant to its August 2, 2018, letter.  (Doc. 422-7 at 22, Ex. 35, Sept. 1, 2018, email from RDC counsel to Chairperson Wauneka).  Even assuming RDC had cause to terminate for the unauthorized communications that formed the basis of the alleged breach by Sage on September 1, the SAC did not entitle RDC to receive a Termination Payment *prior* to September 1.[13]

---

[12] RDC is also entitled to a Termination Payment if the SAC expires, which neither party claims occurred.

[13] The parties disagree about whether RDC's August 2nd letter to the Sage Board cited

No facts in the record support RDC's contention that it had terminated the SAC for cause on or before August 27 such that it had an entitlement to a Termination Payment on that date.

### b.      Sage Did Not Terminate the SAC Without Cause on or before August 27

Sage also argues that nothing in the record shows that RDC was entitled to the Termination Payment on August 27 on its assertion that Sage had terminated the SAC without cause on or before that date. The Court again agrees. Razaghi's affidavit says that "[o]n July 23, 2018, Mr. Razaghi had a conversation with Mr. Wauneka that in combination with disagreements between Sage and RDC regarding RDC's personnel management and oversight rights under the SAC, *led R. Razaghi to believe that Sage was terminating* the SAC." (Doc. 430 at 8; Doc. 444, Razaghi Decl. at ¶ 6 (emphasis added)). Defendants state that under "the circumstances present at the time, Mr. Razaghi believed that Sage terminated the SAC without cause and/or that RDC was or would soon be entitled to terminate the SAC for cause," and because of this, "on August 27, 2018, RDC's accounting department transmitted Invoice #1369 representing the Termination Payment in the amount of $10,855,134.15 to the Sage accounts payable department for approval and payment." (Doc. 430 at 8; Doc. 444, Razaghi Decl. ¶ 8).

The Court finds that Mr. Razaghi's beliefs that Sage had terminated the SAC without cause on or before August 27 contradict other facts that he does not dispute. Defendants offer no other evidence, and Razaghi does not and cannot aver, that Sage did in fact terminate the SAC prior to August 27. The Meeting Minutes from the July 23, 2018, Board Meeting do not reflect that Razaghi and Chairperson Wauneka discussed Sage's desire to terminate the SAC on that date. (Doc. 422-6 at 39–42, Ex. 23, July 23, 2018, Sage Board of Directors Meeting Minutes). When pressed during his deposition, Mr.

---

"material" breaches under the terms of the SAC. But the Court need not get into that dispute to resolve the issue of RDC's entitlement to a Termination Payment on August 27. Even assuming that Sage's alleged breaches cited in RDC's August 2 letter were material, it is undisputed that RDC did not give 30 days for Sage to cure said breaches before taking the Termination Payment on August 27. Nothing in the SAC entitled RDC to take the Termination Payment before the cure period expired.

1    Wauneka acknowledged that the Board had not voted to end the SAC with RDC during

2    that meeting.  (Doc. 422-7 at 66, Ex. 37, Wauneka Dep. at 43:5–7).  When Razaghi was

3    asked during his deposition if there was any written documentation following his July 23

4    discussion with Mr. Wauneka that led him to believe he had been terminated, he stated that

5    he "wrote a note to the file."  (Doc. 422-3 at 117, Ex. 13, Razaghi Dep. at 77:22).  But

6    Defendants do not identify or extrapolate upon this "note."

7         And uncontested facts show Defendants did not believe the SAC had been

8    terminated on or before August 27.  Razaghi admits that he continued to manage Sage after

9    his discussion with Wauneka on July 23.  (Doc. 422-3 at 117, Ex. 13, Razaghi Dep. at

10   82:7–9).  On August 13, 2018, in response to Wauneka's query as to whether the Sage

11   Board wanted to continue its relationship with RDC, Sage's counsel Davis wrote back:

12       Mr. Stenson I have yet to meet you via e-mail, telephone or otherwise. Thank
13       you for sending the e-mail, I see you have included Mr. Razaghi, the CEO. I
         would respectfully disagree with your statement that the Board is [at] a point
14       where the question is whether the Board wants to continue its relationship
         with Razaghi Development Company. Quite the contrary, I have had the
15       pleasure of talking with other Board members and they are ready and willing
         to work with all and invigorate the Board so that it is an equal partner in
16       insuring that members of the Navajo Nation are provided services by Sage
17       Memorial Hospital received the best possible medical treatment and
         programs at a cost-efficient medical facility.
18

19   (Doc. 430, Ex. 31 at 1).  As Davis noted, Razaghi was included on this email in which

20   Davis rejects Wauneka's suggestion that Sage is questioning its relationship with RDC.

21   Nothing in either Wauneka's email or Davis's response suggested Sage had terminated the

22   SAC.  (*Id.*)   Indeed, August 30 records from a teleconference between Razaghi, Hasan,

23   Greenfield, and Chairperson Wauneka—held three days *after* RDC had taken the

24   Termination Payment from Sage—show *RDC* intended to terminate the SAC, not that Sage

25   already had.  Those minutes reflect that on August 30, Razaghi gave "courtesy notice to

26   the Chair today that [RDC] *will be providing written notice to terminate the Contract*. . .

27   [and that RDC] has issued invoice 1369 with a total due of $10.8 Million net. . .[t]he

28   payment will be contemporaneous with the notice to terminate. . . [and] paid out of the

board approved TY2018 budget. . . ." (Doc. 422-11 at 252, Ex. 64, August 30 Teleconference Minutes) (emphasis added).[14] Finally, as Defendants note, on September 1, 2018, counsel for RDC sent a letter to the Board that gave Sage notice that RDC was terminating the SAC following the expiration of the cure period triggered by his August 2, 2018 letter. (Doc. 430 at 8–9; 422-6 at 63, Ex. 28, Aug. 2, 2018, letter from RDC attorney Stachowiak to Sage Board; Doc. 422-7 at 22, Ex. 35, Sept. 1, 2018, email from RDC attorney Stachowiak to Sage Board).

In sum, nothing in the record substantiates Razaghi's averred belief that Sage had terminated the SAC without cause on or before August 27 such that RDC was entitled to a Termination Payment on that date. His conclusory speculation is contradicted by the record and is afforded no weight. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Rivera v. Nat'l R.R. Passenger Corp.,* 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment."); *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir. 1993) ("When the non-moving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

Alternatively, RDC argues that even if the taking of the Termination Payment was a material breach on August 27, it was only a premature taking because it was ultimately entitled to it. (Doc. 430 at 17 ("RDC's receipt of the Termination Payment on August 27, 2018 was at best premature and at worst a material breach of the SAC."). RDC's position is that

receipt of the Termination Payment on August 27, 2018, rather than on

---

[14] The parties do not dispute that the $10.8 million payment was processed by Sage and received by RDC three days earlier.

> September 1, 2018, 30 days after RDC's August 2, 2018 notice of Plaintiff's breaches of the Contract, may have constituted a non-criminal material breach of the Contract. However, Plaintiff terminated the Contract without providing RDC with written notice of this breach and without giving RDC 30 days to cure any such breach. Consequently, Plaintiff terminated the Contract under circumstances entitling RDC to the Termination Payment.

(Doc. 422-8 at 90, Ex. 43, Defs' Third Supp. Resps. to Pl's First Set of Rogs; *see also* Doc. 430 at 10 (arguing that when Sage failed to give notice and time to cure, "RDC was entitled to the Termination Payment on August 31, 2018")). But RDC's possible entitlement to a Termination Payment at some later date does not negate undisputed facts that show RDC's *August 27* taking was not authorized by the SAC and thus was a breach of the contract. Indeed, much ink has been spilled over which party terminated the SAC first and whether those reasons were justified and/or proper under the SAC. But the Court finds these discussions largely immaterial to the breach alleged in Sage's Fourth Amended Complaint and on which it seeks summary judgment—namely, RDC's taking of the Termination Payment on August 27, 2018. (*See* Docs. 338, 422, 440).[15] The earliest date RDC identifies for Sage's alleged improper termination of the SAC is August 31, 2018. (Doc. 430 at 2).[16] Had RDC unilaterally sent and processed an invoice for a Termination Payment *after* August 31, the issue as to when and who terminated first may be necessary for the Court to resolve in assessing this breach. But it is undisputed that RDC took the Termination Payment on August 27. So, the only issue the Court needs to resolve in assessing RDC's breach is whether circumstances authorizing a Termination Payment under the SAC had occurred by this date, i.e., whether RDC had terminated for cause, or whether Sage had terminated without cause. (*See* Doc. 422-5 at 8–9, Ex. 18, SAC § 4.C). Other purported breaches discussed by the parties in the briefing—e.g., Sage's alleged

---

[15] These arguments are, as discussed *infra*, relevant to the issue of damages, not breach.

[16] Defendants appear to disagree amongst themselves on when Sage allegedly terminated the SAC. As noted, Razaghi testified that he believed Sage terminated the SAC on July 23, 2025, and testified that he was not taking the position that Sage terminated the SAC on August 31, 2018. (Doc. 422-3 at 116, Ex. 13, Razaghi Dep. 81:23-82:1). But as discussed, there is no evidence supporting Razaghi's belief that Sage terminated the SAC prior to August 27.

breach for engaging in unauthorized communications with Sage employees; Sage's alleged wrongful termination on August 31 for failure to comply with the notice and cure provisions; RDC's alleged breach for wrongfully terminating the SAC on September 1 because Sage was engaged in protected whistleblower communications with its employees; and RDC's breach for overbilling Sage for Razaghi's services at amounts not authorized in the SAC—are simply not material to the issue of whether RDC's taking of a $10.8 million Termination Payment on August 27 was a breach.

Sage has met its high burden of establishing beyond controversy that RDC breached the SAC when it took the Termination Payment on August 27, 2018. The factual record shows that no circumstances existed on this date that would have entitled RDC to take a Termination Payment under the SAC.

### 2. Whether Sage Has Shown Damages for $10.8 Million with Reasonable Certainty

Arizona courts "have long-recognized that absolute certainty in the amount of damages is not necessary where the fact of damage is proven, with doubts to be resolved in favor of the non-breaching party." *Great W. Bank v. LJC Dev.*, LLC, 362 P.3d 1037, 1049 (Ariz. Ct. App. 2015) citing *Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963) and Restatement (Second) of Contracts § 352 (1981) ("Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred."). Thus, under Arizona law, a plaintiff bears the burden of showing contract damages with "reasonable certainty." *Gilmore*, 386 P.2d at 82. Reasonable certainty is provided where there is "some reasonable method of computing [the] net loss." *Lininger v. Dine Out Corp.*, 639 P.2d 350 (Ariz. Ct. App. 1981) (citing *Irish v. Mountain States Tel. & Tel. Co.*, 500 P.2d 151, 154 (Ariz. 1972)); *see also Gilmore*, 386 P.2d at 82 ("[T]he evidence must make an 'approximately accurate estimate' possible.") (*quoting Martin v. LaFon*, 100 P.2d 182 (Ariz. 1940)).

Sage says its damage calculation is simple: RDC wrongfully took $10.8 million on August 27 and Sage was subsequently damaged in that amount. Though it does not directly

address the issue, RDC seems to take the position that Sage did not suffer a net loss because it was contractually entitled to the $10.8 million Termination Payment mere days later— either because Sage terminated the contract without cause, or because RDC terminated the contract with cause.  So, whether Sage can show it was damaged with reasonable certainty on summary judgment turns in large part on whether RDC was *ever* entitled to a Termination Payment under the SAC.  Accordingly, for Sage to establish that it has been damaged by the $10.8 million Termination Payment, it must show that RDC was never entitled to a Termination Payment, either because RDC terminated the SAC without cause, or because Sage terminated for cause.  (See Doc. 422-5 at 9, Ex. 18, SAC § 4.D ("In the event that [RDC] terminates this Contract without 'cause' as previously defined in Section 4.A., [RDC] shall not be entitled to the Termination Payment."); *id.* at §§ 4.B & C (obliging Sage to pay a Termination Payment to RDC if the SAC expires; RDC terminates with cause; or if Sage "elects to terminate this Contract at any time prior to termination of this Contract for any reason other than those listed as 'cause' in Section 4.A").

In advancing the former argument, Sage says "[t]aking $10.8 million from Sage for a "Termination Fee" is so clearly inconsistent with the continued existence of the Contract that the only reasonable interpretation of RDC's actions is that they were a termination of the contract."  (Doc. 422 at 18 citing *Altmayer-Pizzorno v. L-Soft Int'l, Inc.*, 302 Fed. Appx. 148, 153 (4th Cir. 2008)).[17]  The Court agrees.

In Arizona, a notice to rescind "is not required to be formal and may be evidenced by conduct, but manifestation of an intent to rescind must be unequivocal."  *Miller v. Crouse*, 506 P.2d 659, 664 (Ariz. Ct. App. 1973).[18]  Here, RDC issued and took $10.8

---

[17] The SAC is governed by Arizona law, making Sage's citation to an unpublished Fourth Circuit opinion applying Maryland law peculiar.  (Doc. 422-5 at 15, Ex. 19, SAC § 12.D).  RDC points out as much in its Response.  (Doc. 430 at 14).  In its Reply, Sage says that it is nonetheless "a general principle that contracts may be terminated through conduct," and cites to a footnote from Chief Justice Struckmeyer's dissent in *American Continental Life Ins. Co. v. Ranier Construction Co., Inc.*, 607 P.2d 372, 379 n.2 (Ariz. 1980) (Chief Justice Struckmeyer, dissenting) as support.  (Doc. 440 n. 6; *id.* n.2) (noting that a jury "could have concluded that when [owner] advised [contractor] that it would not pay the balance of the contract, such conduct terminated the contract, thus waiving the condition that payment was dependent on the [] issuance of a Certificate of Final Payment").

[18] RDC conclusively argues "*Miller* is clearly inapplicable here because it dealt with

million for a "Contract Termination Fee, Section 5.D" "due upon receipt." No reasonable juror would understand this communication to be anything but an unequivocal statement of RDC's intent to terminate the SAC. Invoice 1369 plainly refers to "Section 5.D"—the applicable "Termination Payment" section in the SAC. (Doc. 422-5 at 11, Ex. 18, SAC § 5.D). And there is no contingency noted in the invoice that would otherwise render RDC's intent to terminate equivocal, as made clear by the fact that the large payment was "due upon receipt." The amount was processed and paid to RDC. RDC points to nothing in the record showing it offered to pay the money back to Sage if certain conditions were met. The Court need not reach the question of whether Sage terminated the SAC for cause because RDC has not met its burden of showing that any rational juror could find that RDC did not terminate the SAC without cause when it took the $10.8 million Termination Payment on August 27.

The Court also finds that as a matter of law, RDC's termination was effective when Sage received notice that the Termination Payment had been taken. The SAC is silent as to how a party is to effectuate termination without cause, but clearly contemplates the possibility. (*See* Doc. 422-5 at 9, Ex. 18, SAC § 4.D. ("In the event that RD terminates this Contract without "cause as previously defined in Section 4.A., RH shall not be entitled to the Termination Payment"); *id*. § 4.C. ("In the event that [Sage] elects to terminate this Contract at any time prior to termination of this Contract for any reason other than those listed as 'cause' in Section 4.A., [Sage] shall pay . ."). In contrast, the SAC provides that in each of the "for cause" circumstances in subsections 4.A.1–5, receipt of the termination notice is required for the termination to be effective. (*See id*. at § 4.A (requiring written

---

recission as opposed to termination, which is fundamentally different." (Doc. 430 at 14). The Court agrees there are differences in recission versus termination. *See Reed v. McLaws*, 110 P.2d 222, 225 (Ariz. 1941) ('To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made.) ((quoting Black on Rescission and Cancellation, 2d Ed., Vol. 1, sec. 1, page 1). But RDC does not elaborate on how those differences matter to the issues of termination by conduct, or whether receipt of notice is required to effectuate either the right of recission or termination.

notice of termination by certified mail no later than 120 days prior to the intended termination date under § 4.A.1–3; allowing written notice of termination "immediately" under § 4.A.4; and allowing written notice of termination "following the expiration of the 30 day curative period" under § 4.A.5); *see also id.* § 9 ("Any notice required or permitted to be given under this Contract shall be sufficient if in writing and if sent certified mail (return receipt requested). . .").

"When interpreting a contract, [courts] seek to discover and effectuate the parties' expressed intent." *Terrell v. Torres*, 456 P.3d 13, 15–16 (Ariz. 2020), as amended (Feb. 21, 2020). Arizona courts apply ordinary interpretative principles to determine the parties' contractual intent according to the plain and ordinary meaning of the terms. *Id.*

Given that the SAC requires the non-terminating party to receive a notice of termination for cause to be effective, the Court finds that the parties intended that the same was required for a not for cause termination. Indeed, Arizona courts have found that "[u]nless otherwise agreed, mutual promises by principal and agent to employ and to serve create obligations to employ and to serve which are terminable *upon notice by either party*." *Horizon Corp. v. Weinberg*, 531 P.2d 215, 217 (Ariz. Ct. App. 1975) citing Restatement, Agency 2d, § 442 (emphasis added). *See also Miller*, 506 P.2d at 664 (citing 17A C.J.S. Contracts § 435 (1963)) (stating that a notice of recission "is not effective as such until it is received and unless the party giving the notice is entitled to rescind"); *N.L.R.B. v. Vapor*, 311 F.2d 782, 785 (9th Cir. 1962) (citing 1 Corbin on Contracts, § 881: "In the case of an option to terminate existing contractual relations, the power of the option holder is generally to be exercised by giving notice."); *id.* ("The general rule that a notice to terminate must actually be received is apparently recognized without dissent."). *See also* 17B C.J.S. Contracts § 614 (2025) ("As a general rule, notice of termination is essential to the exercise of an option to terminate a contract, especially where it is so provided by the terms of the contract.") 13 Corbin on Contracts § 68.9 (2019) (discussing notice as a condition precedent to the exercise of the power to terminate a contract); 15 Williston on Contracts § 48:7 (4th ed. 2019) ("[T]he uniformly held view [is] that if no

time is specified, notice within a reasonable time is an implied condition.").

It is undisputed that Sage's CEO and CFO were notified of the Termination Payment on August 27 and that Sage's Board was informed that RDC took the Termination Payment "on the evening of August 30, 2018." (*See* Doc. 422-7 at 75, Ex. 38, Aug. 31, 2018, Sage Meeting Minutes). At the latest, RDC's termination of the SAC became effective on August 30, before any purported cure period had expired. RDC's notice of termination was therefore received by Sage first and was without cause. RDC was not ever entitled to a Termination Payment under the terms of the SAC.

Sage has established beyond controversy that Sage incurred $10.8 million in damages because of RDC's breach. The Court will enter summary judgment on Sage's breach of contract claim relating to RDC's unauthorized taking of the Termination Payment on August 27.

### B. Sage's Claim that Defendants Were Unjustly Enriched by Receiving the $10.8 Million Termination Payment (Count Ten)

Under Arizona law, an unjust enrichment claim requires proof of "five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). "[I]f there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application," but a plaintiff may plead an unjust enrichment claim in the alternative where the validity of a relevant contract is disputed. *Trustmark Ins. v. Bank One, Ariz.*, 48 P.3d 485, 491–93 (Ariz. Ct. App. 2002) (citations and internal quotation marks omitted). Indeed, if there is a remedy provided by law for the breach of contract claim, the unjust enrichment claim fails and the claim must be dismissed. *Id.*

Here, Sage and RDC do not dispute they have a valid contractual relationship and that the SAC governs the issue of whether RDC had an entitlement to the Termination Payment. Sage therefore has a remedy at law for this breach. Sage acknowledges in its Reply that it "seeks summary judgment under this claim <u>in the alternative</u>, if the Court

finds Defendants' seizure of the $10.8 million was not a breach of the Contract." (Doc. 440 at 10). The Court has determined RDC breached the SAC in this regard as a matter of law. Sage is therefore not entitled to summary judgment on this aspect of its Count Ten claim for unjust enrichment, and this aspect of Sage's unjust enrichment claim is dismissed.

### C.    Sage's Claim that Razaghi and Hasan's Acts Related to the Taking of the $10.8 Million Were a Violation of RICO (Count One)

Section 1962(c) of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") imposes liability on "any person employed by or associated with an enterprise" who engages in a pattern of racketeering activity. "The statute sets out four elements: a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); *see also* 18 U.S.C. § 1962(c). "Racketeering activity . . . requires predicate acts," and when "alleged to be mail and wire fraud under 18 U.S.C. §§ 1341 and 1343," as here, a plaintiff must establish a defendant's "specific intent to defraud." *Eclectic Props.*, 751 F.3d at 997.

In Count One of the Fourth Amended Complaint, Sage alleges that "Razaghi and Hasan, through their management of RDC and total control of Sage's accounts and payment systems, engaged in a years-long scheme to systematically bilk Sage." (Doc. 422 at 27). However, Sage says that the Court "need not parse those allegations to enter a RICO judgment for Sage as to the $10.8 million." (*Id.*) It says "[t]he taking of the $10.8 million and Defendants' fraud surrounding it independently gives rise to RICO liability because: (1) RDC was not entitled to the $10.8 million, . . . and (2) the wrongful seizure of the money involved many acts, all of which were RICO predicate acts." (*Id.*)

In making its case, Sage specifically argues that Razaghi and Hasan formed an enterprise, RDC, "for the common purpose of engaging in acts to defraud Sage," and those acts "culminat[ed] in the theft of the $10.8 million on August 27, 2018." (Doc. 422 at 26). Sage argues that Razaghi and Hasan engaged in at least two predicate acts of wire and mail fraud particular to the taking of the $10.8 million, including: transferring $500,000.00 from one Sage account to another to cover the taking of the $10.8 million payment; misusing

1    bank ACH transfers to take the $10.8 million; manipulating Sage's payment approval
2    processes to push payment of the $10.8 million without Sage ever knowing about it; and
3    sending a September 1, 2018, termination notice to Sage "in an attempt to paper over their
4    fraudulent seizure of the $10.8 million five days prior." (*Id*. at 27).

5        Razaghi and Hasan argue that Sage's motion should be denied because Sage cannot
6    sufficiently establish facts in the record to show there was an enterprise; that they had the
7    intent to defraud required for wire or mail fraud; or that they engaged in a pattern of
8    racketeering activity.  (Doc. 430 at 21).

9        The Court agrees with Razaghi and Hasan that factual disputes preclude summary
10   judgment on Sage's RICO claim.  Factual disputes exist about the scope of the enterprise
11   alleged and Razaghi's and Hasan's specific intent to defraud.  Sage's version of the facts
12   as to the scope of the enterprise (that Razaghi and Hasan "formed an enterprise for the
13   common purpose of engaging in acts to defraud Sage. . . culminating in the theft of the
14   $10.8 million on August 27, 2018" (Doc. 422 at 26)) and Razaghi and Hasan's version
15   (that they were a managing CEO and CFO engaging in routine discussions and
16   arrangements about processing payments due) rest on disputes of material fact for a jury to
17   determine.  The same applies to whether Razaghi and Hasan committed the alleged
18   predicate offenses with the specific intent required to establish mail and wire fraud.[19]  Sage
19   says that Razaghi and Hasan had discussions and schemed to take the Termination Payment
20   months before August 27.  (Doc. 422 at 26).  Sage says that Razaghi and Hasan directed
21   RDC employee Nicole Hardy to analyze payments made by Sage to Razaghi from 2013 to
22   2017 and "later use[d] this information to construct the sham Termination Payment," and

---

[19] The elements of mail fraud and wire fraud are virtually identical. To establish a violation of mail or wire fraud, it is "necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails [or wires] or caused a use of the United States mails [or wires] in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1399–400 (9th Cir. 1986); *see* 18 U.S.C. §§ 1341, 1343.  The requirement of specific intent under these mail/wire fraud statutes is satisfied by "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." *Schreiber Distrib. Co.*, 806 F.2d at 1400 (citation omitted).  In other words, a court may look to the intent of the scheme when determining whether the third element of the mail/wire fraud claim is met.

that Hasan directed the transfer of $500,000.00 of restricted funds to cover the $10.8 million payment, and that both of them directed and ultimately processed the payment via ACH without telling anyone at Sage.  (Doc. 422 at 28).   But Hasan disavows any knowledge of the Termination Payment provisions in the SAC or that he had any discussions with Razaghi about it.  (Doc. 430 at 20–21; *see also* Doc. 432-8, Ex. Y, Hasan Decl. ¶ 9 ("I did not have any discussions with anyone at RDC regarding the termination of its contract with Sage, whether RDC was entitled to receive a Termination Payment, or whether, when or how RDC would receive a Termination Payment.")).  And Razaghi avers that the invoice for the Termination Payment was submitted and processed on August 27 because he believed "that Sage had terminated the SAC without cause and/or that RDC was or would soon be entitled to terminate the SAC for cause, and under either scenario be entitled to receive a Termination Payment under the SAC."  (Doc. 444 ¶ 8, Razaghi Decl.). These are issues of Defendants' intent that must be vetted by a jury, not this Court.  *See Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1204 (Fed. Cir. 2006) (noting that intent to deceive is "a factual matter rarely free from dispute and thus rarely enabled in summary proceedings").

Sage's motion is denied as to its claim that Razaghi and Hasan violated the federal RICO statute when RDC took the $10.8 million on August 27.

### D.    Sage's Claim that Defendants' Taking of the $10.8 Million was Fraudulent (Count Three)

Count Three of Sage's FAC alleges claims of common law fraud against RDC, Razaghi, and Hasan.  Again, Sage seeks summary judgment on Count Three only as to "the portion of that claim based on the wrongful seizure of the $10.8 million." (Doc. 422 at 28). Civil fraud claims require proof by clear and convincing evidence.  *Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1034 (Ariz. Ct. App. 2010).

As to the $10.8 million taking, Sage alleges the following in the FAC:

[O]n August 27, 2018, Razaghi caused the fraudulent taking of more than $10.8 million from Sage Memorial.  Specifically, the following occurred:
a.    At approximately 9 a.m., Hardy received a telephone call

directly from Hasan, the contract CFO employed by Razaghi Healthcare NV but with fiduciary duties owed to Sage Memorial, requesting status and payment on three invoices sent that same day. In submitting these invoices, Razaghi Healthcare NV and Razaghi made "representations" regarding the legitimacy of the statements contained therein which, at the time they were made, they knew were not true.

b.      Hardy checked the invoices and determined the total was $11,048,517.71. Invoice #1369 was for a total of $10,855,134.15. Hardy checked for backup documents and determined there were none – the only attachment was her July 16, 2018 "cost report" spreadsheet. Finally, Hardy discovered the "re" on the invoice merely referenced a "Contract Termination Fee, Section 5.D." Worried about the size of the invoice, never having processed such a large amount and seeing that there was no backup and the invoice only referenced a contract provision, Hardy went to her supervisor Arave and then ultimately to Arave's supervisor Matenaer. Matenaer advised Hardy that he would speak to Hasan about the matter, specifically to request the backup documents and to obtain information regarding the coding issues.

c.      Following a short break, Hardy returned to the office and noticed Matenaer's inquiry e-mail to Hasan on the two issues – the lack of backup documents and coding issues. However, in the meantime, she also discovered that Hasan, the CFO and Matenaer's superior, had left a message for her to call him back immediately. Upon returning his call, Hardy was ordered by Hasan to immediately input the invoices into Sage Memorial's electronic banking system for payment and to code the payment for invoice #1369 as "Management Services Fees" so that he could approve the payment to Razaghi Healthcare NV.

d.      At 10:50 a.m., Hardy completed inputting invoice #1369 into Sage Memorial's payment system (Meditech Financial Management System) and Sage Memorial's online banking portal.

e.      At 10:53 a.m., Hardy notified Hasan that she has completed uploading invoice #1369 in Sage Memorial's payment system. f. At 10:59 a.m., Hasan accessed Sage Memorial's system and transferred $500,000.00 from the hospital's IHS Funding Account and $10,855,000.00 from Sage's Third-Party Revenue Account to Sage's General Operating Account to cover the additional outstanding checks in order to avoid an overdraft and ensure the payment of the $10.8 million invoice.

g.      At 11:02 a.m., Hasan, as contract CFO, approved a $10.8 million payment to Razaghi Healthcare NV. Pursuant to the scheme to defraud, Razaghi Healthcare NV was paid by "automated clearing house" or ACH payment instantly and the funds were taken from Sage Memorial's General Operating Account at Wells Fargo – not the Escrow Account, which had been created for the specific purpose of paying the termination fee.

Razaghi was aware that in order to release any funds from the Escrow Account, he would need a second signature from a member of the Sage Board. Therefore, pursuant to the scheme to defraud, Razaghi and Hasan used their access to, and control over, Sage Memorial's bank accounts to fraudulently initiate and approve the transfer of $10.8 million from Sage Memorial's bank account to Razaghi Healthcare NV's bank account.

h. The invoice for this payment falsely stated that Sage Memorial owed Razaghi Healthcare NV $10,855,134.15. At the time the invoice was submitted, both Razaghi and Hasan knew the invoice was false.

i. These fraudulent acts were also concealed from the Sage Board, which was unaware of the misappropriation of the $10.8 million from Sage Memorial's bank account until the afternoon of August 30, 2018 when a Sage Memorial Employee contacted one of the Sage Board members concerning the unauthorized wire transfer which was sent in furtherance of the scheme to defraud…

(Doc. 338 ¶ 135).

Under Arizona law, to prevail on a common law fraud claim, a plaintiff must show, by clear and convincing evidence,

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978); *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local. No. 395 Pension Trust*, 38 P.3d 12, n.24 (Ariz. 2002) ("Fraud unquestionably requires clear and convincing evidence.") (citation omitted).  Arizona follows the Restatement (Second) of Torts.  *Jesik v. Maricopa Cnty. Cmty. Coll. Dist.*, 611 P.2d 547, 550 (Ariz. 1980).

In its PMSJ, Sage briefly argues that it is entitled to summary judgment on Defendants' alleged fraudulent misrepresentations and concealment related to the Termination Payment.  In sum, it argues:

As discussed above,[20] Defendants engaged in numerous deceptive acts to

---

[20] It is unclear what discussion in the previous 29 pages Sage is expecting the Court to refer to in assessing whether the nine elements of fraud have been established by clear and convincing evidence.  It is not the Court's responsibility to make Plaintiff's case or hunt for the evidence that may support its contentions.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its

enable the theft of the $10.8 million.  Defendants hid their intentions but represented they wished to continue working with Sage.  Defendants actively concealed their actions: not notifying Sage about the $10.8 million seizure until days later, not following internal approval processes for high-dollar transfers, and not following the Escrow Agreement procedures and account. Sage reasonably relied on Defendants' outward representations, given the parties' longstanding relationship, and it was undisputedly harmed by Defendants' fraudulent scheme.

(Doc. 422 at 29).

In their Response, Defendants argue that summary judgment should be denied because Sage's fraud claim is barred by the economic loss doctrine and because Sage cannot prove an actionable representation upon which its fraud claim is based.  (Doc. 430 at 23–26).[21]

### 1.    Economic Loss Doctrine

Defendants first argue that "Sage manufactured its fraud claim out of its claim that RDC breached the SAC" and thus is precluded by the economic loss doctrine.  (Doc. 430 at 23).

The Arizona Supreme Court has referred to the economic loss doctrine as a "common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property."  *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 P.3d 664, 667 (Ariz. 2010).  The

---

motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.

[21] Defendants also argue that Sage advanced a fraudulent concealment theory for the first time in its PMSJ and thus the Court should ignore it.  (Doc. 430 at 25 citing *Schock v. Jacka*, 460 P.2d 185 (Ariz. 1969)).  The Court rejects this argument and *Schock* does not support it.  In *Schock*, the court noted that misrepresentation and concealment "may factually be but two sides of the same legal coin. Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous." *Id*.  In that case, the court found that the plaintiff had not plead nor raised a theory of concealment before the trial court and only shifted to a theory of fraudulent concealment on appeal. *Id*. at 187.  The appellate court thus found the trial court did not err in limiting itself to the issue before it. *Id*.  Here, in contrast, Sage's Fourth Amended Complaint alleges that Defendants fraudulently concealed the taking of the $10.8 million by representing that it was due and failing to disclose its taking to the Board (*see* Doc. 338 ¶¶ 135(i), 136, 140–148, 193–194) and Sage clearly makes that argument in its PMSJ.

primary function of the doctrine is "to encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain." *Id*. at 671. Whether the doctrine applies depends on "context-specific policy considerations" underlying contract law and tort law. *Id*. at 669.

"Although some courts apply the doctrine to generally bar tort recovery of purely pecuniary losses, Arizona takes a narrower approach." *Sullivan v. Pulte Home Corp.*, 306 P.3d 1, 2 (Ariz. 2013). "Arizona courts generally apply the doctrine in product liability and construction defect cases." *Arimilli v. Rezendes*, 2021 WL 3406332, at *4 (D. Ariz. Aug. 4, 2021). The Arizona Supreme Court has not determined whether the doctrine bars fraud claims. *Jes Solar Co. v. Matinee Energy, Inc.*, 2015 WL 10943562, at *4 (D. Ariz. Nov. 2, 2015). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Ticknor v. Choice Hotels Intern., Inc.*, 265 F.3d 931, 939 (9th Cir. 2001). " '[A]bsent controlling authority, federal courts look to existing state law' but refrain from 'predicting potential changes' in that law." *Barrett-Jackson Auction Co. v. Mountain Sports Int'l Inc.*, 2020 WL 9349176, at *3 (D. Ariz. Sept. 9, 2020) (quoting *Ticknor*, 265 F.3d at 939).

Two Arizona Court of Appeals cases have addressed the applicability of the economic loss doctrine in fraud cases. In *Cook v. Orkin Exterminating Co.*, 258 P.3d 149 (Ariz. Ct. App. 2011), the appeals court held that the economic loss doctrine barred the plaintiffs' claims, which included claims for fraud and misrepresentation. *Cook*, 258 P.3d at 153. However, as noted by the court in *Shaw v. CTVT Motors, Inc.*, 300 P.3d 907 (Ariz. Ct. App. 2013), *Cook* "did not explicitly address the viability of a claim for fraudulent inducement under the economic loss rule" but rather held that, under the limited facts of that case, contractual remedies were sufficient. *Shaw*, 300 P.3d at 909. Notably, the *Shaw* court expressed "concerns about applying the economic loss rule . . . to any claim of fraud in the inducement" because the economic loss rule "exists 'to encourage private ordering of economic relationships and to uphold the expectations of the parties,' " which is not

furthered when such "private ordering" is procured by fraud.  *Id.*, 300 P.3d at 910 n.4 (quoting *Flagstaff*, 223 P.3d at 671).  Federal courts have found similarly, holding that the economic loss doctrine should not apply to claims for fraudulent inducement because doing so would not further the policy behind the doctrine.  *See Barrett-Jackson*, 2020 WL 9349176, at *4 (collecting cases).

    As an initial matter, the economic loss doctrine does not apply to non-contracting parties and thus is not a basis to bar to Sage's fraud claims against Razaghi and Hasan, who are not parties to the SAC.  *See Sullivan*, 306 P.3d at 3.  The question is closer with regard to RDC, however.  Defendants argue that "Sage manufactured its fraud claim out of its claim that RDC breach the SAC," and thus "seeks the recovery of economic losses solely related to the SAC."  (Doc. 430 at 23).  In its Reply, Sage disagrees and says that "the doctrine generally bars solely-economic tort claims based on <u>deficient performance</u> under a contract."  (Doc. 440 at 15).  It says that Sage's fraud claim is "not based on deficient performance but rather on Defendants' abuse of the trust and control Sage gave them, to steal millions from Sage in a scheme."  (*Id.*)  It also says that Defendants have failed to cite to case law that the doctrine bars recovery in such a situation and public policy does not support its application in any event.  (*Id.*)

    The Court is strained to understand what damages beyond the $10.8 million Sage seeks to recover from RDC on this aspect of its fraud claim,[22] which by all accounts appears to be based on RDC's entitlement to a termination payment under the SAC.  Yet the Court also tends to agree with Sage that the limited Arizona case law cited does not support barring the claim under the economic loss doctrine, particularly when a portion of the claim is based on Defendants' fraudulent concealment.  Arizona courts have construed the doctrine narrowly and Defendants have not persuaded this Court to determine otherwise.  *See Sullivan*, 306 P.3d at 2.  Given the limited application of the doctrine by the Arizona courts, and the failure of the parties to meaningfully brief the issue, the Court declines to

---

[22] In a footnote, Sage says that its fraud claim "covers many more thefts and frauds" than the $10.8 million taking, "and even as to the $10.8 million theft, at the very minimum, the fraud claim is an additional claim *seeking the same funds*."  (*Id.* n.16) (emphasis added).

1  find that Sage's fraud claim against RDC related to taking the $10.8 million is precluded

2  by the economic loss doctrine.

### 2.    Actionable Misrepresentation

4  Defendants also argue that Sage's fraud claim fails "at the first element, because it

5  fails to argue or cite any evidence that any Defendant made an actionable representation in

6  connection with RDCs receipt of the Termination Payment." (Doc. 430 at 24).  Defendants

7  say it follows that Sage "cannot demonstrate that any representation was false and material,

8  and importantly, which Defendant made a representation." (*Id*.)  In their Reply, Sage says

9  "Defendants made misrepresentations in an invoice and to Sage accounting employees that

10 a Termination Payment was owed, and Defendants engaged in deception to hide

11 information from Sage about the $10.8 million theft for several days, including instructing

12 Sage's accounting employees to withhold information from Sage." (Doc. 440 at 15).  Sage

13 also says it has shown that "Defendants fraudulently concealed their seizure of $10.8

14 million" by hiding the fact of its taking from the Board for days, and instructing Hardy to

15 "withhold financial information from the Board, despite its requests." (*Id*. at 16).

16 The Court rejects Defendants' arguments that Sage has not provided evidence of

17 Defendants' fraud related to the Termination Payment.  Invoice 1369 plainly states

18 $10,855,134.15 is "due upon receipt" to RDC and there is sufficient evidence in the record

19 to show that Defendants knew this was not true and took necessary steps to conceal its

20 falsity (and existence) from Sage.  (Doc. 422-11 at 248, Ex. 63, Aug. 27, 2018, Invoice

21 1369).  The Court agrees with Defendants, however, that Sage has not yet established its

22 fraud claim by clear and convincing evidence such that the Court should enter judgment.

23 A plaintiff "seeking summary judgment on a claim must offer evidence sufficient to

24 support a finding upon every element of [its] claim other than elements admitted by the

25 defendants." *Barnes v. Sea Hawii Rafting, LLC*, 889 F.3d 517, 537 (9th Cir. 2018) (cleaned

26 up).  "It is ordinarily a heavy burden." *Id*. at 538.  Here, there are factual disputes as to

27 whether Defendants concealed the taking of the $10.8 million.  Sage says the taking was

28 concealed because the Board was not told of it and because Defendants purposely avoided

using the escrow account that was set up for this purpose.  Defendants say there was no concealment because the invoice was approved by Sage's Co-CEO Greenfield and CFO Hasan.[23]  There are also material disputes as to whether Hasan knew that the payment was not due and owning when he instructed Sage accounting employees to pay it.  Rule 56 "authorizes summary judgment only where. . . it is quite clear what the truth is."  *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (internal quotation marks omitted) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944)).  "Reasonable doubts as to the existence of material factual issue are resolved against the moving part[y] and inferences are drawn in the light most favorable to the non-moving party."  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  In light of these factual disputes, the Court denies Sage's PMSJ on its fraud claim related to the $10.8 million.

### E.    Sage's Claim that RDC's Taking of the $10.8 Million was in Breach of Their Fiduciary Duties (Counts Five, Six, and Seven)

Sage also seeks summary judgment on the portion of its breach of fiduciary duty claims against Defendants based on the seizure of the $10.8 million.  To prevail on its claims, Sage must show that each Defendant owed a fiduciary duty, breached that duty, and caused damages related to the breach.  *John E. Shaffer Enters. v. City of Yuma*, 904 P.2d 1252, 1256 (Ariz. Ct. App. 1995).  Generally, whether a duty is owed is a question of law for the court.  *Stanley v. McCarver*, 92 P.3d 849, 851 (Ariz. 2004).  However, "[t]he elements of breach and causation, and the measure of damages, if any, are generally questions for the trier of fact."  *Smethers v. Campion*, 108 P.3d 946, 949 (Ariz. Ct. App. 2005).

#### 1.    Fiduciary Duty

Sage says all three Defendants owed Sage fiduciary duties.  It says RDC expressly contracted under the SAC that it would not violate fiduciary duties in serving as CEO of Sage (Doc. 422 at 30; Doc. 422-5 at 3, Ex. 18, SAC, Recital H), and Razaghi and Hasan were Co-CEO and CFO respectively, at the time of the taking.  Sage argues that undisputed

---

[23] As noted, however, Greenfield testified that he had no knowledge of the invoice and said he was not asked to approve or verify it.

facts show that Sage gave Defendants control over most facets of its operations, including its banking and finances and each Defendant assumed those responsibilities.  (Doc. 422 at 30).  In response, Defendants argue that "fact questions abound which preclude summary judgment" as to the existence of a fiduciary relationship between Sage and Defendants. (Doc. 430 at 27).  They say that RDC only served as an independent contractor to Sage under the SAC, and that Razaghi and Hasan's corporate officer status was not authorized under Sage's bylaws.  (*Id*.)  Hasan specifically argues that he was hired by RDC to be Sage's CFO and "there exists no evidence that Sage knew anything about him or that it entrusted great trust in him when he became its Finance Director or Chief Financial Officer."  (Doc. 430 at 28).

Defendants offer no authority for the proposition that an independent contractor cannot be a fiduciary, or that corporate officers have to be authorized by corporate bylaws to be a fiduciary.  Indeed, these are not the considerations Arizona courts make in determining whether a fiduciary relationship exists.  Under Arizona law, a confidential relationship can be found even if the relationship "does not fall into any well-defined category of law," but still demonstrates "just as great intimacy, disclosure of secrets, intrusting of power, and superiority of position," rendering the relationship so similar to a fiduciary relationship "that it should have like results."  *Taeger v. Catholic Fam. & Cmty. Servs.*, 995 P.2d 721, 726 (Ariz. Ct. App. 1999) (quoting *Condos v. Felder*, 377 P.2d 305, 308 (Ariz. 1962)).

Here, however, each Defendant was a fiduciary in name and fact.  RDC contracted to serve as CEO of Sage in a manner that would "not constitute or create a conflict of interest, violation of *fiduciary* duty, or appearance of impropriety, all on the terms and conditions stated herein."  (Doc. 422-5 at 3, Ex. 18, SAC Recital H (emphasis added)). Though "purely commercial transactions do not give rise to a fiduciary relationship," when one contracts to serve in that capacity, such a relationship is found.  *Urias v. PCS Health Sys., Inc.*, 118 P.3d 29, 35 (Ariz. Ct. App. 2005).  RDC unquestionably stood in a fiduciary relationship with Sage.  And though RDC was to use its "reasonable business judgment"

in selecting CEOs and CFOs for Sage, that does not mean that once selected, those officers were not required to discharge their discretionary duties in good faith, "[w]ith the care an ordinarily prudent person in a like position would exercise in similar circumstances," and "[i]n a manner the officer reasonably believes to be in the best interests of the corporation." A.R.S. § 10–842(A).  Hasan acknowledged as much in his deposition.  (Doc. 422-8 at 16, Ex. 40, Hasan Dep. at 31:7–14).  In Arizona, corporate directors, officers, and controlling shareholders owe fiduciary duties to the corporation and its shareholders. *See Master Records, Inc. v. Backman*, 652 P.2d 1017, 1020 (Ariz. 1982); *Pioneer Annuity Life Ins. Co. by Childers v. Nat'l Equity Life Ins. Co.*, 765 P.2d 550, 555 (Ariz. Ct. App. 1988).  *See also Wichansky v. Zowine*, 150 F.Supp.3d 1055, 1067 (D. Ariz. 2015).  Where a corporate fiduciary breaches any of these duties, the fiduciary is subject to liability for any losses legally caused by the breach. Am. Law Inst., Principles of Corporate Governance § 7.18(a).  The Court finds that RDC and Razaghi, as CEOs of Sage, and Hasan, as CFO of Sage, owed these fiduciary duties to Sage.

Sage has met its burden of showing each Defendant owed a fiduciary duty to Sage.

### 2.    Breach and Damages

Sage does not separately identify how each Defendant breached their respective fiduciary duties.  Instead, Sage says Defendants breached their duties when they "[stole] $10.8 million that RDC was not entitled to; abuse[d] their control over Sage's bank accounts and financial approval processes to do so; process[ed] the purported invoice for the $10.8 million with no review; actively conceal[ed] the theft of the $10.8 million from Sage; and engage[d] in all of the related conduct incumbent in that $10.8 million fraudulent scheme."  (Doc. 422 at 31).  Defendants do not directly contest the alleged breaches but say that Sage improperly invites the Court to invade the province of the jury and decide "whether RDC's receipt of the Termination Payment resulted from the breach of that duty." (Doc. 430 at 28).

The Court finds that Sage has not sufficiently made its case that Defendants breached their duties on summary judgment because it does not cite to the specific evidence

1    supporting its claims.  As noted, the burden for Sage on summary judgment is high.

2    Moreover, it is *Sage's* burden, not the Court's, to identify the undisputed evidence

3    supporting its claims.  *See Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418

4    (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason

5    to deny a motion for summary judgment."); *Bischofshausen, Vasbinder, and Luckie v. D.W.*

6    *Jaquays Min. and Equip. Contractors Co*, 700 P.2d 902, 909 (Ariz. Ct. App. 1985) ("If

7    there is the slightest doubt whether there is an issue of fact in ruling on the motion for

8    summary judgment, such a doubt should be resolved in favor of a trial on the merits.").

9    Generally, the issue of whether one has breached their fiduciary duty is a factual one, best

10   determined by a jury.  The Court declines to enter summary judgment on these claims.

11        **F.    Conclusion on PMSJ**

12        In sum, Sage has met its burden of showing that RDC breached the SAC when it

13   took the $10.8 million Termination Payment on August 27, 2018, and was damaged in that

14   amount.   Factual disputes preclude summary judgment on the remainder of Sage's claims

15   related to the withdrawal of the Termination Payment.

16   **IV.   Sage's Motion for Summary Judgment on RDC's Counterclaims**

17        Sage also seeks summary judgment on aspects of RDC's Count II breach of contract

18   and Count III breach of good faith and fair dealing claims.  (Doc. 428).  In doing so, Sage

19   has the burden of showing there are no genuine disputes of material fact with regard to

20   RDC's claims.  *Celotex Corp.*, 477 U.S. at 323.  If Sage can make such a showing, the

21   burden shifts to RDC, who must then "set forth specific facts showing that there is a

22   genuine issue for trial" without simply resting on the pleadings.  *Anderson*, 477 U.S. at

23   256.   In carrying that burden, RDC must do more than simply show there is "some

24   metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

25   *Corp.*, 475 U.S. 574, 586 (1986).  Where the record, taken as a whole, could not lead a

26   rational trier of fact to find for RDC, there is no genuine issue for trial.  *Id.* at 587.

27        **A.    Breach of Contract for Failure to Pay Compensation Under SAC**
              **(Count II)**

28        As noted, the parties entered into the FAC on May 17, 2013.  Among other things,

- 40 -

the FAC required Sage to pay RDC the cost of the services of any employees, consultants, or independent contractors "based on the fair market value of their services consistent with [Sage's] budget." (*Id.*)   In 2017, when the parties entered into the SAC, they agreed the SAC would "entirely supersede[] the Original Contract and the [FAC]; provided, however that any rights, obligations, or claims of [Sage], Razaghi, or [RDC] related to the Original Contract or the [FAC] during the time it was in effect shall not be affected in any way by this section." (Doc. 422-5, Ex. 18, SAC § 1).

RDC's breach of contract claim alleges that Sage breached the SAC "by, among other things, failing to pay RDC the entire compensation outlined in Management Contract up to the date of its termination, including but not limited to Incentive Fees, Annual Retention Bonuses, Management Consulting Services, Executive Leadership Services, employee reimbursements, and reimbursement for D&O Insurance." (Doc. 217 ¶ 109). RDC's counterclaim specifically identifies three invoices that Sage has failed to pay: a September 6, 2018, invoice for "Management Consulting Services" totally $129,986.76 ("Invoice 1372); a September 6, 2018, invoice seeking payment for "Executive Leadership Services" totaling $106,120.38 ("Invoice 1373"); and an August 12, 2019, invoice for "D&O Insurance" totally $14,475.00 ("Invoice 1398"). (*Id.* ¶¶ 70–72).

Sage argues that judgment should be entered in its favor on any part of this claim that is related to non-payment of invoices disclosed by RDC in April 2024, including a September 29, 2015, Invoice for $7,042,713.52 ("Invoice No. 1214"). Sage also argues that RDC is equitably estopped from advancing RDC's breach of contract counterclaim based on Invoices 1372, 1373, and 1398, because if owed and unpaid, it was due to RDC employees' failure to pay them. (*Id.* at 20). Sage finally argues that any counterclaims seeking 1.5% interest per month are contractually unsupported. (*Id.* at 20–22).

### 1. The Timeliness of Invoice 1214 and Other Invoices Disclosed by Defendants in April 2024

Sage first says any claims related to invoices RDC disclosed to Sage in April 2024 are time-barred. Arizona has a six-year statute of limitations period for breach of contract claims. "Generally, the statute of limitations in a breach of contract claim begins to accrue

on the date of breach." *Telasaurus VPC, LLC v. Power*, 2008 WL 11339949, at *2 (D. Ariz. June 9, 2008) (citing *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995)).  Generally, Arizona courts strongly disfavor the statute of limitations defense.  *Manterola v. Farmers Ins. Exch.*, 30 P.3d 639, 642 (Ariz. Ct. App. 2001).  Nevertheless, courts have recognized that the statute of limitations serves to protect defendants and courts from stale claims where plaintiffs have slept on their rights.  *Gust, Rosenfeld & Henderson*, 898 P.2d at 968.

RDC issued Invoice No. 1214 to Sage on October 2, 2015.  (Doc. 423-8 at 60–62, Ex. 42, Oct. 2, 2015, Letter from RDC to Sage with Invoice 1214 ("Invoice 1214")).  Invoice 1214 amounted to $7,042,713.52 of "carry forward costs" incurred by Sage between February 4, 2014, and September 23, 2015.  (*Id.*)  Invoice 1214 is dated September 29, 2015, and states that it is "[d]ue on receipt."  (*Id.*)

Sage says it was not put on notice of the alleged non-payment of Invoice 1214 until April 15, 2024—when RDC amended an interrogatory response and identified Invoice 1214 as well as lesser Invoices 1232, 1244–69, 1272, 1276, 1280, 1284, 1288, 1292–93, 1297–98, 1311–12, 1316, 1319, 1327, 1331, 1335, 1340, 1344, 1348, 1353, 1357, 1361, 1370–74, 1394, 1398, 1403, and 1410 as evidence of its contract damages.  (Doc. 423 at 5 n.1).  Sage argues, and RDC does not dispute, that prior to the 2024 disclosure, RDC had not specifically referenced or demanded payment related to Invoice No. 1214 or the other lesser invoices in a prior pleading, disclosure, or demand letter.

RDC says that it timely brought a breach of contract claim for non-payment of all of compensation owed under the SAC—including Invoice 1214—in its 2020 First Amended Counterclaim.  This Counterclaim was filed on September 1, 2020, and alleged that

> On June 16, 2017, Sage [] and RDC entered into a valid contract (Amendment No. 2 to CEO Services Contract) for the provision of management services by RDC to Sage [].  This Management Contract was in effect at the relevant times herein and was not set to expire until September 30, 2025. . . . Sage [] materially breached the contractual provisions of the Amendment No. 2 to CEO Services Contract by, among other things, failing

> to pay RDC the entire compensation outlined in the Management Contract up to the date of its termination, including but not limited to Incentive Fees, Annual Retention Bonuses, Management Consulting Services, Executive Leadership Services, employee reimbursements, and reimbursement for D&O Insurance.

(Doc. 92 ¶¶78–79).   RDC says that even though Invoice 1214 was not specifically referenced in the First Amended Counterclaim, the claim adequately satisfies Rule 8 and put Sage on notice "the specific contract out of which its counterclaims arise, the provisions of that contract that Sage breached and how the breach occurred (by failing to pay RDC all compensation to which it was entitled under the SAC) [and] that its damages (comprised of the outstanding balance of RDC's unpaid invoices, including the outstanding balance of Invoice 1214) would be proven at trial."  (Doc. 428 at 7 *citing Castillo v. Norton*, 219 F.R.D. 155 (D. Ariz. 2003)).

Sage replies by saying the pleading standards enunciated in *Castillo* are outdated after *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).  (Doc. 441 at 7).  It says where a court is unable to fairly evaluate the plausibility of a claim it is deficiently plead.  (*Id.*)  Sage says RDC's failure to specifically reference Invoice 1214 in its 2020 First Amended Counterclaim renders it deficient, particularly "when, as here, the parties exchanged hundreds of invoices, any one of which could form the basis of the claimant's allegation."  (*Id*. at 8).

The Court is sympathetic to Sage's position that it was taken by surprise in 2024 by the amount of damages RDC was claiming for this breach of contract claim, particularly because that amount had never been demanded of Sage before.  But RDC's "late"[24] damage disclosure does not mean that RDC had failed to plausibly allege its breach of contract claim in 2020.  Even *Twombly* and *Iqbal* do not require a party to separately identify in a pleading the basis for each and every indebtedness owed in order to satisfy Rule 8.  *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual

---

[24] The Court notes that RDC supplemented its interrogatory response prior to the conclusion of fact discovery and as such, the disclosure was not "late" under the Scheduling Order.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Any claims of indebtedness related to "compensation outlined in the Management Contract" that was due six years prior to September 1, 2020, when RDC alleged its counterclaim for breach of contract, has been timely pled. Invoice 1214, though not disclosed until 2024, was due on September 29, 2015. If owed under the SAC, it was timely raised under Arizona's six-year limitation period. Though Sage has suspicions about the legitimacy of the indebtedness, in part because RDC did not demand the large sum earlier than 2024, summary judgment is not warranted on the grounds that it is barred by the statute of limitations. And Sage proffers no evidence here, as there was in the cases it cites, showing that it has been unduly prejudiced by RDC's 2024 disclosure. *Compare Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1153 (D. Ariz. 2016) (summary judgment for defendant was warranted when plaintiff raised entirely new claim in opposition to motion); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (district court did not err by rejecting plaintiff's attempt to introduce new factual allegation for the first time on summary judgment); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–94 (9th Cir. 2000) (district court did not err when it refused to permit plaintiff to proceed on a new theory of liability after the close of discovery, and in its motion for summary judgment, as it would prejudice the defendant). Unlike these cases, RDC's disclosure was not made after the fact discovery deadline or for the first time in a response to summary judgment. Accordingly, RDC's claim to the invoices disclosed in 2024 is not barred by the statute of limitations.

### 2. Whether Invoice 1214 Represents Amounts Owed Under the SAC

Sage next argues judgment as to Invoice 1214 is warranted because Sage was not contractually obligated to pay the expenses in Invoice No. 1214 and they were never Board-approved. It further argues that even if approved, the charges in Invoice 1214 were satisfied by a $6.785 million bonus payment made to RDC in 2017. (Doc. 423 at 4–10).

Sage first says the non-payment of Invoice 1214 cannot be based on a breach of the

1    SAC because nothing in the FAC (the operative contract at the time Invoice 1214 was

2    issued and due) "authorized RDC to invoice 'carry forward costs' (the difference between

3    the rates set forth in the 2013 Contract and the higher amounts RDC contends would have

4    been 'fair market value') billed months and years after the fact." (Doc. 441 at 5). Sage

5    says Todd McGee, RDC's Rule 30(b)(6) designee, conceded during his deposition that "the

6    amounts from which the 'discounts' were taken were not contracted or agreed [upon] by

7    Sage." (Docs. 423 at 8; 423-2 at 128, Ex. 7, McGee Dep. at 59:14–16). Sage argues

8    because there is no contractual basis prompting payment of the Invoice, "the only way

9    RDC could maintain a breach of contract counterclaim based on [the] Invoice . . . is if Sage

10    had, separately, contracted to pay [the] [I]nvoice." (Doc. 423 at 7).[25]

11        Sage also contends that even if Sage was obligated under the SAC, a performance

12    fee it awarded to RDC in 2016 satisfied any obligation it had to RDC under Invoice 1214.

13    Specifically, Sage says that on July 21, 2016, the Sage Board met to discuss awarding a

14    discretionary performance fee to RDC for fiscal years 2015, 2014, and 2013. (Doc. 423-9

15    at 144, Ex. 48, July 21, 2016, Sage Board Meeting Minutes). At the meeting, Sage's Co-

16    CEO El-Meligi presented on RDC's management efforts, noting in part, that RDC had

17    "shared the risk to Sage's operating cash flow by continuing to discount its services by

18    $7,042,713, 48% below fair market value (FMV) during fiscal years 2015 and 2014." (Id.

19    at 145). The Board ultimately awarded RDC a performance fee in the amount of

20    $6,785,000.00. (Id. at 148; Doc. 423-9 at 150, Ex. 49, July 21, 2016, Invoice 1238 for

21    "Management service fee" in the amount of $6,785,000.00 ("Invoice 1238")). Sage says

22    the performance fee paid in Invoice 1238 "fully compensated [RDC] for the purported

23    'discounts' sought in Invoice 1214." (Doc. 441 at 10). As support for this, Sage points to

24    an email from RDC employee and 30(b)(6) witness Allen Billings. (Doc. 423-10, Ex. 51,

25    March 22, 2017, email from Allen Billings to Luis Argueso ("Billings email")). Therein,

26    Billings explains to Mr. Argueso that "[i]n 2016, the board approved payment of $6.785M

27

28    _____
     [25] If this were the case, Sage also argues that such an alleged breach would be "outside the
     limited breach of contract counterclaims that were timely brought and stated in RDC's
     pleading." (Id.) The Court agrees.

(see Invoice 1238) out of $7.04M (see Invoice 1214) carried forward.  This amount represents discounts on 38,279 hours of work and is ambiguously included in 'management fees' in footnote 3 of the 2016 audit (See footnote 3 in audits)."  (Doc. 423-10, Ex. 51, Billings Email).[26]  Sage says Billings confirmed that when Sage paid Invoice 1238, it "repaid" RDC for the same discounts listed in Invoice 1214.  (Doc. 441 at 11).

In its Response, RDC says Sage was contractually obligated to pay for the expenses in Invoice 1214, which were board-approved, and that nothing in Invoice 1238 was intended to satisfy the obligations in Invoice 1214.  RDC says that "[s]tarting in January 2014, RDC's invoices included a Professional Services Discount representing a deferral of a portion of RDC's invoices (the 'carry forward cost') that Sage requested for the purpose of allowing it to continue as a going concern while it managed extraordinary circumstances."  (Doc. 428 at 3).  As support, RDC points to an October 2, 2015, letter Razaghi sent to Sage Co-CEO El-Meligi.  (Doc. 423-8 at 59–60, Ex. 42, Oct. 2, 2015 letter from Razaghi to El-Meligi).  The letter states,

> Since January 2014, you requested that [RDC] carry forward a portion of each of its service invoices as discounts ("costs") below fair market value to assist Sage in continuing as a going concern while it manages the extraordinary circumstances caused by its former disgruntled ex-employees, Navajo Area HIS investigation, subsequent litigation, and related matters. Over the past 20 months, the current balance due on those unpaid Costs is $7,042,713.52 for approximately 38,279 hours of regular, overtime, weekend, and holiday professional time.  Please refer to the attached invoice no. 1214.

(*Id.*)  Razaghi says "Invoice 1214's only purpose was to notify Sage of RDC's demand for payment of the amounts reflected in the invoice."  (Doc. 428-3, Ex. B, Razaghi Decl. ¶ 4).

---

[26] RDC says Mr. Billings's email is inadmissible hearsay and cannot be considered by the Court on summary judgment.  (Doc. 428 n.3).  As an RDC employee and 30(b)(6) witness, the email from Billings is not hearsay but a statement by a party opponent under Federal Rule of Evidence 801(d)(2)(C) and (E).  Even if considered hearsay, the contents of the email could be admitted at trial through Mr. Billings's own testimony and thus is properly considered on summary judgment.  Though "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment," it may consider evidence that could "could conceivably be converted into an admissible form for trial."  *See Orr v. Bank of Am. NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002); *Cheeks v. Gen. Dynamics,* 22 F.Supp.2d 1015, 1027 (D. Ariz. 2014).

Razaghi further avers that he explained the costs at issue in Invoice 1214 at Sage's November 14, 2025, board meeting.  (*Id.* ¶ 5).  Among the agenda items was a discussion of "Razaghi Healthcare Invoice #113, FY2014 and FY2015 $7.042 million carry forward costs. . .." (Doc. 428-2 at 3, Ex. A, Nov. 14, 2015, Meeting Agenda).  Razaghi says he told Sage's directors that Invoice 1214 "reflected amounts due and owing by Sage for the portions of the RDC's prior invoices for the fair market value of the services provided by its employees, consultants and independent contractors deferred at Sage's request."  (*Id.*)  The Minutes reflect that he "reported to the Board the $7.042 Million in discounts below fair market value for fiscal year 2014 and 2015." (Doc. 428-4 at 3, Ex. C, Nov. 14, 2015, Meeting Minutes).  Razaghi says after his presentation, the Board entered into an executive session to discuss Invoice 1214, and "after exiting executive session, Sage's board approved Invoice 1214." (Doc. 428-3, Ex. B, Razaghi Decl. ¶ 6).  The meeting minutes show that Board member Terry moved to "accept the discounts as discussed." (Doc. 428-4 at 3, Ex. C, Nov. 14, 2015, Meeting Minutes).  The motion was seconded by board member Moore and unanimously approved.  (*Id.*)  RDC says that though Sage approved Invoice 1214 "RDC did not immediately pay the invoice because, in RDC's judgment, Sage's cash position would have been adversely affected by such a payment and consequently, its services to the Navajo Nation would have suffered." (Doc. 428-3 at ¶ 5, Ex. B, Jan. 5, 2025, Razaghi Decl. ¶ 7).   In reply, Sage adamantly points out that the Minutes do not reflect that the Board voted to approve payment of Invoice 1214.

RDC also disputes the characterization of Invoice 1238 as payment made or accepted in satisfaction of Invoice 1214.  (Doc. 428 at 10).  It points out that the July 21, 2016, Meeting Minutes are devoid of any discussion that Invoice 1238 was being paid in lieu of or as payment for Invoice 1214.  RDC also says "it is telling that Sage relies on the interpretation of the [Billings email], as opposed to the testimony of its board members present during the July 21, 2016, board meeting or any other evidence (e.g. minutes, notes, correspondence, etc.) as support for its position." (Doc. 428 at 10).

Upon review of the record, the Court declines to enter summary judgment in favor

of Sage on this issue.  It is plain that whether Sage owes RDC for Invoice 1214 is replete with factual disputes over the parties' respective understandings of "carry forward costs" and "discounted services;" whether those were the type of "compensation" expenses the parties agreed Sage would reimburse RDC for under the SAC or whether there was a separate agreement to pay them; and what inferences should be drawn from the Board's approval of the discounts in Invoice 1214—namely, whether the Board's vote to approve the discounts was a vote to pay the balance of Invoice 1214, or merely an acknowledgment of RDC's discounted services that was used to award RDC a performance fee that Sage contends represents the amounts in Invoice 1214.  Where a fact-finder can draw from the evidence reasonable inferences in favor of either party, summary judgment is inappropriate.  RDC will have the burden at trial of showing Invoice 1214 (and the lesser invoices) were in fact obligations that Sage agreed to pay under the SAC.

### 3. Whether RDC is Equitably Estopped from Seeking Payment on Invoices 1372, 1373, and 1398

Sage also says RDC is equitably estopped from seeking damages related to non-payment of Invoices No. 1372, 1373, and 1398.  (Doc. 423 at 20).

Equitable estoppel is an affirmative defense and Sage bears the burden of proving its elements.  *Frank Lloyd Wright Found. V. Kroeter*, 697 F.Supp.2d 1118 (D. Ariz. Mar. 15, 2010) (citing *City of Tucson v. Clear Channel Outdoor, Inc.*, 181 P.3d 219, 241 (Ariz. 2008)).  "A claim for estoppel arises when one by his acts, representations or admissions intentionally. . .induces another to believe and have confidence in certain material facts and the other justifiably relies and acts on such belief causing him injury or prejudice."  *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 818 (Ariz. 1987).  In order to state a claim for equitable estoppel, Plaintiff must prove (1) affirmative acts inconsistent with a claim afterwards relied upon; (2) action by a party relying on such conduct; and (3) injury to the party resulting from a repudiation of such conduct.  *John C. Lincoln Hosp. and Health Corp. v. Maricopa County*, 96 P.3d 530, 535 (Ariz. Ct. App. 2004) (*citing Tucson Elec. Power Co. v. Ariz. Dep't of Revenue*, 851 P.2d 132, 141 (Ariz. Ct. App. 1992)).

1    In its Motion, Sage briefly argues RDC should be equitably estopped from claiming

2    nonpayment of these invoices "because *RDC's employees*, which handled the processing

3    of invoice payments, failed to make them."  (*Id*.)  Sage says it would be unjust to hold Sage

4    accountable for RDC's failures.  (*Id*.)

5    Sage's cursory argument cites no supporting evidence and again, the Court declines

6    to dig through the substantial record for evidence supporting its case.  *Celotex*, 477 U.S. at

7    232 (the moving party has "the initial responsibility of. . .identifying those portion of the

8    [the record]. . .which it believes demonstrate the absence of a genuine issue of material

9    fact.").  "Questions of estoppel, including reasonable reliance, are fact-intensive inquiries."

10    *John C. Lincoln Hosp.*, 96 P.3d at 535.  The Court notes, for example, that at least two of

11    the invoices in question—1372 and 1373—appear to be due after the SAC was terminated

12    (*see* Doc. 217-1 at 106, Ex. F, Invoice 1372; *id*. at 141, Ex. G, Invoice 1373), and thus

13    presumedly after Sage discontinued RDC employees' access to its banking accounts.  If

14    true, Sage would not have been reasonable in relying on RDC to process these invoice

15    payments.  But again, this is all speculation because Sage proffers no facts to support its

16    argument.  Indeed, even Sage's legal argument in its Motion is cursory and only developed

17    in its Reply.  (*See* Doc. 441 at 12).  The Court will not consider arguments raised or

18    developed for the first time in a reply brief.  *Delgadillo v. Woodford*, 527 F.3d 919, 930 n.

19    4 (9th Cir. 2008) ("Arguments raised for the first time in [the] reply brief are deemed

20    waived."); *Marlyn Nutraceuticals, Inc. v. Improvita Health Prods.*, 663 F.Supp.2d 841,

21    848 (D. Ariz. 2009) ("The Court need not consider Defendants' position, however, since it

22    was first raised in their reply brief. . .Thus, even if the argument has merit, this Court cannot

23    appropriately consider it, since Plaintiffs did not have the opportunity to respond.").

24    Having failed to meet its burden, the Court declines to enter summary judgment on Sage's

25    claim for equitable estoppel related to these invoices.

26    **4.    Whether RDC is Entitled to Seek 1.5% Interest on All Alleged**
            **Indebtedness**

27

28    Sage argues that RDC should be precluded from seeking 1.5% per month interest

       on any alleged indebtedness that is not related to CEO base pay.  (Doc. 423 at 20).  Sage

1    says the SAC only provides for a 1.5% per month interest charge for late payments in

2    Section 5.A, and that section of the SAC only addresses the base pay rate for Razaghi and

3    any successor CEO. (*Id*.) Accordingly, Sage says that any 1.5% interest rate sought is

4    limited to CEO compensation and does not apply to "allegedly unpaid annual incentive

5    fees, annual retention bonuses, and D&O insurance reimbursements." (*Id*.)

6        Section 5 of the SAC is titled "Compensation." (Doc. 422-5 at 9, Ex. 18, SAC § 5).

7    It is divided in seven subsections: "Base Pay," "Incentive Fee," "Additional Benefits,"

8    "Termination Payment," "Discretionary Performance Fee," "D&O Insurance," and

9    "Section 409A of Internal Revenue Code." (*Id*. at 9–12). Only one of these subsections

10   calls for interest to accrue if amounts are unpaid is subsection A: "Base Pay." That section

11   reads:

> A.   Base Pay.  The Corporation agrees to pay [RDC] a discounted rate of
> $175.00 per hour for the professional services rendered by Ahmad R.
> Razaghi or any successor CEO pursuant to this Contract; provided however,
> that [RDC's] hourly rate for such services rendered by Ahmad R. Razaghi or
> any successor CEO shall be renegotiated annually between [RDC] and the
> Board.  [RDC] shall submit to [Sage] bi-weekly invoices, payment of each
> of which shall be due upon receipt.  Any amounts due to [RDH] but not pay
> by [Sage] will, accrue interest at a rate of 1.5% per month or the maximum
> rate permitted by applicable law, whichever is less. Each and every payment
> to [RDC] under this Contract is to be made by direct deposit to [RDC] at the
> following address. . .

19   (*Id*.)  RDC says 1.5% interest rate is justifiably applicable to all alleged indebtedness

20   because subsection 5.A says that "**[a]ny** amounts due. . .will accrue interest at a rate of

21   1.5% per month. . ." (Doc. 428 at 12).  It says this interpretation is bolstered by the fact

22   that this "Base Pay" section directs that "[e]ach and every payment to [RDC] under this

23   Contract" is to be made by direct deposit. (*Id*. at 13).

24       "The interpretation of a contract is generally a matter of law." *Powell v. Washburn*,

25   125 P.3d 373 (Ariz. 2006). "Generally, and in Arizona, a court will attempt to enforce a

26   contract according to the parties' intent." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854

27   P.2d 1134, 1138 (Ariz. 1993)). Where the language of the contract is clear and

28   unambiguous, it must be given effect as it is written." *Hadley v. Sw. Props., Inc.*, 570 P.2d

190, 193 (Ariz. 1977).  However, if a contract is susceptible to multiple interpretations and requires reference to extrinsic evidence, then the interpretation of extrinsic evidence, any controversy over what occurred, and the proper inferences to draw from evidence of the surrounding circumstances are considered disputes of fact preventing summary judgment. *Taylor*, 854 P.2d 1134; *State ex rel. Goddard*, 75 P.3d 1075 (Ariz. Ct. App. 2003).  In such cases "the question of what the parties truly intended" is left to the fact finder.  *Burkons*, 813 P.2d 710.

RDC's interpretation of the SAC is unpersuasive.  Read in context and in light of the structure of Section 5, "any amounts" does not encompass *all* indebtedness under the SAC, but is clearly limited to late payments for CEO base compensation due under Section 5.A.  Moreover, the fact that all payments made under the SAC are to be made by direct deposit does not evidence an intent that all amounts due under the SAC are to accrue at a 1.5% interest rate.  That directive simply means what it says: that all payments to RDC are to be made by direct deposit.  The Court agrees with Sage that RDC is precluded from asserting a contractual basis to a 1.5% interest rate for any non-CEO base pay indebtedness.[27]

## B.    Breach of Covenant of Good Faith and Fair Dealing

Sage is also seeking summary judgment on RDC's counterclaim for breach of the covenant of good faith and fair dealing.  RDC says Sage breached its duty of good faith and fair dealing "by preventing RDC from receiving the benefits of the contract, including but not limited to RDC's rights to receive revenue, profits, performance bonus(es), retention bonuses, incentive fees, and other benefits under this contract."  (Doc. 217 ¶ 114).

Sage argues it is entitled to judgment as a matter of law because: (1) RDC's theory is duplicative of its breach of contract counterclaim, (2) Sage did not breach the covenant of good faith and fair dealing, and (3) RDC concedes that it has not been damaged by any alleged breach.  (Docs. 423 at 22–24; 441 at 15–17).  Sage asserts that courts within this judicial district routinely recognize that breach of covenant is not proper when there are no

---

[27] In light of this legal conclusion, the Court need not reach Sage's argument that RDC is equitably estopped from seeking a 1.5% interest rate on its claims.

1    additional breach allegations "other than through the breach of an express contractual

2    term." *Aspect Sys., Inc. v. Lam Rsch. Corp.*, 2006 WL 2683642, at *3 (D. Ariz. Sept. 16,

3    2006).

4          Under Arizona law, the covenant of good faith and fair dealing is implied in every

5    contract. *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). The

6    covenant's purpose is to ensure that "neither party will act to impair the right of the other

7    to receive the benefits which flow from their agreement or contractual relationship." *Id.* at

8    423. Arizona law recognizes that the implied covenant can be breached by both: (1)

9    "exercising express discretion in a way [that is] inconsistent with a party's reasonable

10   expectations" and (2) "by acting in ways not expressly excluded by the contract's terms

11   but . . . nevertheless bear adversely on the party's reasonably expected benefits of the

12   bargain." *Id.* at 435. However, a breach of covenant claim is not proper when the moving

13   party merely alleges a breach of an express contract term. *First Fin. Bank, N.A. v.*

14   *Claassen*, 2011 WL 5865013, at *2 (D. Ariz. Nov. 22, 2011) (citation omitted); *see also*

15   *Ipro Tech LLC*, 2019 WL 2106417, at *3 (stating that "it would be meaningless to

16   recognize an action for breach of an *implied* covenant if . . . such a claim [could be proven]

17   solely by showing that the defendant breached an *express* obligation to perform")

18   (emphasis in original); *Aspect Sys., Inc. v. Lam Rsch. Corp.*, 2006 WL 2683642, at *3 (D.

19   Ariz. Sept. 16, 2006) (holding that a breach of a contractual term does not support a claim

20   for breach of the covenant); *Ireland Miller, Inc. v. Shee Atika Holdings Phoenix*, *LLC*, 2010

21   WL 2743653, at *2 (D. Ariz. July 12, 2010) (dismissing a breach of the covenant claim

22   when it was found to be duplicative of plaintiff's breach of contract claim). Thus, to assert

23   a claim for the breach of the implied covenant, the moving party must show they were

24   "deprive[d] . . . of the benefits of their bargain" by "offer[ing] evidence that the [opposing

25   party] acted in bad faith or unfairly." *Ipro Tech LLC*, 2019 WL 2106417, at *3.

26         Indeed, though plaintiffs are generally allowed to plead alternative claims, where a

27   party is bringing a breach of covenant and a breach of contract claim, as here, the breach

28   of covenant claim "must rest on allegations separate from those substantiating a breach of

1  contract claim" to survive summary judgment.  *USI Ins. Servs. LLC v. Alliant Ins. Servs.*

2  *Inc.*, 2025 WL 1179412, at *15 (D. Ariz. Apr. 23, 2025) (citation omitted).  Thus, if the

3  nonmovant bears the burden at trial on both claims, they must make an affirmative showing

4  of "specific facts" indicating that each claim stands on its own to survive summary

5  judgment on both claims.  *Id.*; *Celotex*, 477 U.S. at 322, 324.

6        Upon reviewing RDC's counterclaims (Doc. 217) and its response to the Motion

7  (Doc. 428), the Court agrees with Sage that RDC's claim for breach of covenant is

8  premised on the same factual allegations forming the basis for its breach of contract claim.

9  (*Compare* Doc. 217 at ¶¶ 111–15 *with* ¶¶ 107–110).  RDC makes no meaningful effort to

10  distinguish the two claims or to demonstrate that the breach of covenant claim is supported

11  by separate or additional facts apart from the breach of contract allegations.

12  (*See id.*; Doc. 428 at 14–16).  In short, RDC fails to articulate how the covenant claim

13  stands on its own.  *See Shaw*, 201 F. Supp. 3d at 1252.

14        This is further evidenced by the fact that the only damages RDC identifies are those

15  resulting from Sage's non-payment of invoices.  (Doc. 428 at 16).  Thus, RDC's breach of

16  covenant claim is tied exclusively to its breach of contract claim.  Specifically, RDC states:

17  "The invoices Sage has failed and refused to pay represent amounts due and owing under

18  the [SAC] for management services provided by RDC." (*Id.*)  Because RDC's breach of

19  covenant claim is entirely derivative of its second breach of contract claim, it cannot

20  survive summary judgment.  *See Aspect Sys., Inc.*, 2006 WL 2683642, at *3.

21        Even if RDC's claims were not premised on each other, the Court still finds that

22  RDC's breach of covenant claim cannot survive summary judgment because RDC has

23  failed to put forth any evidence that Sage acted in bad faith.  (*See* Doc. 428).  In its response

24  to the Motion, RDC attempts to satisfy its burden by stating that "the facts reveal conduct

25  by Sage that the jury may reasonably consider to constitute dishonest or objectively

26  unreasonable conduct."  (Doc. 428 at 16).  However, RDC does not point to **any** specific

27  facts, other than Sage's alleged failure to pay invoices, that gives rise to an inference of a

28  genuine dispute warranting a trial.  (*Id.*).  Instead, RDC essentially asserts a "hope" that

1   Sage's witnesses will reveal information in support of this bad faith counterclaim.  (*Id.*)

2   Such hope is insufficient to defeat summary judgment.  *See Cecala v. Newman*, 532 F.

3   Supp. 2d 1118, 1156 (D. Ariz. 2007) (stating that a party "may not proceed on the mere

4   hope that trial w[ill] produce evidence [they] w[ere] unable to garner at the . . . summary

5   judgment [stage].") (citation and quotation marks omitted).

6          While RDC is allowed to plead in the alternative, the breach of covenant claim must

7   still stand independently.  *See USI Ins. Servs. LLC*, 2025 WL 1179412, at *15 ("[B]reach

8   of the implied covenant must rest on allegations separate from those substantiating a breach

9   of contract claim.") (citation omitted).  RDC's theory does not appear to extend beyond the

10  alleged breach of contract as it fails to point out any separate benefit it was deprived of—

11  indicating that the claim is merely duplicative and cannot survive summary judgment as a

12  standalone cause of action.  *See id.* (holding that a breach of covenant claim survived

13  summary judgment, even where the breach of contract served as a "factual predicate" to

14  the claim, because it "extend[ed] beyond th[e] [breach of contract] and [went] to the benefit

15  [the party] would have derived").  Instead, RDC merely states that a "jury is entitled to

16  hear answers from Sage's witnesses regarding the question [of] whether Sage's failure to

17  pay RDC's outstanding invoices was . . . motivated by[] [bad faith]."  (Doc. 428 at 16).

18  Additionally, rather than identifying specific facts, RDC again relies on a broad assertion,

19  stating only that "[d]isputes of material fact as to whether Sage acted in bad faith or unfairly

20  to deprive RDC of its contractual rights exist."  (*Id.*).  RDC essentially lays down the

21  foundation but forgets to build the house.  Thus, summary judgment would be warranted,

22  even if the claims were not premised on each other, because RDC has failed to satisfy its

23  burden of alleging "specific facts" that go beyond the pleadings and demonstrate a need to

24  assemble a jury.

25  **V.    CONCLUSION**

26         The Court will grant Sage summary judgment on the aspect of its Count Eleven

27  Breach of Contract claim relating to RDC's unauthorized taking of the Termination

28  Payment on August 27.  In light of this ruling and Sage's concession that the portion of its

Unjust Enrichment claim relating to the Termination Payment is plead only in the alternative, Sage's Unjust Enrichment claim related to the Termination Payment shall be dismissed.  The remainder of Sage's PMSJ is denied; a jury must resolve the factual disputes pertaining to the rest of Sage's claims.

With regard to Sage's Motion for Summary Judgment on RDC's claims, the Court finds summary judgment in favor of Sage is proper only as to RDC's Count III for Breach of Covenant of Good Faith and Fair Dealing.  RDC has agreed to the dismissal of Count I for First Breach of Contract; Count VIII for Aiding and Abetting Breach of Contract and Breach of Fiduciary Duties; and Count IX for Tortious Interference with Contractual Relations. (Doc. 428 at 2).  Summary judgment is denied as to RDC's Count II for Second Breach of Contract but the Court finds that RDC is precluded from asserting a contractual right to a 1.5% interest rate for any non-CEO base pay indebtedness sought under that claim.

Accordingly,

**IT IS ORDERED granting** Sage's Partial Motion for Summary Judgment (Doc. 422) as to its Count Eleven Breach of Contract claim relating to the Termination Payment.  Sage's Count Ten for Unjust Enrichment relating to RDC's taking of the Termination Payment is **dismissed**.  In all other respects, Sage's Partial Motion for Summary Judgment (Doc. 422) is **denied.**

**IT IS FURTHER ORDERED granting in part** Sage's Motion for Summary Judgment on RDC's Counterclaims (Doc. 423).  The following counterclaims shall be dismissed: Count I for Breach of Contract; Count III for Breach of Covenant of Good Faith and Fair Dealing; Count VIII for Aiding and Abetting Breach of Contract and Breach of Fiduciary Duties; and Count IX for Tortious Interference with Contractual Relations.  RDC may proceed to trial on its Count II for Second Breach of Contract but shall be precluded from asserting a contractual basis to a 1.5% interest rate for any non-CEO base pay indebtedness.

**IT IS FINALLY ORDERED** that Sage shall file a Notice of Readiness for Trial

within seven (7) days of the Court's ruling on Defendants' Motion for Leave to File Motion for Summary Judgment on Plaintiff's Claims Against Defendants (Doc. 452), or Defendants' Motion for Summary Judgment, whichever is earlier.    This instruction supersedes that Court's instruction in the Scheduling Order.  (Doc. 303).

Dated this 19th day of September, 2025.

Honorable Diane J. Humetewa
United States District Judge